ASARCO LLC, Southern Peru
Holdings, LLC, Plaintiffs,

v.

AMERICAS MINING CORPORATION,
Defendant.

Civil No. 1:07–CV–00018.

United States District Court,
S.D. Texas,
Brownsville Division.

Aug. 30, 2008.

283

George Irvin Terrell, Michael C. Massengale, Rebeca Aizpuru Huddle, Samuel Wollin Cooper, Baker Botts LLP, Houston, TX, James R. Prince, Eric A. Soderlund, Fernando Rodriguez, Jr., Jack L. Kinzie, Thomas Edward O'Brien, Baker Botts LLP, Dallas, TX, Kevin M. Sadler, Baker Botts LLP, Austin, TX, Michael J. Urbis, Jordan Hyden, Brownsville, TX, Shelby A. Jordan, Jordan Hyden, Corpus Christi, TX, Garland Doty Murphy, IV, Smyser, Kaplan & Veselka, LLP, Houston, TX, for Plaintiffs.

Charles A. Beckham, Jr., Brian F. Antweil, Elizabeth Brooks Hamilton, Kirk L. Worley, Mark Ryan Trachtenberg, Haynes and Boone, LLP, Houston, TX, David R. Gelfand, Luc A. Despins, Stacey J. Rappaport, Alan J. Stone, Melanie Westover, Milbank, Tweed, Hadley & McCloy, LLP, New York, NY, David S. Cohen, Milbank Tweed, Hadley & McCloy, LLP, Washington, DC, for Defendant.

J.A. Tony Canales, Canales & Simonson, PC, Corpus Christi, TX, for Daniel Tellechea.

Evelyn H. Biery, Zach A. Clement, Mark Allan Worden, Sharon Marie Beausoleil–Mayer, Fulbright Jaworski LLP, Houston, TX, Louis Raymond Strubeck, Jr., John N. Schwartz, Fulbright & Jaworski, Dallas, TX, for Intervenor Official Committee of Unsecured Creditors of ASARCO LLC.

Jacob Lee Newton, Robert T. Brousseau, Sander L. Esserman, Steven A. Felsenthal, Jo E. Hartwick, Stutzman Bromberg, Dallas, TX, for Intervenor Official Committee of Unsecured Creditors of Subsidiary Debtors.

Debra L. Innocenti, John H. Tate, II, Raymond W. Battaglia, Oppenheimer, Blend, Harrison & Tate, San Antonio, TX, for Robert C. Pate.

## MEMORANDUM OPINION & ORDER

ANDREW S. HANEN, District Judge.

The plaintiffs, ASARCO LLC and Southern Peru Holdings LLC (both of which are currently in bankruptcy), filed this action in their capacities as debtors in possession and on behalf of ASARCO's creditors to recover from Defendant Americas Mining Corporation ("AMC") the stock representing 54.18% of the outstanding shares of Southern Peru Copper Company ("SPCC") and damages resulting from having been wrongfully deprived of

this stock ownership.[1] Alternatively, they request damages due to the actions of the defendant. They also seek punitive damages. Plaintiffs assert five causes of action: (1) actual fraudulent transfer; (2) constructive fraudulent transfer; (3) breach of fiduciary duty; (4) aiding and abetting a breach of fiduciary duty; and (5) conspiracy.

The defendant has denied these allegations and has pursued a counterclaim for recoupment against ASARCO based on: (1) breach of representation; (2) breach of good faith and fair dealing; and (3) breach of warranty. The Court and the parties have agreed that the Court has jurisdiction over all claims and counterclaims under 28 U.S.C. § 1334 and that venue is proper in this Division and District.

The Court held a four-week bench trial and hereby issues this opinion to partially resolve this matter. The Court prefers to address these issues in a narrative form. Nevertheless, the factual statements made hereinafter (except where the Court specifically notes a factual dispute) should be considered as findings of fact regardless of any heading or lack thereof. Moreover, for virtually every finding, the record is replete with testimony and exhibits that support the finding. Similarly, the legal conclusions, except where the Court discusses the various competing legal theories and positions, should be taken as conclusions of law regardless of any label or lack thereof.

Pending before the Court as the trial began were: (1) Americas Mining Corporation's Motion for Summary Judgment on Plaintiffs' Claims (Doc. No. 251); (2) Americas Mining Corporation's Motion for Summary Judgment on Plaintiffs' Stand-

ing to Bring Counts I and II (Doc. No. 253); and (3) Plaintiffs' Motion for Public Trial. (Doc. No. 301). Also pending were various *Daubert* motions filed by both sides. (Doc. Nos. 302, 304, 305, 306, and 307). Prior to beginning the presentation of the evidence, the Court granted the Motion for Public Trial. It deferred ruling on either of the motions for summary judgment. Since the trial was to the bench, and no harm could result, the Court also deferred ruling on the *Daubert* motions as they were very fact intensive, and the Court preferred to resolve the objections in the context of the evidence as it was being presented and to allow both the direct-examination and cross-examination to fully develop each matter. The rulings expressed herein resolve the *Daubert* motions and also resolve the issues raised by the motions for summary judgment.

During the trial, the parties presented various motions. The defendant made a motion for judgment or directed verdict which the Court, in effect, overruled from the bench preferring to rule on all of the issues raised with a full record. (Doc. No. 392). Also, Plaintiffs filed a motion to enforce trial subpoenas for Daniel Tellechea, German Larrea, and Genaro Larrea. All three witnesses had previously testified in the trial by video deposition. During the arguments on this motion, counsel for Plaintiffs conceded that, despite the fact that hours of these videos had been played, the witness Plaintiffs really needed to testify live was German Larrea. After hearing arguments from both sides, the Court decided it needed to hear from Mr. Larrea for a number of reasons and ordered his appearance. Further, in entering its order on this motion, the Court took into consid-

---

1. The Court recognizes that through a variety of business maneuvers, the stock is no longer the discrete 54.18% of SPCC that it was at the time of the transaction, but it will refer to it in the manner in which it existed at the time of the transfer. It will also refer to Southern Peru Copper Company as SPCC, although its name has also been changed.

eration the many representations made by defense counsel that Mr. Larrea would appear live.[2] Counsel for Plaintiffs relied upon these representations. The Court found that it would result in "unfair gamesmanship" to allow the defendant to shield its CEO, German Larrea, from testifying after having represented to counsel that he would appear live. The Court hereby notes that it found his testimony to be quite valuable, particularly on the history of the relationship between Grupo and ASARCO and on the copper mining industry. He provided information not offered by any other witness for either side and not contained in his previously played video deposition. In formulating this Memorandum Opinion and Order, this Court has not utilized his live testimony, with one exception, as support for any ruling on any contested issues.[3] While the Court did not, in fact, grant the plaintiffs' motion, the practical consequence of the Court's ruling was the granting of Plaintiffs' motion with regard to German Larrea. Plaintiffs' counsel's statement with regard to the necessity, or lack thereof, to hear from Genaro Larrea and Daniel Tellechea live had the practical effect of withdrawing the remaining portion of their motion. (Doc. No. 384). The Court's ruling also had the effect of overruling Defendant's Motion for Reconsideration. (Doc. No. 395).

## I. BACKGROUND OF THE DISPUTE

### A. The Players

As of 2003, ASARCO Incorporated (hereinafter "ASARCO") had been in-volved in the mining industry, both domestically and internationally, for over a century. During the pertinent time-period involved in this dispute, ASARCO was incorporated in New Jersey and headquartered in Phoenix, Arizona. In February of 2005, ASARCO Incorporated was merged into ASARCO LLC, a Delaware limited liability company.[4] One of the primary products from its mining operations was, and is, copper. In 1999, when this saga began, ASARCO also owned two non-mining subsidiaries, Enthone–OMI, Inc., a specialty chemicals maker, and American Limestone Company, which produces construction aggregates, ready-mixed concrete, and limestone.

Grupo Mexico, S.A.B. de C.V. (hereinafter "Grupo") is a Mexican corporation that has been involved in the mining industry since the 1960's. Grupo is essentially a holding company involved primarily in two different industries: mining and railroads. Its railroad operations are concentrated in a subsidiary called Infraestructura y Transportes Mexico, S.A. de C.V. (hereinafter "ITM"), while its mining interests are vested in another subsidiary called Grupo Minera Mexico (hereinafter "Minera Mexico"). Grupo's Chairman of the Board and Chief Executive Officer is German Larrea. He has worked for Grupo for decades. He succeeded his father, who had founded Grupo and headed it for a number of years. The Larrea family and their company, Empresarios Industriales de Mexico, S.A. de C.V. (of which German Larrea is also the Chairman of the Board and Chief Executive Officer), own the con-

---

2. For example, see Stipulation Regarding Witness Testimony [Doc. No. 345].

3. The exception is the issue of why SPHC was created. The Court herein holds that SPHC was created for a genuine business reason and not to defraud creditors. Larrea's live testimony in this regard was somewhat cumu-lative, not only of his own video deposition, but also that of many other witnesses.

4. For purposes of this opinion, unless necessary, ASARCO LLC and ASARCO Incorporated will be simply referred to as ASARCO. References to ASARCO also include both capacities in which it sues.

trolling interest in Grupo. The record establishes without a doubt that German Larrea rules Grupo and all of its affiliates and no major decision is made without his approval.

For many years prior to 1999, Grupo and ASARCO had various business relationships. In Grupo's early ventures in the mining arena, it actually partnered with ASARCO. In fact, at one point in time, ASARCO had an ownership position in Grupo and had a representative on Grupo's Board of Directors. ASARCO even had a subsidiary named ASARCO Mexicana, which over time became a Grupo entity. As Grupo's mining operations grew, it became a more integrated operation, one that took the ore from the ground all the way through the smelting or refining process. Its mining operations, in addition to copper, include mining for silver, zinc, and gold. As time progressed, ASARCO abandoned its position in Grupo, and the two companies eventually seemed to have switched roles. Grupo liked ASARCO's assets and numbers and began to acquire its shares. ASARCO had large copper ore reserves in the United States, in addition to its ongoing copper production and international assets. By 1999, Grupo had accumulated 10 percent of the stock of ASARCO.

One of the international assets that AS-ARCO owned was the controlling interest (54.18%) in Southern Peru Copper Company (hereinafter "SPCC")—a publicly traded Peruvian copper company. ASARCO's ownership equated to approximately 43,-348,949 shares of the Class A Common Stock of SPCC. These shares, as will be discussed in detail below, were "Founder's Shares" with enhanced voting rights. Phelps Dodge and Cerro Trading Co., Inc., both copper mining competitors of ASAR-CO (and with Grupo for that matter), owned the other Founder's Shares. The remaining shares of common stock were "thinly traded." In an average month, less than one percent (1%) of the shares of SPCC were actively traded on the open market. These publicly traded shares did not possess equal voting rights with the Founder's Shares.

In the late 1990's, Grupo began to look for opportunities to expand its mining investments. While Grupo was not necessarily looking for product diversification, it was seeking geographic diversity. Grupo wanted to globalize and take advantage of NAFTA. It also wanted access to the financing available on the New York Stock Exchange. Two companies attracted its interest: ASARCO and Cypress Minerals. Grupo hired Lehman Brothers to study an acquisition of Cypress and Chase to study a possible acquisition of ASARCO. While Grupo was seriously looking at these merger possibilities, it had not begun to actively pursue either target. Consequently, it was somewhat surprised and spurred to action by the fact that one of its competitors, Phelps Dodge, in the latter half of 1999, made a tender offer for ASARCO. In reaction, Grupo accelerated its analysis and decided to enter the bidding war for ASARCO instead of pursuing Cypress. Grupo preferred ASARCO's reserves and production numbers. According to Grupo's thinking, ASARCO had better properties in the United States than Cypress and also had reserves in Chile and Peru. Phelps Dodge's offer was approximately of $26.75 per share, which was more than the stock market price of the stock. A bidding war ensued and ultimately Phelps Dodge's bid was topped by Grupo's bid of $29.75 a share for the remaining 90% of the shares of ASARCO that Grupo did not already own. Due to the fact that the acquisition was the result of a contested bidding war, Grupo was unable to do complete due diligence into ASARCO's condition before acquiring AS-

ARCO. At the time of the acquisition, Grupo did not feel that either the potential environmental or asbestos liabilities of AS-ARCO were a major concern.

Grupo's total purchase price exceeded $2 billion, which included $1.16 billion in cash and the assumption of ASARCO's outstanding debts. A formal agreement between ASARCO and Grupo was entered into in late October of 1999, which was accepted by the stockholders of ASARCO the next month. To finance the acquisition, Grupo negotiated an $817 million loan from Chase Manhattan Bank and Chase Securities Inc. (hereinafter referred to jointly as "Chase") to a subsidiary that Grupo had formed specifically to acquire ASARCO. Its name was ASMEX. This loan was guaranteed by Grupo. The remainder of the cash portion, approximately $430 million, came from equity capital contributed by Grupo or one of its affiliates. After the acquisition was completed, AS-MEX was merged into ASARCO, and AS-ARCO became a wholly owned subsidiary of Grupo. ASARCO's new board of directors consisted of German Larrea, Genaro Larrea, Hector Calva, Daniel Tellechea, Oscar Gonzalez Rocha, Xavier Garcia de Quevedo, Alfredo Casar, Daniel Chavez, Manuel Calderon, Alberto de la Parra, Francis McAllister, and Kevin Morana. All of the individuals, with the exception of Francis McAllister and Morana, were affiliated with Grupo.

Consistent with the practice in many leveraged buyout situations, the debt created by the acquisition was transferred to the acquired company. This greatly increased ASARCO's debt load. The $817 million debt from the Tender Offer Facility was added to its pre-existing debt of approximately $950 million—thus, saddling ASARCO with a total long-term debt of $1.767 billion. ASARCO also had an additional $450 million debt added to its ledger as part of a Revolving Credit Agreement that was financed by a consortium of 19 banks, again headed by Chase. This replaced a pre-acquisition debt facility. This new Revolving Credit Agreement (referred to many times in the record as the "Chase Revolver" or "Revolver") had a maturity date of November 15, 2002. It was to be secured by many of ASARCO's assets including inventory, accounts receivable, and the stock ASARCO held in SPCC. It was also guaranteed by Grupo.

It was this anticipated pledge of SPCC stock that is one of the building blocks of the current controversy. Plaintiffs claim that the following described transaction was motivated by an intent to defraud the creditors of ASARCO. Grupo and Americas Mining Corporation (hereinafter "AMC"), of course, deny this claim. The merits of and defenses to these allegations will be discussed in more detail below. Suffice it to say, Chase sought security for this new Revolver and Grupo, attempting to satisfy this need, sought to offer the SPCC shares as collateral. The ability to "pledge" these shares was arguably limited by the controlling SPCC corporate documents. These documents include the SPCC Shareholders Agreement and the Restated Certificate of Incorporation. ASARCO's stock ownership (being Founder's Shares) was such that it was allowed to nominate a majority of the SPCC directors and it, along with the other Founding Stockholders, had the right to elect 13 of the 15 members of the Board, as well as the SPCC President. SPCC was, and is, a successful mining operation in Peru. Thus, regardless of whose point of view one adopts, this stock was a very valuable asset.

Under the terms of section 4.9 of the Restated Certificate of Incorporation (and under the terms of the SPCC Stockholders Agreement), any Founding Stockholder

who transferred its Founder's Shares to a party that was not an affiliate would cause those shares to lose their super-voting rights. Those remaining Founder's Shares would retain their super-voting features as long as the three Founding Stockholders continued to hold at least an aggregate of 35% of the outstanding SPCC stock. If the percentage of Founder's Shares owned by the three founding entities dipped below 35%, all of the shares would convert to regular common stock.

Grupo was worried about triggering the provision whereby ASARCO's SPCC shares would lose their superior voting rights when it pledged them as the collateral for the Revolver provided by the Chase Bank consortium. It consulted with its legal and financial advisors to devise a strategy to avoid this occurrence. To avoid this possibility, on November 8, 1999, Grupo created Southern Peru Holding Company (hereinafter "SPHC") as a totally owned subsidiary of ASARCO. Its Board of Directors consisted of German Larrea, Genaro Larrea, and Agustin Santamaria, all individuals who owed their loyalty to Grupo. Grupo then had ASARCO transfer ownership of the stock to SPHC. Since SPHC was wholly owned by ASARCO, it was, therefore, an affiliate of a Founding Stockholder and the transfer did not trigger the loss of Founder's Share status. Then ASARCO pledged the SPHC stock, not the SPCC stock, to Chase, thus avoiding a claim that it might have triggered a conversion of its Founder's Shares to common stock by transferring ("pledging") the SPCC shares directly. SPHC's

sole function was to hold and own the SPCC stock. During the time of the events in question, SPHC had no employees, no business to perform, and no debt.[5]

Grupo had a long-range goal of establishing an entity that would encompass producing interests in different geographic areas and ultimately taking that company public. In furtherance of this goal, Grupo next formed Americas Mining Corporation as a wholly owned subsidiary in October of 2000. At all of the pertinent times involved in this matter, AMC had no full-time employees and it did no business other than hold ASARCO's stock. AMC is a Delaware company headquartered in Phoenix, Arizona. Like SPHC, its Board consisted only of Grupo employees or retainers. Grupo then transferred its ASARCO stock to AMC. The stated purpose for this maneuver was the eventual goal of having AMC own all of Grupo's mining interests (in the United States, Mexico, Peru, and anywhere else that they may be acquired) and having this American company have access to domestic capital markets. By the end of this restructuring, for all purposes relevant to this case, a four-tier corporate family was established. Grupo wholly owned AMC, which wholly owned ASARCO, which wholly owned SPHC, which owned the majority of stock in SPCC.[6] Grupo's practice of stocking the boards of its subsidiaries with Grupo employees or loyal retainers was described as a "uniform practice" and was one that continued up through the transaction in question, contrary to the advice of its cor-

---

5. In fact, SPHC's purpose was so limited that it did not even have a bank account to receive the SPCC dividends. Those went directly to ASARCO. At one point in 2001, there was even consideration given to transferring to SPHC some other business purpose so that it would appear to "demonstrate a corporate existence with substance" for tax purposes.

6. There are actually more members to this corporate family tree, as ASARCO has many more subsidiaries in addition to SPHC. None of these are directly pertinent to the issues herein, although some of these subsidiaries are the sources of alleged asbestos liability that contributed to some of the ongoing difficulties ASARCO faces.

porate counsel at Sidley Austin Brown & Wood, LLP (hereinafter "Sidley Austin").

## B. The Market

While somewhat in dispute in this case, all of the evidence from individuals who have been intimately involved in the mining industry portrays the copper market as a cyclical market—one in which prices go through periods of high prices and then fall into periods of low prices. Those in the business essentially described the prediction of copper prices to be an exercise in futility. One veteran of 30–plus years in the mining industry, Bernard Guarnera, basically denied being an "expert" in the area of price predicting because "no one is ever right." This will be discussed in more detail below, but suffice it to say that the five-year period between 1999 and 2004 was one of low prices. In 1999, at the time Grupo acquired ASARCO, average copper prices were approximately 70–80 cents a pound. Subsequently, they were 70–80 cents (in 2000) and 60–70 cents (in 2001 and 2002). In 2003, the average prices inched back above the 80 cents per pound figure and then in 2004 jumped to an average price well above $1.00. These lower prices put a great deal of financial stress on the copper industry as a whole and on ASARCO, specifically—especially given its newly acquired debt. Prices in 2008 now exceed $3.50 per pound based primarily on increased demand. This is compared to a 1990's pre-transaction high of 95 cents per pound of copper in 1995.[7]

Copper companies, despite their size, have little direct effect on prices. The market sets the price, and most companies sell at this price. Even the long-term contracts were and are primarily based upon the current price. It is not customary for prices to be set for a number of years. This is true for Grupo, its subsid-

iaries, and its competitors. The recent rise in prices has been primarily fueled by demand from China and India. Prior to this new trend, the United States was the world's largest consumer, but now China has replaced it. Predictions are that India's consumption will also continue to rise.

## C. ASARCO's Post–Acquisition Financial Position And The Transfer Of The SPCC Stock

The transaction at the heart of this conflict is the 2003 transfer of SPCC stock from SPHC to AMC. AMC claims that this transfer was the most viable option, at the time, to save ASARCO from its financial problems. ASARCO alleges that the transfer was based upon Grupo's assessment that ASARCO's viability was questionable and that the SPCC stock was its most prized asset. Plaintiffs contend that the sale, therefore, was not made to improve ASARCO's financial position, but was solely a means for AMC/Grupo to "cherry-pick" ASARCO's most prized asset before it was lost to creditors or by bankruptcy. There is a general agreement between the parties that whatever the prevailing intent, the actions were taken because of low copper prices, the increased debt load at ASARCO, and the mounting level of contingent environmental and asbestos claims.

### 1. The Department Of Justice (Hereinafter "DOJ") Lawsuit

While there is a dispute over the motivation and intent for the transfer of the SPCC stock, there is no dispute over the fact that ASARCO's environmental problems (in addition to its exposure to asbestos claims) were an overriding and complicating factor that plagued ASARCO and consequently AMC/Grupo. At the time of

---

7. In the 1980's, prices had actually been high- er, having peaked at about $1.30 per pound.

its acquisition by Grupo, ASARCO had numerous environmental problems. The extent of these problems was not known by Grupo because of its inability to conduct meaningful due diligence prior to its tender offer. In 2001, after Grupo had time to evaluate its new acquisition, one Grupo official described ASARCO as a company with very high operating costs, high real liabilities, and very high contingent liabilities. These problems continued to multiply in the post-acquisition years. The environmental problems were complicated by numerous asbestos-related claims.[8] As ASARCO's financial problems began to mount, the number of times it failed to comply with various environmental obligations also increased.

As ASARCO's troubles increased, it became apparent to those concerned that someone, and in all likelihood AMC/Grupo, would try to acquire the SPCC stock, since that stock was ASARCO's "crown jewel." As early as December of 2001, AMC/Grupo/ASARCO discussed selling the SPCC stock as a means to solve ASARCO's outstanding liabilities. These discussions with lenders and others continued throughout 2002 and as will be seen below, culminated with the sale in March of 2003. These discussions become so widely known that on October 4, 2002, Grupo issued a press release to calm the growing speculation that the SPCC stock would be sold on the open market. The release announced instead that the stock would be transferred in such a fashion that there would be no change in beneficial ownership or control.

The clearer it became that the SPCC stock would be transferred to someone, the more uneasy some of ASARCO's creditors became. One of the largest creditors was the United States. Ultimately, the Department of Justice became so concerned about ASARCO's ability to satisfy its environmental responsibilities if the stock was sold that in August of 2002, it filed a lawsuit in federal court to enjoin the sale of the stock. The DOJ was successful in obtaining a temporary injunction. As the plans (detailed below) for the sale of the SPCC and AMC/Grupo began to take shape and gain traction inside the Grupo corporate family, the attempts to resolve the injunction situation with the DOJ intensified. AMC/Grupo's goal in these negotiations was to satisfy the DOJ that the sale of the stock would not jeopardize ASARCO's ability to fulfill its environmental obligations and to otherwise sufficiently satisfy the DOJ such that it would be willing to agree to a dissolution of the injunction. The ASARCO directors at this point were all directors officers or employees of Grupo and/or AMC with the exception of Alberto de la Parra, who was Grupo's outside counsel and is currently its General Counsel.

In late 2001, the DOJ commissioned a study from Behre Dolbear and Company (hereinafter "Behre Dolbear") to estimate the fair value of the SPCC stock[9]. Their report, issued in April of 2002, indicated the value ASARCO's interest in SPCC was $817.2 million. AMC/Grupo was, and is to this day, critical of that evaluation. Grupo, after the acquisition, hired PricewaterhouseCoopers (hereinafter "PWC") to help it assign a value to the recently acquired assets. It assigned a business enterprise value of $893 million, which when adjusted

---

**8.** The epicenter of the asbestos claims was, and is, two subsidiaries of ASARCO, Capco Pipe Company (hereinafter "Capco") and Lac D'Amiante du Quebec Ltee (hereinafter "Lake Asbestos of Quebec" or "LAQ"), against whom the claims number in the tens of thousands.

**9.** Behre Dolbear is an international minerals industry consulting firm.

to a value of the SPCC stock, results in a $672 million valuation. In the spring of 2001, AMC/Grupo/ASARCO retained Houlihan Lokey Howard & Zukin (hereinafter "Houlihan") to provide opinions on the fairness of the transaction and ASARCO's solvency post-transaction. Later, in light of the government's report from Behre Dolbear, ASARCO asked Houlihan to update valuation reports it had previously made, which had put the value of the stock at $720 million. Houlihan eventually concluded in a July 2002 report that the stock was worth $662 million. The pertinent Houlihan employees met with the DOJ and pointed out that if one corrected for the flaws it perceived in the Behre Dolbear report, the "accurate" valuation would be $634.8 million, a figure less than the Houlihan evaluation.

The negotiations between AMC/Grupo/ASARCO and the DOJ continued well into the fall of 2002.[10] Ultimately, the Grupo entities agreed to temporarily resolve their differences with the DOJ by agreeing to fund a $100 million trust in return for a three-year moratorium on any attempt by the federal government to seek judicial enforcement of environmental liabilities. The trust was to be funded by a note that was part of the sale proceeds, and it was to be guaranteed by Grupo. In exchange, the DOJ conceded that ASARCO could proceed with the proposed sale. The settlement agreement was reduced to an agreed judgment ("Consent Decree") which was signed by a federal judge in Arizona on February 3, 2003. The Consent Decree took into consideration the possibility that a lawsuit, like the instant one, might be brought by other interested parties and that the transaction might ultimately be set aside. If the sale were set aside, the agreed judgment would become null and void. An additional term required ASARCO to remain in business (i.e., not seek bankruptcy) for at least one year. The United States remains one of the largest creditors of ASARCO and is pursuing a large claim in the ASARCO bankruptcy.

## 2. Post–Acquisition ASARCO And The Transfer Of The SPCC Stock

To reduce the debt from the 1999 acquisition, ASARCO almost immediately had to begin selling its "non-core" assets. The two most important sales were those of Ethone–OMI, which was sold for $503 million in December of 1999, and American Limestone in May of 2000 for $232 million. ASARCO used these funds to pay off the Tender Offer Facility in 2000.

This left ASARCO with approximately $300 million at its disposal to use as working capital according to Daniel Tellechea, Grupo's Chief Financial Officer. Nevertheless, as the new century began, financial pressures began to mount. In addition to the fact that it was having problems meeting its day-to-day financial obligations, ASARCO was beset with legal liabilities from environmental and asbestos claims. Adverse judgments and settlements resulted in additional financial drain, and at times ASARCO was even having great difficulties paying its defense counsel and experts.

By the fall of 2001, ASARCO's financial difficulties had reached a point where they could no longer be ignored. In September 2001, ASARCO technically defaulted on

10. The evidence concerning the duration and extent of the AMC/Grupo/ASARCO negotiations with the DOJ is somewhat limited. No witness described these talks in detail. Nevertheless, some exhibits indicate that the negotiations were ongoing for a number of months and that various terms and conditions were discussed in addition to the amount that the DOJ would receive in trust.

the $450 million Revolver. In October, it engaged the law firm of Sidley Austin to provide bankruptcy and restructuring advice. Also, in October, ASARCO's debt far exceeded the sales volume and profit it was generating. ASARCO was falling behind on payments to many of its critical vendors. Some even refused to supply the parts or fuel for the vehicles necessary for ASARCO's mining operations. Instead of rebounding, copper prices fell to the vicinity of 60 cents per pound by November 2001. ASARCO did not have the $50 million it needed to pay a bond debt that came due in December. In late 2001, the Larrea family (through AMC) loaned $41.75 million to ASARCO to keep it afloat.[11] In 2002, ASARCO's auditors, reviewing 2001 numbers, indicated that there was "substantial doubt about ASARCO's ability to continue as a going concern." Arthur Anderson reported a loss for ASARCO of $392 million in 2001 and predicted that ASARCO would need an additional $200 million cash infusion in 2003. Late in 2001, AMC/Grupo/ASARCO and their advisors began to seriously discuss plans for some kind of major restructuring, including discussions of filing bankruptcy. By December, they were also in negotiations with their lenders about the best course of action.

The financial problems continued to mount in 2002. In January, ASARCO stopped paying various creditors and contractors. It owed over $80 million in past-due debt by February 2002. Throughout 2002, ASARCO could not even make the payments on the principal or interest it owed to the Larrea family, thus incurring interest charges, which were not paid until October of 2003. ASARCO was not even able to pay the very experts it had retained to help with the cash crisis. Midway through 2002, Sidley Austin noted that Houlihan could not render a solvency opinion for ASARCO and if one was needed, AMC/Grupo would have to hire another firm. Houlihan had valued the shares at $641 million but stated that the purchase price would need to include a premium of $193 million for Houlihan to be comfortable rendering a fairness or solvency opinion. Daniel Tellechea testified that in 2002 ASARCO had a negative stockholder's equity. The record is replete with examples of a variety of debts that ASARCO could not pay.

As more debts became past due, there seemed to be very few options that could resolve ASARCO's financial position. Those included cutting costs and reducing production, high-grading mines, borrowing money, selling assets, or hoping for a quick and/or drastic move upward in copper prices.[12] ASARCO had already begun to high grade and to cut production and costs, but these measures were not enough. Since copper prices seemed mired in the range of 70–80 cents, no help was forthcoming in that area. The only options left available to attempt to right the ship were borrowing more money or selling more assets. With its income already not covering the debts it was incur-

---

11. The "loan" was actually documented as an advance payment on the purchase of the SPCC shares, despite the fact that the details of any such transaction were still very much in a state of flux.

12. "High grading" is a mining term used to describe a process in which a mine operator mines only the high grade ore because it is cheaper to process. Since it generally means the mine operator also stops stripping (uncovering the waste off the ore), it is considered a technique one does only in times of financial hardship or at the very end of the life of a mine. Once one high grades a mine, in order to restart a proper mining program, one must start stripping over again. That process can take a lot of time with little or no resulting production.

ring, as well as the past-due liabilities, the chances of obtaining successful financing seemed remote. Due in part to the unpaid bills, default on loan covenants, cross-default positions, and looming bond obligations, Chase began to apply increasing pressure on ASARCO for payment in full on the Revolver. Chase threatened to foreclose on its security interests (including the SPHC stock) if the debt was not paid. Most AMC/Grupo/ASARCO insiders and consultants felt that there were only plausible two courses of action: bankruptcy or the sale of assets. At least one bankruptcy expert testified at trial that either course of action would have been reasonable. ASARCO's best and most valuable asset was ASARCO's stock in SPCC. Beginning as early as 2001, AMC/Grupo concluded that the most viable option was to sell the SPCC shares. However, AMC/Grupo did not want to relinquish control of this valuable asset. Even in the midst of this prolonged copper price downturn, the SPCC operations remained profitable—this being another indication of the quality of the Peruvian operation.

To stay afloat, ASARCO monetized insurance policies, sold equipment, high graded certain mines, and failed to make payments and cash calls on certain legal obligations, investment properties, and/or mining prospects.[13] Between 1999 and 2002, apart from its ownership in SPCC, ASARCO had net losses in excess of $680 million. This was true despite the fact that it monetized insurance policies in an amount exceeding $170 million.

Various legal and financial experts were hired to help effectuate a restructuring and, if possible, an intra-company sale of the SPCC stock. Houlihan had already been hired to provide opinions regarding the fairness of any proposed consideration and the post-transaction solvency of ASARCO, and Sidley Austin had also been hired by AMC/Grupo/ASARCO. AMC/Grupo/ASARCO hired the law firm of Squire Sanders & Dempsey (hereinafter "Squire Sanders") in early July of 2002 to help formulate and analyze possible options. In August of 2002, they also hired Ernst and Young Corporate Finance (hereinafter "EYCF") to advise them with regard to possible restructuring. Later, ASARCO expanded the duties of EYCF to evaluate the SPCC stock.

As noted, a year earlier, Houlihan estimated that a $720 million sales price for the SPCC stock would be fair from a financial standpoint and also opined that this sale would leave ASARCO solvent. By May of 2002, however, Houlihan reported that ASARCO would need to realize $834 million for the price to be fair from a financial standpoint and for ASARCO to continue operating properly. It also suggested, for the first time, that ASARCO might be better off financially if it kept the shares of SPCC.[14] In July of 2002, Houlihan concluded, somewhat in response to the Behre Dolbear figure of $817.2 million, that the fair market value of the shares was $662 million.

With looming financial deadlines and no expectation for a surge in copper prices, EYCF and Squire Sanders along with company executives began to seriously consider refinancing and restructuring alternatives, including the possibility of filing bankruptcy. From its first meeting with

---

13. ASARCO's competitors, to varying degrees, were faced with similar problems and implemented some of these same remedies.

14. A Sidley Austin email in May of 2002, citing Houlihan as the source, stated that the sale of SPCC was cash positive for ASARCO only in the first year and that after that ASARCO was better off keeping the stock.

Squire Sanders in Mexico City in July of 2002, AMC/Grupo stressed their desire to transfer the SPCC stock to AMC and do it in such a manner as to avoid a fraudulent conveyance action. The record clearly reflects the continual desire of Grupo to keep control of the SPCC stock. While it saw the need to sell the stock to generate funds for ASARCO, neither AMC/Grupo/ASARCO nor any third party marketed the SPCC stock in any kind of public fashion. While German Larrea testified that he told Chase that he would review any third-party offers, AMC/Grupo/ASARCO did nothing to solicit or seek out such offers. For example, they never hired an investment bank, mining consultant, or financial institution to help place the stock on the market. Numerous witnesses testified and multiple exhibits support the conclusion that it was AMC/Grupo's constant desire to retain the SPCC stock.[15] Additionally, the notes from that same meeting indicate a secondary goal of AMC/Grupo was to find a means of putting cash into ASARCO in a manner whereby the "value of new cash investment does not automatically flow to creditors but is retained by [AMC/Grupo]." Shortly thereafter, Squire Sanders recommended that ASARCO add independent directors to ASARCO's Board to help serve on a Restructuring Committee. That Committee was formed in October of 2002 and consisted of the two new independent directors, Al Frei and Jock Patton, plus Genaro Larrea, ASARCO's President (and brother of German Larrea, who was Chairman and CEO of Grupo and AMC). This Committee met five times over the subsequent four months.

By late 2002, Squires Sanders reported that ASARCO was in danger of running out of cash. Tellechea was predicting in October of 2002 that there would be a cash shortfall of $11–31 million by the year's end. AMC/Grupo also entered negotiations with the Chase Bank group for an extension of the Revolver, which otherwise would come due in November of 2002. As part of those negotiations, AMC took a $50 million participation interest in the $450 million obligation. This resulted in a two-month extension of the due date to January 31, 2003. This extension agreement was reached in tandem with the near-completion of the ASARCO/DOJ negotiations to dissolve the injunction. The decision was ultimately reached by Grupo to have ASARCO sell the SPCC shares to AMC.[16] It was recognized by all involved, including the boards of Grupo, AMC, and ASARCO as well as their legal and financial advisors, that such a transaction would be viewed by everyone as an intra-company transaction. That being the case, and in order to get the benefit of the business judgment rule, it was decided that the transaction must not only be for reasonably equivalent value, but that it must also be blessed by the outside directors.

Of additional concern was the upcoming deadline to redeem the so-called "Yankee Bonds." At issue were $100 million worth of outstanding bonds coming due on February 3, 2003. The bonds were unsecured. The bonds were drawing periodic interest, which ASARCO was not paying. These bonds and the Chase Revolver were the

15. The Court should note that there were two reasons for an intra-company transfer that did not originate with Grupo's management strategy. The first was the issue of the Founder's Shares losing their unique voting rights. The second was the potential tax consequences of a sale to a third party, although all experts admitted at trial that an adjustment in the purchase price could have compensated for any adverse tax consequence.

16. Various scenarios had been discussed. For example, at one point it was suggested that the bank debt be transferred to AMC along with stock.

only upcoming fixed debt obligations. The next long-term financing obligations were bonds coming due in 2013. As will be seen below, there was significant internal debate over the need to and/or wisdom of paying the Yankee Bonds at par. The individuals at AMC/Grupo wanted ASARCO to pay the bonds at par plus interest, which is what eventually happened. Various individuals at ASARCO and its advisors suggested at least two separate avenues: (1) buying the bonds at discount (they were trading on the open market at 50–60 cents on the dollar at various times during 2002); or (2) not paying them at all and treating the bond holders as any other unsecured creditor. AMC/Grupo officials testified at trial that the "banks" were forcing it to pay these bonds as a condition of refinancing. There were exhibits introduced at trial to support this assertion, especially with respect to AMC/Grupo's ongoing negotiations with one bank in particular, Barclays. Similarly, there was testimony, verified by at least three witnesses and multiple exhibits, that Genaro Larrea told individuals involved in the restructuring that the bonds had to be paid because Inbursa, a Mexican bank that owned, or whose principals owned, a large number of the bonds, was demanding payment as a condition of its financing the Grupo purchase of the SPCC stock. These statements were later retracted by Genaro Larrea. There was also evidence that several banks expressed the contrary opinion, i.e. that the bonds should not be paid. Suffice it to say, as the proposed sale began to take shape, a second critical debt deadline loomed, and a strategy had to be devised to deal with it.

As stated above, Squire Sanders and EYCF recommended two local business-men to serve as independent directors. Both were local Phoenix businessmen who had worked with Squire Sanders before, and both had experience in companies that were in or on the verge of bankruptcy. When it became clear that Chase would grant an extension beyond the November 2002 deadline, it became less certain that bankruptcy was the only way to protect the SPCC stock from foreclosure. Given that a sale was possible, the role of the two independent directors was changed to include the duties of being the independent eyes and ears on this intra-company transaction.

In the meantime, EYCF (based in part upon the work of its affiliate Ernst and Young LLP) found that the fair market value of the shares in December of 2002 was $640 million and in January of 2003 opined that the $765 million being paid in consideration was greater than the value of the stock at year-end 2002. On January 27, 2003, the Restructuring Committee met to consider the proposed transaction along with other pressing problems. Doug McAllister, General Counsel of ASARCO, presented the latest draft of the Consent Decree, which in substance allowed the stock sale to proceed. On behalf of EYCF, Grant Lyon presented Ernst & Young's analysis of its valuation method and its final analysis concerning the value of the SPCC stock.[17] The Directors questioned this $640 million figure as being too low since the stock market price of the SPCC shares was $670 million at the time in question, but were apparently satisfied by Lyon's explanation. Lyon discussed his reasoning as to why the DOJ/Behre Dolbear figure of $817 million was not accurate. He also discussed the tax consequences of the sale and the various values

---

**17.** EYCF associated its affiliate company, Ernst & Young LLP (hereinafter "E & Y"), to help with the valuation process.

that could be ascribed to the non-cash portion of the proposed consideration. Ultimately, the Committee's conclusion was that, regardless of which of the various values was used, the total package exceeded the $640 million figure. Based upon the advice and the numbers presented to it, the Committee conditionally voted to recommend approval of the sale to AMC.

Nevertheless, the Committee refused to approve the payment of the Yankee Bonds, which were due on February 3, 2003, despite the representation by Genaro Larrea that such payment was a condition of the Banco Inbursa financing. Lyon explained that in 2003 significant cash flow and capital deficits were expected and that the proposed payment of the Yankee Bonds would leave ASARCO with no apparent means of meeting these needs. The Restructuring Committee agreed to defer the consideration of this issue pending updated cash flow projections. The Committee expressed its willingness to approve the payment of the bonds if ASARCO could still maintain operations and meet its obligations to other creditors.

At this point in time, the cohesiveness of the Restructuring Committee seemed to evaporate. The outsider members of the Committee along with some of its advisors sought to confer with senior management on these cash flow and creditor issues. (It was expected that the management team would present figures indicating a $60 million deficit or "hole.") Genaro Larrea, the Committee's third member, allegedly thwarted these efforts by sending the management team to Tucson, Arizona. On January 29, 2003, the Committee reconvened. The AMC/Grupo financing for the transaction was discussed. At that meeting, Genaro Larrea presented "new cash projections," but no one could verify their accuracy. Patton insisted that management be made available to EYCF and the Committee members to verify these projections. The legal advisors present acknowledged that the Committee was undertaking proper procedures.

Then the discussion again turned to the payment of the Yankee Bonds. Larrea told the assembled group that contrary to what he had told them earlier, the payment of the Yankee Bonds was not a prerequisite of the financing that Grupo was seeking from Inbursa. The attorneys from Squire Sanders reiterated to the Committee that, in light of ASARCO's financial position, ASARCO's directors had a fiduciary duty to all of ASARCO's creditors. "This duty requires that the Corporation preserve the value of its assets for the benefit of its creditors and attempt to treat, as much as possible, similarly situated creditors fairly and equitably." They also instructed the Committee "if the payment of the Yankee Bonds did jeopardize the Corporation's ability to continue its operations or meet its other scheduled obligation ... and essentially preferred one group of creditors over other similarly situated creditors, the directors would likely be considered to have breached their fiduciary obligations to creditors." After this caution, the Committee agreed that no payment of the Yankee Bonds would be made until and unless EYCF verified that ASARCO would have the ability to continue after the bonds were paid. The meeting concluded, much like the one two days earlier, with the Committee deciding to wait for further information on the company's cash position.

No sooner had they adjourned when Grupo issued a press release under ASARCO's name. In that release were several statements that were not true or at the very least were misleading, including the statement that "... ASARCO will receive the funds necessary to pay $550 million in debt due next week." This statement is

somewhat misleading in that the plan was for ASARCO to receive only $500 million in cash. Further, the statement, in effect, announced that the Yankee Bonds would be paid—an act that had specifically been tabled by the Restructuring Committee. ($450 million of the cash would go toward paying the Revolver, and the remaining $50 million would go towards paying the Yankee Bonds. The additional $50 million owing on the Yankee Bonds would come from ASARCO.)

The press release also stated: " . . . [T]his agreement provides a structure under which ASARCO can meet near-term obligations . . ." and "[T]he value of the transaction and the terms under which it will occur were validated in an independent analysis conducted by the international accounting firm of Ernst & Young." Neither of these statements were completely true, as EYCF had not approved the "terms under which it would occur."

Initially, ASARCO could not, at the time, meet its short-term obligations, and the agreement did not enable ASARCO to meet any of its other obligations (with the exception of the Chase Revolver, the Yankee Bonds, and the Larrea debt).[18] Further, EYCF later told the Board that it did not believe the payment of the Yankee Bonds would bring ASARCO to a position of financial stability. To the contrary, EYCF emphasized that the payment of the Yankee Bonds would cause ASARCO to face severe liquidity deficits. While upset at the press release for the reasons expressed above and because it violated their engagement agreement and was not cleared with the individuals working on the transaction, EYCF continued to take its directions from the Restructuring Committee. It reviewed the new financial projections and reported back on February 3, 2003. Even using the "new" figures, EYCF predicted negative cash balances of over $50 million during 2003. Further, they noted at least $75 million of unpaid debts to entities such as Glencore ($30 million), Dresder ($11 million), Mitsui ($13 million), the states of New York and Connecticut ($12 million), and $9 million in miscellaneous obligations.[19] Even using the Revised Projections, EYCF stated:

> . . . we do not believe that ASARCO can continue its obligations without significant cash infusions. Such cash infusions could come from both the residual cash of $50 million from the sale of the SPCC stock (after the Chase $450 million facility is satisfied) . . . or the monetization of certain insurance policies in the approximate amount of $49 million . . . However, if the Residual Cash and the Insurance Proceeds are used to pay the $100 million Yankee Bonds . . ., we believe that ASARCO will face the possible inability to continue to fund its operations.

EYCF made it clear that paying the Yankee Bonds would compromise ASARCO's viability and that it expected ASARCO to immediately clarify the press release.

Having received EYCF's analysis, the legal team at Squire Sanders immediately sent the Restructuring Committee a memo that detailed the Committee's duties and obligations. The firm concluded that ASARCO was in the "zone of insolvency," if

---

**18.** The Court notes that the proposed payments of the Revolver and the Yankee Bonds did alleviate ASARCO's immediate need to pay long-term debt obligations, as the next major debt facility did not mature until 2013.

**19.** The concerns over outstanding debts and paying the Yankee Bonds were communicated to German Larrea, Grupo's Chairman, on a number of occasions. During this same January 2003 time period, ASARCO, in addition to not paying these debts, among others, had to layoff 250 employees, as it had trouble meeting its payroll.

not actually insolvent and that the Board owed a fiduciary duty to ASARCO's creditors. They concluded that "[b]ased upon the currently available information regarding ASARCO's financial condition, we believe that it is extremely difficult for AS-ARCO to articulate a supportable business justification consistent with its fiduciary duty to all creditors for paying the Yankee Bonds.... Rather, the motivation for payment ... seems primarily related to AMC's interest in securing financing...."

Genaro Larrea asked Squire Sanders to expand its memo, which it did on February 5, 2003. In addition to the advice it offered, it warned the Board that:

> ... it is well settled that the fact that ASARCO may be receiving reasonably equivalent value in exchange for the sales of the SPCC shares is immaterial to the question of intent and voidability in a fraudulent transfer lawsuit alleging actual intent to hinder, delay or defraud ASARCO's creditors. The projected cash flow deficits of ASARCO materially jeopardize its ability to continue to operate outside of a bankruptcy proceeding. *When coupled with the $75 million dollars in Other Obligations that ASARCO has no present ability to satisfy, the payment of the $100 million to the holders of Yankee Bonds not only jeopardizes ASARCO's ability to continue to operate but also prefers, in a distressed company scenario, one group of creditors* (i.e., the Yankee Bonds) over all other similarly situated creditors (i.e., environmental and asbestos claimants holding unsecured claims, trade creditors, the more than $300 million dollars of unsecured notes outstanding and the $75 million dollars of Other Obligations). [emphasis added]

The opinion concluded that the payment of the Yankee Bonds "... will give creditors a credible basis to challenge the SPCC sales as a fraudulent conveyance under the actual intent to hinder, delay, and defraud creditors standard, not withstanding the Ernst & Young 'reasonable equivalent value' opinion." The firm then predicted this very lawsuit if the Yankee Bonds were paid.

Over the next few days, Squire Sanders, Genaro Larrea, and Daniel Tellechea continued to play out various scenarios, including: (1) paying the Yankee Bonds without filling the deficit/hole; (2) paying the Yankee Bonds and filling the deficit/hole; and (3) not paying the Yankee Bonds. The firm opined that the first scenario involved a significant risk of a successful challenge to the SPCC sale. Despite being warned by its financial and legal advisors, AMC/Grupo insisted on the payment of the Yankee Bonds without filling the hole.

The fallout between ASARCO and its independent directors and EYCF escalated when Grupo had ASARCO announce on February 20, 2003 that ASARCO would use proceeds from the stock transfer to pay the Yankee Bonds at par plus all accrued interest. All the while, ASARCO's financial condition continued to deteriorate. Societe Generale, which had a judgment against ASARCO, sought to execute its judgment on whatever assets it could reach, including the SPCC stock. Millions of dollars were owed to outside creditors. It was noted on February 27, 2003, that even the independent members of the Restructuring Committee had not been paid in months. As of March 3, 2003, the Pozia law firm, ASARCO's national asbestos counsel, was owed over $3.5 million. There also was over $30 million in "held checks." Genaro Larrea wrote German in February telling him that ASARCO had no operating funds. Genaro Larrea believed ASARCO had only three real options: (1) not pay the Yankee Bonds; (2)

secure a keep-well agreement from AMC/Grupo; or (3) put ASARCO into Chapter 11. On behalf of AMC/Grupo, German Larrea considered these suggestions, but rejected all of these options.

Since ASARCO made the Yankee Bonds announcement without the approval of the Restructuring Committee and despite the warnings from its professional advisors, Jock Patton emailed Genaro Larrea after the February 20th announcement with multiple objections and questions. He questioned the fact that no final cash projections were provided as promised. He further complained that the payment of the Yankee Bonds as announced was contrary to the decision in their last meeting. Finally, he reiterated the amount of the debt that still surrounded ASARCO, including a partial list of over $75 million of outstanding debts. He refused to sign any documents related to the matter. In late March of 2003, Squire Sanders informed Patton that he should resign unless the decision to pay the Yankee Bonds was reversed.

Ultimately, on March 26, 2003, Patton and Frei did resign from the Board and withdrew their consent from the entire transaction—not just the payment of the Yankee Bonds.[20] The next day, EYCF resigned over the intended payment of the Yankee Bonds. It also refused to issue the bring-down opinion that had been contemplated and that Sidley Austin had advised AMC/Grupo to get. EYCF considered withdrawing the reasonably equivalent value opinion, but ultimately left it in place after AMC/Grupo threatened it with litigation if it withdrew the opinion.

On March 31, 2003, AMC/Grupo closed the transaction. At this point, ASARCO had numerous creditors, including contingent and liquidated creditors that were unsecured. The transaction was approved by the remaining board members of ASARCO without dissent, primarily because the dissenting board members had resigned and the remaining board members were all affiliated with AMC/Grupo. The funds were dispersed according to a Funds Flow Memorandum. The funds, transferred on this date, which totaled $672,653,400, came from the following sources:

(A) $ 200,000,000 from Servicios Agent Acct;

(B) $ 310,000,000 from AMC's Agent Acct;

(C) $ 102,353,400 from Servicios;

(D) $ 10,300,000 from Grupo; and

(E) $ 50,000,000 from ASARCO

The ultimate recipients of the consideration at the end of the day were:

(A) Chase Bank Group (including AMC)—$450 million principal plus interest on the Revolver (cash payment) (AMC received $50 million plus interest back because of its participation in the Revolver).

(B) SPHC—$123.25 million note from AMC (to be paid in 7 equal annual installments with 7% interest)

(C) The United States—$100 million Trust Note (to be paid in 8 equal annual installments with 7% interest and a AMC/Grupo guarantee)

(D) ASARCO/SPHC—forgiveness of the AMC/Larrea $41.75 million note (the "advance" payment)

(E) Yankee Bond Holders—$100 million plus interest (cash payment)

Before closing, Daniel Tellechea, Armando Ortega, and Douglas McAllister conferred with Michael Fitzgerald of Sid-

---

**20.** Frei and Patton had earlier conditionally signed a draft of the unanimous consent approving the transaction, in order to make the closing easier.

ley Austin, their long-standing corporate counsel, about the propriety of going forward with the transaction, given the resignations of Frei, Patton, and EYCF. At the time, Sidley Austin represented Grupo, AMC, and ASARCO. He did not opine on the future legal consequences, but did tell Grupo that there was no legal prohibition against proceeding ahead with the transaction.

The transaction was completed and the funds were distributed. While ASARCO was relieved of its overdue obligations on the Revolver and Yankee Bonds, it continued to have financial problems. Less than two weeks later, there was at least $23 million in "held checks"—some that had been held for over a year. In June of 2003, Fitzgerald noted in a memo to Grupo that "ASARCO's current operations are under severe financial pressure. It has limited cash flow and numerous creditors are demanding payment." The memo went on to discuss the fact that several individuals from AMC/Grupo still served on the Board of ASARCO and that they would have fiduciary duties to creditors of ASARCO. Fitzgerald emphasized that "[t]hroughout the consideration of this sale, one of the issues has been a potential attack on the sale as being a fraudulent conveyance ...." Fitzgerald advised AMC to immediately prepare to defend such an attack either outside of, or as a part of, an ASARCO bankruptcy proceeding. He also advised that the AMC/Grupo representatives on the ASARCO Board of Directors resign if a bankruptcy occurred. Fitzgerald testified that he had consistently advised Grupo's representatives not to sit on the boards of the company's subsidiaries. He repeated this advice in a memorandum on June 27, 2003. He explained that the overlapping directorships might enable creditors (and particularly asbestos and environmental claimants) to pierce the corporate veil, and he warned that a judge

might allow ASARCO's creditors to make claims against AMC or Grupo. Three weeks later (on July 18, 2003), all nine representatives of Grupo resigned from ASARCO's board, and Grupo's representatives resigned from SPHC's board.

Before resigning, these executives decided to postpone paying $2 million worth of ASARCO bond interest, so that the money could be directed to pay freight and power charges. At the time of the resignations, cash flow was short even for making payroll (as it had been all year). At that point, however, the accounting department described the situation as a "crisis." This confirmed earlier predictions by EYCF that ASARCO would suffer a cash deficit of $61.1 million in 2003, with a cash balance of a negative $46 million. Arthur Anderson had also previously (in 2002) estimated that ASARCO would need $200 million of additional funds in 2003.

Throughout the years prior to its bankruptcy filing (2003–2005), ASARCO continued to survive from hand to mouth. It cannibalized assets, sold or abandoned other assets, fired employees, high-graded mines, monetized badly needed insurance policies, and cut costs. It also maintained a pattern of delaying or refusing to pay creditors. In layman's terms, it was constantly "robbing Peter to pay Paul." Operational personnel also complained that the lack of cash was hurting ASARCO's ability to maintain operations. Years of underfunding had caused a deep drop in performance. They complained that the lost revenues due to lack of funding were nearly $100 million and that the company was losing valuable workers. Two months prior to the March 2003 closing, George Burns had presented in great detail the production problems that 2002 had presented and why he thought ASARCO would suffer the same problems throughout 2003. He complained that he could not

meet the 2003 forecast due to lack of cash. According to Burns, the cash shortage prevented ASARCO's operational divisions from: (1) stripping (resulting in large shortfalls); (2) maintaining pumping operations; (3) making prompt payments, and in many instances any payments, to suppliers (causing curtailment of operations in the Ray, Hayden, Mission Underground, and Mission Pit mines).

These problems continued in the post-closing years. As the cash flow problems continued to mount, ASARCO's legal problems also continued to skyrocket. In November of 2004, Mesirow Financial Consulting assumed that ASARCO's asbestos-related liabilities would climb from $86 million to $550 million and that its environmental liabilities would climb to $900 million, assuming a 2005 bankruptcy. By July 12, 2005—two to three months after five of ASARCO's non-operating subsidiaries filed bankruptcy—Standard & Poor's Rating Service had lowered its credit rating on ASARCO from BB—to CCC. Its outlook was downgraded from "Positive" to "Negative." S & P noted only two positives: rising copper prices and minimal long-term debt maturities in the next seven years. The negatives it noted were: minimum support from AMC and Grupo, high exposure to environmental and asbestos claims, poor operating performance, high production costs, and a recent strike. It especially noted corporate restructuring design "with the intention of isolating the company [AMC] from ASARCO." It questioned the fact that ASARCO was relying on the AMC note payments to "meet its short-term obligations" and pointed out that it did "not have access to bank lines."

Other financial rating organizations had also downgraded ASARCO. According to the Fitch credit rating on August 10, 2005, ASARCO was in the category of imminent default.

By the time ASARCO was looking seriously at bankruptcy in 2005, there were thousands of asbestos claims involving ASARCO or its subsidiaries and they were increasing on a daily basis. ASARCO had also been hit with a labor strike. ASARCO put its subsidiaries, Capco and LAQ, into a prepackaged 524(g) bankruptcy on April 11, 2005. Ultimately (and reluctantly), on advice of counsel, ASARCO followed these subsidiaries into Chapter 11 on August 9, 2005. SPHC filed a voluntary petition for Chapter 11 protection the next year. Plaintiffs now bring these claims in their capacities of debtors in possession and on behalf of ASARCO's unpaid creditors.

## II. FRAUDULENT TRANSFER

 Plaintiffs bring fraudulent transfer claims pursuant to §§ 544 and 550 of the Federal Bankruptcy Code. (Plaintiffs' Second Amended Complaint (hereinafter "Complaint" or "Compl.") ¶ 3.) According to § 544(b), a "trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable [state] law by a creditor" holding an allowable unsecured claim.[21] 11 U.S.C. § 544(b)(1). Trustees and debtors in possession use § 544(b) as a conduit to assert state-law-based fraudulent transfer claims in bankruptcy.[22] In bringing the fraudulent transfer claims, the trustee or debtor

---

**21.** Although the statute says "trustee," for purposes of the fraudulent transfer claims, Plaintiffs, as debtors in possession, have the same rights to sue and be sued as a trustee does. 11 U.S.C. § 1107(a). Plaintiffs have not claimed, under applicable bankruptcy statutes, that these transfers are illegal preferences.

**22.** Section 550 provides the remedies available if a plaintiff prevails on its § 544 cause of action.

in possession is given the same avoiding powers that an unsecured creditor with an allowable claim might have under applicable law. In its Order on Defendant's Motion to Dismiss, the Court determined that the applicable law for Plaintiffs' fraudulent transfer claims is Delaware's version of the Uniform Fraudulent Transfer Act (hereinafter "UFTA"). *ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49, 64 (S.D.Tex.2007). Plaintiffs assert claims under Delaware's constructive fraudulent transfer and actual intent fraudulent transfer provisions.

### A. Standing

■ In order for Plaintiffs to prevail on the fraudulent transfer claims under Delaware law, Plaintiffs must prove the threshold requirements stated in Bankruptcy Code § 544: (1) there are actual, unsecured creditors that would have standing to avoid the challenged transfer; and (2) the challenged transfer involved an interest of the debtor in property, i.e. the debtor transferred property in which it had an interest. *See* 11 U.S.C. § 544.

### 1. ACTUAL, UNSECURED CREDITORS

Plaintiffs must first establish the existence of an actual creditor with a viable cause of action against the debtor that is not time barred or otherwise invalid. COLLIER ON BANKRUPTCY ¶ 544.09 (15th ed. rev.). In other words, each Plaintiff must prove: (1) at the time of the challenged transfer, there was in existence one or more creditors holding unsecured claims against the debtor; (2) the transfer could have been set aside by such creditor under Delaware law; and (3) at least one of the unsecured

creditors with the right to challenge the transaction, or its successor in interest, continued to have a claim against the plaintiff until the commencement of the case and is entitled to an allowed claim against the estate. Commercial Bankruptcy Litigation § 10:4; COLLIER ON BANKRUPTCY ¶ 544.09 (15th ed. rev.).

There is no evidence that SPHC had any debts or obligations at the time of the challenged transfer, much less any evidence of a creditor with an unsecured claim against SPHC. For this reason, SPHC, as debtor in possession, lacks standing to pursue any fraudulent transfer claims via § 544.

■ ASARCO presented evidence at trial and the Court so finds that it had a number of unsecured creditors at the time of the challenged transfer. (*See, e.g.,* PX 0212). The Court finds that, all other elements being satisfied, these creditors could have set the transfer of the SPCC stock aside pursuant to Delaware law. At least one of the unsecured creditors who could have challenged the transfer existed at the commencement of this case and is entitled to an allowable claim against the estate. (*See, e.g.,* PX 1374, PX 1397, PX 1377, PX 1378, PX 1375, PX 1386, PX 1388, PX 1392, PX 1372, PX 1389). ASARCO, therefore, has satisfied the first requirement to bring a claim under § 544.

### 2. INTEREST OF THE DEBTOR IN PROPERTY (ALTER EGO)

■ In order to have standing to pursue its fraudulent transfer claims, ASARCO must also prove it had an interest in the stock that was transferred.[23] If ASARCO cannot prove that it had an interest in the transferred property pursuant to

---

**23.** There is no question that SPHC had an interest in the property that was transferred, as it was the legal holder of the SPCC stock. As discussed above, however, SPHC does not have standing to pursue the fraudulent-transfer claims because it failed to establish the existence of any unsecured creditors who could have avoided the transfer.

Delaware state law, it does not have standing to bring either fraudulent transfer claim. To meet this requirement, ASARCO asserts a reverse-veil-piercing argument, urging this Court to disregard the separateness of ASARCO and SPHC so as to expand ASARCO's estate to include the asset (stock) that formerly belonged to SPHC. In other words, ASARCO asks the Court to find that SPHC was its alter ego so that it can claim an interest in the SPCC stock that was transferred from SPHC to AMC.

### a. Elements Of Alter Ego

██ Although Delaware courts have not yet recognized the availability of reverse-veil piercing, this Court, in a previous Order (Doc. No. 156), predicted that Delaware would adopt this doctrine if presented with a similar factual scenario. The Court also predicted that in determining whether to reverse pierce a corporate veil, Delaware would use similar equitable considerations as it would under a traditional veil-piercing claim.[24] Under Delaware law, in order to pierce the corporate veil on an alter-ego theory, traditionally a plaintiff must prove: (1) the parent and subsidiary operated as a single economic entity; and (2) an overall element of injustice or unfairness is present. *In re Foxmeyer Corp.*, 290 B.R. 229, 235 (Bankr.D.Del. 2003). In short, the question is whether the two corporations operated as a single economic entity such that it would be inequitable to uphold the legal distinction. *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F.Supp. 1076, 1085 (D.Del.1990) (applying Delaware law).

### b. Burden Of Proof

██ Before discussing whether reverse-veil piercing is warranted in this case, the Court must determine what burden of proof Delaware would apply to an alter-ego claim. Delaware courts have not directly addressed the burden of proof required to prevail on a veil-piercing claim. There is a presumption in Delaware, however, that the burden of proof in civil cases is a preponderance of the evidence. *Warwick v. Addicks*, 157 A. 205, 206–07 (Del.Super.Ct.1931). Courts applying Delaware law often discuss alter ego and veil piercing without mentioning any heightened evidentiary standard. *See, e.g., Harper*, 743 F.Supp. at 1085–86 (applying Delaware law). This seems to indicate that the traditional burden, preponderance of the evidence, applies to alter-ego claims under Delaware law.

Nevertheless, numerous Delaware courts have noted that convincing a Delaware court to pierce the corporate veil is a difficult task. *See Wallace ex. rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1183 (Del.Ch.1999); *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, Civ. A. No. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989). At least one Delaware court noted that it would not disregard the corporate form absent "compelling cause." *Midland Interiors, Inc. v. Burleigh*, No. Civ.A. 18544, 2006 WL 3783476, at *3 (Del. Ch. Dec. 19, 2006). Federal courts applying Delaware law have noted that Delaware requires a strong case to pierce the corporate veil and that there is a high burden on a party seeking to disregard the corporate form. *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205–07 (5th Cir.

---

**24.** Numerous other jurisdictions have used the same alter-ego considerations to justify reverse-veil piercing in similar situations. *See, e.g., Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir.2006) (applying Texas law); *In re Mass.*, 178 B.R. 626, 628–30 (M.D.Pa.1995) (applying Pennsylvania law); *In re Schuster*, 132 B.R. 604, 609 (Bankr.D.Minn.1991).

1995); *TransUnion LLC v. Credit Research, Inc.*, No. 00 C 3885, 2001 WL 648953, at *8 (N.D.Ill. June 4, 2001).

However, only one case applying Delaware law has actually held that the burden might be higher than a preponderance of the evidence. *See In re Foxmeyer Corp.*, 290 B.R. 229, 237 (Bankr.D.Del.2003). In that case, the bankruptcy court found it nonsensical that the preponderance of the evidence standard could apply where numerous Delaware courts had noted that the party seeking to pierce the veil had a heavy burden and that persuading a Delaware court to disregard the corporate form was a difficult task. *Id.* at 237. Based on this reasoning, *Foxmeyer* held "the appropriate standard of proof by which one must prove a case for a piercing of the corporate veil under Delaware law is, if not a clear and convincing evidence standard, at least somewhat greater than merely a preponderance of the evidence standard." *Id.* Notably, however, even this court did not find that the standard was clear and convincing evidence, and it failed to elaborate on what this potential intermediate standard would be because it found that the bankruptcy trustee did not even satisfy the minimal preponderance of the evidence standard. *Id.*

Despite the suggestion in *Foxmeyer*, this Court finds that Delaware would apply the preponderance of the evidence standard to Plaintiffs' reverse-veil-piercing claim. There is no authority stating that the standard under Delaware law is clear and convincing evidence, and there is little indication from the Delaware courts that preponderance of the evidence is not the appropriate standard. Moreover, the majority of jurisdictions apply a preponderance of the evidence standard to veil-piercing actions.[25] Furthermore, the prevailing default standard in Delaware civil cases dictates the use of the preponderance of the evidence. This Court acknowledges that it is not easy for a party to prevail on a veil-piercing claim, but this is due to the difficulty in demonstrating that the corporate form was used for a fraud or an injustice, not because there is a heightened burden of proof. Therefore, the Court will analyze the alter-ego claim under the preponderance of the evidence standard.

### c. Single Economic Unit

The first element of an alter-ego claim is that the two corporations operated as a single economic unit. To determine whether a plaintiff meets this first requirement, courts look to a number of factors "which reveal how the corporation operates and the particular [party's] relationship to that operation." *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F.Supp. 1076, 1085 (D.Del.1990) (applying Delaware law). These factors include: (1)

---

**25.** *See, e.g., Rimade Ltd. v. Hubbard Enters., Inc.*, 388 F.3d 138, 145 (5th Cir.2004) (Texas law); *In re Thomas*, No. 01–21302, 01–6321, 2003 WL 21981707, at *7–8 (Bankr.D.Idaho July 17, 2003) (Idaho law); *Sequoia Prop. and Equip. Ltd. P'ship. v. United States*, No. CV–F–97–5044, 2002 WL 31409620 (E.D.Cal.2002) (California law); *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 90 F.Supp.2d 15, 26 (D.D.C. 2000) (District of Columbia law); *George Hyman Constr. Co. v. Gateman*, 16 F.Supp.2d 129, 160 (D.Mass.1998) (Massachusetts law); *In re Lupo*, 353 B.R. 534, 542 (Bankr. N.D.Ohio 2006) (Ohio law); *Ize Nantan Bagowa, Ltd. v. Scalia*, 118 Ariz. 439, 577 P.2d 725, 729 (1978) (Arizona law); *Litchfield Asset Mgmt. v. Howell*, 70 Conn.App. 133, 799 A.2d 298, 310 (2002) (Connecticut law); *Seminole Boatyard, Inc. v. Christoph*, 715 So.2d 987, 989 (Fla.Dist.Ct.App.1998) (Florida law); *Escobedo v. BHM Health Assocs., Inc.*, 818 N.E.2d 930, 933 (Ind.2004) (Indiana law); *J.L. Brock Builders, Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110, 115 (1986) (Nebraska law); *Wyatt v. Bowers*, 103 Nev. 593, 747 P.2d 881, 883 (1987) (Nevada law); *Boles v. Nat'l Dev. Co.*, 175 S.W.3d 226, 249 (Tenn.Ct.App. 2005) (Tennessee law).

whether the corporation was adequately capitalized for the corporate undertaking; (2) whether the corporation was solvent; (3) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (4) whether the dominant shareholder siphoned corporate funds; and (5) whether, in general, the corporation simply functioned as a facade for the dominant shareholder. *Id.* No single factor can justify a decision to disregard the separateness of corporate entities. *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205 (5th Cir.1995) (applying Delaware law).

It is clear from the evidence that SPHC functioned as a single economic unit with ASARCO. SPHC was a shell corporation whose sole purpose was to hold the SPCC stock.[26] SPHC had no other assets besides the 54.18% ownership of SPCC, nor did SPHC have any debts. (Tellechea Depo. (2008) 469:23–25; Williams Depo. 40:10–13). SPHC did not engage in any business or activity other than the ownership of SPCC stock. (PX 0411; Tellechea Depo. (2008) 683:23–684:2). SPHC had no independent officers or directors. (Jt. Pretrial Order Admission No. 14; McAllister Depo. 262:318, 265:18–266:3; Tellechea Depo. (2008) 470:1–6).[27] It had no separate office space and no employees. (Keegan Depo. 42:4–8; Tellechea Depo. (2008) 683:11–13). Additionally, the record indicates that SPHC did not recognize corporate formalities. For example, SPHC's Vice President, Genaro Larrea, could not

recall conducting any activity as an officer or director of this company, and Mr. McAllister, General Counsel for ASARCO, also indicated that corporate formalities were not kept. (Genaro Larrea Depo. 71:19–72:1, 76:7–9; McAllister Depo. at 262:3–1, 265:18–266:3). Further, the Grupo conglomerate treated ASARCO as the owner of the SPCC stock before, during, and after the transaction in question. For example, the SPCC dividends were paid directly to ASARCO prior to the transfer. (PX 0853; PX 0164; PX 0861; PX 0171, PX 0501; PX 0549; PX 0861; Tucker 10–23–11:2). Also, the $41.75 million loan was made to ASARCO as an advance on AMC's purchase of the SPCC shares (which were technically held by SPHC). (PX0042). Similarly, after the transfer, payments on the $123 million note, which were part of the consideration for the SPCC stock, were paid by AMC directly to ASARCO, not to SPHC. (PX 0307; PX 0324; PX 0316). The testimony indicated that for most of SPHC's existence prior to the transfer, it did not even have a bank account. (PX 0164). Also, although not binding upon this court, the Consent Decree, signed by all parties involved, stated that "ASARCO and SPHC intended to sell *their* stock holdings and majority ownership interest" in SPCC to AMC, indicating that both entities had an interest in the stock. (PX 0214 (emphasis added)). This same document referred to the stock interest as belonging to "ASARCO/SPHC." (PX 0214).

---

**26.** Milbank Tweed Hadley McCloy LLP, the corporate law firm for Grupo and its family of companies, acknowledged in a memo on September 2, 2004, that SPHC was a shell holding company. (Plaintiff's Exhibit (hereinafter PX) 0312). Doug McAllister, General Counsel, acknowledged that SPHC existed for no reason other than to hold SPCC stock. (McAllister Depo. 262:3–18).

**27.** The directors of SPHC at the time of the transfer were: German Larrea, Genaro Larrea Daniel Tellechea, Oscar Gonzalez Rocha, Xavier Garcia de Quevedo Topete, Alfredo Casar Perez, Alberto de la Parra Zavalia. (PX 0277).

■ Although it is arguable that not all of the factors are met in this case, the overwhelming weight of the evidence indicates, and the Court finds, that SPHC and ASARCO operated as a single economic unit. Corporate formalities were not observed, and all of SPHC's officers and directors were also officers or directors of ASARCO, AMC, or Grupo. The dividends from SPHC's only asset went directly to ASARCO, its dominant shareholder, which had total control of the funds. In general, SPHC functioned as a facade for ASARCO. For these reasons, the Court finds that ASARCO has proven the first prong of its alter-ego claim, that ASARCO and SPHC were a single economic unit.[28]

### d. Fraud, Unfairness, Or Injustice

■ The second prong recognizes that, under Delaware law, the alter-ego theory requires that the corporate structure cause fraud or some similar injustice. *Outokumpu Eng'g Enters., Inc. v. Kvaerner*, 685 A.2d 724, 729 (Del.Super.1996). Fraud is frequently cited as a basis for piercing a corporate veil, but it is not the only justification. *PSG Poker, LLC v. DeRosa–Grund*, No. 06 Civ. 1104(DLC), 2008 WL 190055, at *10 (S.D.N.Y. Jan. 22, 2008). Delaware courts recognize that veil piercing is permitted "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among

members of the corporation require it, are involved." *Pauley Petroleum Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968); *see PSG Poker, LLC*, 2008 WL 190055, at *10;. In short, although fraud is not required, an inherent trait of Delaware's alter-ego theory is injustice or unfairness. This is because veil piercing is an equitable concept, and the Court must determine whether it would be inequitable to uphold a legal distinction between SPHC and ASARCO.

AMC argues that the fraud, injustice, or unfairness supporting the alter-ego claim "must be distinct from the allegations of the underlying cause of action." *Id.* AMC contends that this means ASARCO cannot rely on "any alleged wrongdoing involved in the underlying fraudulent transfer cause of action."[29]

■ Under Delaware law, a plaintiff must show fraud or inequity in the use of the corporate form, i.e., the corporate structure itself must be used to effect the fraud or injustice. *Outokumpu Eng'g Enters.*, 685 A.2d at 729. Most of the cases in which a court states that the requisite unfairness or injustice cannot be the underlying cause of action are cases in which the underlying claim is for breach of contract or some other allegation that is wholly unrelated to the manipulation of the corporate form. *See id.* at 729. In *Outokumpu*, the plaintiff failed to show that affiliated corporations were "involved in an

---

**28.** As noted above, there is some debate on the burden of proof applicable to an alter-ego claim under Delaware law. Although the Court believes that the appropriate standard is preponderance of the evidence, there is some indication that the burden might be clear and convincing evidence. Clear and convincing evidence is that evidence which "when weighed against the evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." *State v.*

*Williams*, 2001 WL 1403032, at *3 (Del.Super. Sept. 4, 2001) (citing *Edward H. and Dixie H. v. Div. of Child Protective Servs.*, 539 A.2d 1050, 1052 (Del.1985)). Even if the burden were clear and convincing evidence, the Court would still find that Plaintiff proved ASARCO and SPHC operated as a single economic unit.

**29.** *See* AMC's Summary Judgment on Standing Brief, at 8; AMC's Proposed FoF and CoL.

elaborate shell game or [were] otherwise abusing the corporate form to effect a fraud." *Id.* Presumably, had this been shown, the court might have pierced the corporate veil. Similarly, in *Mobil Oil Corp. v. Linear Films, Inc.*, the court noted that every breach of contract or tort is in some way an injustice. 718 F.Supp. 260, 268 (D.Del.1989). The court went on to state that for this reason, the underlying cause of action does not supply the necessary fraud or injustice, and to hold otherwise would sanction bootstrapping. *Id.* It concluded that the fraud, injustice, or unfairness must be in the *use of the corporate form.* *Id.* at 269. The *Mobil Oil* court did not find the requisite injustice to justify piercing the corporate veil. *Id.* at 270. That court noted that the defendant did not use the corporate form to perpetrate a fraud or work an injustice on the plaintiff, nor did it use the corporate form to operate a sophisticated shell game, shuttling assets between entities. *Id.* In these cases, if the plaintiffs had proven that the corporate form was somehow used to perpetrate a fraud, work an injustice, or operated as part of a sophisticated shell game, the result might have been different. The plaintiffs in these cases, however, simply attempted to use the underlying allegation to justify piercing the veil, rather than to demonstrate how the corporate form was misused or manipulated to accomplish the alleged wrongful conduct.

The Court agrees with AMC's assertion that ASARCO must prove more than simply that a fraudulent transfer occurred in order to prevail on its alter-ego claim. ASARCO must show that SPHC's corporate form was somehow used to perpetrate a fraud, work an injustice, or as part of a sophisticated shell game, culminating in a fraudulent transfer. If ASARCO shows that the corporate form was somehow used to accomplish the allegedly fraudulent transfer, then there is no legitimate reason to conclude that ASARCO cannot rely on the wrongdoing surrounding the challenged transaction to justify piercing the corporate veil. In short, a fraudulent transfer, standing alone, cannot be the fraud or injustice that justifies veil piercing; however, if ASARCO proves that the corporate form was manipulated or misused so as to accomplish a fraudulent transfer, it may be equitable to pierce the veil. To hold otherwise would be stating that a party seeking to recover for the fraud or injustice that resulted from a sophisticated shell game is unable to pierce the corporate veil. In effect, a contrary conclusion would essentially recognize that a conglomerate can utilize each subsidiary to work one instance of fraud or injustice with impunity. This has never been the law in Delaware.

### i. SPHC Was Not Created As A Sham To Perpetrate A Fraud

 ASARCO alleges that SPHC was formed as a sham to perpetrate a fraud. (Compl.¶ 4.) That allegation, if true, would certainly be grounds for piercing the corporate veil. This Court, however, finds that SPHC was created in 1999 for a valid business purpose. As part of the acquisition of ASARCO in 1999, Chase Bank Group sought to perfect a security interest against ASARCO's interest in SPCC. (Tellechea Depo. 571:7–22.) There were concerns, however, that under the SPCC Shareholder's Agreement and Restated Certificate of Incorporation, a direct pledge of the SPCC stock would trigger a conversion of the SPCC shares from "super-voting" stock to ordinary common stock, which would reduce the value of those shares. (Williams Depo. 163:3–15; Tellechea Depo. 471:3–25; 571:7–572:23; Fitzgerald, June 3, 2008, 40:1–24). For this reason, Grupo and ASARCO created

SPHC, transferred the SPCC stock to SPHC, and pledged the SPHC shares to Chase as a security for the Revolver, instead of pledging the SPCC shares directly. (Williams Depo. 163:3–15; Tellechea Depo. (2008) 571:7–572:23). This was an effective means by which Chase could have the benefit of a security interest in the SPCC shares without any risk of converting those shares into less valuable stock. (Williams Depo. 163:3–15; Fitzgerald, June 3, 2008, 40:1–24). Thus, the Court finds that SPHC was created for a legitimate reason and not to effect a fraud, injustice, or unfairness.

*ii. SPHC's Corporate Form Was Used To Effect Fraud, Injustice Or Inequity*

The fact that SPHC was created for a legitimate purpose, however, does not necessarily negate ASARCO's argument that the corporate form was later misused or manipulated to accomplish the alleged fraudulent transfer.[30] For the purpose of the analysis in this section, the Court assumes, without deciding, that the challenged transfer was in fact fraudulent. This fact, standing alone, however, would be insufficient to justify piercing the corporate veil. ASARCO must also show that the corporate form was used to commit this fraud or injustice or that recognizing the separateness of the two entities would perpetrate a fraud or an injustice such that equity would require the Court to disregard the corporate veil.

Again assuming arguendo that the transfer was indeed fraudulent, the only

reason that AMC would escape liability for this wrong would be because SPHC, the legal owner of the stock at the time of the transaction, did not have any creditors with standing to avoid the transfer. Yet, ASARCO's creditors would be deprived of ASARCO's most valuable asset and its best means of paying its outstanding debts. If the transfer was fraudulent, AMC unjustly enriched itself at the expense of ASARCO and its creditors. It would be inequitable to allow Grupo to saddle ASARCO with the LBO debt and orchestrate the creation of SPHC and the transfer of SPCC stock first to SPHC (and then AMC/Grupo to wrongly dictate the subsequent stock transfer to AMC), and then also allow AMC to hide behind the fact that SPHC had no unsecured creditors in order to dodge liability for the transfer. If ASARCO had held the stock at the time of the transfer, then there would be no question that ASARCO, as debtor in possession, would have standing to challenge the transfer. Also, if SPHC had any unsecured creditors, then SPHC as debtor in possession could seek to set aside this transfer. Since SPHC was created solely as a holding company for the SPCC stock, neither SPHC nor ASARCO has standing to challenge the transaction. AMC would be shielded from liability for the fraudulent transfer, unless ASARCO can prevail on its veil-piercing claim.

The Court finds that equity does not permit AMC to now claim that ASARCO and SPHC are separate entities solely for the purposes of allowing AMC to take advantage of the corporate form to escape

**30.** Plaintiff's Second Amended Complaint merely alleges that SPHC was created as a sham to perpetrate a fraud, not that the corporate form was used to effect a fraud, injustice, or unfairness. Nevertheless, the Court finds this latter issue was tried by consent. In the joint pretrial order (Doc. 303, Ex. A–1), ASARCO lists as a contested issue of fact:

"whether SPHC is the alter ego of ASARCO because there was a misuse of the corporate form or there was an overall element of injustice or unfairness." The testimony at trial regarding alter ego was not solely directed to SPHC's creation but also to the use of its corporate form to accomplish and avoid liability for the alleged fraudulent transfer.

potential liability. Since the creation of SPHC and the transfer of the SPCC stock thereto, AMC/Grupo have treated ASARCO as the owner of the SPCC stock. For example, in November 2001, AMC loaned ASARCO (not SPHC) $41.75 million as an advance payment on the SPCC stock. (PX 0042). This document contemplated entering into an agreement where "ASARCO, directly or indirectly, would sell to AMC and AMC would purchase from ASARCO, directly or indirectly, the total aggregate amount of its direct and/or indirect equity participation in Southern Peru Copper Corporation . . . ." (PX 0042). In 2002, Grupo issued a press releases regarding the contemplated transfer of the SPCC shares. It represented that Grupo was considering transferring the stock from one subsidiary "ASARCO Inc., to another, the Americas Mining Corp. holding company." (PX 0133). The press release also quoted Grupo as stating that its plans "do not contemplate any change of control in SPCC nor any modification in its ultimate beneficial ownership of SPCC." (PX 0133). Similarly, in the press release issued January 30, 2003, AMC/Grupo represented to the public that ASARCO held the SPCC shares. (PX 0200). In fact, the press release did not even mention SPHC, but rather discussed the benefits to ASARCO that would result from the transfer of "ASARCO's 54.2% interest in SPCC." (PX 0200). At all relevant times, AMC/Grupo not only treated ASARCO and SPHC as a single economic unit but expressly acknowledged ASARCO's interest in SPCC, going so far as to represent to the public that ASARCO owned the SPCC shares. The record is full of references, both within the Grupo corporate family, as well as in

representations made to creditors and the public, that the stock in question was ASARCO's stock. To allow AMC/Grupo to ignore four years (1999–2003) of conduct and now claim the corporate forms protects it from attack would be a great inequity that Delaware courts, sitting in equity, would not allow.

It was not until the instigation of this litigation that AMC/Grupo treated ASARCO and SPHC as separate corporations, and AMC does so now solely as a tactic to shield itself from liability for the alleged fraudulent transfer. After AMC disregarded the corporate separateness of these two entities and treated ASARCO as the owner of the SPCC shares for years, it would be inequitable and unjust to now permit AMC to hide behind the corporate form that it ignored at the time of the challenged transaction.

Although SPHC was not created to perpetrate a fraud, AMC subsequently used its corporate form as a tool to perpetrate an unjust and inequitable transfer and now asks the Court to recognize SPHC's corporate separateness (even though AMC never did so before this litigation) so that it may be shielded from potential liability. In such a situation, equity demands that the Court disregard the corporate separateness of ASARCO and SPHC.[31]

*iii.* *ASARCO Is Not Barred From Claiming Alter Ego Because ASARCO "Created" SPHC*

█ AMC argues that ASARCO should be precluded from asking this Court to disregard the corporate separateness of ASARCO and SPHC, since ASAR-

---

**31.** Although Plaintiff met the lesser standard of preponderance of the evidence, based on the evidence before the Court on the second prong of the alter-ego claim, the Court finds that if the burden is heightened to clear and

convincing evidence, ASARCO would fail to meet that standard and would not have standing to pursue the fraudulent-transfer claims. This would not affect either Plaintiff's ability to pursue the other causes of action.

CO created SPHC. Various jurisdictions have noted that a request to pierce the corporate veil made by the one who voluntarily created the corporate structure should be viewed with greater skepticism, especially if a third party will be disadvantaged thereby. *Schreiber Foods Inc. v. Beatrice Cheese, Inc.,* 305 F.Supp.2d 939, 953 (E.D.Wis.2004); *Sharkey v. Ultramar Energy Ltd.,* 867 F.Supp. 258, 259 (S.D.N.Y.1994) *rev'd on other grounds,* 70 F.3d 226 (2d Cir.1995); 1 Fletcher Cyclopedia § 41.70. Part of the rationale behind this principle is that the alter-ego doctrine is an equitable concept that should be used as a sword, not a shield. *See United States v. Aiello,* D.C. No. CR–94–00142–1–DFL, 1999 WL 891333, at *2 (9th Cir. Oct. 15, 1999); *Lumpkin v. Envirodyne Indus., Inc.,* 933 F.2d 449, 460 (7th Cir.1991).

The present situation, however, is distinguishable from the authorities AMC cited. ASARCO pled, and the Court finds, that the creation of SPHC was not a wholly voluntary act of ASARCO, but rather Grupo dictated the creation of SPHC. But for Grupo's desire to pledge the SPCC shares to Chase in order to help finance the LBO of ASARCO, SPHC would never have existed, and ASARCO's creditors would unquestionably have the ability to challenge the transfer to AMC. This is not a situation in which the parent corporation seeks to prevail on the alter-ego claim in order to avoid liability.

Also, AMC did not allege, and the Court could not identify, any third party who would be harmed if the Court disregards the corporate separateness of ASARCO and SPHC. Piercing the corporate veil in this case will not result in harm to any innocent shareholders or corporate creditors. ASARCO was the sole shareholder of SPHC, and Grupo, who dictated the creation of SPHC and who received the benefit of the challenged transfer, was, at the time, ASARCO's sole shareholder. The only entities "harmed" by disregarding the corporate form would be the company that created it, Grupo, and Grupo's wholly owned subsidiary, Defendant AMC, which received the stock in question. No corporate creditors will be harmed by disregarding the corporate separateness. In fact, ASARCO's creditors might benefit from such a finding. SPHC had no creditors that could be injured.

Unlike the cases cited by AMC, in the case at hand, the parent, as debtor in possession, is using the doctrine as a sword, requesting the Court to pierce the corporate veil to allow it to pursue a claim for fraudulent transfer on behalf of its creditors against a defendant that is the wholly owned subsidiary of the entity who controlled the shell subsidiary. The Court finds it would be inequitable to recognize the corporate separateness of ASARCO and SPHC. It further finds inapplicable the concept behind the argument that AS-ARCO, as SPHC's creator, should be barred from making such assertion. For the above reasons, the Court finds that ASARCO proved its alter-ego claim by a preponderance of the evidence, and equity dictates reverse-veil piercing in this case.

### e. Defenses To The Alter–Ego Claim

▮ Before the Court can discuss the substance of the various defenses that Defendant claims bar Plaintiff's alter-ego claim, the Court must first determine whether the alter-ego claim is subject to the same defenses that the debtor would be subject to if this claim were brought outside of bankruptcy or, alternatively, whether ASARCO stands in the shoes of its unsecured creditors for purposes of the alter-ego claim such that it is only subject to defenses that would be good against the unsecured creditors in whose shoes it stands.

In order to fully answer this question, the Court finds it helpful to understand certain provisions from the Bankruptcy Code regarding the capacity of trustees and debtors in possession to sue and be sued. Section 323(b) of the Bankruptcy Code gives trustees the right to prosecute any action belonging to the bankruptcy estate.[32] Actions commenced on behalf of the estate by a trustee or debtor in possession "fall into two broad categories: (1) actions brought by the trustee as successor to the debtor's interests included as property of the estate under 11 U.S.C. § 541, and (2) actions brought under one of the trustee's avoidance powers." *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir.1996) (citing 2 COLLIER ON BANKRUPTCY 323.02[4]) (now COLLIER ON BANKRUPTCY ¶ 323.03 (15th ed. rev.)).

▮▮▮▮ The filing of a petition in bankruptcy creates the bankruptcy estate pursuant to 11 U.S.C. § 541(a). The estate consists of all legal and equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C. § 541(a)(1). Causes of action that, according to applicable state law, were available to the debtor at the time that the bankruptcy case commenced become property of the estate pursuant to § 541. *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 245 (5th Cir.1988).[33] These actions fall within the first category of cases a trustee may bring on behalf of the estate. The trustee steps into the shoes of

the debtor at the commencement of the case and may assert those claims that are part of the debtor's estate. For suits brought in this capacity, the trustee is subject to all of the same defenses that would have been available against the debtor. COLLIER, ¶ 323.03.

Under certain circumstances, trustees have power to bring actions pursuant to their avoiding power.[34] These are the second category of cases. When the trustee exercises its avoiding powers, i.e., sues as an assignee of the creditors, it accedes to a superior status and possesses extraordinary rights. *In re Ostrom–Martin, Inc.*, 188 B.R. 245, 251 (Bankr.C.D.Ill.1995). The trustee stands in the shoes of the creditor and is subject only to the defenses that would be available against the creditor, not the debtor. COLLIER, ¶ 323.03. For example, the doctrine of *in pari delicto*, which applies to actions brought under the first category (where the trustee stands in the debtor's shoes), does not apply in this situation. *Id.*

▮▮▮▮ Section 544 of the Bankruptcy Code is an example of one of the trustee's avoiding powers. *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir.1996) ("Because § 544 gives a trustee certain avoidance powers, actions brought under the section fall within the second category of types of trustee actions."); *see also In re Porter McLeod, Inc.*, 231 B.R. 786, 792 (D.Colo. 1999).[35] According to § 544(b), the section

---

**32.** Debtors in possession have the same rights to sue and be sued as a trustee does. *See* 11 U.S.C. § 1107. Plaintiffs, ASARCO and SPHC, are debtors in possession; however, the term used in the applicable provisions of the Bankruptcy Code is "trustee." Because there is no distinction between the two terms for purposes of the present discussion, the Court will use the terms interchangeably.

**33.** There is no question that the alter-ego claim, to the extent it is available in this

context under Delaware law, is part of the bankruptcy estate. Neither side disputes this.

**34.** These are often causes of action that are included as property of the debtor's estate under § 541, but because of the nature of the cause of action, they qualify as claims that can be brought under the trustee's avoiding power.

**35.** A debtor in possession in Chapter 11 can exercises the trustee's "strong arm" powers under § 544 pursuant to 11 U.S.C. § 1107.

under which ASARCO brings its fraudulent transfer claims in this case, a trustee or debtor in possession "may avoid any transfer of interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim...." 11 U.S.C. § 544(b)(1). This gives trustees and debtors in possession the ability to avoid pre-petition transfers that are avoidable by an actual, existing unsecured creditor under non-bankruptcy law. COLLIER, ¶ 544.02. Section 544(b) does not indicate the requirements of avoiding a transfer; rather the trustee's powers are predicated on the non-bankruptcy law that is applicable to the action (in this case Delaware's enactment of the UFTA). *Sender*, 84 F.3d at 1304. The trustee's rights are derivative of an actual unsecured creditor's rights, meaning that the trustee steps into the shoes of the creditor. The trustee is subject to the same defenses as the creditor would be (but not those defenses available only against the debtor). *Smith v. American Founders Fin., Corp.*, 365 B.R. 647, 659 (S.D.Tex.2007) (J. Rosenthal). Thus, if the creditor is estopped or barred from recovery, so is the trustee. *Id.*

As noted above, Plaintiff seeks to avoid the stock transfer based on its state-law fraudulent transfer claims, pursuant to § 544(b). (Compl. at ¶ 82, 94). Therefore, with regard to the fraudulent transfer claims, the Plaintiff, as debtor in possession, stands in the shoes of its unsecured creditors, and its claims are subject to defenses that would be available against the creditors, but not those that would prevail against the debtor. This is undisputed. The issue this Court must answer,

however, is whether the alter-ego claim, under which ASARCO must prevail to pursue its fraudulent transfer claims, is brought pursuant to the debtor in possession's avoidance powers under § 544(b) or, alternatively, is a claim brought on behalf of the debtor.

Defendant asserts that the alter-ego claim falls into the category of actions "brought by the trustee as successor to the debtor's interests included as property under § 541," and thus, for purposes of this claim, the debtor in possession stands in the shoes of the *debtor* not the *creditor*. If this is true, Plaintiff's alter-ego claim would then be subject to any defenses that would have been available against the pre-petition debtor. In other words, Defendant essentially contends that even though the fraudulent-transfer claim itself is only subject to defenses that would be available against the unsecured creditors, the alter-ego claim, which ASARCO must prove to succeed on its fraudulent-transfer claim, is not an avoidance action, and, therefore, is subject to defenses that would be available against the debtor.[36]

In support of this argument, AMC cites a district court case applying Delaware law, holding that the alter-ego claim is an asset of the estate under § 541, meaning it is an action the debtor in possession can pursue in the shoes of the debtor. AMC's Proposed Findings of Facts and Conclusions of Law at ¶ 29 (citing *MC Asset Recovery, LLC v. Southern Co.*, Civil Action No. 1:06–cv–0417–BBM, 2006 WL 5112612, at *9 (N.D.Ga. Dec. 11, 2006)). However, the fact that the alter-ego claim qualifies as property of the estate under § 541, standing alone, does not mandate

---

*Gandy v. Gandy*, 299 F.3d 489, 497 (5th Cir. 2002). For this reason, "trustee" and "debtor in possession" will continue to be used interchangeably.

**36.** The cases AMC cites in its brief are only applicable if this alter-ego claim falls within the first category of cases under § 323, and is not an action brought pursuant to ASARCO's avoidance powers.

that it falls solely within the first category.[37] Often times an action can fall into both categories, and a trustee may choose under which provision to proceed. Also, the alter-ego claim in that case was not pursued as a threshold matter for a fraudulent-transfer claim.

Another argument in support of AMC's position is that the first category (claims brought as successor to the debtor's interests) seems to be a default rule. Out of all the claims that belong to the estate pursuant to § 541, some of these claims may also qualify as "avoidance actions." For those special claims that qualify, the trustee may choose to bring them under its avoidance powers so that the trustee can stand in the creditors' shoes, rather than the debtor's, for purposes of that claim. As noted above, § 544, the applicable avoidance-power provision in this case, requires, as a threshold matter, that the debtor have an interest in property. *See* 11 U.S.C. § 544. Without this threshold showing, § 544 does not apply, and so the claim never qualifies as one that can be brought pursuant to the debtor in possession's avoidance powers. ASARCO must prevail on its reverse-veil piercing alter-ego claim in order to establish this threshold issue—that ASARCO, as the debtor, had an interest in the property that is the subject of the allegedly fraudulent transfer it seeks to avoid.

On the other hand, one can view the alter-ego claim as being so intertwined with the fraudulent-transfer claim that it is a claim brought pursuant to its avoidance powers. If ASARCO's unsecured creditors brought the fraudulent-transfer claims outside of bankruptcy they would have to prevail on the alter-ego claim in order to

have standing to challenge the transfer from SPHC to AMC. Without piercing the corporate veil, neither ASARCO nor its creditors could show the interest in property needed to challenge the transfer. Similarly, if Plaintiff had not pursued the fraudulent-transfer claims, there would be no need to assert the alter-ego claim. Under this reasoning, the alter-ego claim could be viewed merely as a sub-issue to the greater fraudulent transfer claim brought pursuant to § 544(b), making the alter-ego claim part of the claim brought pursuant to the debtor in possession's avoiding powers.

The Court finds that the better-reasoned argument is that the alter-ego claim is interrelated with the fraudulent-transfer claims to the point that the alter-ego claim should be viewed as brought under the debtor in possession's avoiding powers. This is not an independent action that the debtor would otherwise bring; rather, the debtor in possession seeks to pierce the corporate veil only so that it may pursue fraudulent-conveyance actions for which it clearly stands in the unsecured creditors' shoes. If ASARCO's creditors were to challenge the stock transfer from SPHC to AMC outside of bankruptcy, they would have to prevail on this alter-ego claim to do so. Therefore, the Court finds ASARCO's rights regarding the alter-ego claim are derivative of the rights of Plaintiffs actual unsecured creditors. Thus, ASARCO, as debtor in possession, is subject only to defenses that would be available against the unsecured creditors if the claim were brought outside of this bankruptcy action.

AMC argues, however, that the alter-ego claim is barred even if ASARCO stands in the creditors' shoes because AS-

---

**37.** Recall that actions commenced on behalf of the estate fall into one of two broad categories: "(1) actions brought by the trustee as successor to the debtor's interests included as

property under 11 U.S.C. § 541 and (2) actions brought under one of the trustee's avoidance powers." *Sender v. Simon,* 84 F.3d 1299, 1304 (10th Cir.1996).

ARCO's creditors failed to pursue an available legal remedy. Specifically, Defendant states that the alleged harm to the creditors occurred in 1999 when the SPCC shares were transferred from ASARCO to SPHC, and ASARCO's creditors could have brought a fraudulent-transfer claim at that time.

Although it is well settled that for a court to award equitable relief, there must be no adequate legal remedy available, Defendant's argument would not necessarily operate as a complete bar to the equitable remedy of veil piercing. If the creditors had asserted a fraudulent-transfer claim based on the 1999 transfer within the statute of limitations period, the creditors would not have been required to prove up this alter-ego claim to do so. This is because the transfer at issue would have been between ASARCO, the debtor, and SPHC. The Court also noted that the transfer of the SPCC stock from ASARCO to SPHC was a separate transaction than the one challenged in this lawsuit. The unsecured creditors, in whose shoes Plaintiff stands, may not have existed at the time of that transfer.[38]

Assuming arguendo that the running of the statute of limitations on the fraudulent-transfer claim for the 1999 transfer does not mean that an adequate legal remedy was unavailable, AMC's argument may not be a complete bar to the equitable remedy of veil piercing. This "adequate remedy at law" defense only bars the alter-ego claim to the extent that ASARCO's veil-piercing argument relies on the creation of SPHC and the initial transfer of the SPCC stock to prove the requisite fraud, injustice, or unfairness. As noted above, however, the Court does not find the requisite fraud, injustice, or unfairness in the *creation* of SPHC or the transfer of the SPCC stock thereto, but rather in the subsequent use of SPHC as a shield to effect the transfer of the SPCC stock. Therefore, AMC's "adequate remedy at law" argument does not bar Plaintiffs' veil-piercing claim based on the subsequent use of SPHC to effect a fraud, injustice or unfairness.

AMC's remaining defenses would not be available against the unsecured creditors. AMC, therefore, cannot prevail on these defenses because Plaintiff brings the alter-ego claim pursuant to its avoiding power and stands in its unsecured creditors' shoes. Even though the Court finds that the alter-ego claim is part of the fraudulent-transfer claims so as to fall under the debtor in possession's avoiding power, the Court acknowledges the strong argument to the contrary and will, therefore, briefly discuss AMC's alleged defenses that could be brought against the Plaintiff if it stands only in the debtor's shoes for purposes of the alter-ego claim. The potential defenses raised by AMC are: (1) judicial estoppel; (2) acquiescence; (3) unclean hands; and (4) *in pari delicto.*

### i. Judicial Estoppel

 Before discussing the judicial estoppel argument, the Court must first determine whether state or federal law should apply to this defense. The Fifth Circuit has recently noted that many courts faced with judicial estoppel questions conclude that "federal law should apply because a federal court should have the ability 'to protect itself from manipulation'

---

38. The Court also observes that from the time of SPHC's creation and the transfer of the SPCC stock to that entity until the challenged transfer in 2003, AMC/Grupo treated ASARCO as the owner of the SPCC stock It would have been reasonable for ASARCO's creditors to feel like the SPCC stock was still within their reach, even after it was transferred to SPHC.

and this ability should not vary in a diversity action because it is a matter of federal procedure and not a substantive concern." *Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 395 (5th Cir.2003) (internal citations omitted). The Fifth Circuit has generally considered judicial estoppel a matter of federal procedure and has applied federal law. *Id.* (citing *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 600 (5th Cir.1996)). In the present case, both the prior proceeding and the current litigation were and are in federal courts; thus,"it is the federal court that is subject to manipulation and in need of protection," further justifying application of federal law to the judicial estoppel issue. *See id.* at 395–96. For these reasons, the Court concludes that federal law applies to the judicial estoppel defense.

■■■■■ The policies underlying the doctrine of judicial estoppel include "preventing internal inconsistency, precluding litigants from 'playing fast and loose' with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment." *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir.1993). The purpose of the doctrine is to protect the integrity of the courts; it is not designed to protect litigants. *New Hampshire v. Maine*, 532 U.S. 742, 749–50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001); *In re Food Fast Holdings, Ltd.*, Civil Action No. 6:04cv562, 2006 WL 2259842, at *4, 2006 U.S. Dist. LEXIS 54761, at *10 (E.D.Tex., Aug. 7, 2006). It is not intended to eliminate all inconsistencies. *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). Judicial estoppel is an extraordinary remedy that should only be used when a party's inconsistent behavior will result in a miscarriage of justice. *Id.* at 365.

■■ The Supreme Court has noted that the circumstances under which judicial estoppel may be invoked are not reducible to any general formulation of principle. *New Hampshire*, 532 U.S. at 750, 121 S.Ct. 1808. Nevertheless, the high court has discussed several non-exclusive factors that can help guide a court in determining whether the doctrine applies. *Id.* Factors a court may consider include whether: (1) the position of the party against which estoppel is sought is "clearly inconsistent" with its prior legal position; (2) the party against which estoppel is sought succeeded in persuading a court to accept its prior position; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750–51, 121 S.Ct. 1808. The Supreme Court also noted that it may be appropriate to resist the application of judicial estoppel when the prior statement is the result of inadvertence or mistake. *Id.* at 753, 121 S.Ct. 1808. The Supreme Court emphasized that judicial estoppel is an equitable concept, and additional considerations may aid a court's decision in different factual contexts. *Id.* at 751, 121 S.Ct. 1808.

■■ AMC argues that ASARCO is estopped from bringing the alter-ego claim because of Plaintiff's pre-petition position before the Arizona District Court. The Government's Complaint in that case alleged, inter alia, that: "ASARCO dominates and controls SPHC through its ownership of all of SPHC's stock and the identity or overlap of ASARCO's and SPHC's officers and directors;" "SPHC conducts no other business than that of owning the Stock, has no employees, has no creditors" and "has no assets other than the Stock;" "as a result of the Banks' secured lien encumbering the Stock, SPHC is grossly undercapitalized;"

"SPHC has failed to respect corporate formalities;" and "SPHC is a mere instrumentality and alter ego of ASARCO and its corporate identity must be disregarded to prevent fraud or injustice to the United States and the other creditors of ASARCO." (PX 0106). In their answer to this complaint, ASARCO and SPHC responded to each of these allegations by stating, "[t]hey deny the averments of [each paragraph]." (DX 0289). This document was signed by an attorney from Sidley Austin, the firm that represented both ASARCO and AMC in connection with the Consent Decree and the SPCC stock transfer. (Lazalde Depo., 414:11–415:20). Based on ASARCO's and SPHC's denial of alter ego in these documents, AMC contends that ASARCO is judicially estopped from claiming alter ego in the present litigation.

The first factor the Court should consider is whether the position of the party against which estoppel is sought is clearly inconsistent with its prior legal position. *New Hampshire*, 532 U.S. at 750, 121 S.Ct. 1808. ASARCO's and SPHC's denial that SPHC was ASARCO's alter ego is a clearly inconsistent position from the opposite position ASARCO currently holds. This factor weighs against ASARCO.

The next factor is whether the party against whom estoppel is sought succeeded in persuading a court to accept its prior position. *New Hampshire*, 532 U.S. at 750, 121 S.Ct. 1808. AMC argues that this factor is met because, by disputing the alter-ego claim, ASARCO convinced the Arizona Court that the underlying litigation would be prolonged and complicated, thus persuading the court to enter the Consent Decree to avoid prolonged litigation and to implement a fair and reasonable settlement. Although AMC's argument is not baseless, an equal inference could be drawn that the Arizona Court believed the two were alter egos, and,

thus, was not persuaded by ASARCO and SPHC's denial of such status. In fact, the Consent Decree repeatedly refers to *their* stock holdings and majority ownership interest in SPCC, meaning both ASARCO's and SPHC's interest, and the decree often referred to "ASARCO/SPHC's ownership in SPCC." (PX 0004). Additionally, the Consent Decree sets forth the terms and conditions to be included in the Agreement of Sale, which specifies payment by AMC to "ASARCO/SPHC" and that "ASARCO/SPHC" pay indebtedness under the Revolver. (PX 0004). The Consent Decree also provides that any dividends paid by SPCC for the fourth quarter of 2002 be paid to ASARCO, regardless of which party is the shareholder of record the date the right to the dividend vests. (PX 0004). These statements in the Consent Decree indicate that the District Court did not accept ASARCO and SPHC's denial that SPHC was ASARCO's alter ego. Based on the record before this Court, the Court finds that in entering the Consent Decree, the Arizona Court did not make any decision as to whether the two entities were alter egos; therefore, ASARCO did not "succeed in persuading a court to accept its prior position.". This factor weighs in ASARCO's favor.

The third factor considers "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 751, 121 S.Ct. 1808. This factor also weighs in favor of ASARCO. Although the statements made in ASARCO and SPHC's answer in the DOJ case are inconsistent with ASARCO's alter-ego claim, this is not a case in which a plaintiff is changing its position so as to derive an unfair advantage or impose an unfair detriment on the defendant. ASARCO will not derive an unfair advantage by "changing its position" because its prior

position was dictated, at least in part, by the defendant in this case. For the same reason, it would not impose an unfair detriment on AMC for ASARCO to assert a position inconsistent with its prior statements that were made pursuant to AMC/Grupo's direction.

Throughout the course of this trial, ASARCO has consistently alleged that it was under the control of AMC and Grupo with respect to the pertinent events of this case. There has been a plethora of testimony in support of these contentions. For example, Mr. McAllister, ASARCO's in-house counsel, testified that ASARCO could not do anything without Grupo's, i.e. German Larrea's, approval. (McAllister Depo. 168:9–168:25). Also, Genaro Larrea, ASARCO's CEO at the time, indicated that Grupo controlled ASARCO's board. (Genaro Larrea Depo. 164:3–165:11). There is also evidence of Grupo's and AMC's control over ASARCO and SPHC's answer in the DOJ case. This answer was signed by a lawyer from Sidley Austin. There was conflicting testimony throughout the course of the trial regarding which entities Sidley Austin represented.[39] Even ASARCO's in-house counsel believed Sidley Austin's loyalty was to Grupo and AMC, not ASARCO and SPHC. (McAllister Depo. 401:13–403:3). Because AMC/Grupo controlled ASARCO and SPHC with regard to the Arizona case, and the SPCC transfer as a whole, defendant AMC cannot now

claim that Plaintiff would derive an unfair advantage or impose an unfair burden on AMC by now asserting a position different than the one AMC forced ASARCO to take in the DOJ case.

■ Another factor courts often consider is whether the prior statement is the result of inadvertence or mistake. This consideration is not directly applicable here. ASARCO does not contend that its prior denial of alter ego was a result of inadvertence or mistake but instead was the result of being controlled by its parent, the defendant in this case.[40]

Judicial estoppel is an equitable remedy that courts should only use when a party's inconsistent behavior will result in a miscarriage of justice. Considering the facts of this case, the Court does not find that justice would be served by declaring that ASARCO cannot pursue its case against AMC because of an inconsistent statement made in a prior proceeding that ASARCO was forced to make, in part, by its parent AMC. The Court finds that ASARCO's alter-ego claim would not be barred by judicial estoppel even if the claim were not brought under Plaintiff's avoiding powers.

### ii. Acquiescence

■ AMC next argues that ASARCO's alter-ego claim is barred by the doctrine of acquiescence. Specifically, AMC alleges that ASARCO's request to reverse pierce

---

**39.** Jaime Callazo believed Sidley Austin only represented Grupo (Collazo Depo. 220:18–226:20; PX 077); Jorge Lazalde Psihas stated Sidley Austin represented ASARCO and AMC (Lazalde Depo. 414:4–415:20); McAllister asserted (McAllister Depo. 401:13–403:3); Fitzgerald believed Sidley Austin represented AMC and Grupo and was not looking (McAllister Depo 401.13–403:3); Fitzgerald believed Sidley Austin represented AMCL Grupo, and was not looking out for ASARCO's creditors (Fitzgerald, June 3, 2008, 58:7–58:20; 115:10–14).

**40.** Although ASARCO does not rely on this evidence to prove inadvertence or mistake, Mr. McAllister testified that the reason he allowed the answer to be filed with these denials was because he may not have looked at every complaint and every response and that the denials might have been made because he "didn't pay particular attention to this document before it was filed." (McAllister Depo. 261:17–263:05).

SPHC's corporate veil is an attempt to undo the corporate form that ASARCO created. AMC contends that Delaware law prohibits a shareholder from seeking to unwind his own acts and, for this reason, ASARCO is precluded from bringing its alter-ego claim.

■ According to the Supreme Court of Delaware, "[a]cquiescence is an equitable defense which is assertable against a party who remains inactive for a considerable period of time, or who recognizes the validity of the complained of act or who acts in a manner inconsistent with the subsequent repudiation and thus leads the other party to believe the act has been approved." *Julin v. Julin*, 787 A.2d 82, 84 (Del.2001). A determination of whether this defense applies is fact intensive, often requiring an evaluation of the knowledge, intention, and motivation of the allegedly acquiescing party.[41] *Id.*

■ The doctrine has traditionally included a showing that the plaintiff, by words or deed, has acknowledged the legitimacy of the conduct it now wishes to challenge. *Clements v. Rogers*, 790 A.2d 1222, 1238 n. 46 (Del.Ch.2001); *In re PNB Holding Co. Shareholders Lit.*, No. Civ. A. 28–N, 2006 WL 2403999, at *21 (Del.Ch. Aug. 18, 2006). A Delaware chancery court has found that this test was met when "an uncoerced stockholder, acting on an informed basis, casts an affirmative vote in favor of a transaction." *In re PNB*, 2006 WL 2403999, at *21. In other words, the stockholder cannot cast an affirmative vote at the election and then try to go back on that vote in court, if the vote was informed and uncoerced. *Id.*

Some Delaware courts, in cases outside of the merger context, have included, as an element of an acquiescence defense, a showing that the party to be estopped benefitted from the transaction. A Delaware chancery court stated that "one who has full knowledge of and accepts the benefits of a transaction may be denied equitable relief if he or she thereafter attacks the same transaction." *Con't Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1240 (Del.Ch.2000). In *Continental Ins.*, a limited partner sued the general partner and its sole shareholder. *Id.* at 1223. One of the general partner's defenses was that it could not be liable for self-dealing because the limited partner (the plaintiff) acquiesced. *Id.* at 1240–41. The court found the defense inapplicable because the plaintiff "had not at that time accepted any benefit from any self-dealing transactions." *Id.* at 1241.

AMC contends that ASARCO's alter-ego claim is barred by acquiescence because ASARCO approved the creation of SPHC and the transfer of the SPCC stock to SPHC. The Court has already determined, however, that the creation of SPHC and the transfer of the SPCC stock to SPHC was done for a legitimate business purpose and did not effect a fraud, injustice, or unfairness. ASARCO's alter-ego claim does not rest only on the purpose of SPHC's creation, but also, on how the corporate form was subsequently used to transfer the SPCC stock from SPHC to AMC and the injustice that would result if AMC were now allowed to use the corporate form as a shield. Assuming arguendo that ASARCO did acquiesce to the cre-

---

41. This equitable defense often is raised against shareholders who bring suit in the context of mergers and acquisitions. *See, e.g., In re PNB Holding Co. Shareholders Lit.*, No. Civ. A. 28–N, 2006 WL 2403999 at *1 (Del.Ch. Aug. 18, 2006); *Clements v. Rogers*, 790 A.2d 1222, 1237 (Del.Ch.2001); *Siegman v. Columbia Pictures Entm't, Inc.*, Civ. A. No. 11152, 1993 WL 10969, at *1 (Del.Ch. Jan. 15, 1993). Nevertheless, the doctrine does have application outside the merger context. *See Julin v. Julin*, 787 A.2d 82 *passim* (Del.2001).

ation of SPHC and the transfer of the SPCC shares thereto, this would not prevent ASARCO from prevailing on its alter-ego claim, which is based on the use of SPHC subsequent to its creation.

### iii. Unclean Hands

 AMC next contends that ASARCO is barred from bringing its veil-piercing claim because of the doctrine of unclean hands. AMC contends that to prove its reverse-veil-piercing claim, ASARCO must demonstrate its own inequitable conduct in the creation or use of the corporate form of SPHC.

 It is a well-known maxim that one who comes into equity must do so with clean hands. *Nakahara v. NS 1991 Am. Trust,* 739 A.2d 770, 791 (Del.Ch.1998). The doctrine of unclean hands provides that "a litigant who engages in reprehensible conduct in relation to the matter in controversy ... forfeits his right to have the court hear his claim, regardless of merit." *Portnoy v. Cryo–Cell Int'l, Inc.,* 940 A.2d 43, 80–81 (Del.Ch.2008) (quoting *Nakahara,* 739 A.2d at 791–92). This equitable doctrine "is not strictly a defense to which a litigant is legally entitled. Rather, it is a rule of public policy to protect the public and the court against misuse by persons who, because of their conduct, have forfeited the right to have their claims considered." *Gallagher v. Holcomb & Salter,* Civ. A. No. 9337, 1991 WL 158969, at *4 (Del.Ch.1991). In order for the plaintiff's claim to be barred, its inequitable conduct must relate directly to the matter in controversy. *Nakahara,* 739 A.2d at 792. The question is whether the plaintiff's conduct is so offensive to the integrity of the court that its claim should be denied. *Portnoy,* 940 A.2d at 82 (citing *Gallagher,* 1991 WL 158969, at *4). Delaware courts have noted that this doctrine does not apply if its application would work an inequitable result. *Id.*

 There is no dispute that veil-piercing and alter-ego claims in Delaware are only available in courts of chancery, i.e., they are only available in equity. *Medi–Tec of Egypt Corp. v. Bausch & Lomb Surgical, France,* Consolidated C.A. No. 19760–NC, 2004 Del. Ch. LEXIS 21, at *8 (Del.Ch.2004). Thus, ASARCO must pursue this equitable relief with clean hands. The Court disagrees with AMC's argument that ASARCO must prove its own inequitable conduct in order to prevail on its alter-ego claim. ASARCO has successfully proven that its conduct related to the SPCC transfer was dominated and controlled by AMC and Grupo, and that ASARCO's parents, not an independent ASARCO, dictated the creation of SPHC, the transfer of the SPCC stock to it, and the subsequent transfer of the stock to AMC. ASARCO had no choice in those transactions. Its actions were compelled by AMC/Grupo, and, therefore, AMC/Grupo cannot now argue that equity precludes ASARCO from challenging those actions. It would be inequitable to allow AMC to blame ASARCO for the conduct in which it was forced to participate.[42]

### f. Proof of Claim

 AMC next contends that ASARCO's alter-ego claim is barred because ASARCO did not file a proof of claim against

---

42. Similarly, AMC raises the defense of *in pari delicto* based on its claim that ASARCO must show that it created SPHC for a wrongful purpose. As noted above, the Court believes SPHC was created for a legitimate purpose, but was later used for an improper purpose. In any event, this defense would fail against the debtor because Grupo (AMC's sole shareholder) completely controlled the creation of SPHC and the transfer of the SPCC stock to SPHC.

SPHC. ASARCO responds that it was not required to file a proof of claim and, alternatively, that its complaint, constitutes an informal proof of claim.

A creditor is required to timely file a proof of claim or interest if the claim is disputed, contingent, or unliquidated. 11 U.S.C. § 502. The bankruptcy court sets the deadline, or bar date, for creditors to file their proof of claims. FED. R. BANKR. P. 3003(c)(3). Failure to file such a claim means that the claim may be disallowed and that the creditor may not be treated as such with respect to such claim for the purpose of voting and redistribution. *Id., see* 11 U.S.C. § 502; FED. R. BANKR. P. 3003(c)(3).

The Bankruptcy Code defines "creditor" as an:

(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor; (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or (C) entity that has a community claim. 11 U.S.C. § 101(10).

A "claim" is defined as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. 11 U.S.C. § 101(5).

The Court finds that ASARCO is not a "creditor" as the term is defined in the Bankruptcy Code, because it does not have a "claim" against SPHC; therefore, it was not required to file a proof of claim against SPHC. ASARCO is not asserting any right to payment by SPHC, nor is it seeking an equitable remedy for breach of a performance. Rather, the alter-ego claim is a threshold issue in ASARCO's efforts to hold AMC, who is not a debtor in bankruptcy, liable for an alleged fraudulent transfer. Since ASARCO is not a creditor with a claim against SPHC's estate, it was not required to file a proof of claim.

Even if a proof of claim were required, ASARCO contends that it met the requirement because the complaints filed in this case and in the bankruptcy court constitute an informal proof of claim. In *In re Nikoloutsos*, the Fifth Circuit stated that the following elements must be met in order for a document to qualify as an informal proof a claim: (1) the claim must be in writing; (2) the writing must contain a demand by the creditor on the debtor's estate; (3) the writing must evidence an intent to hold the debtor liable for such debt; (4) the writing must be filed with the bankruptcy court; and (5) based upon the facts of the case, allowance of the claim must be equitable under the circumstances. 199 F.3d 233, 236 (5th Cir.2000).

■ To qualify, the informal proof of claim must be filed by the bar date. The bar date in this case was May 21, 2007.[43] The Original Complaint in this case was filed on February 2, 2007. In that Complaint, ASARCO alleged that SPHC had no business other than owning the SPCC shares, was a mere instrumentality and alter ego of ASARCO, and was formed as

---

**43.** Defendant states, in one of its summary judgment briefs, that the bar date was May 17, 2007, but the "Notice of Setting Bar Date for Certain Subsidiary Debtors" filed in the bankruptcy case states that the bar date was May 21, 2007.

a sham to perpetrate a fraud. (Doc. No. 1, n. 4). This Complaint was also filed in the bankruptcy court on the same date. (Case No. 05–21207, Doc. No. 3697). On May 4, 2007, ASARCO filed its First Amended Complaint containing similar allegations and adding SPHC as a plaintiff in this action.[44]

■ The first requirement, that the claim be in writing, was met by both complaints. The second requirement is that the writing contain a demand by the creditor on the debtor's estate. This Court does not find ASARCO's alter-ego allegation constitutes a "demand on the estate," nor is it an effort to hold the debtor liable for any debt; however, the Original Complaint makes the same alter-ego allegations as are currently asserted and, to the extent possible, satisfies the third and fourth requirement. Lastly, based upon the facts of the case, allowance of the claim is equitable under the circumstances. Although ASARCO does not actually assert any "claim" against SPHC, to the extent AMC believes the alter-ego allegation constitutes a claim, the Original Complaint satisfies the requirements of an informal claim.

For the reasons stated herein, ASARCO's failure to file a proof of claim does not bar Plaintiff from asserting that AS-ARCO and SPHC were alter egos in order to pursue its fraudulent-transfer claims against AMC.

*g. Conclusion*

In summary, the Court finds ASARCO has standing to pursue the fraudulent-transfer claims under Delaware law, but SPHC does not. ASARCO (but not SPHC) demonstrated that it had an actual, unsecured creditor who existed at the time of the transfer and who still has a claim against ASARCO. ASARCO also prevailed on its reverse-veil-piercing claim by proving, by a preponderance of the evidence, that ASARCO and SPHC were alter egos. This finding, in effect, expands Plaintiff's estate such that ASARCO my claim an interest in the asset transferred (the SPCC stock) and have standing to pursue its fraudulent-transfer causes of action.

### B. Constructive Fraudulent Transfer

■ All parties agree that Delaware's enactment of the UFTA provides that a transfer is constructively fraudulent if the debtor made the transfer: (1) "[w]ithout receiving a reasonably equivalent value in exchange for the transfer …," and (2) the debtor: (a) "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;" (b) "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due;" or (c) "was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 6 Del. C. §§ 1304(a)(2), 1305(a). In short, to prevail on its constructive fraudulent-transfer claim, ASARCO must prove, by a preponderance of the evidence, that (1) it did not receive reasonably equivalent value ("REV"); and (2) it was "insolvent" under any of the above three tests.[45]

44. The current live Complaint is the Second Amended Complaint. (Doc. No. 169). It was filed in October 2007, after the bar date passed. For this reason, it cannot constitute an informal proof of claim.

45. The Court recognizes that the high court in Delaware has not yet determined the burden of proof applicable to a constructive fraudulent transfer claim under its enactment of the UFTA. Both parties agree, however, that Delaware would likely adopt a preponderance of

### 1. Reasonably Equivalent Value

ASARCO must first demonstrate that it did not receive reasonably equivalent value for the SPCC stock it transferred to AMC. The question of whether a debtor received REV is a two-step analysis. *See In re MDIP Inc.*, 332 B.R. 129, 133 (Bankr. D.Del.2005). The Court must first decide whether ASARCO received any "value." *Id.* Second, the Court must determine whether the value received was reasonably equivalent to that transferred. *Id.* The Court finds, and neither party disputes, that each piece of consideration given by AMC constituted "value." [46] The more difficult issue is whether the value ASARCO/SPHC received was reasonably equivalent to the value of the SPCC stock.

Prior to 1996, Title 6, Chapter 13 of the Delaware Code was called the "Fraudulent Conveyances Act." [47] In 1996, Delaware adopted the Uniform Fraudulent Transfer Act. The UFTA replaced the term "fair consideration" with "reasonably equivalent value." Neither the UFTA nor Delaware's enactment of the UFTA offers a universal definition of REV. *See* 6 Del. C. § 1303; *see also VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir.2007). [48] The Court has not found, and neither of the parties provided the Court with, any reported decision from Delaware indicating how that state would define or determine "reasonably equivalent value." As the law in Delaware on this question is unsettled, the Court must predict how the high court in Delaware would determine REV. In undertaking this analysis, the Court may be guided by: (1) the Uniform Fraudulent Transfer Act, which Delaware adopted; (2) cases interpreting other states' versions of the UFTA; and (3) the manner in which other courts have defined REV in the context of the Bankruptcy Code's fraudulent transfer provision, § 548. [49]

 All jurisdictions agree that courts should measure the value of the property transferred and the consideration received at the time of the transfer. *See, e.g., Matter of Fairchild Aircraft Corp.*, 6

---

the evidence standard. After considering the available case law, the Court agrees with this prediction.

**46.** "Value" is a defined term under the statute. "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied ...." 6 Del. C. § 1303(a).

**47.** This was Delaware's enactment of the Uniform Fraudulent Conveyances Act, "UFCA."

**48.** The UFTA does define REV for use in foreclosure contexts, but that provision is inapplicable to the case at hand. Section 1303(b) states, "[f]or the purposes of §§ 1304(a)(2)and 1305, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust or security agreement."

**49.** In states that have adopted the UFTA, courts have held that they may look to cases decided under the Bankruptcy Code's fraudulent transfer provision, as well as cases interpreting other states' versions of the UFTA, to determine the meaning of REV. *See, e.g., Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947 (7th Cir.2007); *In re Chapman Lumber Co., Inc.*, Adv. No. 06–09112, 2007 WL 2316528, at *2 (Bankr. N.D.Iowa Aug. 8, 2007); *In re W.R. Grace & Co.*, 281 B.R. 852, 857 (Bankr.D.Del.2002) (noting that the court could seek guidance from cases interpreting similarly worded statutes, like the Bankruptcy Code); *In re Hemstreet*, 258 B.R. 134, 139 (Bankr.W.D.Pa. 2001). Numerous courts interpreting REV under the UFTA rely on the test used in that circuit for REV under § 548. *See, e.g., VFBLLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir.2007); *Smith v. Am. Founders Fin. Corp.*, 365 B.R. 647, 666 (S.D.Tex.2007).

F.3d 1119, 1126 n. 8 (5th Cir.1993) (citing *In re Morris Comm'ns NC, Inc.*, 914 F.2d 458, 466 (4th Cir.1990)). The Court should not consider subsequent events, such as the exponential improvement in copper prices. *See id.* By analyzing whether AS-ARCO received reasonably equivalent value at the time of the transfer, courts avoid valuing an asset "through the 20/20 vision of hindsight." *In re Jumer's Castle Lodge, Inc.*, 338 B.R. 344, 354 (C.D.Ill.2006). This also means that courts should use the industry standards in place at the time of the transaction to determine the fair market value of the SPCC stock because these standards determine what a hypothetical sale of such property would yield for the company. *In re WRT Energy Corp.*, 282 B.R. 343, 406 (Bankr.W.D.La.2001); *Union Bank of Switzerland v. Deutsche Fin. Servs., Corp.*, 98 Civ. 3251(HB), 2000 WL 178278, 2000 U.S. Dist. LEXIS 1481 (S.D.N.Y. Feb. 16, 2000).

 The REV inquiry is focused on the value that the debtor received in exchange for the property transferred. "The touchstone is whether the transaction conferred realizable commercial value on the debtor . . . ." *In re R.M.L., Inc.*, 92 F.3d 139, 149 (3d Cir.1996) (quoting *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646–47 (3d Cir.1991)). The determination of whether the debtor received REV should be made from the standpoint of the debtor's creditors, by looking at the net effect of the transfer on the unsecured creditors. *In re GTI Capital Holdings, LLC*, 373 B.R. 671, 677 (Bankr.D.Ariz. 2007).

 Courts also seem to agree that there need not be a dollar-for-dollar exchange. *Weaver v. Kellogg*, 216 B.R. 563, 574 (S.D.Tex.1997). Some courts have stated that a debtor receives reasonably equivalent value if it receives roughly the value it gave. *See, e.g., In re Phillips Group, Inc.*, 382 B.R. 876, 887 (Bankr. W.D.Pa.2008); *In re Gonzalez*, 342 B.R. 165, 173 (Bankr.S.D.N.Y.2006).

The Court now turns to the question of what it means, under Delaware law, for the value received to be reasonably equivalent to the value of the asset transferred. The United States Supreme Court has had one opportunity to discuss reasonably equivalent value. In *BFP v. Resolution Trust Co.*, the high court held that the price received at a foreclosure constitutes REV so long as the sale complies with the state's foreclosure laws. 511 U.S. 531, 545, 114 S.Ct. 1757, 128 L.Ed.2d 556(1994). The Court noted that outside of the foreclosure context, REV "will continue to have an independent meaning (ordinarily a meaning similar to fair market value) . . . ." *Id.*[50] Discussing the meaning of REV in his dissent, Justice Souter states, "[a]lthough this formula makes no pretense to mathematical precision, an ordinary speaker of English would have no difficulty grasping its basic thrust: the bankruptcy court must compare the price received by the insolvent debtor and the worth of the item when sold and set aside the transfer if the former was substantially (unreasonably) less than the latter." *Id.* at 552, 114 S.Ct. 1757. (Justice Souter dissenting) (internal quotation omitted). Justice Souter called attention to the fact that the majority indicated that this is what the statute means

---

**50.** The UFTA (and Delaware's version thereof) includes a special provision regarding the meaning of REV in the foreclosure context. The *BFP* case was decided in 1994, ten years after the UFTA was drafted; thus, one cannot make the argument that the UFTA intended to incorporate *BFP*. By this holding, however, the Supreme Court made a distinction between REV in foreclosure and non-foreclosure contexts. The UFTA, by providing a special test for REV in foreclosure, does the same.

in all contexts outside of foreclosure. It is up to the courts to decide what constitutes an amount substantially or unreasonably lower than an item's fair market value.

The tests courts use to determine whether the value received is reasonably equivalent to the value transferred varies among jurisdictions. A minority of courts look at the percentage of property value to determine whether the debtor received REV. The majority of courts, however, seem to use a totality of the circumstances approach.

The percentage approach may have begun with a Fifth Circuit case in which the court stated, in dicta, that a foreclosure sale conducted within one year of bankruptcy violated § 548 if the proceeds realized were less than seventy percent of the value of the foreclosed property. *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201, 203 (5th Cir.1980). A number of courts utilized this 70–percent rule, while the majority of Circuits flatly rejected the rule in favor of a less formulaic, totality of the circumstances approach. *Matter of Besing*, 981 F.2d 1488, 1496 n. 14 (5th Cir. 1993) (citing cases adopting the totality of the circumstances from other Circuits). The *BFP* case, discussed above, effectively overruled *Durrett* by holding that the price received at a foreclosure constitutes REV so long as the transaction complied with the state's foreclosure laws. *BFP*, 511 U.S. at 545, 114 S.Ct. 1757. It is unclear whether this 70–percent rule retains any viability.

■ The more widely accepted approach is to look at the totality of the circumstances.[51] In utilizing this approach, the factors most widely considered are: (1) the disparity between the fair value of the transferred property and what the debtor received; (2) the good faith of the parties; and (3) whether the transaction was at arm's length. *Peltz v. Hatten*, 279 B.R. 710, 736–37 (D.Del.2002); *see also In re Jumer's Castle Lodge*, 338 B.R. 344, 354 (C.D.Ill.2006); *In re Sun Valley Prod., Inc.*, 328 B.R. 147, 156–57 (Bankr.D.N.D. 2005); *In re Nelco, Ltd.*, 264 B.R. 790, 814 (Bankr.E.D.Va.1999).

Despite the overwhelming acceptance of these factors, there seems to be some debate over the role "good faith" plays in a REV analysis. The comments to the UFTA expressly state that good faith should not be a consideration in the REV inquiry, but, rather, it is an affirmative defense. UFTA § 4 cmt. 2. Under the former fraudulent conveyance law, the UFCA, which used the term "fair consideration" instead of "reasonably equivalent value," courts considered the good faith of the parties involved in determining whether adequate consideration was received. UFTA prefatory note and § 4 cmt. 2. Under the UFTA, however, the drafters eliminated "good faith" from the inquiry in an effort to achieve a more objective test. *See id.* Collier, a leading authority on bankruptcy law, also notes that "reasonably equivalent value" does not contain a good faith component. COLLIER ON BANKRUPTCY ¶ 548.05 (15th ed. rev.). Nevertheless, the majority of jurisdictions continue to consider good faith as a factor in the reasonably equivalent value determination.[52]

---

**51.** *See, e.g., In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir.2006); *In re Commercial Fin. Servs., Inc.*, 350 B.R. 559, 576–77 (Bankr.N.D.Okla.2005); *Peltz v. Hatten*, 279 B.R. 710, 736 (D.Del.2002); *see also In re Jumer's Castle Lodge, Inc.*, 338 B.R. 344, 354 (C.D.Ill.2006); *In re Phillips Group, Inc.*, 382

B.R. 876, 887 (Bankr.W.D.Pa.2008); *In re Sapp*, 364 B.R. 618, 632 (Bankr.N.D.W.Va. 2007); *In re Nelco, Ltd.*, 264 B.R. 790, 813–14 (Bankr.E.D.Va.1999); COLLIER ON BANKRUPTCY ¶ 548.05 (15th ed. rev.).

**52.** At least one court used a totality of the circumstances approach without considering

■ This Court finds that the high court of Delaware would adopt the totality of the circumstances approach, which is applied in most jurisdictions. Although the Third Circuit includes "good faith" as a factor in its reasonably equivalent value analysis in cases brought under § 548, the comments to the UFTA make clear that "good faith" should not be a consideration in the REV inquiry. *Compare In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213–14 (3d Cir.2006), *with* UFTA prefatory note and § 4 cmt. n. 2. For this reason, the Court finds that Delaware would look at all the facts surrounding the transaction, including whether the transaction was at arm's length, but would not include "good faith" as a factor in its REV assessment.

### a. Value Of Consideration Received

Both parties agree that ASARCO/SPHC transferred its 54.18% stake in SPCC to AMC for an aggregate nominal amount of $765 million, which included: (1) $450 million in cash, used to pay the Chase Revolver debt; (2) $50 million in cash, earmarked to pay part of the Yankee Bonds; (3) AMC's execution and delivery of a promissory note to SPHC in the amount of $123.25 million (the "AMC Note"); (4) AMC's execution and delivery to SPHC of a promissory note in the amount of $100 million, which was dedicated to pay environmental claims, and which was guaranteed by Grupo (the "DOJ Trust Note"); and (5) AMC's and/or its affiliate's cancellation of the $41.75 million debt against ASARCO/SPHC ("Debt Forgiveness"). (PX 270; DX 467).

In order to resolve the constructive-fraudulent-transfer claim, the Court must determine the 2003 present value and net effect of the consideration received by ASARCO/SPHC. ASARCO's experts, Navigant, concluded that the present value of the consideration was between $660.21 million and $726.61 million. Navigant then subtracts from these numbers what it describes as the additional net economic effect on ASARCO of paying the Yankee Bonds. This reduced Navigant's conclusion to a range of $611.21 and $702.11. Dr. Pirrong, the valuation expert called by AMC, concluded that the present value of the consideration totaled $720.31 million. Dr. Pirrong did not reduce this number to account for the additional money ASARCO used to pay the Yankee Bonds.

### i. $450 Million

All parties agree, and the Court finds, that the present value of the $450 million paid in cash to retire the past-due Chase Revolver is $450 million.[53]

### ii. The AMC Note

The nominal value of the AMC Note was $123.25 million. (PX 0271). According to the terms of the note, AMC was required to pay SPHC the principal amount in seven consecutive installments, consisting of $17,607,143 each, in October of each year from 2003 to 2009. (PX 0271).

Navigant concluded that the present value of the note was between $78.66 million and $105.68 million. EYCF performed a present-value analysis on this note using a discount rate of 12.5% to 25%. (PX 0187).

---

"good faith," but there was no indication by that court that the omission of that factor was intentional. *See In re Lindell*, 334 B.R. 249, 255–56 (Bankr.D.Minn.2005).

**53.** While ASARCO has somewhat attacked the motivation for paying the overdue Revolver (since Grupo was a guarantor of the note and

AMC received $50 million of this amount because of its participation in the Revolver), the Court finds that any secondary motivation that Grupo had for paying the note does not affect the amount that it represents toward the REV calculation.

EYCF determined that the value was between $77.1 million and $ 105.68 million. (PX 0187). Dr. Pirrong considered the applicable credit rating and the fact that Grupo did not guarantee this note. He used varying discount rates, ranging from 17.55% and 19.36%, based on a credit spread of 16.43%. Dr. Pirrong arrived at a value of $94.36 million. (DX 0611; Pirrong, June 4, 2008, 124:16–125:5).

The Court finds Dr. Pirrong's approach to be reasonable. His conclusion is based upon supportable assumptions and methodologies and is somewhat buoyed by the fact that it falls within the center of the ranges Navigant and EYCF found. For this reason, the Court finds that the present value of the AMC Note was $94.36 million.

### iii. DOJ Trust Note

The nominal value of the DOJ Trust Note was $100 million. Under the terms of this note, AMC was to pay SPHC the principal amount in eight consecutive annual installments of $12,500,000. (PX 0272). In turn, SPHC was to transfer these sums to the DOJ trust.

Unlike the AMC Note, this note was guaranteed by Grupo. For this reason, EYCF performed a present-value analysis using discount rates of 10% to 12.5% (rather than 12.5% to 25% as it used for the AMC Note), resulting in a value of $85.1 million to $91.4 million. (PX 0187). Navigant reviewed EYCF's analysis and did an independent present-value analysis, concluding that the DOJ Trust Note was worth $85.67 million to $91.68 million to ASARCO. (PX 1217). Dr. Pirrong examined Grupo's credit rating and the prevailing market yields. He used a credit spread of 4.55% and discount rates ranging from 5.68% to 7.99% to determine that the note was worth $99.83 million. (DX 0611).

The Court finds that Dr. Pirrong's discount rates were too low in calculating the present value of the DOJ Trust Note. The Court further finds that the high ends of EYCF and Navigant's analyses are most appropriate and concludes that the present value of the $100 million note was $91.68 million.

### iv. $50 Million Earmarked For Yankee Bonds

■ There is debate over the value of the $50 million that went toward payment of the Yankee Bonds at par value ($100 million) plus interest. AMC contends that the $50 million is worth $50 million. ASARCO argues that the Yankee Bonds were trading below par and, therefore, there was a discount in the net economic benefit to ASARCO of any cash received that ASARCO was required to use to redeem the unsecured Yankee Bonds at par. In other words, ASARCO argues that because it was required to use the $50 million to pay off bonds above their market trade value, it did not receive the full value of the $50 million.

The Court finds that at the time the Yankee Bonds were paid off, they were trading at a discount. There is evidence of market discounts of 25%–50% for the Yankee Bonds. (PX 0903; PX 0006; PX 0096). In fact, German Larrea testified that he imagined these bonds were trading at a discount. (German Larrea Depo. 410:09–12). Additionally, contemporaneous internal emails indicated that the bonds were trading at around 50 to 60 cents on the dollar. (PX 0059; PX 0068).

The Court, however, does not find that this results in a discount to the $50 million in cash that AMC paid. Even if ASARCO purchased the bonds off the market for 50 cents on the dollar, it would have had to use $50 million to do so. For this reason, the Court finds that the value of the $50

million in cash to ASARCO was $50 million.[54]

### v. Debt Forgiveness

As part of the consideration, AMC/Grupo cancelled a $41.75 million past-due note that ASARCO/SPHC owed.[55] Navigant reduced this by 0%–50%, resulting in a value of $20.88 million to $41.75 million. (PX 1217). Dr. Pirrong found that the value of the debt forgiveness was $26.12 million. (DX 0611). He reached this number by concluding that the note could have been renegotiated at 9.28% interest. (DX 0611). Assuming this interest rate and that the maturity date would be extended to 2010, Dr. Pirrong arrived at a present value of $26.12 million. (DX 0611).

 The Court notes that if ASARCO had filed bankruptcy within the limitations period to challenge this debt forgiveness as a preference, the value of this piece of consideration would have been substantially less, possibly even zero. (PX 1218). Sidley Austin also advised Ortega and Tellechea in late 2002 that debt forgiveness would receive little, if any, value in the proposed acquisition. (PX 0127). Sidley Austin and Ralph Mabey, one of AMC's experts in this case, both believed this debt forgiveness might have been considered a preference in bankruptcy. (PX 0293; Mabey, May 22, 2008, 155:22–156:5). This fact, however, is an issue of law, not one of valuation. (Pirrong, June 5, 2008, 25:25–26:16). Neither ASARCO's experts nor EYCF discounted this debt forgiveness to zero. Therefore, the Court does not find it appropriate to consider in this analysis the possibility that this consideration might have been set aside as a preference in a hypothetical bankruptcy.

 As discussed above, the Court does not think it is appropriate to discount the value of the cash used to pay the Yankee Bonds based on the possibility that the Yankee Bonds could have been renegotiated at a lower price. The Court finds the situation with the intra-conglomerate debt forgiveness to be an analogous situation and does not believe it appropriate to reduce the value of cancelling a debt based on the mere possibility that the debt could have been renegotiated. In other words, the Court does not believe that the net effect on ASARCO's balance sheet or its creditors is any different based on the possibility that ASARCO could have renegotiated the note. Although the funds for this loan originated with the Larrea family, there is no evidence that this was any-

---

**54.** The additional funds ($50 million) used to pay the Yankee Bonds at par ($100 million) plus interest came from ASARCO AMC/Grupo required ASARCO to monetize its insurance policies and use other cash it had available to pay these bonds at par. ASARCO argues that to the extent that the amount paid toward the Yankee Bonds exceeded the value at which the bonds were traded, the value of the consideration should be reduced to reflect the "net effect" on the creditors. The Court declines to adopt this reasoning. Although the Court finds, based on overwhelming evidence, that the SPCC stock sale and the payment of the Yankee Bond were part and parcel of the same transaction, the question regarding the amount of consideration ASARCO received is legally different from the question of whether the money should have been used to pay the Yankee Bonds at 100 cents on the dollar plus interest. That issue is more properly reserved for the discussion on actual fraudulent intent and breach of fiduciary duty. For this reason, the Court declines to discount the consideration received to account for the use of any money ASARCO had to produce to pay the Yankee Bonds.

**55.** Although not germane to this particular issue, the Court notes that despite forgiving the $41.75 million unsecured loan, AMC did not forgive the interest. (PX 2045). In fact, AMC charged ASARCO default interest on the note, and by October 2003, ASARCO paid more than $7 million in past-due interest on the forgiven loan. (PX 2099; PX 2045).

thing but a legitimate note that was past due, and there was no evidence that AMC/Grupo actually would have renegotiated the note. In fact, the loan was structured as an advance payment on the SPCC shares at the time it was made. (PX 0042). For these reasons, the Court finds that the $41.75 million debt forgiveness was worth $41.75 million to ASARCO.[56]

### vi. Conclusion

The Court finds that the cash consideration of $450 million and $50 million were worth a total of $500 million. The present value of the $123 million AMC Note was $94.36 million, and the value of the $100 million DOJ Trust Note was $91.68 million. The Court determines that the value of the $41.75 million intra-company debt forgiveness was $41.75 million. Therefore, the Court finds that the total consideration ASARCO received for its stake in SPCC was $727.79 million.

### b. Valuation Of SPCC Shares

The Court must now determine the fair value of ASARCO/SPHC's 54.18% interest in SPCC at the time of the transfer. To aid in this determination, the parties presented the Court with live testimony and valuation reports from both ASARCO's and AMC's experts. This Court also had the benefit of contemporaneous valuations performed by PWC, Behre Dolbear, Houlihan Lokey, and E & Y. There were three basic valuation methodologies used by these experts, and the Court will discuss

each in turn: (1) Stock Price Valuation; (2) Market Multiples; and (3) Discounted Cash Flow.

### i. Stock Price

■ AMC's expert, Dr. Pirrong, contends that the market price the day of the transaction is the best method for valuing a company in an efficient market. (Pirrong, June 4, 2008, 47:9–52:9). ASARCO disagrees that the stock price is the best indicator of a company's value, in part because it does not believe SPCC was traded on an efficient market, and in part due to the use of a serendipitously low one-day share price. ASARCO also contends that a control premium is appropriate, whereas AMC argues that a control premium should not be added to the stock price.

### (a) Market Efficiency

■ Market efficiency is the idea that publicly available information is reflected in the price of a stock. (Pirrong, June 4, 2008, 49:13–14). Dr. Pirrong contends that SPCC was traded in a semi-strong market, meaning that publicly available information, including past stock prices, is quickly incorporated in the current price. (Pirrong, June 4, 2008, 49:12–22). Delaware courts have recognized that the "market price of shares may not be representative of true value." *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 301 (Del. 1996) (quoting *Paramount Comm'ns, Inc.*

---

56. The Court realizes that in making this finding it is putting a value on this note that exceeds that offered by experts for both sides. The Court found Navigant and EYCF's discount range of 0%–50% to be done without any explanation and in an arbitrary fashion. Further, this broad range calls into question the reliability of any resulting figure. The Court rejected Dr. Pirrong's analysis, viewing his use of a hypothetical renegotiation as fanciful speculation. This $41.75 million loan

was provided to ASARCO, and it is unquestioned that the funds were used to pay off $41.75 million of outstanding bond debt in 2001. No one questions that this was real money used to pay real debt. The fact that in this transaction it was an intra-conglomerate payback may be questionable, but that is a question that does not have any application in determining the value of consideration received by ASARCO in context of the REV analysis.

*v. Time Inc.*, 571 A.2d 1140, 1150 n. 12 (Del.1989)). For example, "[i]nformation and insight not communicated to the market may not be reflected in stock prices." *Id.* Additionally, Delaware courts have declined to place much weight on stock price valuations if the stock is thinly traded. *Crescent/Mach I P'ship v. Turner*, No. Civ. A. 17455–VCN, 2007 WL 1342263, at *15 n. 101 (Del.Ch.2007). The weight a court should give the stock price in determining reasonably equivalent value necessarily depends on the reliability of that stock price as a reflection of the value of the company at the relevant time. Thus, market efficiency is an important consideration in determining what weight to give the market value of the stock.

■ In *Cammer v. Bloom*, a securities fraud case, the District Court of New Jersey articulated factors that many courts have utilized to decide whether a stock trades in an efficient market. 711 F.Supp. 1264, 1286–87 (D.N.J.1989); *see also Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 n. 10 (5th Cir.2005). These factors include: "(1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S–3 (as opposed to Form S–1 or S–2); (5) the existence of empirical facts 'showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price'; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock." *Id.* (quoting *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir.2005)).

AMC contends that the *Cammer* factors should not be used in this case because the SPCC shares were traded on the New York Stock Exchange ("NYSE"), which courts presume to be an efficient market. *See, e.g., In re PHP Healthcare Corp.*, 128 Fed.Appx. 839, 848 (3d Cir.2005) (noting that NYSE is one of the most efficient capital markets in the world); *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 368 (D.Del.1990). Nevertheless, there are other cases in which courts found it appropriate to apply the *Cammer* factors even though the stock was traded on an interpersonal, well-developed market. *See, e.g., Bell*, 422 F.3d at 313 (applying factors to stock traded on NASDAQ); *In re SCOR Holding (Switzerland) AG Litig.*, 537 F.Supp.2d 556, 574 (S.D.N.Y.2008) (using the *Cammer* factors to determine efficiency of stock traded on NYSE); *In re Polymedica Corp. Sec. Litig.*, 453 F.Supp.2d 260, 278 n. 23 (D.Mass.2006) (finding market inefficient even though stock was traded on NYSE).

■ The first factor the Court should analyze is the average weekly trading volume. Courts have found that a trading volume of 1% justifies a substantial presumption of market efficiency. The SPCC common stock was traded daily on the NYSE. (Pirrong, June 4, 2008, 51:10–17). Nevertheless, between April 2002 and March 2003, the average weekly trading volume of SPCC shares was 0.5%. (PX 2108; PX 1294). The average weekly trading for the twelve months preceding March 31, 2003 was 0.3%. (Tucker, June 11, 2004, 53:24–54:6). This low weekly trading volume does not lead to a presumption of efficiency.

The Court next considers the number of securities analysts following and reporting on this stock. According to Nelson's Directory of Investment Research, fourteen separate analysts covered the SPCC stock

in 2000 and 2001, and in 2002 and 2003 there were ten and nine analysts, respectively, that covered this stock. (DX 0611). Pursuant to a 1996 academic study, this would have placed SPCC in the 80th or 90th percentile of number of analysts covering the company. (DX 0611). ASARCO does not respond to this allegation. Next, AMC argues that there is a strong correlation between the price of copper and the price of SPCC stock, indicating that the stock price is sensitive to a major determinant in SPCC's cash flow. (DX 0611). These factors all support AMC's argument that SPCC was traded on an efficient market.

The last factor some consider is the public float. According to SPCC's 2002 10–K, 82.4% of the stock was held by insiders, meaning that only 17.6% of the stock was available for public trading. (PX 1021). Dr. Pirrong noted that 25% of SPCC's publicly traded stock was held by institutional investors, who are sophisticated and well informed, which, according to Dr. Pirrong, provides high confidence that the stock price reflects all publicly available information. (DX 0611). Twenty-five percent of the publicly held stock, however, is only 5% of the total outstanding stock.

Additionally, the Court does not overlook the fact that SPCC shares were traded on the NYSE and were subject to SEC disclosure requirements. (DX 0611). The NYSE is the most highly regulated trading market in the world, which supports a finding of market efficiency. On the other hand, Dr. Gulley opined that because of SEC regulations, companies such as SPCC are unable to communicate all relevant information about their resource base and this can lead the market to undervalue companies, like SPCC, that have particularly favorable resource endowments. (PX 1220).

At the time of the transfer, the stock was traded on an extremely reliable exchange and was followed by a number of securities analysts. The low weekly trading volume and low public float, however, cuts against AMC's argument that SPCC was traded on a semi-strong efficient market. The Court finds that the stock price valuation in this case is indicative of the value of the SPCC shares; however, because the stock was relatively thinly traded, the Court does not rest its entire reasonably equivalent value analysis on this valuation method.[57]

(b) The Stock Price

■■■ It is undisputed that on March 31, 2003, the day the transaction closed, SPCC's price per share was $14.60. (PX 1226). ASARCO and SPHC transferred 43,348,949 shares to AMC on this date. Thus, without factoring in a control premium and using a single-day stock price, the value of the SPCC stock transferred was $632,894,655.40. ASARCO contends that this number does not reflect the value of the SPCC shares for two reasons: (1) it is inappropriate to use a single-day stock price; and (2) there should be a control premium added to this amount. The Court will discuss each contention in turn.

(i) *Single Day v. Trailing Average*

ASARCO contends that it is appropriate to use a 20–, 30–, or 60–day trailing price, rather than the single-day stock price. Plaintiff argues that mainstream valuation industry practice supports using an aver-

---

57. The Court thinks it important to note that the stock price analysis was not relied upon by AMC/Grupo in determining the amount of compensation to be paid in the March 31, 2003 closing. German Larrea tested that the amount of consideration was simply the amount it took to settle the lawsuit with the DOJ.

age trailing price to smooth out volatility in the stock price.

The evidence of record supports ASARCO's contention that using a trailing average is a standard industry practice. Houlihan Lokey, in its analysis, used a 20–day trailing average of closing prices. (PX 0089). Also, E & Y, which used a stock price valuation as a "sanity check," calculated both a single-day closing price as well as a 60–day trailing average. (PX 0185). Additionally, AMC/Grupo used a trailing average in discussing the price to pay for the stock. For example, Mr. Tellechea wrote a letter to German Larrea in May of 2001 stating that the value would be adjusted with "the average market price of 30 days before the close of the transfer of the shares of Asarco to AMC." (PX 0015). There is a handwritten note on this letter that states, "[a]nalyze whether the average should be for 10 or 30 days." (PX 0015). This letter acknowledges that Tellechea and German Larrea both recognized and agreed with the practice of using a trailing average.[58] Even Dr. Pirrong, AMC's economic expert, acknowledged that entities conducting valuations under a stock price analysis use a trailing average stock price. (Pirrong, June 5, 2008, 8:11–16).

ASARCO has also presented evidence proving that the SPCC stock was rather volatile, further justifying the use of a trailing average. Dr. Pirrong testified that on the trading day immediately before the SPCC transfer, the stock price was $15.05; therefore, using a single-day price, the SPCC stock would have been worth $20 million more than on March 31. (Pirrong June 5, 2008, 10:8–22). Dr. Pirrong

also agreed that there was volatility in SPCC's stock price in the first quarter of 2003. (Pirrong, June 5, 2008, 8:11–25). The stock price on March 31, 2003 was the lowest it had been since December 31, 2002. (PX 1226). During the period between December 31, 2002 and the day of the transfer, the stock usually closed at over $15.00, and the price even closed above $16.00 on a number of days. (PX 1226).[59]

In response to ASARCO's contention that the Court should use a trailing average, AMC argues that the stock price the day the transaction closed is appropriate because: (1) markets are informationally efficient, so the information about past stock prices is already reflected; and (2) there is an element of arbitrariness regarding the number of days to use. (Pirrong, June 4, 2008, 48:20–49:11). As discussed above, the Court is not persuaded that the SPCC stock price reflected all available information because of the low trading volume and low public float. For this reason, the Court is not convinced by AMC's first argument that the past prices are already fully included in the March 31, 2003 stock price.

The Court, however, agrees that there is an element of arbitrariness in selecting the number of days to average. Nevertheless, in this case, whether the Court uses 20, 30 or 60 days, the results are strikingly similar. Using a 20–day trailing period, the value of Plaintiffs' interest in the SPCC stock was $671 million. (PX 1226; PX 2066). A 30–day average price results in a value of $676 million, and a using a 60–day average the value is $678.8 million.[60] (PX 1226; PX 2066).

**58.** Navigant also used a trailing average. (PX 1226).

**59.** Another example is found in the minutes of the Restructuring Committee meeting where it is noted that the stock market price of the

SPCC shares on January 27, 2003 was approximately $670 million. (PX 0191).

**60.** Each of these values is calculated without factoring in a control premium.

The Court is persuaded that the SPCC stock was sufficiently volatile so as to warrant the use of a trailing average. The Court finds that use of a 30–day average to be the most appropriate, although whether the Court uses 20, 30 or 60 days makes little real difference because the price is between $671 million and $678.8 million.

(ii) Control Premium

■■■ The Court must next determine whether there should be a control premium added to the stock price and, if so, in what amount. ASARCO contends that a 30%–49% control premium should be added to the stock price.[61] AMC responds that a control premium is inappropriate for three reasons: (1) based on the Restated Certificate of Incorporation and Founding Stockholders' Agreement, there was no guarantee that a third party in an arm's-length transaction could obtain a controlling interest; thus the purchaser would not pay a premium; (2) even if ASARCO could transfer control, there is no evidence that a potential buyer could increase the cash flow of the company, and consequently, no premium was merit ed; and (3) the benefits of control were already factored into the stock price because SPCC already had a controlling shareholder. Alternatively, AMC contends that if any control premium is appropriate, it should only be 7 or 8%.

The Court first notes that one valuation firm, Houlihan Lokey, conducting a stock price analysis prior to the transfer (and well before this litigation) added a 20% control premium to the market price. (PX 0016; Croft Depo. 340:11–19). Ernst and Young, however, did not include an additional control premium in the stock price valuation because it thought that the stock

price had some element of control factored into it. (Uebelhack Depo. 76:13–17, 102:6–24). E & Y felt that investors knew the stock might be in play, which was reflected in the stock price, but E & Y was not sure how much control was included. (Uebelhack Depo. 96:6–22). Since it could not determine the appropriate control premium to add, E & Y found the stock price valuation less reliable than other methodologies, and used this approach merely as a sanity check. (Uebelhack Depo. 96:6–22; 76:13–17).

AMC's first argument is that a third-party purchaser would not pay a premium due to language in SPCC's Restated Certificate of Incorporation and Founding Stockholders' Agreement. The shares held by ASARCO/SPHC were Class A Common Stock (aka "Founder's Shares"), which meant that each share was entitled to five votes. (DX 0005). In 2002, ASARCO/SPHC's Class A Common Stock represented 54.18% of the total outstanding shares. Cerro Trading Company and Phelps Dodge were also Founding Stockholders who held Class A Common Stock and each held approximately 14% of the total number of shares outstanding (28.2% total). (PX 1021). The remaining stock (Common Stock) was entitled to only one vote per share. (DX 0005).

The Restated Certificate of Incorporation of SPCC provided that "[e]ach share of Class A Common Stock shall convert automatically into one ... share of common stock upon ... the sale, gift, or other transfer of such share of Class A Common Stock to a party other than a Founding Stockholder or its Affiliate ...." (DX 0005). In other words, the transfer by a Founding Stockholder of Class A Common

**61.** The 30% number is based on the control premium E & Y added to its market multiples analysis. The 49% is based on the amount above the market price that Grupo paid for ASARCO in 1999. (PX 1217).

Stock to a third party would cause the transferred stock to lose its super-voting rights. "In addition, all outstanding shares of Class A Common Stock shall convert automatically into an equal number of ... shares of Common Stock upon the date on which the Founding Stockholders and their Affiliates (in the aggregate) no longer own at least 35% of the Outstanding Common Shares." (DX 0005).

In short, and as Sidley Austin advised Tellechea and Ortega in 2002, if the SPCC shares held by SPHC/ASARCO, an affiliate of a Founding Stockholder,[62] were transferred to a third party, "there would be an automatic conversion of all Class A Common Stock (resulting in a third party holding 54.1% [sic] of the Common Stock and therefore having control) unless [the other Founding Stockholders] had collectively acquired enough additional common stock in the market to raise their aggregate holdings of Common Shares to 35%. (PX 0119). In the latter event, [Phelps Dodge/Cerro's] Class A Common Stock would not convert so [Phelps Dodge/Cerro] would have control by virtue of being the only holders of Class A Common Stock." (PX 0119).

The question this Court faces is whether a third party would be willing to pay a control premium for Plaintiffs' 54.18% ownership of SPCC with the possibility that the remaining Founding Stockholders could acquire enough shares to prevent all of the Class A Common Stock from converting. In other words, would a third party still pay a control premium knowing of the risk that the other stockholders could prevent that party from obtaining a controlling interest?

The risk of Phelps Dodge and Cerro acquiring enough additional shares to reach the 35% mark was relatively low.

There were a number of witnesses at trial who opined that Cerro and Phelps Dodge might have tried to obtain the necessary shares to retain control. (*See, e.g.,* Croft Depo. 240:19–243:8). The Court was not presented with any evidence, however, that either Founding Stockholder expressed an intent to do so, nor that either company even had the means to acquire the additional shares. Phelps Dodge and Cerro would have had to acquire 5.6 million shares, which, at that time, would have cost approximately $80 million. (Halperin, May 21, 2008, 100:5–22). Additionally, if the Founding Stockholders sought to purchase 40% of the available stock off the market, which is what they would have needed to do, this might have put upward pressure on the stock price. (Halperin, May 21, 2008, 100:5–22). During this time, Phelps Dodge was having financial problems, and its own stock had recently dropped significantly. (Halperin, May 21, 2008, 102:8–21). Although not raised by the parties, the Court finds it notable that E & Y felt that the SPCC stock was known to be "in play" and that an element of control was included in the price for that reason, yet, in spite of the rumors of ASARCO/SPHC's intention to sell, the parties presented no evidence that the Founding Stockholders were looking to acquire more shares so as to retain their superior voting rights.

Even if the Founding Stockholders had the desire and the means to purchase the stock, as ASARCO explains in its brief on the notice requirements of a sale of the SPCC stock, ASARCO/SPHC had no obligation to notify the Founding Stockholders, or anyone else, of their intention to sell the SPCC stock. ASARCO/SPHC could have quietly entered an agreement

---

**62.** ASARCO was a Founding Stockholder at the time of the 1999 LBO. Subsequent to acquiring ASARCO, however, Grupo substituted itself as a Founding Stockholder.

to sell its interest in SPCC to a third party. Under the plain language of the Restated Certificate of Incorporation and Stockholders Agreement, all of the stock would have automatically converted into Common Stock (one share, one vote), and the third-party purchaser would have a controlling interest. Considering the evidence presented to the Court on this issue, the Court finds that it is pure speculation to believe that the Founding Stockholders would have had the desire, the means, or the requisite notice to acquire the additional 7% interest they would need in order to prevent a third party from obtaining control of SPCC.

The Court finds that a third party would have paid a control premium for the stock even knowing of the risk that other Founding Stockholders could prevent that party from obtaining a controlling interest. The argument that Phelps Dodge and Cerro would acquire a sufficient interest to prevent a third party from acquiring a controlling interest is based on speculation. While just as speculative, one might imagine a third party entering into some sort of arrangement with Phelps Dodge and Cerro to bypass this problem. Less speculative is the prospect of a quiet sale such that all the stock converts prior to the other Founding Stockholders being able to compensate for it. For these reasons, the Court finds that the risk of the stock converting would not prevent a third party from paying a control premium.

AMC's second basis for claiming that a control premium is inappropriate is that even if ASARCO was capable of transferring control, there is no evidence that a potential buyer could increase the cash flow of the company.

Dr. Pirrong explained that there are two sources of a control premium. The first type of premium is the value of concentrated control of a company that accrues to all equity holders. Minority shareholders may benefit from acquisition of a controlling stake as the majority can reduce agency and governance costs. This premium is reflected in the stock price. (DX 0621). The second refers to the private benefits that accrue to the owner of the controlling stake but not other shareholders. These benefits include superior voting rights and the ability to influence policies. This control premium leads to a higher value of the controlling shares than minority shares. (DX 0621). AMC contends that since there was already a controlling shareholder, ASARCO/SPHC, the benefits that would accrue to all equity holders were already factored into the stock price. The Court agrees that the reduced governance and agency costs associated with having a controlling shareholder were already factored into the price.

The true debate centers around the second type of premium—whether it would be appropriate to include a control premium for the benefits that would run only to the purchaser of a controlling block. AMC contends that there is no reason for a control premium if a potential buyer cannot identify certain aspects of the company it would change in order to increase cash flow if it had control. Navigant did not analyze whether the SPCC management was inefficient or granted itself excessive perks nor did it consider whether a purchaser might gain tax benefits or synergies in the transaction. (Schwickerath, May 20, 2008, 61:22–64:21, 65:17–19). ASARCO did not offer any additional evidence regarding the potential benefits a third party could derive by acquiring a controlling interest in SPCC. Therefore, AMC argues, ASARCO has not proven that a control premium is warranted.

The Court's focus in the reasonably equivalent value analysis should be on the price that would be paid by a willing

buyer to a willing seller in an arm's-length transaction.[63] AMC does not dispute that in such a situation, a buyer frequently pays well over the stock price if he is acquiring a controlling interest in the company. Whether this is based solely on the benefits of control, or synergies, or the effect of competitive bidding, the fact is that a willing buyer would have likely paid some amount above the stock price if it were to acquire a controlling interest. Therefore, the Court finds that ASARCO's failure to pinpoint the exact benefits a third party might derive from having a controlling interest in SPCC does not mean that a third-party purchaser would not have paid a premium above the stock price.

AMC's final argument against applying a control premium is that the benefits of control were factored into the stock price because SPCC already had a controlling shareholder. This contention is supported by E & Y's decision not to add a control premium to its stock market valuation because it felt that the stock price already had some element of control factored into it. (Uebelhack Depo. 76:13–17, 102:6–24). There were rumors that the SPCC stock might be in play, so there was probably some element of control factored into the price, but E & Y was unable to determine how much control was integrated into the stock price. (Uebelhack Depo. 96:6–22).[64] As discussed above, the benefits of having a controlling shareholder that accrue to all equity holders is already included in the price of the shares. Thus, the Court agrees that it would be inappropriate to add a premium on this basis. Nevertheless, the benefits of acquiring a controlling interest that would run to the purchaser of the stock are not factored into the price, and a control premium is appropriate to account for benefits that would accrue to the controlling shareholder.

The Court finds that in an arm's-length transaction, a willing buyer would have paid a willing seller a premium on top of the stock price to acquire a controlling interest in SPCC. For this reason, AMC/Grupo should also have paid a control premium.[65] Indeed, most of AMC/Grupo's internal analysis prior to the actual transaction calculated a control premium into the price. The Court must next determine the appropriate control premium to apply to the stock price.

■ ASARCO contends that the appropriate control premium is 30% to 49%. This range is supported by several sources. E & Y included a 30% control premium in its market multiples analysis.[66] According to Navigant, when Grupo ac-

---

63. "The willing seller and willing buyer contemplated for fair valuation purposes are hypothetical figures—not the buyer and seller in the transaction at issue." *In re WRT Energy Corp.*, 282 B.R. 343, 406 (Bankr.W.D.La. 2001) (citing *In re Trans World Airlines, Inc.*, 134 F.3d 188, 194–95 (3d Cir.1998)).

64. The Court notes, however, that once rumors had been circulating, AMC/Grupo issued a press release on October 4, 2002, stating that there would not be any change in control of SPCC, meaning Grupo would only consider an intra-conglomerate transfer. (PX 0133). This would have counteracted any effect created by speculation of third-party bidders.

65. "[I]t is elementary that a holder of a substantial number of shares would expect to receive the control premium as part of his selling price, and if the corporation desired to obtain the stock, it is unreasonable to expect that the corporation could avoid paying what other purchaser would be required to pay for the stock ...." *Cheff v. Mathes*, 199 A.2d 548, 555 (Del.1964).

66. As stated previously, E & Y did not include a control premium in its stock price valuation because it could not determine the amount of control already factored in to the price. (Uebelhack Depo. 96:6–22; 76:13–17).

quired ASARCO in 1999, it paid 49% more than the stock price. (Jt. Pretrial Order Admission of Fact No. 4; PX 1217). Additionally, in its June 2001 opinion, as well as its preliminary analysis in 2002, Houlihan Lokey added a 20% premium to the market price. (PX 0016; Croft Depo. 340:11–19). As part of its preliminary analysis in 2002, Houlihan performed a study of Latin American control premiums and found a weighted average and median of 34.0% and 35.8%. (PX 0333). Also, ASARCO points to a Mergerstat control premium study from 2002 indicating 12–month mining industry median and average control premiums of 25.9% and 39.5% respectively.[67] (PX 1342). Project Resource Group (hereinafter "PRG"), an advisor that reviewed Behre Dolbear's analysis for the DOJ, suggested a control premium between 25% and 50%. (PX 0063). Behre Dolbear adopted the view that up to 50% might be appropriate. (Guarnera Depo. 112:24–113:9).

AMC argues that if any control premium is appropriate, it should only be 7% to 8%. Dr. Pirrong based this figure on control premium studies that analyzed the amount paid for control alone separate from synergies. (Pirrong, June 5, 2008, 34:8–36:4; DX 0676; DX 0660). AMC criticizes Navigant's use of a 30% premium. Navigant applied a 30% premium because this was the premium E & Y applied to its market multiples analysis based on Mergerstat data. (Pirrong, June 4, 2008 69:25–72:18). AMC contends that Mergerstat is not a reliable basis for calculating a control premium because it does not separate control and synergies, does not account for negative premiums, does not control for other factors affecting the stock price, is skewed by the use of a

mean, and overvalues control. (Tucker, May 15, 2008, 149:21–25, 151:20–153:14, 158:11–163:3; Schwickerath, May 20, 2008, 67:10–14). AMC also asserts that reliance on the 49% premium that Grupo paid for ASARCO in 1999 was inappropriate because the premium included synergies, not just control. (Pirrong, May 4, 2008, 72:19–73:8).

AMC relies too heavily on the distinction between synergies and control. As stated above, to determine SPCC's value, the Court must determine what a willing buyer would pay a willing seller in an arm's-length transaction. Thus, it is not important to determine the precise purpose for which a buyer might pay a premium on top of the stock price. The Court has already determined that a premium based on control is appropriate in this case. The Court finds that the synergies that existed among Grupo, AMC, ASARCO, and SPCC were reflected in the stock price, but the price did not reflect the synergies that might exist between SPCC and a third-party purchaser. (Tucker, May 15,2008, 149:15–20). The Court believes that a willing buyer would pay a premium above the market price without mechanically separating the reasons for the additional consideration. For this reason, the Court rejects Dr. Pirrong's suggestion that the maximum premium should be 8%.

After reviewing all the evidence relevant to this decision, the Court finds that an appropriate premium to apply to the stock price is 20%. As discussed above, the Court believes that some premium is warranted in this case and that 8% is too low. The Court also considered the 30% premium used by E & Y in its market multiples analysis and suggested by Navigant in its stock price valuation. The Court found it

___

67. Mergerstat is a company that delivers global merger and acquisition information to the corporate financial marketplace.

significant that E & Y was uncomfortable applying this premium to the stock price valuation because of the uncertainty of how much control was already factored into the stock price. The Court finds merit in some of AMC's criticisms of using the Mergerstat data to calculate the control premium to add to the market price of the SPCC shares. The Court is also not convinced that a third-party purchaser would have paid 49% above the stock price for the shares in question, especially considering the price of copper at the time. In 1999, Grupo was involved in a bidding war with Phelps Dodge for 100% ownership of ASARCO. This back-and-forth bidding resulted in Grupo paying 49% above the stock price. There is no indication that competitive bidding for the SPCC stock would have driven the price so far above the stock price. The Court also examined PRG's suggestion that a 25%–50% control premium would be appropriate. The Court finds that this is not a neutral source because PRG was hired by the Department of Justice to support the DOJ's position in that lawsuit. PRG suggested that "the Government's consultant find the academic support to demand a premium at the top-end of the accepted premium' range." (PX 0063). In addition, this recommended control premium related to the market multiples analysis and the DCF analysis, and was not referring to a control premium to apply to the market price. For this same reason, the Court does not find Behre Dolbear's application of a 25% control premium to its DCF analysis to be helpful in determining what premium to apply to the stock price. The Court is persuaded that 20% is a reasonable premium and one supported by the evidence. This was the premium that Houlihan Lokey added to the stock price in its 2001 opinion as well as its preliminary analysis in 2002. It was also the premium mentioned in AMC/Grupo documents prior to closing. The Court finds that Houlihan's rationale for this premium is sound and accurately accounts for any synergies and control that might already exist in the stock price.

**STOCK PRICE VALUATION AT VARIOUS TRAILING PERIODS AND CONTROL PREMIUMS**
(in millions of dollars)
(*See* PX 1226)

| | Closing Day | 20–Day Trailing Avg. | 30–Day Trailing Avg. | 60–Day Trailing Avg. |
|---|---|---|---|---|
| No premium | 632.9 | 671 | 676.2 | 678.8 |
| 8% | 683.5 | 724.7 | 730.1 | 733.1 |
| 20% | 759.5 | 805.2 | 811.4 | 814.6 |
| 25% | 791.1 | 838.7 | 845 | 848.5 |
| 30% | 822.8 | 872.3 | 879.1 | 882.4 |
| 49% | 943 | 999.8 | 1,007.24 | 1,011.4 |

Based on a 20% control premium, the value of ASARCO/SPHC's interest in SPCC was $805.2 million based on a 20–day trailing average, $811.4 million based on a 30–day trailing average, and $814.6 million based on a 60–day trailing average. The Court finds it reasonable based upon the record to use a 30–day trailing average, middle value of $811.4 million, as the appropriate value of the SPCC shares using the market price valuation.

*ii. Market Multiples*

■ The market multiples valuation is commonly used in the valuation industry.

(Tucker, May 15, 2008, 15:10–11). E & Y, Behre Dolbear, and Houlihan each included a market multiples analysis prior to the transaction. (PX 0185, PX 0097, PX 0071). Dr. Pirrong also used a market multiples approach in his discounted cash flow analysis to determine terminal value. (Pirrong, June 4, 2008, 107:3–108:2). Dr. Pirrong, however, testified that this approach is "highly unreliable as a stand alone methodology, particularly if one has the information available to carry out a full blown discounted cash flow analysis." (Pirrong, June 4, 2008, 119:11–17). Dr. Pirrong opined that the market multiples valuation is unreliable because one is required to make inapposite comparisons, and with mining companies, it is especially difficult to find comparable companies because they operate in different countries with different costs of extraction and different purities of ore. (Pirrong, June 4, 2008, 120:10–24). For these reasons, the Court agrees that in valuing this company, the market multiples approach is not as reliable a methodology as performing a discounted cash flow analysis or the stock price valuation, but the Court finds that a willing buyer and willing seller would have performed this analysis and considered its results in negotiating the ultimate price for the SPCC shares. Thus, the Court will discuss the market multiples approach but will use it primarily as a reasonableness check and will not rely on it heavily.

There are two approaches to the market multiples analysis: (1) comparable companies; and (2) comparable transactions. Houlihan, E & Y, and Behre Dolbear each included at least one of these methods. The Court will discuss each approach in turn.

(a) Comparable Companies [68]

Ernst and Young used the market multiples valuation as a stand-alone methodology. The companies it considered comparable to SPCC were Antofagasta PLC; Falconbridge Ltd.; Freeport–McMoRan Copper; Inco Ltd.; Noranda, Inc.; Phelps Dodge Corp.; and Teck Cominco Ltd. (PX 0185). According to this method, it found the SPCC shares were worth $644 million. To reach this number, E & Y incorporated a 30% downward adjustment to the analysis to account for size and foreign risk. (PX 0185). E & Y then added a 30% control premium to its results.

Houlihan Lokey also used the market multiples valuation method in its July 2002 preliminary analysis. The comparable companies Houlihan selected were: Boliden Ltd.; Falconbridge Ltd.; Freeport McMoran Copper & Gold, Inc.; Inco Ltd.; Noranda, Inc.; Phelps Dodge Corp.; Rio Tinto PLC; Teck Cominco Ltd. (PX 0097). Houlihan did not include a downward adjustment based on size or company risk. Houlihan added a 20% control premium.

---

**68.** This approach is called various names by different valuation companies. For example, E & Y refers to it as the Guideline Company Method. Regardless of the label, the approach is the same. The comparable company analysis uses certain market information, such as revenue and EBITDA (earnings before interest, taxes, depreciation, and amortization) from companies that are considered comparable to the company being valued. The value of each comparable company is then measured as a multiple of the various pieces of market data. For example, if a company's EBITDA is $200,000 and the company's value is $2 million, the multiple derived is 10. After determining multiples based on various information for each of the companies, one takes the average or median multiple for each piece of information and applies it to that information available for the target company. Thus, in the above example, if the company being valued has an EBITDA of $300,000, this figure would be multiplied by 10 to reach a value for the subject company of $3 million.

Behre Dolbear used a market multiples of EBITDA approach and concluded SPCC's total value was $1.135 billion, and ASARCO/SPHC's 54.18% interest was approximately $615 million.[69] Behre Dolbear averaged the result of its market multiples approach with the results from two different DCF analyses and two related-transaction valuations. (PX 0071). To this averaged value, Behre Dolbear added a 25% control premium. (PX 0071). It noted that such premiums are subjective and are typically in the 20% to 35% range. (PX 0071). If Behre Dolbear had added a 25% premium solely to its market multiples valuation, the result would have been $768.7 million.[70]

Navigant, ASARCO's trial experts, also performed a comparable company analysis using the exact same information and calculations as E & Y, except Navigant did not make the 30% downward adjustment. Navigant's market multiples analysis determined that the value of ASARCO/SPHC's interest in SPCC was $965 million.

Dr. Pirrong did not use the market multiples approach as an independent method of valuing the SPCC shares. He did, however, conduct such an analysis as part of his discounted cash flow valuation in order to determine SPCC's terminal value.[71] (DX 0611). Dr. Pirrong did not make any downward adjustment or add a control premium. Had Dr. Pirrong performed this analysis as a stand-alone method, the resulting value of ASARCO's interest in SPCC would have been over $1 billion. (Pirrong, June 4, 2008, 242:20–243:16).

In determining the most reliable application of the market multiple methodology, the Court must first determine whether the downward adjustment that E & Y made based on size and country-specific risk was appropriate. Dr. Gulley opined that Peru had low to moderate political risks compared to other mining countries and that South America in general is far less risky than other copper-rich regions such as Indonesia and the West African copper belt. (PX 1220). Raul Jacob, the Peruvian director of investor relations at SPCC, testified that there is no political advantage or disadvantage to working in Peru and that the environmental regulations are comparably favorable. (Jacob, 86:7–24, 234:23–235:23). Dr. Pirrong, however, testified that Peru had the highest risk of any of the top twelve copper-producing countries between 1984 and March 2003, citing the International Country Risk Guide. (DX 0621).

Setting aside the debate over Peru's riskiness, there is little evidence presented by AMC to support the 30% downward adjustment made by E & Y. Houlihan chose not to use a downward adjustment of any kind as it believed doing so would slant the valuation downward and it believed that the comparable companies also had some international risk that was incor-

---

**69.** This analysis is slightly different than the comparable companies analysis done by the other valuation firms in this case. Behre Dolbear did not determine the appropriate multiples based on comparable companies, but rather looked at SPCC's EBITDA and used multiples 5, 7.5, and 10. Behre Dolbear concluded that the year 2000 EBITDA best reflected SPCC's value, and that a multiple of five was appropriate for a slow-growing, mature industry like natural resources. (PX 0071).

**70.** A control premium of 20% would have resulted in a value of approximately $738 million.

**71.** Terminal value is a key input into the discounted cash flow model as it represents the worth of a company above and beyond its present income stream. It is essentially the long-term business value.

porated into the betas captured.[72] (Croft Depo. 364:22–365:20). Similarly, Navigant determined that it was not appropriate to apply this downward adjustment because the comparable companies were subject to similar levels of mining-specific country risk. In fact, even Dr. Pirrong, in his market multiples analysis, which he used to calculate terminal value, made no such downward adjustment. Considering this evidence, the Court finds that the companies used for comparison had international risk built into their numbers. Further, this Court finds that without further justification, E & Y's adjustment seems subjective and rather arbitrary. AMC did not offer a satisfactory explanation of why an adjustment of almost one-third was necessary. The Court is not convinced that the country risk and size of SPCC warranted such a change. Thus, the Court finds that the 30% downward adjustment is not appropriate.[73]

The Court must next determine what, if any, control premium should be used. The Court finds that a control premium should be added to the market multiples valuation.[74] The Court determined that 20% was an appropriate control premium to add to the stock price valuation. This was due, in part, to the recognition that there was some element of control factored into the stock price. In the context of the market multiples valuation, however, there is no control factored into the resulting value. Therefore, there is some basis to apply a higher control premium to the market multiples valuation. ASARCO urges the Court to apply a 30% to 49% premium, and AMC argues that no premium or a maximum 8% premium is appropriate.

The Court again finds it instructive to look at the control premiums used in contemporaneous valuations and by experts in this case. Houlihan used a 20% control premium and E & Y used a 30% premium. Behre Dolbear averaged five valuation methods, including a market multiples analysis, and then applied a 25% premium. Dr. Pirrong did not apply a premium, but contends if any premium is appropriate, it should be 7–8%. Navigant, like E & Y, used a 30% premium. Considering the evidence presented, the Court finds it reasonable to apply a 20% to 30% premium to the market multiples valuation.[75]

72. A beta is a qualitative measure of the volatility of a given stock relative to the overall market. A beta above one (1) is more volatile than the overall market, while a beta below one (1) is less volatile.

73. There is no explanation of why 30%, as opposed to 20% or 10% for example, was necessary. If E & Y had made a 20% downward adjustment, the stock at issue would have been valued at over $700 million, and a 10% downward adjustment would result in a value over $800 million.

74. As discussed previously, AMC argues that a control premium is inappropriate because based on SPCC's Restated Certificate of Incorporation and Stockholders' Agreement, there was no guarantee that a third party would obtain a controlling interest, thus would not pay a premium, and even if ASARCO could transfer control, there is no evidence that a potential buyer could increase the cash flow of the company. For the reasons stated above, the Court is not persuaded by these arguments. The evidence in favor of adding a control premium is even stronger in the market multiples valuation because E & Y added such a premium to this analysis, whereas it did not add a premium to its stock price valuation.

75. The Court acknowledges that this 10% differential could yield a large range of market multiple values but emphasizes that it is using the market multiples approach merely as a reasonableness check. The Court was persuaded by the evidence at trial that this was the least accurate valuation methodology for the SPCC stock.

The Court must next decide which formula to use to determine the value of the SPCC stock. Dr. Pirrong's comparable companies were: Boliden AB; Falconbridge Ltd.; Freeport–McMoRan Copper and Gold, Inc.; Inco Ltd.; Noranda Inc.; Phelps Dodge Corp.; Rio Tinto PLC; and Teck Cominco Ltd. The multiple Dr. Pirrong used was an average of the quotient of each of these comparable companies' total enterprise value (hereinafter "TEV") over their last twelve months EBITDA. (DX 0611). These are the same companies that Houlihan found to be comparable. It is unclear from Houlihan's preliminary report, however, which multiples it would use to calculate the SPCC's value based on the market multiple approach. (PX 0097).

For its comparable companies, E & Y used: Antofagasta PLC; Falconbridge Ltd.; Freeport–McMoRan Copper; Inco Ltd.; Noranda, Inc.; Phelps Dodge Corp.; and Teck Cominco Ltd. (PX 0185). For each company, E & Y considered various multiples: Total Invested Capital ("TIC") over revenue; TIC over EBITDA; TIC over Debt-free net income; TIC over debt-free cash flow; TIC over total assets; Market Value of Equity ("MVE") over book equity; and MVE over year ahead earnings. E & Y then found the median of each of these various multiples (and made a downward adjustment of 30% to each multiple, which the Court does not agree with). (PX 0185). Next, E & Y applied each multiple to the corresponding SPCC data, determined the enterprise value, subtracted for debt, and determined the median equity value of SPCC as a whole. (PX 0185). This figure was $914 million. Navigant used the exact same methodology, except it eliminated the downward adjustment to the multiples. (PX 1217). Navigant determined that the equity value of SPCC was $1.37 billion [76] (PX 1217).

The Court finds that the approach used by E & Y and Navigant leads to the more reliable results as it uses various valuation multiples rather than just one, as Dr. Pirrong did. Furthermore, the Court finds the companies chosen by E & Y to be sufficiently comparable to SPCC to lead to the most reliable result in this type of analysis.

Using the equity value derived from E & Y's analysis, less the 30% downward adjustment, the Court finds that the market multiple valuation indicates that AS-ARCO/SPHC's equity stake in SPCC was worth $890 million applying a 20% control premium, $928 million with a 25% premium, and $965 million using a 30% premium.

**MARKET MULTIPLES VALUATION AT VARIOUS CONTROL PREMIUMS
AND DOWNWARD ADJUSTMENTS**
(in millions of dollars)

| | 30% premium | 25% premium | 20% premium | No premium |
|---|---|---|---|---|
| No adjustment | 965.2 | 928 | 890.9 | 742.4 |
| 10% adjustment [77] | 813.5 | 782.2 | 750.9 | 625.8 |
| 20% adjustment | 715.8 | 672.8 | 645.9 | 538.2 |
| 30% adjustment | 644 | 619.3 | 594.5 | 495.4 |

(b) Comparable Transactions

 E & Y considered the similar

76. This represents the equity value of 100% of SPCC without applying a control premium.

77. The 10% and 20% downward adjustments were not calculated by either party.

transaction method but decided not to give weight to this analysis because the publicly available information was incomplete and not considered reasonably comparable to derive a meaningful valuation. (PX 0185).

Behre Dolbear used two related transaction analyses. One considered the related transactions of similar companies on a price per pound of copper production, and for the other, Behre Dolbear looked at related transactions for purchase of proven and probable copper reserves. (PX 0071). Using these methods, Behre Dolbear found SPCC's value to be $1.26 billion and $1.19 billion, respectively, meaning ASARCO/SPHC's interest would be $682.67 million and $644.74 million.

Houlihan, in its preliminary analysis, also looked at comparable transactions. (PX 0097). These transactions included Tech Corp.'s acquisition of Cominco Ltd., BHP Ltd.'s acquisition of Billiton PLC, Grupo's acquisition of ASARCO, Phelps Dodge Corp.'s acquisition of Cyprus Amax Minerals Co., and Inter–Rock Minerals, Inc.'s acquisition of Min–Ad, Inc. (PX 0097). Houlihan found multiples for TEV over revenue ranging from 0.72 to 1.77, with a median of 1.13, and multiples from TEV over EBITDA ranging from 5.2 to 8.6 with a median of 5.7. (PX 0097). For the twelve-month period preceding December 31, 2002, SPCC's revenue was $660 million. (PX 0185). Using the median multiple that Houlihan derived and multiplying it by SPCC's revenue, the value of SPCC would be $746.5 million and ASARCO/SPHC's 54.18% interest would be valued at $404.45 million.[78] For the same period, SPCC's EBITDA was $182.4 million. (PX 0185). Thus, using the median multiple from above times SPCC's EBITDA, SPCC's value would be $1.04 billion and ASARCO/SPHC's interest would be valued at approximately $563.32 million.[79]

Navigant did not use the comparable transactions approach as an independent valuation approach. However, Dr. Gulley opined that Compania Minera Disputada de las Condes ("Disputada"), which was sold months before SPCC, was very similar to SPCC. (Gulley, May 20, 2008, 107:19–108:9). Disputada had similar mining operations in Chile, consisting of two copper mines, a smelter, some refining plants and other assets. (Gulley, May 20, 2008, 107:19–108:9). It was offered for sale by Exxon, and was purchased for $1.3 billion. (Gulley, May 20, 2008, 107:19–108:9). SPCC's reserves and production were 50% higher than Disputadas. (Gulley, May 20, 2008, 107:19–108:9).

Bernard Guarnera, president and CEO of Behre Dolbear, agreed that SPCC and Disputada were very similar. Guarnera testified that in the Disputada sale, the purchaser paid 6.3 cents per pound of copper in proven and probable reserves and if a buyer had paid the same price per pound for SPCC, SPCC would be worth $2.05 billion. (Guarnera Depo. 36:12–38:06). This would mean ASARCO/SPHC's 54.18% interest in SPCC would be worth $1.11 billion. Although the Court recognizes the similarities between Disputada and SPCC, the Court finds that the evidence does not otherwise support the contention that ASARCO/SPHC's interest in SPCC exceeded $1 billion.

After considering the various "comparable transactions," which various valuation

---

**78.** Based on the range of multiples, the value of SPCC would be between $475.6 million and $1.17 billion, and ASARCO/SPHC's interest would be valued between $257.7 million and $633.5 million.

**79.** The range of SPCC's value would be $948.5 million to $1.57 billion and ASARCO/SPHC's 54.18% interest would be worth $513.9 million to $849.9 million.

firms and experts in this case analyzed, the Court finds that, in this case, the comparable transaction analysis is not a reliable approach or even a helpful exercise. This method has produced results ranging from $257.7 million to over $1 billion. For this reason, the Court is not influenced by the results of the comparable transaction valuation method in this case.

### iii. Discounted Cash Flow

█ The next method of valuing the SPCC stock is the discounted cash flow ("DCF") analysis. The Court finds that, at least in this case, the DCF method is the most reliable means of valuing the SPCC stock. Each contemporaneous valuation firm and both Plaintiffs' and Defendant's experts used this method.[80] There are numerous variables that go into a DCF analysis; however, the most important variables in this case are the price of copper and the discount rate. There was a substantial amount of evidence from both sides on each of these variables.

### (a) COPPER PRICE

On March 31, 2003, the day the transaction closed, the spot price of copper was just over 71 cents per pound. Throughout this trial, copper has consistently closed at well over three dollars per pound. This most recent figure, however, is not pertinent to the question the Court must now decide—what would have been the most reasonable long-term average copper price for the parties to utilize in a DCF analysis in March 2003?[81] To make this determination, the Court considers prices used by valuation firms at the time, contemporaneous analysts' forecasts, the long-term assumptions made by SPCC and ASARCO, and the experts' opinions presented at trial. For the reasons that follow, the Court concludes that an appropriate long-term copper price to use at the time of the transfer was 90 cents.

First, the contemporaneous valuations support the use of 90 cents as an average long-term copper price. In April 2002, Behre Dolbear conducted a DCF analysis in which it used 90 cents and 92 cents as its long-term copper prices. Behre Dolbear reached these numbers by looking at contemporaneous forecasts, which projected a 15–year average price of 96 cents per pound. (PX 0071). It also looked at Brook Hunt, which predicted an average price from 2004 to 2019 of 95 cents per pound (in 2001 dollars), and Bloomsbury, which found the long-term average price to be 95 cents to one dollar. (PX 0071). After examining the contemporaneous

---

**80.** Houlihan's DCF analysis concluded that the enterprise value of the SPCC stock was $854 million to $1.17 billion. PRG, in late 2001, determined that the stock was worth $821 million to $1.03 billion. In April 2002, Behre Dolbear's DCF analysis valued the stock between $595 million and $637 million. (PX 0071). PWC concluded, using a DCF analysis, that the business enterprise value of the stock was $978 million. (PX 0007). E & Y's DCF methodology determined that the stock was worth $633 million. Navigant, Plaintiffs' expert, found that the value was between $1.025 billion and $1,026 billion, according to their DCF analysis. Lastly, Dr. Pirrong, Defendant's expert, found that the stock's value using the DCF approach was $637.7 million.

**81.** All parties agree, in varying degrees, that the price of copper is somewhat volatile and cyclical. (*See, e.g.,* Guarnera Depo. 14:10; Genaro Larrea Depo. 161:4–22; Lee Depo. 53:5–54:16; Gulley, May 20, 2008, 117:5–117:9). Most witnesses also testified that the depression in prices prevailing in 2002–2003 would not last and that the price of copper would rise. (*See, e.g.,* Guarnera Depo. 16:7–17:11; Genaro Larrea Depo. 161:4–22). With this in mind, it would be inappropriate to use the spot market price as a basis for the long-term average price in the DCF model.

forecasts, Behre Dolbear concluded that "the industry seems to believe copper prices will rebound to around $0.90 to $0.95 per pound, and that is the copper price which is generally used to determine reserves ...." (PX 0071 at 34). Behre Dolbear performed its DCF valuation at three different copper prices: at 85 cents, the value of SPCC was $904 million; at 90 cents, $1.10 billion; at 92 cents, $1.18 billion; at 96 cents, $1.33 billion, and at one dollar, $1.49 billion.[82] Guarnera testified that Behre Dolbear felt that the appropriate long-term average was 96 cents but utilized 90 and 92 cents in the final valuation to be conservative. (Guarnera Depo. 43:15–44:07; 54:12–55:3). PRG reviewed Behre Dolbear's analysis for the Department of Justice and conducted its DCF analysis based on a long-term average price of copper of 89 cents. (PX 0063).[83]

Dr. Gulley, an expert for ASARCO in this case, looked at price forecasts made between July 1, 2002 and January 15, 2003.[84] (PX 1220). For 2003, there were 59 forecasts, for 2004 there were 38, for 2005 there were 11, there were 9 for 2006, and 7 for 2007. The remaining years had four or fewer forecasts, and thus, are less reliable. The average of the median price forecasts for these five years was 94.67 cents.[85]

ASARCO and SPCC were both using 90 to 92 cents during the relevant time period. According to Schwickerath, ASARCO was using a ten-year average price of 91 cents per pound and their mine plans used 90 and 92 cents at this time (Schwickerath, May 20, 2008, 49:13–50:3). ASARCO's management used the ten-year average price of copper, 91 cents, for purposes of reviewing for asset recoverability. (PX

---

82. These numbers represent Behre Dolbear's DCF results for the total value of SPCC. To determine ASARCO/SPHC's interest, one must multiply by 54.18%.

83. Another contemporaneous valuation supports a finding that 90 cents was an appropriate long-term copper price. Although it did not conduct a DCF analysis, in February 2002, Winters Dorsey performed a technical audit of ASARCO's Arizona copper mines. In this opinion, Winters Dorsey noted ASARCO's ore reserves were valued at 90 cents per pound. Winters Dorsey stated that it was not unusual for mining companies to carry ore reserves based on prices higher than actual current price of 70 cents "if, in the mining company's opinion, a reasonable long-term average, real copper price is substantially in excess of the current price." (PX 0054 at 4–8). This certainly indicates that Winters Dorsey did not find 90 cents to be an unreasonable long-term price.

84. The defendant filed a *Daubert* motion pertaining to some of Dr. David Gulley's testimony and more specifically argued vehemently that the Court should not use Dr. Gulley's criticism of AMC's management of ASARCO (or ASARCO's management) and should not admit or rely on Dr. Gulley's projections on copper trends. While the Court found a por-

tion of Dr. Gulley's testimony to be relevant and useful, it concurs with Defendant's characterization of his copper trend price graph and accompanying testimony and did not rely upon it in its analysis in any fashion. With regard to his criticisms of management, the Court cannot hold that, across the board, such were not relevant or that he was not qualified to offer any such opinion just because he has never worked directly in the mining industry. He is educated and trained in the mining industry as he has a Ph.D. in mineral economics and a B.S. in mineral engineering and has worked as a consultant for the industry for decades. The Court felt that AMC's criticisms went to the weight that should be given to Dr. Gulley's testimony and not the admissibility of that testimony. Thus, it did not, as was suggested in Defendant's motion, find his entire testimony to be excludable, although the Court preferred to and did rely on the original source documents in evidence and did not rely on Dr. Gulley's characterization of them.

85. The average of the 25th percentile forecasts for these five years was 86.27 cents, and the average of the 75th percentile through 2007 was 96.6 cents.

1371).[86] Also, in ASARCO's 2001 and 2002 10–Ks, it used 90 cents to value its ore reserves. (PX 0659, PX 1021). The 10–Ks also stated, "[t]he company believes the copper price assumption it uses is consistent with average historical copper prices over recent full economic and pricing cycles." (PX 1021). SPCC's public filings also reported that 90 cents was its long-term copper price. (PX 1021; PX 1026).[87] Genaro Larrea testified that he believed that copper prices would increase in 2003. (Genaro Depo. at 161:4–22). Also, SPCC used 95 cents as a long-term copper price in its company valuation in October 2002. (PX 2004).

There is also evidence that the appropriate long-term copper price was higher than 90 cents. For example, in 2000, PWC used a long-term average price of $1.02, relying on a forecast by Brook Hunt. Dr. Gulley, looking at analyst forecasts, also recommended using 95 cents. Navigant concurred in this opinion, and used 90 and 95 cents in its DCF analyses. Also, in October 2003, Prudential predicted 90 cents in 2004 and 95 cents for 2005. (PX 0143). Despite evidence that a higher price might be appropriate, the Court is more heavily persuaded by the evidence in favor of using 90 cents as a long-term price in March 2003, especially as that was the price used internally by SPCC and ASARCO.

Defendant contends that the appropriate long-term price was 85 cents. One of AMC's strongest arguments in support of this contention is that Houlihan used 85 cents as a long-term price in its preliminary analysis. (PX 0097). This was purportedly based in part on analysts reports

for 2002 and 2003. In 2002, the median price forecasted in these analysts' reports was 80 cents and the mean was 82. For 2003, however, the mean and median price were 91 cents. There was also testimony that Tellechea expressed his belief to Houlihan that 85 cents would be more appropriate than 92 cents for purposes of the DCF analysis. (Croft Depo. 144:17–154:17). Nevertheless, Houlihan's conclusion that 85 cents was an appropriate long-term price was not thoroughly explained, in light of the fact that it seems inconsistent with the analysts' forecasts that Houlihan considered.

AMC also points out that E & Y used 80 cents in 2002 and 85 cents for the remaining period as a long-term copper price. E & Y, was probably given this scenario by Daniel Tellechea, who, unbeknownst to E & Y was employed by both ASARCO and AMC. (Jacob 219:3–23; Uebelhack 40:1–41:8). AMC put forth testimony indicating that E & Y did not know what numbers ASARCO and SPCC were using, but instead based its long-term price on analysts' forecasts. As Mr. Uebelhack, Executive Director in the transaction advisory practice at E & Y, acknowledged, however, many of these analysts were predicting copper prices above 85 cents and some projected prices of at least 95 cents for 2005. (Uebelhack Depo. 117:5–25).

 Although Dr. Gulley now claims 95 cents was the appropriate long-term price to use in 2003, AMC argues that Dr. Gulley suggested using a long-term copper price of 82–85 cents during the relevant period in his publication, "Metals Market

**86.** On December 31, 2002, the 10–year average price of copper was 91 cents according to Comex. (PX 1371).

**87.** AMC maintains this is just a figure it used to calculate ore reserves, but its 10–Q goes

further, "Ore reserve calculations for 2002 and recent prior years were calculated based on 90 cents per pound copper price assumptions which represented the company's long-term outlook for copper price."

Sentiment." (DX 0178, DX 0837). In each issue of this quarterly publication, there was a survey questionnaire sent to a number of industry participants. One question they were asked was, "[w]hat price do you suggest using for purposes of longer-term valuation and investment analysis?" (DX 0178, DX 0837). The median of the handful of responses is published as the answer. (Gulley, May 20, 2008, 127:6–128:18). The answers ranged from 80 to 82 cents. (DX 178, DX 837). Dr. Gulley testified that this is a price assumption used for investment purposes and was not a forecast. (Gulley, May 20, 2008, 127:6–128:18). A forecast, Dr. Gulley explained, is a year-by-year projection of copper prices; whereas the published information here was merely a survey of what some industry participants might use for investment purposes. (Gulley, May 20, 2008, 127:6–128:18). More importantly, these numbers are the result of an informal survey, and there is no proof as to what methodology, if any, the respondents to the survey used to arrive at their answers. The Court finds this information less reliable than the year-by-year analysts' forecasts relied on by Dr. Gulley for his opinion in this case.

■ Dr. Pirrong looked to London Metals Exchange ("LME") futures prices to determine the long-term price of copper. According to his analysis of the LME data, the appropriate long-term price was 80 cents. The Court is not persuaded that this is the most reliable means of determining the appropriate long-term price. First, Dr. Pirrong relied, in part, on 63–month forward contracts. This type of contract was not available for trading until September 2002, and there were zero trades from January through March 2003. (Uebelhack, May 20, 2008, 130:12–131:6). Forward contracts were very thinly traded beyond short term, making the price of these long-term contracts less reliable. (Lee Depo. 76:6–19). Long-dated copper futures are not widely held by institutional investors nor are they widely covered by analysts. (Gulley Rebuttal Report at 7–8). It is also significant to note that Dr. Pirrong is the only valuation individual or firm in this case who relied so heavily on the LME futures market to determine the copper price. For these reasons, the Court finds that using long-term futures prices is not the most accurate means of determining a long-term copper price.

Despite the evidence before the Court in favor of adopting a copper price of 85 cents or a copper price above 90 cents, the Court finds that 90 cents would have been the most reasonable long-term average copper price to use in a DCF analysis in March 2003.

(b) DISCOUNT RATE [88]

■ The parties presented three approaches for calculating a discount rate in

---

**88.** One of the most hard fought aspects of this trial was which discount rate should be applied and how it should be calculated. It was the source of the only dueling *Daubert* motions filed, with each side saying the other's witnesses were unqualified and were using the wrong methodology. The Court will address each one in turn.

The Court finds Dr. Pirrong to be qualified to offer the testimony about how to calculate the value of the SPCC stock. He is a Professor of Finance and Director of the Global

Energy Management Institute at the University of Houston and has a Ph.D. in Economics. The fact that he used a different method (the Fama–French method) to calculate a discount rate does not render him unqualified nor does it suggest his opinion is invalid. Nevertheless, as will be seen, the Court chose not to adopt his opinion for the reasons stated in the text. The Court also rejected his use of a single day stock price—despite the fact the day he chose was the day of closing. His opinion that a single-day stock price was ap-

this case: (1) Capital Asset Pricing Model ("CAPM"); (2) the Build-up method; and (3) Fama–French.[89] Behre Dolbear, Houlihan, E & Y, and Navigant all used CAPM to calculate the discount rate for purposes of valuing SPCC. Dr. Pirrong was the sole individual or firm who used the Fama–French method. The Court finds that CAPM is the appropriate method for calculating the discount rate in this case.

■ By Dr. Pirrong's own admission, the Fama–French method is used primarily by academics and was not used by the valuation industry at the time of the transfer. (Pirrong, June 4, 2008, 234:21–235:7). Even today, Fama–French has not gained wide-spread acceptance by valuation firms. (Pirrong, June 4, 2008, 175:15–22). Currently, Fama–French may be prevalent in academia and may be used in the investment community. It may eventually evolve into the preferred approach universally; however, this is not the method that the parties in this case (or a hypothetical willing buyer and willing seller) would have utilized to determine the value of SPCC's stock in 2002–2003.[90]

AMC points out that Delaware courts have regarded the Fama–French method favorably. Most of the Delaware cases using Fama–French did so because it led to a reasonable result that was in line with

propriate also did not disqualify him as an expert. The Court weighed all of the evidence, especially the evidence involving the analysis being done in 2002–2003, and found that method wanting.

Conversely, Defendant lodged similar objections to Tucker and Schwickerath (Navigant) and their methodology. The fact that their DCF analysis used the capital asset pricing model (or the build-up method) instead of the Fama–French method to determine the discounted cash flow does not render their opinions inadmissible. At times, the main complaint aimed at these gentlemen was that they were advocates not experts. There were a number of times during their testimony where the Court agreed with this objection; however, that goes to the weight of their testimony not to the overall admissibility. AMC objected to their valuation method and conclusions, their approach to solvency, and how one determines insolvency. It also objected to their ad hoc application of control premiums. Again, much of this was fodder for cross-examination throughout their testimony. The Court followed their suggested methodology where it was appropriate (discount cash flow), but rejected it when it was not supportable by the evidence (the SPCC stock being worth over $1 billion dollars in 2003).

The Court states that with regard to all three gentlemen, it rejected the testimony they offered when it was speculative or when it went outside their expertise. When the testimony was inside their fields of expertise, the Court considered it, but chose to follow

the evidence it found to be most credible not only from a testimony standpoint, but also based upon the thousands of documents in evidence.

89. For purposes of this opinion, the Court will refer to both CAPM and the Build-up method jointly as CAPM. The Build-up method is essentially the CAPM approach with additional risk factors added to it.

90. AMC argues that the question is not what the "business valuation industry" standard was at the time, but rather what the copper industry standards were. Rather than getting caught up in this fine distinction, the Court simply notes that its goal is to determine the price a willing buyer would have paid a willing seller in an arm's-length transaction at the time of the transfer. In conducting this inquiry, the Court must recognize that the buyer and seller might each have hired consultants to determine the value of the stock prior to the transfer or had the analysis done internally. It is ludicrous to think that one would invest $500 million to $1 billion without conducting such an analysis first. Indeed, AMC/Grupo hired Houlihan and E & Y to do that very thing, and, similarly, the DOJ hired Behre Dolbear to undertake this evaluation. Based on the evidence before the Court, it is apparent that in 2003, such a consultant would almost certainly not have used the Fama–French method. Therefore, the Court finds the method inappropriate in this context.

the other evidence in the case; they do not contain a blanket endorsement of the method. For example, in *Cede & Co., Inc. v. MedPointe Healthcare, Inc.*, the Court noted that the most important factor in deciding which method to use was that the expert not using Fama–French came up with a discount rate outside the range used for most other valuations of the subject company. No. Civ.A. 19354–NC, 2004 WL 2093967, at *18–19 (Del.Ch.2004). In this case, Behre Dolbear applied a 9.7% discount rate (PX 0071); PRG applied a 10% discount rate (PX 0063); Houlihan used a 10% discount rate (PX 0097); and E & Y applied a 9% discount rate (PX 0185). In contrast, Dr. Pirrong, using the Fama–French approach, applied a discount rate of 13.4%. This is outside the range of the discount rates applied by contemporaneous valuation firms. The Court finds the Fama–French method, and Dr. Pirrong's discount rate of 13.4%, to be inappropriate in this case.

Navigant applied a 9% discount rate in its DCF analysis. This was consistent with the discount rate E & Y used. The Court finds that a discount rate between 9% and 10% would not be unreasonable, but that the 9% discount rate used by Navigant and E & Y was most appropriate in valuing SPCC.

### (c) DCF CONCLUSION

After reviewing the various DCF models presented to the Court by the various experts in this case, the Court finds that Navigant's approach is the most accurate. Using this DCF model, and simply changing the long-term price from 95 cents to 90 cents and leaving the 9% discount rate, the value of the SPCC stock was $853 million. If one uses 90 cents and adjusts the discount rate from 9% to 9.5%, the value of ASARCO/SPHC's share of the SPCC stock at the time of the transfer

was $775.3 million, and if one were to apply a 10% discount rate the value of the stock would be $708.3 million. As discussed above, the Court finds 90 cents to be the most reasonable long-term copper price and 9% to be the most appropriate discount rate. Therefore, the value of ASARCO/SPHC's stake in SPCC using a discounted cash flow method was $853 million.

### iv. Conclusion

The Court has found that the value of SPCC using the stock price approach is $811.4 million using a 30–day trailing price and a 20% control premium. Using the comparable company method, the value of the stock was $890 million applying a 20% control premium, $928 million with a 25% control premium, and $965 million adding a 30% premium. Finally, the Court's DCF analysis resulted in a value of $853 million applying a 9% discount rate with a long-term copper price of 90 cents.

As noted above, the Court performed the comparable company approach merely as a reasonableness check, and finds it to be the least reliable methodology in this case. After considering the stock price valuation and discounted cash flow approach, it is apparent that the market multiples/comparable company method produced a result outside of the range of the other two methods, and considerably higher than any contemporaneous valuation. For this reason, along with the criticism of it in the record already detailed above, the Court finds this method to be unpersuasive in determining the value of the SPCC shares.

The Court, therefore, concludes that an accurate analysis performed in March 2003 would have found that the value of ASAR-

CO/SPHC's stake in SPCC was worth between $811.4 million and $853 million.[91]

### c. The Consideration Received Was Reasonably Equivalent To The Value Of The SPCC Stock

 As discussed above, the Court finds that the value of the consideration ASARCO received was $727.79 million. The value of the SPCC stock transferred to AMC was between $811.4 million and $853 million. The Court must determine, in light of the totality of the circumstances, whether these two figures are reasonably equivalent, i.e., whether the value ASARCO received was substantially or unreasonably less than the fair value of its interest in SPCC.

The value $727.79 million, is approximately 85% of $853 million and 90% of $811.4 million. Percentage-wise, the values are very close—certainly well above the 70–percent rule suggested in some earlier cases. The difference between these values, however, is $83,610,000 to $125,210,000. These amounts are not insubstantial. The disparity between the value of consideration received by the debtor compared to the value of the asset transferred is the most important factor, but the Court must consider the totality of the circumstances surrounding the transaction, especially in a situation such as this where the consideration amounts to a large percentage of the value of the asset, but there is still an eight- to nine-figure

difference between the fair market value and the value ASARCO received.

One factor the Court considers is whether this was an arm's-length transaction.[92] *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir.2006). There is no question that this was not a true arm's-length transaction as Grupo controlled the buyer (AMC), the seller (ASARCO/SPHC), and the target company (SPCC). (*See, e.g.*, PX 0507; PX 0965). Indeed, this Court would be hard pressed to cite any single witness's testimony that supports a finding otherwise. This, however, was not a typical insider transaction. Although Grupo controlled the parties to the transfer, the DOJ had some input with the price. (DX 0306; PX 0802). According to Defendant's witnesses, the DOJ established the price to be paid, relying on its own retained valuation firm, Behre Dolbear. (PX 0802). The DOJ had an incentive to ensure that reasonably equivalent value was paid for the SPCC shares because the government would need to look to the seller, ASARCO, in the future for environmental liabilities. (Mabey, May 22, 2008, 58:22–59:12). A federal court in Arizona then approved the agreement between the DOJ and Grupo and its affiliates regarding the price and terms of the SPCC stock transfer. (DX 0001). Because the sales price was partially negotiated in settlement of a judicial proceeding and approved by a federal court, this Court finds a distinction between this case and the typical non-arm's-length transaction.[93]

---

**91.** The Court notes "the irony that judges, few of whom would qualify as expert witnesses in any trial of asset valuation, regularly determine the worth of assets...." *In re Heilig–Meyers Co.*, 319 B.R. 447, 461 (Bankr.E.D.Va. 2004) (quoting *Domestic Loan and Inv. Bank v. Mann*, 249 B.R. 831, 839 (1st Cir.2000)).

**92.** An arm's-length transaction is "[a] transaction between two unrelated and unaffiliated parties" or "[a] transaction between two par-

ties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises." BLACK'S LAW DICTIONARY (8th ed.2004).

**93.** Although the Court finds that the purchase price resulted, in part, from negotiations with the DOJ, the Court does not find that the DOJ had the same incentive to maximize the value of consideration as a seller would. Further, the Court does not find that the DOJ was

The Court is presently five years removed from the transaction, and the price of copper is currently over $3.00 more per pound than it was at the time of the transfer. The Court has had the benefit of reviewing thousands of documents, analyzing contemporaneous valuations, hearing the sworn testimony of key players, and listening to and asking questions of valuation experts who have done the same. The Court's task, however, is to put itself in the position of the parties involved in the transfer on March 31, 2003. At the time of the transfer, copper was approximately 71 cents per pound, E & Y and EYCF had conducted an analysis and issued an opinion stating that the consideration was fair, and the DOJ seemingly agreed that the consideration was reasonably equivalent to the value of the stock. Thus, while not determinative of REV, it was reasonable for AMC/Grupo to believe ASARCO was receiving reasonably equivalent value.

Considering the totality of the circumstances, the Court finds that the value ASARCO received, $727.79 million, was not unreasonably less than the value of the SPCC shares (between $811.4 million to $853 million). Although the difference in price is at least $83 million, ASARCO received 85% to 90% of the value of the SPCC stock. The law does not demand

that a plaintiff receive an amount equal to the fair market value of the asset it transfers; the consideration must only be *reasonably* equivalent. Given all the surrounding facts and circumstances, including the various considerations, assumptions, business judgments, and the lack of precision, which are inherent to the calculation of REV of mining stock, the Court finds that ASARCO received reasonably equivalent value for its stake in SPCC.[94]

Since the Court finds that ASARCO received reasonably equivalent value for the SPCC shares transferred on March 31, 2003, ASARCO's constructive fraudulent transfer claim fails and there is no need to reach the second prong regarding whether ASARCO was insolvent.[95]

### C. Actual Fraudulent Transfer

According to the Delaware Code, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor." 6 Del. C. § 1304(a), (a)(1).

concerned with the interests of any of ASARCO's other creditors in negotiating this settlement. This fact, however, is not germane to the REV analysis and will be discussed in detail in the actual fraudulent transfer analysis, *infra.*

**94.** The Court, in making this finding, is keenly aware that the additional $83 million to $125 million could well have made the difference in ASARCO's eventual need to file bankruptcy. Houlihan predicted that ASARCO needed to realize $834 million to remain operationally sound. That amount fits squarely in the range that the Court has found to be the value of the shares at the time. The question of what amount ASARCO needed to stay afloat,

however, is a separate consideration from whether ASARCO received reasonably equivalent value for the asset transferred.

**95.** As discussed *infra,* the Court finds that ASARCO was "insolvent" at the time of the challenged transfer. The Court discusses insolvency in determining whether ASARCO's directors owed a fiduciary duty to ASARCO's creditors. The parties agreed that the tests for "insolvency" are the same in the breach of fiduciary duty context as they are under the constructive fraudulent transfer provision of the UFTA. Therefore, had ASARCO not received REV, AMC would be liable for constructive fraudulent transfer.

*1. Burden Of Proof*

 Neither the Delaware Supreme Court nor any Delaware appellate court has expressly addressed the issue regarding the standard of proof applicable to Delaware UFTA claims. Since Delaware's case law is silent as to the standard of proof required for an actual-intent fraudulent transfer claim, it is proper to look to other UFTA jurisdictions for guidance. *See, e.g., Terry v. June*, 432 F.Supp.2d 635, 639 (W.D.Va.2006). Additionally, § 548 of the Bankruptcy Code is substantially the same as Delaware's actual fraudulent transfer provision.[96] Thus, although ASARCO has not brought an action under § 548, the Court may look to cases interpreting actual-intent fraudulent transfer provisions of the Bankruptcy Code to predict the standard that would be applied under Delaware's enactment of the UFTA. *See In re PHP Healthcare Corp.*, 128 Fed.Appx. 839, 847 (3d Cir.2005) ("We need not discuss the [actual-intent fraudulent transfer] provisions of the Delaware Fraudulent Transfer Act ... because they are substantially the same as the relevant parts of the Bankruptcy Code.").

More than forty states plus the District of Columbia have adopted the UFTA. *See Terry*, 359 F.Supp.2d at 520; *see, e.g.*, 6

Del. C. § 1304(a)(1) (2008); Fla. Stat. § 726.105(1)(1)(a) (same); Mo. St. § 428.024(*l*)(*l*)(a) (2008) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor ... if the debtor made the transfer or incurred the obligation ... [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor ..."); N.J. Stat. § 25:2–25 (same). Despite the uniform language in each states statute, the burden of proof applied to actual-intent fraudulent transfer varies among jurisdictions. *See, e.g., Gen. Trading, Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1498 (11th Cir.1997) (using the preponderance of the evidence standard under Florida law); *VFB LLC v. Campbell Soup Co.*, 2005 WL 2234606, at *31 n. 74, 2005 U.S. Dist. LEXIS 19999, at *108 n. 74 (D.Del. Sept. 13, 2005) (noting that the burden is unsettled Civil Action No. 02–137 KAJ, in New Jersey); *Bueneman v. Zykan*, 52 S.W.3d 49, 54 (Mo.Ct. App.2001) (T.1., p. 216) (requiring clear and convincing evidence in Missouri). The reason for the lack of uniformity is that UFTA jurisdictions determine the standard of proof required in an actual-intent fraudulent transfer claim by focusing on that state's pre-UFTA fraudulent conveyance law.[97] Prior to the enactment of the

**96.** *Compare* 11 U.S.C. § 548(a)(1)(A) ("The trustee may avoid any transfer ... of an interest of the debtor. if the debtor ... made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity ..."), *with* 6 Del. C. § 1304(a)(1) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor ... if the debtor made the transfer or incurred the obligation ... [w]ith actual intent to hinder, delay or defraud any creditor of the debtor.").

**97.** *See Epperson v. Entm't Exp., Inc.*, 159 Fed. Appx. 249, 251–52 (2d Cir.2005); *General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1497–98 (11th Cir.1997); *Wachovia Sec., LLC v. Neuhauser*, 528 F.Supp.2d 834, 858 (N.D.Ill.2007); *Kreidler v. Taylor*,

No. 05–cv–1262–BR, 2007 WL 1560627, at *6 (D.Or. May 24, 2007); *In re Foxcroft Square Co.*, 184 B.R. 671, 674 (E.D.Pa.1995); *Mann v. Hanil Bank*, 920 F.Supp. 944, 950 (E.D.Wis.1996); *In re Chapman Lumber Co.*, Bankr. No. 05–0408, 2007 WL 2316528, at *2 (Bankr.N.D.Iowa Aug. 8, 2007) (quoting *Benson v. Richardson*, 537 N.W.2d 748, 756 (Iowa 1995)); *In re O'Day Corp.*, 126 B.R. 370, 410 (Bankr.D.Mass.1991); *In re Am. Way Serv. Corp.*, 229 B.R. 496, 530 n. 112 (Bankr.S.D.Fla.1999); *Matter of Twin Lakes Village, Inc.*, 2 B.R. 532, 538 (Bankr.D.Nev. 1980); *In re Stanley*, 384 B.R. 788, 798–99 (Bankr.S.D.Ohio 2008); *In re Solomon*, 300 B.R. 57, 62–63 (Bankr.N.D.Okla.2003); *Glinka v. Bank of Vermont (In re Kelton Motors, Inc.)*, 130 B.R. 170, 181 (Bankr.D.Vt.1991);

UFTA, jurisdictions were split as to whether clear and convincing evidence or a preponderance of the evidence was the proper standard of proof in an actual-intent fraudulent transfer claim.[98] Thus, a split remains as to whether the applicable standard of proof in an actual-intent fraudulent transfer claim is by clear and convincing evidence or a preponderance of the evidence. *See id.*

Since most UFTA jurisdictions look to pre-UFTA law when determining the standard of proof required under their current versions of the UFTA, this Court should look to Delaware's pre-UFTA law. In 1996, Delaware adopted the UFTA. Prior to 1996, Delaware's fraudulent transfer law was governed by its enactment of the UFCA.[99] There is no case from the Supreme Court of Delaware or a Delaware appellate court that conclusively sets out the standard of proof required in an actual-intent fraudulent transfer claim under Delaware's current or pre-existing case law. There are, however, two unpublished opinions from the Chancery Courts that offer some guidance. *Beal Bank, SSB v. Lucks*, No. C.A. 14896, 1999 WL 413356, at *9 (Del.Ch. June 11, 1999); *Justice v. D & R Builders, Inc.*, No. 5387, 1978 WL 2513, at *2 (Del.Ch. Jan. 18, 1978).[100] In both Beal and Justice, the Chancery Court used

*Gerow v. Covill*, 192 Ariz. 9, 960 P.2d 55, 62 n. 8 (1998); *Clark v. Bank of Bentonville*, 308 Ark. 241, 824 S.W.2d 358, 361 (1992); *Gagan v. Gouyd*, 73 Cal.App.4th 835, 840, 86 Cal. Rptr.2d 733 (Cal.Ct.App.); *Consumers United Ins. Co. v. Smith*, 644 A.2d 1328, 1358 (D.C. 1994); *Kekona v. Abastillas*, 113 Hawai'i 174, 150 P.3d 823, 830–31 (2006); *Mohar v. McLelland Lumber Co.*, 95 Idaho 38, 501 P.2d 722, 726 (1972); *Morin v. Dubois*, 713 A.2d 956, 957 (Me.1998); *Bueneman v. Zykan*, 52 S.W.3d 49, 54 (Mo.Ct.App.2001); *Parker v. Parker*, 268 Neb. 187, 681 N.W.2d 735, 742 (2004); *Ellen Equip. Corp. v. C.V. Consultants & Assocs., Inc.*, 144 N.M. 55, 183 P.3d 940, 943 (2008) (citing *First Nat'l Bank in Albuquerque v. Abraham*, 97 N.M. 288, 639 P.2d 575, 579 (1982)); *Cox v. Wall & Huske*, 132 N.C. 730, 44 S.E. 635, 635 (1903); *Jahner v. Jacob*, 252 N.W.2d 1,5 (N.D.1977); *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 842 (Tex.App.-Dallas 2006); *Bradford v. Bradford*, 993 P.2d 887, 891 (Utah Ct.App.1999); *Sedwick v. Gwinn*, 73 Wash.App. 879, 873 P.2d 528, 531 (1994); *Calhoun County Bank v. Ellison*, 133 W.Va. 9, 54 S.E.2d 182, 193 (1949);.

98. Prior to the enactment of the UFTA, the fraudulent transfer law of many states was embodied in the Uniform Fraudulent Conveyance Act (UFCA). Many courts reason that "[b]ecause the UFTA substantially tracks with the UFCA" there is "no reason why the proof requirements under the UFTA should be different from those which were required under the UFCA." *Clearwater v. Skyline Constr. Co.*, 67 Wash.App. 305, 835 P.2d 257, 266 (1992).

99. Under the Delaware UFTA, the actual intent provision is found in § 1304 of the Delaware Code. 6 Del. C. § 13 04(a), (a)(1) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor."). Under the UFCA, however, the actual intent provision was found in section 1307. 6 Del. C. § 1307 (1953) ("Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.").

100. There are two other cases from the federal district court of Delaware that mention a burden in the context of fraudulent transfer, but neither are applicable here. *China Res. Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc.*, 856 F.Supp. 856, 859 (D.Del.1994); *United States v. West*, 299 F.Supp. 661, 664–65 (D.Del. 1969). *China Resource Products* is not controlling because the court merely quoted from a jury instruction that employed the preponderance standards to a constructive fraudulent transfer claim. 856 F.Supp. at 859. *United States v. West* is also inapplicable because it addresses burden shifting where a conveyance is to a family member of the debtor, instead of addressing the standard of proof required in actual-intent fraudulent transfers. 299 F.Supp. at 664–65.

the preponderance of the evidence standard in determining whether there was actual fraudulent intent under the UFCA. *Id.* These two unpublished opinions that mention the burden in passing, however, do not convince this Court which standard the Supreme Court of Delaware would adopt.

Since the law in Delaware is unsettled, the Court may consider cases interpreting § 548 of the Bankruptcy Code in determining which burden of proof is appropriate. *See In re PHP Healthcare Corp.*, 128 Fed. Appx 839, 847 (3d Cir.2005). Courts are split as to the standard of proof that must be met in order to avoid a conveyance under § 548 of the Bankruptcy Code, depending on each jurisdiction's treatment of *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).[101]

In *Grogan*, the Supreme Court of the United States unanimously held that the standard of proof for the dischargeability exceptions (which include an exception for fraud) in § 523(a) of the Bankruptcy Code is the ordinary preponderance of the evidence standard. 498 U.S. at 286, 111 S.Ct. 654. The Court reasoned that neither the language nor the legislative history of § 523 prescribe the standard of proof for the discharge exceptions. *Id.* The Court "presume[d] that [the preponderance of the evidence] standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.' " *Id.* (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389–390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)). Next, the Court in *Grogan* found that the fact that most states required proof of fraud by clear and convincing evidence for the fraud discharge exception did not support the conclusion that Congress intended to adopt the clear and convincing standard. *id.* at 288–90, 111 S.Ct. 654.

Although the *Grogan* Court did not address avoidance actions based on fraudulent transfer, most decisions since *Grogan* have held that the same rationale applies to actions under § 548. *In re Jackson*, 318 B.R. 5, 23 (Bankr.D.N.H.2004) (citing *In re Model Imperial, Inc.*, 250 B.R. 776 (Bankr.S.D.Fla.2000); *In re Bennett Funding Group, Inc.*, 232 B.R. 565, 570 (Bankr.N.D.N.Y.1999); *In re Wolcott*, 194 B.R. 477, 485 (Bankr.D.Mont.1996); *In re Food & Fibre Protection, Ltd.*, 168 B.R. 408, 418 (Bankr.D.Ariz.1994); *In re Sullivan*, 161 B.R. 776, 779 (Bankr.N.D.Tex. 1993)).[102] "A minority of courts ... have

---

**101.** *Compare In re Gabor*, 280 B.R. 149, 155 (Bankr.N.D.Ohio 2002) (trustee must meet preponderance of the evidence standard in actual fraudulent transfer action); *In re Model Imperial, Inc.*, 250 B.R. 776, 791 (Bankr.S.D.Fla.2000) (same) and *In re Bennett Funding Group, Inc.*, 232 B.R. 565, 570 (Bankr.N.D.N.Y.1999) (same) *with In re Lease–A–Fleet, Inc.*, 155 B.R. 666, 674 (Bankr.E.D.Pa. 1993) (clear and convincing standard applies in § 548(a) (1)(A) cases) and *In re Ste. Jan–Marie, Inc.*, 151 B.R. 984, 987 (Bankr. S.D.Fla.1993) (same). "The strong current of opinion now holds that actual intent under 11 U.S.C. § 548(a)(1)(A) need only be shown by a preponderance of the evidence.... A minority of courts, however, have continued to adhere to the clear and convincing standard in section 548(a)(1)(A) cases." *In re Canyon Sys.*

*Corp.*, 343 B.R. 615, 636 (Bankr.S.D.Ohio 2006) (quoting David B. Young, *Preferences and Fraudulent Transfers*, 876 PLI/Comm. 667, 803–04 (2005)).

**102.** One of the leading cases applying *Grogan* to § 548 of the Bankruptcy Code is *In re Sullivan*. The *Sullivan* court held that a trustee must prove an actual-intent fraudulent transfer by a preponderance of the evidence. 161 B.R. at 779. The court reasoned that preponderance was the proper standard by stating that cases from the U.S. Supreme Court and the Fifth Circuit follow "an apparent trend towards using a preponderance standard unless Congress specifically prescribes some other standard or unless some particularly important individual interest is at stake (*e.g.*, a constitutional 'liberty' interest)."

continued to adhere to the clear and convincing standard in section 548(a)(1) (A) cases without discussing or distinguishing *Grogan*." *In re Jackson*, 318 B.R. at 23 (citing *In re Taylor*, 133 F.3d 1336, 1338 (10th Cir.1998); *In re McLaren*, 236 B.R. 882, 889 (Bankr.D.N.D.1999); *In re Lease-A-Fleet, Inc.*, 155 B.R. 666, 674 (Bankr. E.D.Pa.1993)); *In re Kelton Motors, Inc.*, 130 B.R. 170, 172 (Bankr.D.Vt.1991).

This Court must determine whether the dictates of *Grogan* should extend to § 548 of the Bankruptcy Code such that a preponderance of the evidence standard should apply.[103] Section 548 of the Bankruptcy Code, like § 523, is silent regarding the standard of proof applicable in actual-intent fraudulent transfer claims. *Compare* 11 U.S.C. § 548, *with* 11 U.S.C. § 523. The Court in *Grogan* held that the silence of § 523 was "inconsistent with the view that Congress intended to require a special, heightened, standard of proof." 498 U.S. at 286, 111 S.Ct. 654. The *Grogan* Court reasoned that at the time that § 523 was enacted, there was a split of judicial authority as to the proper standard of proof required to establish exemption of discharge, so the court found that it would be unreasonable to conclude that Congress was silently adopting the clear and convincing standard. *Id.* at 289–91, 111 S.Ct. 654. Similarly, this Court finds that the silence of § 548 is not indicative of a heightened standard of proof for actual-

intent fraudulent transfer claims. The *Grogan* Court's reasoning also "presume[d] that [the preponderance of the evidence] standard is applicable in civil actions between private litigants unless 'particularly important individual interests and rights are at stake.'" *Id.* at 286, 111 S.Ct. 654 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389–390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)). The Court does not find, and the parties do not contend, that this case concerns a particularly important liberty interest. *See Herman & MacLean*, 459 U.S. at 389, 103 S.Ct. 683 (listing examples of individual interests and rights that might require a heightened level of proof). Using the rationale from *Grogan*, the Court concludes that the preponderance of the evidence standard would also apply to actual-intent fraudulent transfer under § 548.

Considering the two unpublished opinions from the chancery courts in Delaware, stating that preponderance of the evidence is the appropriate standard for actual fraudulent intent under pre-UFTA law, and noting that the preponderance of the evidence standard applies to the analogous actual fraudulent transfer provision in the Bankruptcy Code, plus the fact that preponderance of the evidence is the default standard under Delaware law, the Court finds that ASARCO must prove its actual-

---

*Id.* As support, the court cited *Grogan* and cases construing and extending *Grogan*. *Id.* (citing *Matter of Briscoe Enters., Ltd.*, 994 F.2d 1160, 1164–65 (5th Cir.1993)) (discussing *Grogan* and concluding that a "preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown"); *In re Lawler*, 141 B.R. 425, 428 (9th Cir. BAP 1992) ("A fair reading of [*Grogan*] leads to the inference that the preponderance standard applies in all bankruptcy proceedings grounded in allegations of fraud.").

**103.** AMC argues that ASARCO fails to cite a single UFTA jurisdiction that has ever applied *Grogan* to require a preponderance standard under state law. This, however, is not surprising because if a state's pre-UFTA law was well settled, then courts apply the same burden of proof to the actual-intent claim as they did under the previous law. Where the pre-UFTA law is well settled there is no need to look at the Bankruptcy Code for guidance. Since Delaware's pre-UFTA law was unsettled, the Court will look to § 548 of the Bankruptcy Code for guidance.

intent fraudulent transfer claim by a preponderance of the evidence.

### 2. AMC's Intent Can Be Imputed To AS-ARCO

 Under the UFTA's actual fraudulent transfer provision, the *debtor* must make the transfer and the *debtor* must have the intent to hinder, delay, or defraud any of its creditors. In this case, ASARCO claims that AMC, the transferee, had the intent to hinder, delay, or defraud creditors, not ASARCO, the debtor/transferor. ASARCO contends that AMC's intent may be imputed to ASARCO because AMC exercised dominion and control over ASARCO with respect to the transfer.

 As a general rule, to prove actual fraud, the plaintiff must prove fraudulent intent on the part of the debtor.[104] *See Sec. & Exch. Comm'n v. Res. Dev. Int'l, LLC,* 487 F.3d 295, 301 (5th Cir. 2007); *In re Bayou Group, LLC,* 362 B.R. 624, 631 (Bankr.S.D.N.Y.2007). There is an exception to this rule, however. Most courts recognize that when a transferee is in a position to dominate or control the debtor's disposition of the property, the transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor. *In re FBN Food Servs. Inc.,* 175 B.R. 671, 686 (Bankr.N.D.Ill.1994); *In re Sackman Mortgage Corp.,* 158 B.R. 926, 938 (Bankr.S.D.N.Y.1993); *In re Parker Steel Co.,* 149 B.R. 834, 855 (Bankr. N.D.Ohio 1992); COLLIER ON BANKRUPTCY ¶ 548–24 (15th ed. rev.). Although there is no Delaware case law indicating whether Delaware would impute the transferee's intent onto the debtor/transferor if the domination and control test is met, this seems to be a generally recognized rule, and the Court predicts that the high court in Delaware would adopt this rule if called upon to do so.

 To establish this exception, AS-ARCO must prove: (1) the controlling transferee (AMC) possessed the requisite intent to hinder, delay, or defraud the debtor's (ASARCO's) creditors; (2) AMC, the transferee, was in a position to dominate or control; and (3) the pertinent domination and control related to ASARCO's disposition of the property. *In re Adler, Coleman Clearing Corp.,* 263 B.R. 406, 443 (S.D.N.Y.2001) (citing COLLIER, ¶ 548–24).[105]

The Court finds that the companies involved were affiliated and not independent. AMC was in a position to dominate and control ASARCO/SPHC. ASARCO was the wholly owned subsidiary of AMC, which was a wholly owned subsidiary of Grupo. All of ASARCO's directors at the time of the transfer were affiliated with Grupo and AMC. (PX 0507; PX 0965). Sidley Austin jointly represented AMC and ASARCO in discussions with the DOJ about the stock transfer. (Lazalde Depo. 452:3–452:15). Doug McAllister testified that ASARCO was controlled by and was not dealing at arm's length with Grupo.

---

**104.** There is no case from Delaware's highest court on this matter, thus the Court should look to cases interpreting the Bankruptcy Code and other states' versions of the UFTA.

**105.** In determining whether the transferee was in a position to dominate or control the debtor's disposition of the asset, some courts consider: (1) whether the transferor and transferee are affiliated companies, or alternatively, are independent and unaffiliated; (2) the extent to which the relationship between transferor and transferee was at arm's length and their interests potentially hostile; (3) the existence of a "continuous institutional channel through which the transference of fraudulent intent simultaneous with a disposition of property could be effected;" and (4) whether an agency relationship existed between transferor and transferee. *In re Adler,* 263 B.R. at 448–49.

(McAllister Depo. 46:19–47:23; 91:9–91:20). All decisions ASARCO made had to be approved by German Larrea, Chairman and CEO of AMC and Grupo. (McAffrey Depo. 227:25–228:7; PX 0507).

The Court also finds the pertinent domination and control related to ASARCO's disposition of the SPCC stock. ASARCO's directors, who were all affiliated with AMC or Grupo, signed a unanimous consent by which ASARCO transferred its interest in SPCC to AMC. (PX 0965). The only independent directors (and EYCF) resigned in protest to the transaction prior to the closing. Numerous emails and memos reveal AMC President German Larrea's involvement in and control over the transaction. For example, an email from Jonathan Williams states that "German wants to accomplish [the transfer] at all costs and by any means." (PX 0612). Tellechea, who was on the board of ASARCO, AMC, and Grupo at the time, stated that no one overruled German Larrea, and that he never won disputes with German Larrea regarding SPCC. (Tellechea Depo. 68:24–69:9, 70:7–70:12).

Having found the requisite domination and control over the SPCC transfer by AMC, the Court now turns to the more complicated question of whether AMC possessed the requisite intent to hinder, delay, or defraud ASARCO's creditors.

### 3. Actual Intent

#### a. Legal Framework

■ To prove actual-intent fraudulent transfer under the Delaware statute, plaintiff must prove that the transfer was made with the actual intent to hinder, delay, or defraud any of ASARCO's creditors. 6 Del. C. § 1304(a)(1). Actual fraudulent intent is rarely susceptible to direct proof; therefore, the requisite intent may be proved circumstantially by presenting evidence of certain "badges of fraud" that may cumulatively give rise to an inference of intent to hinder, delay, or defraud. *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 374–75 (S.D.N.Y.2003); *China Res. Prods. (U.S.A.) Ltd. v. Fayda Int'l Inc.*, 856 F.Supp. 856, 863 (D.Del.1994). The Delaware statute sets forth a non-exhaustive list of "badges" the court may consider to help it determine whether the requisite intent existed. 6 Del. C. § 1304(b).

The statutory badges of fraud direct the Court to consider whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. *Id.*

■ These statutory badges are non-exclusive, and "it is clear from the language of the Statute that in determining intent, consideration may be given to factors other than those listed ... In addition, courts take into account 'the particular facts surrounding the conveyance,' and avoid determining in a vacuum the presence or absence of a debtor's actual intent to hinder or delay a creditor." *Gen. Trad-*

*ing Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1498–99 (11th Cir.1997) (quoting *Kirk v. Edinger*, 380 So.2d 1336, 1337 (Fla.Dist.Ct.App.1980)) (other internal citations omitted). ASARCO has suggested additional "badges" for the Court to consider in determining AMC's intent regarding the transfer, which the Court will discuss in turn, as it deems them appropriate considerations. The circumstantial evidence that ASARCO asks the Court to consider is whether: (1) The transfer was an insider transaction on terms dictated by AMC; (2) AMC wanted to take ASARCO's "crown jewel" away from ASARCO's creditors and preserve it for itself; (3) ASARCO was insolvent and starving for cash at the time of the transfer and became even more insolvent as a result of the transfer; (4) The transfer occurred at a time when ASARCO faced numerous lawsuits and the threat of an involuntary bankruptcy proceeding; (5) AMC paid only itself and key creditors it had to pay to accomplish the SPCC transfer; (6) AMC refused to auction SPCC to the highest bidder inside or outside bankruptcy; (7) AMC sought to obstruct the independent directors, EYCF, Squire Sanders, and the DOJ from receiving accurate information; (8) AMC closed the SPCC transfer and paid the Yankee Bonds over the objections of every group identified solely with ASARCO and its creditors; (9) AMC improperly paid Inbursa and Carlos Slim a profit of approximately $27 million with ASARCO's funds to facilitate the transfer; (10) AMC broke promises it made through Genaro Larrea to ASARCO's independent directors; (11) AMC did not pay REV for its SPCC shares.

 It is not necessary that all or any one of these badges of fraud support a finding of fraudulent intent; nor can one badge alone make out an inference of actual intent to hinder, delay, or defraud creditors. *In re Northgate Computer Sys., Inc.*, 240 B.R. 328, 364 (Bankr.D.Minn. 1999); *Dryden v. Estate of Gallucio*, C.A., No. 442–N, 2007 WL 185467, at *5 (Del. Ch. Jan. 11, 2007). Rather, "the confluence of several [badges of fraud] in one transaction generally provides conclusive evidence of an actual intent to defraud." *Gilchinsky v. Nat'l Westminster Bank N.J.*, 159 N.J. 463, 732 A.2d 482, 490 (1999) (considering whether debtor had the requisite intent under New Jersey's adoption of the UFTA).

### b. Statutory Badges

 The first statutory badge of fraud is that the transfer was to an insider. According to the Delaware UFTA, an "'[i]nsider' includes: . . . (d) An affiliate or an insider of an affiliate as if the affiliate were the debtor." 6 Del. C. § 1301(7)(d).[106] Both parties agree that

---

**106.** (1) Affiliate means:

 a. A person who directly or indirectly owns, controls or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities:

 1. As a fiduciary or agent without sole discretionary power to vote the securities; or

 2. Solely to secure a debt, if the person has not exercised the power to vote;

 b. A corporation, 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by the debtor or a person who directly or indirectly owns, controls or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities:

 1. As a fiduciary or agent without sole power to vote the securities; or

 2. Solely to secure a debt, if the person has not in fact exercised the power to vote;

 c. A person whose business is operated by the debtor under a lease or other agreement or a person substantially all of whose assets are controlled by the debtor; or d. A person

AMC qualifies as an insider under Delaware law. Nevertheless, AMC contends that the actual nature of the challenged transaction in this case confirms that this was an arm's-length transaction. AMC argues that the terms of the transaction were negotiated with the DOJ in the context of a judicial proceeding, and a settlement was reached only after independent experts valued the SPCC stock. While this may be true, the Court notes that the DOJ was not concerned with the interests of any other creditors. The DOJ wanted to ensure that ASARCO would have adequate funds to pay its environmental liabilities to the DOJ. Once the DOJ negotiated this aspect of the transaction, there is no evidence that the DOJ considered the impact any aspect of the transaction would have on ASARCO's other creditors. Although the Court does agree that the price paid for the stock was subject to more negotiation than a typical non-arm's-length transaction, the Court does not find that this fact removes it from being an insider transaction as the term is defined in the UFTA.[107] This badge, therefore, supports ASARCO's argument that AMC had the actual intent to hinder, delay, or defraud the other creditors.

The second statutory badge of fraud considers whether the debtor retained possession or control of the property transferred. This badge is not as applicable as it is in the typical fraudulent-transfer claim where the transferor is sued for fraudulent transfer because, in the present case, the transferee is the party accused of having the intent to hinder, delay, or defraud. Unsurprisingly, the transferee, AMC, had possession and control of the SPCC stock after the transfer.

The third badge considers whether the transfer was disclosed or concealed. The share transfer was not concealed from any party of interest.[108] The Court acknowledges that the transfer price and certain terms of the transaction were negotiated with the DOJ in the context of a judicial proceeding and memorialized in the Consent Decree. (PX 0214).[109] Nevertheless, the Court finds that the press release, which was issued January 30, 2003, was intended to manipulate the facts so as to convince the public that the transfer was not fraudulent and was actually in ASARCO's best interest. (PX 0200). As will be discussed in greater detail below, the press release inaccurately stated, among other things, that EYCF validated the value of the transfer and terms of the transaction. (PX 0200). This statement was presumably made to convey an impression that a respectable accounting firm agreed that the transfer was in the best interest of

---

who operates the debtor's business under a lease or other agreement or controls substantially all of the debtor's assets.
6 Del. C. § 1301(1).

**107.** The evidence concerning the actual negotiations between the DOJ and AMC/Grupo/ASARCO was not detailed. The Court actually would have appreciated more evidence concerning these discussions.

**108.** The extent to which various creditors were informed about the transaction is outside the evidence presented.

**109.** The Court notes that there are potentially other aspects, apart from the transfer itself, that were concealed from those involved in the decision-making process. For example, there is evidence that AMC/ASARCO directors, including German Larrea, sought to conceal information from the independent directors, EYCF, and potentially the DOJ and Squire Sanders. (See, e.g., PX 0245; PX 0252, Tellechea Depo. 294:17–296:23). There is also some evidence that the identity of the Yankee Bondholders was intentionally not disclosed to others involved in the transaction. These allegations more properly fit under badges of fraud articulated by ASARCO rather than this statutory badge.

ASARCO and its creditors. (PX 0200). EYCF told AMC/Grupo that this was a mischaracterization of their services, but AMC/Grupo never corrected the press release. (PX 0212). This press release provided inaccurate information to ASARCO's other creditors and the public. Although the transfer itself was not concealed, the Court finds that the dissemination of inaccurate information might have misled interested parties regarding the transaction and constitutes some evidence of AMC's intent.

The fourth statutory badge looks at whether the debtor had been sued, or threatened with suit, before the transfer was made. During the time leading up to the transfer, ASARCO and its subsidiaries were defendants in over 6,000 lawsuits with over 25,000 plaintiffs. (PX 1070). In 2002 alone, ASARCO was served with over 10,000 asbestos-related claims. (PX 1070). ASARCO itself was a defendant against 5,000 plaintiffs. (PX 0242). At the time of the transfer, ASARCO owed over $1 million pursuant to a settlement agreement in a class action that it had not paid. (PX 0288). In addition to asbestos-related claims, the United States Environmental Protection Agency had notified ASARCO that it was a potentially responsible party for multiple sites under Superfund Legislation. (PX 1070). Also, the Consent Decree did not limit ASARCO's liability for future environmental response costs; therefore, there were presumably additional environmental claimants. (PX 0214; PX 1070). ASARCO had other creditors who were threatening suit, such as Deutsche Bank. (PX 0056). There were also concerns, prior to the transaction, that ASARCO's unpaid, unsecured creditors might put ASARCO into involuntary bankruptcy to challenge the transfer. (PX 0153; PX 0168). As all of ASARCO's directors (who approved the transfer) were also directors and officers of AMC/Grupo,

the Court can safely presume that AMC/Grupo knew of these lawsuits and threatened suits. This factor supports ASARCO's argument that AMC had the actual intent to hinder, delay, or defraud ASARCO's creditors.

The fifth badge is that the transfer was of substantially all of the debtor's assets. Although the SPCC stock was the most valuable asset and "crown jewel," the stock transfer did not represent a sale of substantially all of ASARCO's assets. It was, however, all of the assets of SPHC.

The sixth badge is that the debtor absconded and the seventh is that the debtor removed or concealed assets. Neither of these badges are present in this case.

The eighth statutory badge looks at whether the debtor received reasonably equivalent value for the asset transferred. As discussed in detail, *supra*, the value ASARCO received was reasonably equivalent to the SPCC stock transferred to AMC. This badge weighs in favor of finding no actual intent to hinder, delay, or defraud ASARCO's creditors.

The ninth badge of fraud is whether the debtor was insolvent or became insolvent shortly after the transfer was made. As discussed in detail, *infra*, the Court finds that ASARCO met its burden of proving "insolvency" at the time of the transaction through the inability to pay debts test and unreasonably small assets test. The Court also presumes ASARCO's liabilities exceeded its assets in March 2003 because ASARCO was generally not paying its debts as they became due. This badge, therefore, supports a finding of actual-intent fraudulent transfer.

The tenth badge is whether the transfer occurred shortly before or shortly after a substantial debt was incurred. There is no evidence to support this badge. Lastly, there is not even a suggestion of the elev-

enth badge, which is that the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor, although, as the Court has noted, the actual transfer was to an insider.

The only statutory badges of fraud that strongly suggest that AMC had the requisite intent for an actual fraudulent transfer are that the transfer was to an insider, ASARCO was insolvent at the time of the transfer, and the debtor had been sued or threatened with suit before the transfer was made. The Court finds that this evidence, standing alone, does not support a conclusion that AMC had the intent to hinder, delay, or defraud ASARCO's creditors.

### c. ASARCO's Suggested Badges Of Fraud

Although, as stated above, the statutory badges do not persuade the Court of AMC's intent to hinder, delay, or defraud ASARCO's creditors, the statute provides only a non-exclusive list and the Court may look to other evidence in its efforts to determine AMC's intent. *See* COLLIER ON BANKRUPTCY ¶ 548.04 (15th ed. rev.). ASARCO presented a number of additional facts that provide circumstantial evidence that the Court may consider in determining whether AMC had the requisite intent for Plaintiff to prevail on its actual-intent fraudulent transfer claim.[110]

### i. AMC/Grupo Wanted ASARCO's Crown Jewel For Itself

ASARCO contends that AMC wanted to take ASARCO's "crown jewel" away from ASARCO's creditors and for itself. ASARCO alleges that the facts demonstrate that AMC/Grupo's primary goal was to protect its interest in SPCC, not to restructure ASARCO's debt in such a way that would allow it to operate long term.

The Court finds that the SPCC stock was ASARCO's most valuable asset, or, in the words of ASARCO, its "crown jewel." Although SPCC accounted for only 28% to 35% of ASARCO's revenues from 1995 to 1998, SPCC generated almost all of ASARCO's net income and cash flows during this period. (PX 1217). After Grupo acquired ASARCO, SPCC accounted for most of ASARCO's net income and more than half of ASARCO's revenues by 2002. (PX 1217). Between 1999 and 2002, SPCC contributed $650 million to ASARCO's operating cash flow, and without the stock, ASARCO would have had a negative cash flow of $278 million. (PX 1217). Kevin McCaffrey, counsel for ASARCO, testified that in 1999, he believed SPCC to be the "crown jewel" of ASARCO, and in March of 2002 Jonathan Williams of Sidley Austin referred to SPCC by the same description. (McCaffrey Depo. 77:23–78:9; PX 0062).

Prior to acquiring ASARCO, Grupo did not fully understand the extent of ASARCO's liabilities, especially its contingent liabilities. In his notes on a meeting he had in October 2001 with German Larrea and Daniel Tellechea, Agustin Santamirina writes, "with the exception of the acquisition of control of SPCC, since it was necessary to buy ASARCO blindly, due to the *'takeover,'* we acquired a company with low productivity, very high operating costs, high real liabilities and extremely high contingent liabilities." (PX 0023). Daniel Tellechea stated that he agreed with this assessment. (Tellechea Depo. 97:7–98:1). German Larrea testified that because of the nature of the acquisition, Grupo was

---

**110.** The Court will discuss each of ASARCO's additional "badges" that are not redundant of the statutory badges found in Delaware's version of the UFTA and discussed above. By reviewing each, the Court is not agreeing that each necessarily is a "badge" of fraud.

not able to conduct due diligence until after the close of the LBO transaction in 1999. (German Larrea Depo. 61:5–66:8). Only after acquiring ASARCO did Grupo learn of ASARCO's asbestos, environmental, and off-balance-sheet liabilities. (German Larrea Depo. 61:5–66:8).

The Court also finds that German Larrea, and therefore AMC/Grupo, had a strong desire to transfer the SPCC stock from ASARCO to AMC so as to keep the shares within the Grupo conglomerate. Kevin McCaffrey testified that after discovering the staggering liabilities burdening ASARCO, especially the contingent liabilities, German Larrea expressed a desire to isolate SPCC from risk of exposure to the government and other creditors. (McCaffrey Depo. 276:24–277:17). Doug McAllister likewise believed that German Larrea and the other officers of Grupo intended to remove the SPCC shares from ASARCO to protect the stock from creditors. (McAllister Depo. 64:4–13). In late 2001, Jonathan Williams of Sidley Austin wrote that it seemed like German wanted to transfer the SPCC stock from ASARCO to AMC "at all costs and by any means." (PX 0612).

In sum, the Court finds that SPCC was the most valuable asset (the "crown jewel") of ASARCO. The Court also finds that AMC/Grupo did not realize the extent of ASARCO's liabilities, real or contingent, until after acquiring ASARCO in 1999. Additionally, the Court finds that AMC/Grupo had a strong desire and intent to transfer the SPCC shares from ASARCO to AMC so that AMC/Grupo could have this asset unencumbered by the claims of others. There is both direct and circumstantial evidence, which the Court finds credible, supporting an inference that AMC/Grupo intended to isolate the ASARCO's "crown jewel" from ASARCO's creditors.

*ii. AMC/Grupo Paid Only Itself And Key Creditors It Had To Pay In Order To Accomplish The Transfer*

ASARCO next encourages the Court to consider that AMC/Grupo paid only itself and those key creditors who could have obstructed the transfer, knowing that ASARCO would be left unable to operate its business in the ordinary course and pay its debts as they came due. The Court finds that only AMC/Grupo and key creditors benefitted from the transaction. The Court also finds that ASARCO had past-due obligations at the time of, and following, the transaction and that the transaction left ASARCO unable to pay these creditors.

(a) Only Paid AMC/Grupo And Key Creditors

Despite the wide variety of creditors, including vendors and service providers, to whom ASARCO owed money in March 2003, the only creditors who received any of the proceeds of the SPCC stock transfer were AMC/Grupo and those creditors that AMC/Grupo needed to pay in order to close the transaction.

(1) $450 Million Cash For Revolver

The $450 million in cash paid as consideration for the stock was used to pay off the bank group that loaned money to ASARCO under the Revolver. This debt was secured by the SPCC stock and was past due. AMC benefitted from payment of the Revolver, however, because it had purchased a participation in the Revolver on November 12, 2002. (PX 0156). In other words, AMC paid $450 million to ASARCO, who then turned around and paid that sum to the participants in the revolving loans, and AMC, as one of the participants, received $50 million of that amount back. This payment is specified in the funds flow

memorandum, and included interest so that the amount transferred to AMC totaled $51,061,367. (PX 0270). Additionally, Grupo had guaranteed the Revolver, so paying the Revolver eliminated any liability for Grupo. (PX 0415). Payment of the Revolver, therefore, benefitted AMC/Grupo both directly and indirectly, and was necessary to close the transaction.

### (2) $100 Million DOJ Trust Note

The $100 million DOJ Trust Note was given as part of a settlement agreement with the government for certain environmental liabilities. (PX 0214). The DOJ obtained an injunction preventing the transfer of the SPCC stock to AMC. (Jt. Pretrial Order Admission of Fact # 44). The $100 million trust was established to appease this large creditor and to get its agreement to dissolve the injunction and allow the transaction to go forward. (PX 0106, PX 0214).

### (3) $123 Million AMC Note

The AMC Note, in the amount of $123.25 million, was the only consideration that was not, in its entirety, earmarked for a key creditor or in some other way intended to benefit AMC/Grupo. It appears that the DOJ insisted on this note.[111] (DX 0306). The note was to be paid to ASARCO in seven annual payments starting in October 2003. (PX 0279). AMC, however, made an advance payment on the note of $12.6 million. AMC/Grupo required ASARCO/SPHC to use these funds to pay part of the closing costs, interest, and Yankee Bonds—once again, indirectly benefitting AMC/Grupo by going towards obligations and costs that needed to be paid in order to complete the transfer. (PX 0270).

### (4) $41.75 Million Debt Forgiveness

The $41.75 million debt forgiveness cancelled the principal amount of a loan AMC had made to ASARCO. (PX 0279, DX 0145). Clearly, this benefitted AMC, as it had the same effect of paying ASARCO $41.75 million and forcing ASARCO to give that amount back to Defendant AMC as an unsecured creditor of ASARCO. Furthermore, even though the principal was forgiven, the accumulated interest, including default interest, totaling over $7 million was demanded by AMC and paid by ASARCO by October 2003. (PX 2045, PX 2099).[112]

### (5) Yankee Bonds

At the time of the stock transfer, ASARCO owed $100 million of Yankee Bonds at par, plus the interest on these bonds. $50 million in cash that AMC/Grupo paid to ASARCO was earmarked to pay these Yankee Bonds. To pay the remaining Yankee Bonds, ASARCO used $46.5 million it obtained from monetizing an insurance settlement and $3.5 million in cash it had on hand. (PX 0270). ASARCO paid the interest on the bonds from AMC's partial prepayment of the AMC Note. (PX 0270).

Inbursa, who owned part of the Yankee Bonds, loaned AMC $310 million it needed to fund the SPCC transaction. (DX 0465; Tellechea Depo. (2008) 356:15–18).[113] Payment of the Yankee Bonds at par plus interest was a condition of the financing

---

**111.** The Court observes that there is evidence that the DOJ insisted that AMC issue this note to ASARCO, meaning that even this piece of the consideration was made in order to satisfy a key creditor, the DOJ, so that the transaction could go forward.

**112.** The Court observes that $7 million was paid by ASARCO to AMC as interest on the forgiven note in the same month it was scheduled to receive a payment on the AMC Note.

**113.** The payment of the Yankee Bonds is discussed *infra*.

for the SPCC transfer; therefore, the bondholders, regardless of their identity, were another "key creditor" that needed to receive payment in order to close the transaction.

### (6) Other Creditors Who Benefitted From The Transfer

Societe Generale had a lien on the SPCC shares. Prior to the transfer, Societe Generale agreed to strike out all of its liens that it had on the SPCC stock and other collateral in exchange for $14 million. ASARCO, therefore, paid Societe Generale this amount by monetizing various assets. (Tellechea Depo. 281:2–282:24). This payment was necessary to close the SPCC transfer. Also, shortly after the SPCC stock transfer, ASARCO paid $2.9 million to Sidley Austin, the firm that closed the transaction. (Fitzgerald, June 3, 2008, 68:16–69:4; PX 2011).

### (b) ASARCO Had Past Due Obligations That Were Not Paid

The Court finds that at the time of the transfer, ASARCO had numerous creditors to whom it owed money, and many of these obligations were past due. ASARCO's treasurer testified that there were possibly thousands of creditors, including vendors and service providers, who were having difficulty getting paid. (Guerrero Depo. 84:24–85:6). In February 2003, Genaro Larrea, ASARCO's CEO, acknowledged that ASARCO had stopped checks for almost $30 million. (PX 0241). In early March of 2003, there were over 900 held checks totaling over $23 million. (PX 2106, PX 2107, PX 2039). Two-thirds of that amount had been held more than 30 days. (PX 2106). Numerous creditors filed proofs of claims against ASARCO for debts incurred prior to March 31, 2003. (*See, e.g.,* PX 1374, PX 1397, PX 1377, PX 1378, PX 1375, PX 1386, PX 1388, PX 1392, PX 1372, PX 1389). Many of these debts were referenced in contemporaneous documents. For example, a February 2003 letter from EYCF listed obligations that were not included in the revised projections. (PX 0212). These included: $30 million owed to Glencore, $11 million owed to Dresdner, $13 million owed to Mitsui, and $12 million owed to New York and Connecticut for property taxes. (PX 0212). In addition, in March 2003, ASARCO owed its national asbestos counsel $3.6 million and was in arrears with local counsel for $1.2 million. (PX 0242). There is no indication that any lawyers, other than Sidley Austin, received payment after the transfer.

### (c) The Transfer Left ASARCO Unable To Pay Its Other Creditors

ASARCO did not walk away from the transaction with any cash. (Tellechea Depo. (2008) 430:19–431:14; PX 0270). In fact, the transaction took substantial amounts of cash out of ASARCO because it was forced to use $50 million of its own funds toward the payment of the Yankee Bonds. Further, it had to use the advance loan payments to cover transaction costs. Houlihan and EYCF both warned ASARCO and AMC that ASARCO would face a severe liquidity deficit if the transaction was structured as it went forward. (PX 0082, PX 0084, PX 0212). After the transfer, ASARCO was not able to pay its obligations, including its operational debts, as they came due any more than it was before the transaction. (O'Neil Depo. (2008) 257:13–258:6; Tellechea Depo. (2004) 134:2–134:4). In June 2003, Sidley Austin advised that there were numerous creditors demanding payment and ASARCO had limited cash flow with which to pay them. (PX 0293).

### (d) Conclusion

The Court finds that almost all of the consideration for the SPCC stock was used

to benefit AMC/Grupo, directly or indirectly, and/or it was used to satisfy "key creditors," i.e., those creditors who needed to be paid in order to close the transaction. ASARCO, which AMC knew was in a "liquidity crisis," according to its own witnesses (or "insolvent" according to Plaintiffs'), before the transfer, walked away from the transaction with even less cash in hand, minus its most valuable asset, an asset that generated cash. As a result, ASARCO was left with no means by which to pay its numerous other past-due obligations. This evidence supports ASARCO's claim that AMC intended to hinder, delay, or defraud ASARCO's other creditors.[114]

### iii. AMC Did Not Auction SPCC To The Highest Bidder

ASARCO next alleges that AMC refused to auction SPCC to the highest bidder so that it could retain control of SPCC. ASARCO alleges that AMC's and ASARCO's directors refusal to obtain the highest possible price for ASARCO demonstrates that AMC was interested only in protecting its own interests, and not those of ASARCO's creditors.

The Court finds that AMC did not attempt to sell SPCC to a third party. Neither EYCF or any investment banker was ever asked to solicit bids for the SPCC stock. (Genaro Larrea Depo. (2008) 135:2–9; Tellechea Depo. 2008 at 227:17–20; Lyon Depo. 160:8–25). Craig Hansen of Squire Sanders testified that AMC/Grupo was unwilling to expose the SPCC stock to the marketplace. (Hansen Depo. 30:14–31:10). German Larrea testified that AMC/Grupo intended to retain control of SPCC and was not interested in selling SPCC to a third party because, in part,

Grupo felt like it had already paid for the stock when it acquired ASARCO. (German Larrea Depo. 90:13–21, 124:7–20,-258:16–259:1).

AMC contends that the SPCC shares were sold to a related party so as to maximize the value that ASARCO could obtain from the sale. AMC alleges that a sale of the shares to a third party would have triggered a significant taxable gain. AMC also argues that a sale to a non-affiliate of the Founding Stockholders would have triggered a conversion of the stock, making it less valuable.

#### (a) Tax Consequences Of A Third–Party Sale

AMC argues that it was preferable to sell the stock to an insider rather than a third party because ASARCO could defer the tax on the gain if it were sold to someone within the corporate family. ASARCO argues that the tax consequences of a sale to a third party did not present an impediment to seeking third-party offers for the SPCC stock.

The Court finds that the sale of the SPCC shares to AMC, rather than an unaffiliated third party, deferred the tax on the gain from such sale. (PX 0162). All parties agree with this point; they differ, however, with respect to the amount of tax liability that would be incurred.

According to the minutes of the Restructuring Committee meeting on January 27, 2003, EYCF advised that the tax liability on a sale to a third party would be $9 million. (PX 0191). Stanley Jozefiak, ASARCO's tax expert, testified that if the stock were sold for $765 million, the tax obligation could be between $9 million and $28 million. (PX 1219). This calculation

---

**114.** The Court did not ignore the fact that ASARCO had substantially less debt after the transaction because it extinguished $450 million in secured debts and eliminated $141.75 million of unsecured obligations.

includes an assumption that ASARCO would exhaust all of its net operating losses, totaling $358 million, and it includes using a $40 million tax refund. (Jozefiak, May 21, 2008, 40:25–41:6). If the tax refund were not included, then the tax liability would total approximately $50 million.

The Court does not need to determine the exact amount of the potential tax liability if the stock were sold to a third party. The Court recognizes that all things being equal, especially consideration, it would have been preferable for ASARCO to avoid triggering the gain. This statement, however, assumes that a third party would have paid the same amount for the SPCC shares as AMC did. There is no way of knowing whether this is in fact the case because the stock was never offered for sale to a third party. It is equally plausible that a third party would have offered an amount that would satisfy the tax liability plus put more money into the hands of ASARCO than AMC did. Therefore, the Court does not find that the tax consequences of a third-party sale were a legitimate reason for not at least soliciting outside offers for the SPCC shares.[115]

### (b) SPCC's Restated Certificate Of Incorporation And Stockholders' Agreement Were Not A Hindrance

As discussed above, according to the Stockholders' Agreement and Restated Certificate of Incorporation of SPCC, if the Class A Common Stock (the "Founder's Shares" or "super-voting" shares) were transferred to a third party not affiliated with one of the Founding Stockholders, those shares would automatically convert to regular Common Stock and lose their super-voting rights. (DX 0005). Recall, however, that if the Founding Stockholders or their affiliates no longer held at least 35% of all the outstanding shares, all of the Class A Common Stock would convert to Common Stock. (DX 0005). The other Founding Stockholders held approximately 28% of the stock; therefore if ASARCO sold its 54.18% interest, all of the stock would convert into Common Stock and the third-party purchaser would still have the controlling interest. Further, since AMC did nothing to test the open market, it has no way of knowing whether a third party was willing to take the risk that the Founder's Shares would convert to Common Stock. There was no evidence from any potential buyer that these provisions would have kept it from purchasing the stock. For these reasons, the Court is unpersuaded that the Stockholders' Agreement and/or the Restated Certificate of Incorporation of SPCC necessarily hindered a sale to a third party.

In sum, the Court finds that neither the tax consequences nor the Stockholders' Agreement and Restated Certificate of Incorporation presented insurmountable impediments to offering the SPCC stock for sale to third parties. The ultimate result of exposing the SPCC stock to a competitive bidding process is unknown because AMC/Grupo refused to open it up to the public. The Court finds that this supports

115. Defendant filed a *Daubert* motion objecting to the testimony of Plaintiffs' tax expert, Stanley Jozefiak, complaining that he was not qualified and that his testimony was not relevant. By the same token, AMC called their own tax expert, David Glickman. The Court agrees that the tax consequences of the proposed transaction were of minimal relevance, but they were not entirely irrelevant as they were one of the purported motivations for an intra-conglomerate sale. This conclusion is found in the testimony during trial, and also in the exhibits generated around the time of the SPCC transfer. Having noted that, the Court finds that on the most pivotal point both experts agreed that if a third party paid enough for the stock, the ultimate tax consequences were inconsequential. The Court finds that both experts were qualified to render that opinion.

ASARCO's contentions regarding AMC's intent to hinder, delay, or defraud ASARCO's creditors.

### iv. Whether AMC Sought To Obstruct Certain Players From Receiving Information

ASARCO next contends that AMC sought to obstruct the independent directors, EYCF, Squire Sanders, and the DOJ from receiving accurate information.

The independent directors, EYCF, and the DOJ were not given certain pieces of information regarding Houlihan's assessment of the transaction. Houlihan wrote a letter on May 21, 2002, indicating that in addition to the $641 million representing the market price of the SPCC shares, ASARCO needed an additional $193 million of equity consideration. (PX 0082). In a letter dated May 23, 2002, Houlihan stated that ASARCO would need $346 million to $508 million of cash following the transaction in order to ensure continuing operations as a going concern. (PX 0084). Houlihan did an analysis of the effect on cash flow of selling the SPCC shares and reducing its debt and interest expense. (PX 0687). According to Jonathan Williams of Sidley Austin, Houlihan's analysis showed that the transaction would be cash flow positive in the first year but thereafter ASARCO would be better off keeping the stock. (PX 0687; PX 0079). Ultimately, Houlihan concluded that it was not going to be able to produce a favorable solvency opinion with numbers in the range ASARCO/AMC desired. (PX 0095). Grant Lyon and independent director Jock Patton both testified that neither EYCF nor the independent directors received any of this information. (Patton, May 12, 2008, 16:15–19:15, 93:13–96:24, 96:24–99:11; Lyon Depo. 153:3–158:1). The documents regarding Houlihan's decision not to issue a solvency opinion were withheld from the DOJ because, according to Mr. McAllister's testimony, providing that information to the government would have been "detrimental." (McAllister Depo. 396:16–22). The independent directors, EYCF, and the DOJ were also not given information concerning PWC's fair market valuation, which used $1.02 as the copper price and a discount rate of 9%. (PX 0007; Patton, May 12, 2008 84:7–86:3; Tellechea Depo. (2008) 294:17–296:23). PWC ultimately concluded that the business enterprise value of ASARCO/SPHC's interest in SPCC was $978 million. (PX 0007). Patton testified that the independent directors and EYCF should have been given all of this information so that they could most effectively represent ASARCO's interests. (Patton, May 12, 2008, 16:15–19:15, 84:7–86:3, 105:25–106:16).

There was also evidence that Genaro Larrea gave the independent directors some questionable information. For example, EYCF reported that ASARCO's cash flow projections showed cash flow and working capital deficits. (PX 0191). Genaro Larrea then produced revised cash flow projections that showed significant improvements in ASARCO's cash position. (PX 0197). The underlying assumptions for the new projections came from Genaro Larrea, not from the operations managers within ASARCO as is typical. (Lyon Depo. 245:15–247:21). The independent directors and EYCF were highly skeptical of these new projections. (Hansen Depo. 106:4–10).

AMC/Grupo also disseminated inaccurate information via a press release in January 2003. (PX 0200). This press release stated that E & Y conducted an independent analysis and validated the value of the transaction and its terms. (PX 0200). The document also stated that ASARCO would receive funds necessary to pay $550 million in past-due debt, which

presumably references the Revolver and the Yankee Bonds, despite the fact that the Restructuring Committee had not approved payment of the Yankee Bonds. (PX 0200). It also implies, at the very least, that ASARCO would receive $550 million in cash; whereas ASARCO actually received only $500 million, plus the first payment on the AMC Note. (PX 0270). AMC then made ASARCO expend the loan proceeds on closing costs of the transaction and related expenses. The press release further stated that the transaction would allow ASARCO to move forward on a path that would bring it to financial stability. (PX 0200). Despite the implications of the press release, EYCF did not validate the transaction, and it believed that paying the Yankee Bonds would cause financial instability. (Lyon Depo. 261:25–262:17; 263:8–20).

Additionally, the information provided to the independent directors, EYCF, and Squire Sanders regarding the Yankee Bonds was incomplete and inconsistent. On January 27, 2003, Genaro Larrea stated that Inbursa conditioned its financing on paying the Yankee Bonds at par. (Patton, May 12, 2008, 88:3–11; Frei, May 13, 2008, 52:11–18; Hansen Depo. 90:2–18). There was also evidence that Inbursa, and its controlling shareholder, Carlos Slim, held a large number of these bonds. (PX 0006; PX 0096; PX 0332; PX 1046). On January 29, 2003, Genaro Larrea retracted his statement that paying the Yankee Bonds was a requirement for the financing. (Patton, May 12, 2008, 101:14–22; Frei, May 13, 2008, 53:18–23). The independent directors, EYCF, and Squire Sanders never received satisfactory answers to why AMC/Grupo was so insistent on paying off the bonds, why they would pay the bonds when doing so would leave a cash deficit, who the bondholders were, and why the bonds were to be paid in full

although they were trading at a discount. (Hansen Depo. 123:25–125:14).

Approximately one month before the transfer, independent director Jock Patton wrote an email to Genaro Larrea complaining about the lack of information and requesting an "orderly flow of honest information. . . ." Ultimately, the independent directors resigned, in part, because of the lack of (accurate) information they received from ASARCO and AMC/Grupo. (PX 0252; PX 0257).

The Court finds that relevant information was not given, and in some instances actively concealed, from the independent directors, EYCF, and the DOJ. This lends support to ASARCO's proposition that AMC/Grupo wanted the SPCC shares for itself regardless of the transfer's effect on ASARCO and its creditors.

*v. AMC Closed The Transaction Over Objection Of EYCF And Independent Directors*

ASARCO further contends that AMC's intent to hinder, delay, or defraud ASARCO's creditors is evidenced by the fact that AMC closed the transfer and paid the Yankee Bonds over the objection of every group identified solely with ASARCO and its creditors.

The independent directors resigned days before the transaction closed and withdrew their consent. (PX 0255). Patton and Frei's resignation letter explicitly stated that the transaction, as it was structured, lacked their approval. (PX 0255). After Patton and Frei's resignation, every member of ASARCO's board who approved the transaction was also an officer or director of AMC and/or Grupo. (PX 0507).

EYCF also resigned before the transaction closed. (PX 0264). Grant Lyon testified that EYCF would resign either if the independent directors resigned or if the

Yankee Bonds were paid. (Lyon Depo. 170:5–171:18). Both of these contingencies occurred. (Lyon Depo. 170:20–171:18). EYCF was concerned about there being an independent voice on AS-ARCO's board such that the decisions regarding the transfer would be made in the best interest of ASARCO's creditors. (Lyon Depo. 173:13–21). EYCF also expressed concern regarding the impact that paying the Yankee Bonds would have on ASARCO's liquidity and its ability to continue operations in the ordinary course and meet other obligations. (PX 0064). EYCF considered withdrawing its reasonably equivalent value opinion, but in the end, chose not to do so, in part because of an insinuation made by Armando Ortega that AMC/Grupo might sue EYCF if it withdrew its opinion. (Lyon Depo. 448:1–455:1). Although it did not withdraw this opinion, EYCF refused AMC's request to issue a bring down opinion. (Lyon Depo. 444:5–446:1).[116] Thus, AMC closed the transaction without EYCF's approval.

Squire Sanders expressed its concern that taking the transaction as a whole, AMC might have actual intent to hinder, delay, or defraud ASARCO's creditors. (Hansen Depo. 123:1–24). Squire Sanders wrote a letter to the Restructuring Committee (Al Frei, Jock Patton, and Genaro Larrea) on February 5, 2003, warning of potential fraudulent conveyance challenges and suits for breach of fiduciary duty if the transaction proceeded as planned. (PX 0220). The firm also told the Restructuring Committee that ASARCO could not articulate a legitimate business reason for

paying the Yankee Bonds at that time. (PX 0213).

There were others within ASARCO who were uncomfortable with the transaction, particularly the payment of the Yankee Bonds. Kevin McCaffrey testified that he expressed concern to Tellechea about the price of copper used in the valuation and that he advised against paying the Yankee Bonds. (McCaffrey Depo. 276:2–277:17, 280:5–20). On March 25, 2003, McAllister likewise advised Genaro Larrea of the potential liability to ASARCO and its officers if the Yankee Bonds were paid. (PX 0259). On this same day, Brian Boylan wrote a memo to the file stating that he and McAllister had met with Genaro Larrea to discuss their concerns and opposition to the decision to pay the Yankee Bonds. (PX 0259).[117]

The Court finds that AMC's decision to close the transaction in spite of the objections to the transaction and concerns expressed by those within ASARCO is additional circumstantial evidence of AMC's intent to hinder, delay, or defraud ASARCO's creditors.

### vi. Payment Of The Yankee Bonds

ASARCO contends that by paying the Yankee Bonds, AMC improperly paid Banco Inbursa and Carlos Slim a multi-million dollar profit. In this vein, ASARCO claims that AMC's decision to pay the Yankee Bonds at par, plus interest, in order to obtain financing for the SPCC transfer, knowing full well that it would leave ASARCO unable to operate its business in the ordinary course and unable pay its debts as they came due, demonstrates

---

116. The stock purchase agreement required a bring down of the E & Y opinion, but AMC, and only AMC, could waive this requirement. (PX 0279).

117. The Court also observes that Sidley Austin never advised Grupo, AMC, or ASARCO

that the transaction should still go forward after the independent directors and EYCF resigned. Rather, Sidley Austin merely told the companies that under Delaware law, ASARCO's inside directors could approve the transfer.

AMC's actual intent to hinder, delay, or defraud ASARCO's creditors.

There were numerous indications by witnesses throughout the trial and in the exhibits admitted at trial that German Larrea/AMC/Grupo had a "handshake" deal with Carlos Slim, the controlling shareholder of Banco Inbursa, to the effect that Inbursa would loan the money to AMC to complete the transfer only if ASARCO paid the Yankee Bonds at par with interest. The Court finds that the Yankee Bonds, in part, were owned by Inbursa. (PX 1046; PX 0332). This is evidenced by Banc of America account statements for Inbursa. (PX 1046; PX 0332). Nevertheless, the Court is hard pressed to find that Inbursa held more than approximately $20 million worth of Yankee Bonds. (PX 1046). There is some evidence that another company controlled by Carlos Slim, Orient Star Holdings, held over $52.3 million worth of the Yankee Bonds in 2000. (PX 0006). This document, however, has the account name, Orient Star Holdings LLC, handwritten on one of the first pages with a handwritten note that the company was owned by Carlos Slim. (PX 0006). There was no additional evidence that Carlos Slim owned the company, nor was there evidence that this company held the bonds at the time of the transfer. There was testimony, however, that Genaro Larrea told the ASARCO board that Inbursa or someone affiliated with Inbursa "owned a chunk of the bonds." (Hansen Depo. 92:6–93:9). The evidence at trial was certainly enough to raise the Court's suspicions of a "handshake" deal, but the Court finds the evidence insufficient to find the existence of an improper agreement.

Nevertheless, the Court finds that Carlos Slim/Inbursa conditioned the financing on payment of the Yankee Bonds. Jock Patton and Al Frei, the independent directors of ASARCO who resigned before the transaction closed, testified that on January 27, 2003, Genaro Larrea told them that paying the Yankee Bonds in full was a condition of the Inbursa financing. (Patton, May 12, 2008, 88:3–11; Frei, May 13, 2008, 52:11–18; Hansen Depo. 90:2–18). Mr. Larrea retracted this statement at a meeting on January 29, 2003. (Patton, May 12, 2008, 101:14–22; Frei, May 13, 2008, 53:18–23). Jock Patton testified that Genaro Larrea indicated that there had been similar conditions in past transactions between Grupo and affiliates of Carlos Slim. (Patton, May 12, 2008, 88:3–11). Squire Sanders, in a memo to the Restructuring Committee, stated "it appears that Inbursa ... is requiring the payment by Asarco of the Yankee Bonds as a condition to the financing to be provided to AMC." (PX 0220).

Despite finding that the payment of the Yankee Bonds in full was a condition of the Inbursa financing, ASARCO did not prove that such a condition was improper. As a general rule, it is not uncommon for a lender to want a bond default cleared or extinguished before extending additional credit to a company. (Halperin, May 21, 2008, 10:18–11:7). German Larrea testified that as part of the ASARCO and Minera Mexico restructuring, all nineteen of the banks involved, including Inbursa, Bank of America, and Chase, required that payments be current on the Yankee Bonds and other debt facilities. (German Larrea Depo. 320:5–323:2). In fact, payment of the Yankee Bonds was contemplated in 2001, well before AMC tried to secure financing from Inbursa.

In sum, the Court is bothered by the fact that Inbursa held $20 million, if not more, of the Yankee Bonds and that Inbursa also conditioned its extension of credit on payment of the defaulted bonds at par, the evidence does not support a finding that there was an improper "hand-

shake" agreement underlying the condition. The Court finds that there is an equal inference that the condition might have been imposed by any lender, regardless of whether it held any of the past-due bonds. Since Plaintiff failed to meet its burden of proving an improper agreement, the Court must find one did not exist.

Regardless of whether an improper agreement existed between AMC/Grupo and Inbursa/Carlos Slim, the fact that AMC/Grupo insisted that ASARCO pay the bonds at par with interest during a time that ASARCO was starved for cash is still evidence of AMC's actual intent to hinder, delay, or defraud ASARCO's other creditors.[118] Not only was part of the consideration earmarked to pay the Yankee Bonds, but ASARCO was required to monetize badly needed insurance policies and use the cash from monetizing the policies and the cash it received as an advance on the AMC Note combined with what little cash it had on hand to pay the Yankee Bonds at par plus interest. (PX 0270). The evidence establishes that the Yankee Bonds were trading at a discount, perhaps as low as 50 cents on the dollar. (German Larrea Depo. 410:9–12; PX 0006; PX 0059, PX 0068; PX 0096; PX 1046). The money ASARCO used to pay the Yankee Bonds could have been used to purchase the bonds in the market at a discount. ASARCO could have also tried to restructure the bonds given its financial distress. In fact, Genaro Larrea suggested this option to German Larrea. (PX 0241). Nevertheless, AMC/Grupo insisted that ASARCO not even try one of these options and simply pay the bonds in full.

AMC/Grupo knew that ASARCO was in a liquidity, or cash-flow, crisis and was not able to pay its other creditors, including vendors and service providers needed to continue its operations, yet AMC required that ASARCO pay the Yankee Bonds at par plus interest, without pursuing any other alternative for resolving the Yankee Bond obligation. This requirement is evidence that AMC/Grupo was, at the very least, indifferent to the fact that ASARCO would be left without sufficient cash to pay its other past-due obligations, and consequently had intent to hinder and delay ASARCO's other creditors.

*vii. Broken Promises*

ASARCO next contends that AMC broke promises it made, through Genaro Larrea, to the independent directors.

Genaro Larrea promised to facilitate a meeting between ASARCO's independent directors, EYCF, and ASARCO's senior management in January 2003. (Hansen Depo. 51:12–52:6; PX 0196). This promised meeting never took place. (Hansen Depo. 51:12–52:6; PX 0196). In fact, Jock Patton testified that the management team was sent to Tucson, Arizona so that they would not be able to meet with the Restructuring Committee and Grant Lyon of EYCF. (Patton, May 12, 2008, 100:12–25).

Also, Genaro Larrea did not correct the inaccuracies in the January 30, 2003 press release, as he told the directors he would. (PX 0200; Patton, May 12, 2008, 114:3–9). The press release incorrectly stated that "the value of the transaction and the terms under which it will occur were validated in an independent analysis conducted by . . . Ernst & Young." (PX 0200). EYCF

---

**118.** The Court finds that the transfer of the SPCC stock and the payment of the Yankee Bonds are interconnected. According to the funds flow memorandum, the payment of the Yankee Bonds was one of many money transfers in this transaction. (PX 0270). All of the transfers described were interrelated and each was an integral part of the transaction and had to go forward in order to close the transfer. (Tellechea Depo. (2008) 358:1–9).

wrote a letter to the ASARCO board stating that "both the characterization of [their] services and the reference to Ernst & Young are inaccurate." (PX 0212). One of the other inaccuracies in the press release was that it stated that ASARCO would receive the funds necessary to pay $550 million in overdue debt. (PX 0200). This was presumably a reference to paying off the Chase Revolver and the Yankee Bonds. ASARCO actually only received $500 million in cash in order to pay these debts totaling over $550 million. (PX 0270). Also, paying the Yankee Bonds was contrary to a unanimous decision of the Restructuring Committee to not pay the bonds unless and until the Committee received and approved reasonable projections that showed ASARCO would have sufficient cash remaining to continue operations and satisfy other payment obligations.[119] (PX 0197). EYCF, the independent directors, and Squire Sanders contacted Genaro Larrea and the ASARCO board demanding that the press release be corrected. (Patton, May, 12, 2008, 114:3–9; PX 0237; PX 0228; PX 0212). Genaro Larrea told the independent directors that the mistake would be corrected, but it never was. (Pattern, May, 12, 2008, 114:3–9).

Genaro Larrea also broke his promise that the SPCC transfer and the payment of the Yankee Bonds would not occur until the Restructuring Committee was satisfied that certain conditions were met. On November 19, 2002, the Restructuring Committee, including Genaro Larrea, "unanimously agreed to defer any decision with respect to whether or not the Yankee Bonds could or should be paid for later consideration in light of the Corporation's significant working capital requirements

and its obligations to similarly situated creditors." (PX 0162). On January 27, 2003, the Restructuring Committee unanimously agreed "to defer any decision on the payment of the Yankee Bonds until after receipt of current projections which would permit evaluation of the Corporation's ability to pay the Yankee Bonds and still maintain operations and meet its payment obligations to other creditors." (PX 0191). On January 29, the Committee unanimously agreed that "no payment of the Yankee Bonds would be made unless and until the Committee has received and approved reasonable projections, confirmed by EYCF ... which demonstrated that [ASARCO] would have sufficient cash resources after payment of the Yankee Bonds to continue its operations and satisfy its other payment obligations to similarly situated creditors." (PX 0197). Jock Parton testified that there was a unanimous decision at this meeting that no payment of the Yankee Bonds would be made without another Restructuring Committee meeting. (Patton, May 12, 2008, 111:18–23). There was never another Restructuring Committee meeting, and AMC closed the SPCC transfer and paid the Yankee Bonds without the Restructuring Committee over receiving and approving reasonable projections demonstrating that ASARCO would have sufficient cash to continue operations and pay other obligations. (PX 0255). This is all circumstantial evidence of AMC's fraudulent intent.

### viii. Establishing Bank Accounts To Avoid Garnishment

The Court considers AMC/Grupo's creation of bank accounts for the sole purpose of avoiding garnishment to be virtually

---

**119.** Recall that the Restructuring Committee consisted of Jock Patton, Al Frei, and Genaro Larrea.

direct evidence of AMC's intent to hinder, delay, or defraud ASARCO's creditors. When the transaction was being finalized, it was pointed out that some creditors were trying to garnish or attach at least one of ASARCO's bank accounts. (PX 0193). AMC/Grupo had a new bank account opened before it would proceed with the transaction so that the creditors seeking to garnish or attach ASARCO's accounts would not be able to seize the funds that would pass through ASARCO's bank accounts when the transaction closed. (Genaro Guerrero Depo. 13:15–14:8). The Court finds this to be persuasive evidence of AMC's intent to hinder and delay ASARCO's creditors.

### ix. Conclusion

The circumstantial evidence that ASARCO introduced at trial illustrates that AMC/Grupo was aware that the SPCC transaction, which included payment of the Yankee Bonds as a necessary element, would hinder and delay some of ASARCO's other creditors from collecting overdue payments from ASARCO. AMC/Grupo instructed ASARCO to pay only those creditors to whom payment was necessary to close the transaction, or where payment would benefit AMC/Grupo either directly or indirectly. AMC/Grupo concealed and manipulated information, broke promises, and ultimately closed the transaction over the objections and contrary to the advice of the independent directors, EYCF, Squire Sanders, and members of ASARCO's management. It is clear from the record that AMC/Grupo wanted the SPCC shares, ASARCO's "crown jewel," for itself. In isolation, there is nothing improper about AMC/Grupo wanting to acquire the ASARCO's interest in SPCC. Nor is there anything wrong with AMC/Grupo in-

sisting that past-due debts be paid. The Court, however, must look at all the surrounding facts and circumstances to try to decipher AMC/Grupo's intent. At the time of the transaction, ASARCO was "insolvent" according to the UFTA and suffering from a liquidity crisis. ASARCO or its subsidiaries were named defendants in thousands of asbestos lawsuits and many creditors had threatened to file suit and/or to put ASARCO into involuntary bankruptcy. ASARCO owed numerous past due obligations that it was unable to pay and had 900 "held" checks totaling over $20 million at the time of the transaction. AMC/Grupo knew that the SPCC transfer, as it was structured, would leave ASARCO with even less cash than it had before the transaction and less ability to pay its overdue obligations. It knew there would be a "hole," or deficit, after the transfer. The evidence demonstrates that AMC knew that proceeding with this transaction, specifically paying itself and the Yankee Bonds, would hinder and delay ASARCO's ability to pay other creditors' ability to receive payments due and owing to them.[120]

▆▆▆ The Court now turns to the question of whether AMC's "calloused indifference" to the fact that ASARCO's creditors would be delayed or hindered constitutes actual intent to hinder, delay, or defraud ASARCO's creditors. Some courts have held that the intent required must be an intent to harm creditors. 9C Am.Jur.2d *Bankruptcy* § 2226 (citing *Kupetz v. Cont'l Ill. Nat. Bank and Trust Co. of Chicago,* 77 B.R. 754, 763 (C.D.Cal.1987)). Other courts have held that a transfer may be made with fraudulent intent even though the debtor did not intend to harm creditors but knew that by entering the transaction, creditors would inevitably be hindered, de-

---

**120.** There were creditors ASARCO owed at the time of the transaction who still have

claims for unpaid obligations against ASARCO. (*See e.g.,* PX 0212, PX 1374).

layed, or defrauded. *See, e.g., In re Am. Props., Inc.*, 14 B.R. 637, 643 (Bankr. D.Kan.1981).

Many fraudulent transfer cases cite to the Restatement (Second) of Torts for the definition of "intent" under the UFTA. *See, e.g., In re Manhattan Inv. Fund Ltd.*, Adv. Pro. No. 01–02606, 2007 WL 4440360, at *8 n. 16, 2007 U.S. Dist. LEXIS 92194, at *29 n. 16 (S.D.N.Y. Dec. 17, 2007); *In re Indep. Clearing House Co.*, 77 B.R. 843, 860 (D.Utah 1987).[121] According to the Restatement, "[t]he word 'intent' is used . . . to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." RE-STATEMENT (SECOND) OF TORTS § 8A (1965).

According to the comments, "[i]f the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id.* at cmt. b.

Even when not specifically referenced, other cases apply the definition found in the Restatement, i.e., if one acts with knowledge that creditors will be hindered or delayed by a transfer but then intentionally enters the transaction in disregard of this fact, he acts with actual intent to hinder and delay them.[122] For example, in *American Properties*, the court found that the debtor did not have a conscious intent to hinder, delay, or defraud any creditors. *Id.* at 640.[123] The parent company and its

**121.** Most of the courts citing the Restatement definition of "intent" are cases dealing with ponzi schemes. The Court finds this factual distinction to be of little relevance and finds these cases instructive on the proper definition of "intent" as used in the UFTA's actual-intent fraudulent transfer provision.

> "In general, a ponzi scheme is a fraudulent investment arrangement in which returns to investors are not obtained from any underlying business venture but are taken from monies received from new investors . . . . Typically, investors are promised high rates of return . . . initial investors obtain a greater amount of money from the ponzi scheme than those who join the ponzi scheme later. As a result of the absence of sufficient, or any, assets able to generate funds necessary to pay the promised returns, the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse." *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D.Ohio 1993) (internal citations omitted).

**122.** In fact, the cases that purportedly support the opposite conclusion do not actually contradict this holding. In *Kupetz v. Cont'l Ill. Nat. Bank and Trust Co. of Chicago*, the court declined to find actual intent on the part of the seller. 77 B.R. 754, 760 (C.D.Cal. 1987). The court noted that "this was an

entirely fair transaction from the seller's perspective" and that the seller should not be held responsible for the underhanded way in which the buyers raised the capital to make the purchase. *Id.* Considering the injustice that would result by granting the relief sought, the court denied the fraudulent transfer claim. *Id.* The court stated that relief was denied because "[t]here was no evidence of any intent of [the debtor] to harm or hinder . . . future creditors." *Id.* at 765. This court did not preclude a finding of actual intent if intent to hinder (but not otherwise harm) creditors was shown. This seems to be merely a restatement of the statute, not a commentary on whether the debtor must enter the transaction with a goal to harm creditors.

Likewise, in *In re Southeast Cmty. Media Inc.*, the court found that the debtors "did not proceed with the sale knowing that it would frustrate other creditors but disregarding their rights." 27 B.R. 834, 841 (Bankr. E.D.Tenn.1983). In the case at hand, the Court finds that AMC did proceed with the sale knowing that it would frustrate some of ASARCO's creditors but disregarded those creditors' rights.

**123.** This case was brought under the Bankruptcy Code's fraudulent transfer provision, 11 U.S.C. § 548. Regarding the present issue, however, the Court finds no significant distinction between this section and the UFTA provision, which applies in the case at hand.

subsidiaries were "desperately trying to weather a financial hurricane." *Id.* at 643. The parent company had a well-founded belief that the transaction would benefit one of its subsidiaries, but also had full knowledge that the transaction as proposed would be harmful to the creditors of another subsidiary because it would hinder or delay the ability of those creditors to receive satisfaction of debts owed them. *Id.* The Court found that because the transaction was intentionally carried out with full knowledge of the effect of the transaction on one of its subsidiary's creditors, there was actual intent to hinder delay or defraud these creditors. *Id.*

This Court finds that Delaware would use the definition of "intent" found in the Restatement and supported by the majority of the case law on this point. Thus, AMC acted with intent to hinder, delay, or defraud ASARCO's creditors if it knew that proceeding with the transaction as structured was substantially certain to hinder, delay, or defraud ASARCO's creditors.

Plaintiff proved that AMC knew that the SPCC transaction, specifically paying itself and the Yankee Bonds, would hinder and delay some of ASARCO's other creditors'

ability to collect on the obligations ASARCO owed. The Court finds that AMC knew that payments to some creditors would be hindered and delayed as a result of the transaction, but it closed the transaction anyway. For this reason, the Court finds that AMC closed the SPCC transfer with the actual intent to hinder or delay some of ASARCO's creditors.[124]

### d. Facts AMC Claims Negate A Finding Of Intent To Hinder, Delay, Or Defraud Creditors

The Court now turns to AMC's contention that various factors negate any inference of fraudulent intent. First, AMC asserts that the fact that some creditors benefitted from the transfer negates any claim that AMC intended to hinder, delay, or defraud its creditors. Next, AMC argues that it had a legitimate business purpose for the transfer; therefore it could not have had the requisite intent for actual fraudulent transfer. AMC also claims that the fact that it paid REV negates intent. Lastly, AMC contends that the presence of the DOJ settlement and the Consent Decree prevent a finding of actual-intent fraudulent transfer. The Court will address each of these in turn.[125]

---

**124.** Although the Court found that a preponderance of the evidence was the appropriate burden for the actual fraudulent transfer claim, the Court notes that Plaintiff also proved AMC's intent by clear and convincing evidence.

**125.** AMC also contends that the decision not to go into bankruptcy prior to the transaction is not evidence of AMC's actual intent to hinder, delay, or defraud ASARCO's creditors. The Court did not take this fact into consideration in determining AMC's intent; therefore, the Court need not analyze the merits of this contention. The Court heard from two bankruptcy experts, Alan Halperin (against whom the defendant filed a *Daubert* motion) and former United States Bankruptcy Judge Ralph Mabey. Of the two, the Court found the latter

to be the more helpful witness. Further, the Court found that some of what Mr. Halperin and Mr. Mabey testified to invaded the province of the Court and/or amounted to "educated guesses" and in some instances was considered by the Court to be pure speculation. The primary opinions of Halperin objected to by the defendant were his opinions on debtor-in-possession financing and that a bankruptcy court would bypass or void the restrictions on sales. The Court found the former to be of little relevance and somewhat speculative and did not rely upon it. The latter opinion the Court found to be highly relevant, but also very speculative and the Court did not rely on it in any fashion. In fact, the only opinion of either witness that Court found of overwhelming significance was Mr. Mabey's conclusion that at the time

### i. Some Creditors Benefitted From The Transfer

AMC contends that ASARCO's fraudulent-transfer claim necessarily fails because some of ASARCO's creditors benefitted from the transaction.[126] In essence, AMC contends that ASARCO's claim is not one for fraudulent transfer, but one for improper preference, which was not pled.

■■■ AMC correctly notes that the purpose of the state and federal fraudulent transfer provisions is to "preserve assets of the estate for the benefit of creditors." *In re Solomon*, 300 B.R. 57, 63 (Bankr. N.D.Okla.2003). The UFTA "was designed to protect unsecured creditors against debtors who make transfers out of . . . the debtor's estate in a manner adverse to creditor's rights." *In re Matter of Michigan Tool Control Corp.*, 381 B.R. 657, 667 (Bankr.E.D.Mich.2008) (internal citations omitted). It does not necessarily follow from this purpose and policy statement that there can be no actual intent to defraud creditors where the challenged transaction actually benefitted some of the debtor's creditors.[127]

AMC cites *In re Lodi* as holding that there can be no intent to defraud creditors if the transfer actually benefitted creditors. AMC's Proposed Findings of Facts and Conclusions of Law at ¶ 129 (citing *In re Lodi*, 375 B.R. 33, 40 (Bankr.D.Mass. 2007)). This case dismissed the actual fraudulent-transfer claim in a few short sentences. *In re Lodi*, 375 B.R. at 39–40. Noting that the majority of the proceeds of the refinance were paid to creditors, that court found that there was no evidence of an intent to hinder, delay, or defraud. *Id.* at 40. There was no other evidence of intent mentioned. *Id.* The court in *Lodi* considered that some creditors benefitted from the transfer in determining whether the debtor had the requisite intent, but, contrary to AMC's contention, the court did not hold that there can never be fraudulent intent if any creditors benefit. *See id.*

Defendant also cites *In re Ducate*, 369 B.R. 251, 264 (Bankr.D.S.C.2007). In this case the debtor transferred money from one account to a household account, out of which he and his wife paid bills. *Id.* The court did not expressly state that no fraudulent intent was possible solely because the money from this account was used to pay creditors. *Id.* Rather, the court recognized that several badges of fraud were present from which the court could infer actual fraud, but taking the evidence as a whole, and considering the testimony explaining the circumstances surrounding

---

of, and immediately before, the transaction it would have been reasonable for ASARCO to have decided to file Chapter 11 and it would have been just as reasonable to decide not to go into bankruptcy.

**126.** There is no Delaware authority directly addressing this issue; thus, the Court will consider cases interpreting the actual fraudulent transfer provision of the Bankruptcy Code and other states' enactments of the UFTA in order to predict what Delaware would decide under similar circumstances.

**127.** Recall that the consideration for the SPCC shares was allocated as follows: (1) $450 million went to retire a credit facility owed by ASARCO to Chase and guaranteed by Grupo; (2) $100 million was put in a trust for ASARCO's environmental claims; (3) $41.75 million of the consideration was forgiveness of ASARCO's intracompany debt; (4) $50 million of the cash proceeds was required to be paid toward the Yankee Bonds; and (5) AMC executed a promissory note to ASARCO for $123 million to be paid over 7 years, and there was a $12.6 million advance made in order to pay closing costs, interest, and the Yankee Bonds. (PX 0270). There is no question that some creditors (namely Chase, the Yankee Bond holders, the DOJ, and AMC/Grupo/the Larrea family) benefitted from the transfer.

the transfer, the court ultimately found that the transfers were not made with the intent to hinder, delay, or defraud debtor's creditors. *Id.* The court recognized that determining whether a debtor is liable for actual fraudulent transfer involves a subjective evaluation of whether the debtor had the requisite intent by looking at all the facts and circumstances surrounding the transfer. *Id.* (citing *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir.1987)).

 AMC builds on this argument by suggesting that ASARCO's claim is one of preferential treatment and that preferential treatment of a creditor does not amount to a fraudulent transfer. None of the cases AMC cites, however, stand for the proposition that showing preference to a creditor will prevent all other creditors from asserting an actual fraudulent transfer claim. Rather, the cases AMC relies on indicate that an intent to prefer one

creditor over another is not, standing alone, sufficient to prove the requisite intent. For example, in *Rubin Brothers Footwear, Inc.*, the court stated that there must be actual intent to defraud creditors, and "[m]ere intent to prefer one creditor over another ... will not establish a fraudulent transfer ...." 119 B.R. 416, 423 (S.D.N.Y.1990); *see also In re Hartley*, 52 B.R. 679, 690 (Bankr.S.D.Ohio 1985) ("The intent which the Trustee must prove under § 548(a) must be more than a simple intent to prefer a creditor."); *In re Lucar Enters., Inc.*, 49 B.R. 717, 718 (Bankr. S.D.Fla.1985) (quoting same).[128]

Also, AMC insinuates that the court in *In re Leneve* rejected the trustee's actual-fraudulent-transfer claim solely because the transferee was "herself a creditor." That case did not say that the trustee's claim was denied solely for that reason, rather the court stated, "repaying one creditor at the expense of others may not

---

**128.** Other cases AMC cited do not even discuss preference of certain creditors in the context of deciphering whether a debtor had actual intent to hinder, delay, or defraud creditors. The court in *In re Sharp Int'l Corp.*, in deciding whether a debtor received "fair consideration," discussed the fact that mere preference of a creditor does not constitute bad faith. 403 F.3d 43, 54 (2d Cir.2005). (In the UFCA constructive fraud provision, "fair consideration" was used instead of REV, and a determination of whether or not "fair consideration" was received required courts to consider whether the transfer was made in bad faith.) In *Sharp*, the court never implied that an intent to prefer a creditor precluded a claim that there was actual intent to defraud other creditors. *Id.* In *Matter of Michigan Tool Control Corp.*, the Complaint did not even plead actual fraudulent transfer; rather, the plaintiff brought a constructive fraudulent transfer claim. 381 B.R. 657, 667 (Bankr. E.D.Mich.2008). The trustee argued that once a debtor becomes insolvent, every payment the debtor makes on a contractual obligation incurred before the debtor became insolvent is a constructive fraudulent transfer. *Id.* at 668. The court disagreed with this

proposition, finding "[n]either the Bankruptcy Code nor Michigan['s UFTA] prevent a debtor from paying contractual obligations, even where the continued payment of those obligations contributes to a debtor's insolvency." *Id.* AMC quotes *HBE Leasing Corp. v. Frank*: "[E]ven the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because the basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors; it normally does not try to choose among them." 48 F.3d 623, 634 (2d Cir.1995) (emphasis in original) (internal citations omitted). AMC fails to point out, however, that the court made this statement in reference to a determination of whether the debtor received "fair consideration" according to the constructive fraudulent transfer provision then in place. *Id.* That court also noted that a preferential repayment will not invalidate a transfer, *absent proof that the debtor had actual intent to hinder, delay, or defraud its creditors. Id.* The trial court clearly did not preclude the possibility of a preferential payment constituting actual fraudulent transfer if the requisite intent existed.

be nice but it does not *automatically* provide conclusive evidence of fraudulent intent." 341 B.R. 53, 61 (Bankr.S.D.Fla. 2006) (emphasis added). The claim for actual fraudulent transfer failed because there was no additional proof of the requisite intent. *Id.* at 64.

A review of these cases makes it clear that an intent to prefer one creditor over others is not, standing alone, enough to prove that the debtor had the intent to hinder, delay, or defraud any creditors. Nevertheless, this Court did not uncover any authority indicating that a plaintiff can never prove an intent to hinder, delay, or defraud creditors if some of the debtor's creditors benefitted from the transaction.

 Furthermore, AMC's suggestion is contrary to the express language of the applicable provision of the statute. The Delaware statute reads: "a transfer made ... by a debtor is fraudulent as to a creditor ... if the debtor made the transfer ... [w]ith actual intent to hinder, delay or defraud *any* creditor of the debtor...." 6 Del C. § 1304(a), (a)(1) (emphasis added).[129] Plaintiff only must prove that AMC had intent to hinder, delay, or defraud *any* of ASARCO's creditors, not all of them. Thus, even if some creditors potentially benefitted, others might still be hindered, delayed or defrauded.

 The question of whether the debtor had the requisite intent is a subjective evaluation that courts must make by looking at all the facts and circumstances surrounding the transfer. If some of the debtor's creditors benefitted from the transaction, this might constitute some evidence that the debtor did not have the intent to hinder, delay, or defraud his creditors, but the fact that some creditors benefitted from the transfer is not a bar to an actual-intent fraudulent transfer claim.

### ii. Legitimate Business Purpose

AMC contends that a legitimate business purpose behind the SPCC share transfer negates any inference of actual fraudulent intent. Specifically, AMC claims that the SPCC transfer was part of restructuring ASARCO and was intended to pay off "looming debt obligations."

 Once a plaintiff puts forth sufficient evidence that the defendant had the requisite intent, the defendant may avoid liability by demonstrating a "legitimate supervening purpose" for the transfer. *In re Harris*, Case No. 02–05803, 2003 WL 23096966, at *2, 2003 Bankr.LEXIS 1757, at *5 (Bankr.D.Del. Dec. 30, 2003). Some courts have held that once the plaintiff introduces a "confluence of the badges of fraud," a presumption of fraudulent intent arises, and the burden shifts to the defendant to rebut the presumption by showing a legitimate business purpose supports the transfer. *Kelly v. Armstrong*, 206 F.3d 794, 801 (8th Cir.2000). Thus, even though Plaintiff proved that AMC had the requisite intent, AMC may still prevail on this claim if it can prove that there was a legitimate supervening purpose for the transaction.

**129.** Additionally, the construction proposed by AMC goes against the fraudulent transfer provision's purpose of protecting "creditors against debtors who make transfers out of ... the debtor's estate in a manner adverse to creditor's rights." *In re Matter of Michigan Tool Control Corp.*, 381 B.R. 657, 667 (Bankr. E.D.Mich.2008). For example, if a debtor owes $1 million to a creditor and transfers to that creditor stock worth $10 million, thereby keeping its other creditors from reaching this stock, then, under AMC's interpretation, a plaintiff could never prove that the debtor made that transfer with the intent to hinder, delay, or defraud its other creditors because the transfer was made to a creditor. This cannot be the result intended by the UFTA or the Bankruptcy Code.

■ The Court finds that the sale of the SPCC shares was a legitimate means by which to restructure ASARCO. Prior to the transfer, ASARCO was in default on the $450 million Revolver, an obligation that was secured, indirectly, by the SPCC shares. ASARCO's options, aside from filing bankruptcy, were to allow the Revolver lenders to foreclose on the stock or to sell the SPCC shares. (Tellechea Depo. 577:7–23). ASARCO's management viewed the sale of the SPCC shares as necessary for ASARCO's survival. (O'Neil Depo. 184:4–22, 189:16–190:2). The main purpose of the SPCC share transfer was to extinguish ASARCO's long-term debt obligation under the Revolver. (Williams Depo. 165:15–167:1). The Court finds that paying the creditors that had a security interest in the stock, upon which they might foreclose, was a legitimate business purpose for the transfer.

This finding, however, does not necessarily negate complaints about the manner in which the transfer was structured. ASARCO's actual-intent fraudulent transfer claim is not based solely on the fact the transfer took place, but that there were elements of the transaction that were unfair to creditors, such as paying the Yankee Bonds at par, counting as consideration forgiveness of a $41.75 million note held by AMC, and leaving ASARCO with less liquidity than it had before the transfer.[130]

AMC contends that the Yankee Bonds were a valid, past-due debt, and after paying these bonds, ASARCO would have no long-term debt obligations due until 2013.

(McAllister Depo. 67:25–68:11; PX 802). This is a compelling argument. After all, ASARCO did owe this debt, and by paying off the bonds, ASARCO was free from any long-term obligations for a decade. In its efforts to determine the intent of Defendant, however, the Court should look at the transaction as a whole. The Yankee Bonds were unsecured, and past due, but as discussed previously, they had been trading at a substantial discount. AMC/Grupo/ASARCO made no effort to try to buy the bonds off the market, nor did they consider renegotiating the bonds. Additionally, these were not the only multimillion dollar obligations on which ASARCO was past due. Squire Sanders advised the Restructuring Committee against paying these bonds, stating, "it is extremely difficult for ASARCO to articulate a supportable business justification ... for paying the Yankee Bonds at this time." (PX 0213).

There was likewise no legitimate business purpose for $41.75 million in consideration to consist of forgiveness of an unsecured debt ASARCO owed AMC/Grupo (the Larrea family). By structuring the transfer in this way, ASARCO was deprived of $41.75 million that it could have used to pay some of its other overdue obligations.

There were numerous other creditors to whom ASARCO was in arrears who received no benefit from the transaction. In fact, because the Yankee Bonds were paid, ASARCO was left with less cash with which to pay its past-due obligations than

---

**130.** The Court acknowledges that one could fashion a similar argument about the approximately $50 million of the Revolver payment that went to AMC because it had purchased participation in the $450 million Revolver. (PX 0156; PX 0270). However, the Court need not address this issue or the defense that AMC would raise that its participation was not voluntary and was caused by Chase insisting on it as a condition for the extension of the Revolver beyond November 15, 2002. Further, the Court would also anticipate the argument that regardless of why AMC participated, it was still a secured creditor like all of the other participants in the Revolver.

it had before the transaction. Thus, although one of the purported purposes of paying the Yankee Bonds was to eliminate ASARCO's long-term debt until 2013, this actually harmed the creditors to whom ASARCO was already in arrears at the time.

For these reasons, even though there was a legitimate business purpose for the transfer, when the Court considers all of the circumstances surrounding the transaction as a whole, the Court finds that the presumption of fraud has not been adequately rebutted. Stated differently, the Court finds that Plaintiff has proven its actual fraudulent transfer cause of action by a preponderance of the evidence, despite the legitimacy of selling the SPCC shares to pay off the Revolver because there was no legitimate business reason for other aspects of the transaction.

### iii. ASARCO Received Reasonably Equivalent Value

 AMC contends that a finding of reasonably equivalent value precludes a finding of actual intent to hinder or delay ASARCO's creditors.[131] The law in Delaware, however, does not support this assertion. Courts of Chancery in Delaware have stated that "where there is an actual intent, the question of the presence or absence of a valuable or an adequate consideration is immaterial." *Richards v. Jones,* 142 A. 832, 834 (Del.Ch.1928); *see also Mitchell v. Wilmington Trust Co.,* 449 A.2d 1055, 1060 (Del.Ch.1982). Furthermore, the statute itself does not lend itself to such an interpretation. "Reasonably equivalent value" is an element of constructive fraudulent transfer, whereas it is only one *factor* a court may consider in deciphering the defendant's intent in an actual-intent fraudulent transfer claim. *Compare* 6 Del. C. § 1304(a)(1), (b), *with* 6 Del. C. § 1304(a)(2). At least one Delaware court has acknowledged that "a plaintiff pursuing a fraudulent transfer claim need not satisfy every (or any particular) statutory factor." *Dryden v. Estate of Gallucio,* C.A. 442–N, 2007 WL 185467, at 6 n. 36, (Del.Ch. Jan. 11, 2007).

Despite the Court's finding that ASARCO received reasonably equivalent value for the SPCC shares, taking the circumstantial evidence as a whole, the Court, nevertheless, finds that AMC possessed the requisite fraudulent intent.

### iv. The DOJ Settlement And The Consent Decree

 AMC's next argument is that ASARCO is unable to prove actual-intent fraudulent transfer because of the DOJ settlement and the Consent Decree. AMC claims that ASARCO's settlement with one set of creditors cannot, as a matter of law, constitute a fraudulent transfer as to remaining creditors. AMC cites *In re Long Dev., Inc.* in support of this legal assertion. In that case, the debtor unquestionably owed the partnership $5 million, and the debtor chose to settle this obligation for $3.1 million, but left other creditors unpaid. 211 B.R. 874 (Bankr.W.D.Mich. 1995). In an adversary proceeding, the committee of unsecured creditors unsuccessfully challenged the settlement as a fraudulent transfer. *Id.* This case is distinguishable because in *Long Development* the settlement itself was challenged. In contrast, ASARCO does not claim that the

---

**131.** The Court recognizes that "a showing by a defendant that a reasonable equivalent has been given in good faith for a transfer or obligation is a complete defense although the debtor is shown to have intended to hinder, delay, or defraud creditors." UFTA Prefatory Note. As discussed in further detail below, the Court does not find that AMC acted in good faith; therefore this defense is unavailable to Defendant.

settlement with the DOJ was fraudulent. Rather, it is the transfer of the SPCC stock and some of the other interrelated payments made part of that transaction that ASARCO challenges.

■ Even if such a settlement would typically preclude a finding of an actual fraudulent transfer, the Court finds that the facts surrounding the settlement between ASARCO/SPHC and the government would not lead the Court to such a result. The Consent Decree entered by the District Court of Arizona made clear that the settlement only addressed the parties to that suit: the government, AS-ARCO, and SPHC. (PX 0214; PX 0281). The Decree itself contemplated that the transaction might be unwound by other creditors, and that other creditors would not be bound by this settlement. (PX 0214; PX 0281).[132] That court also noted that it was not satisfied that the government was interested in protecting the rights of other creditors, "particularly since the United States could approve a settlement that would protect its own interests and still allow the proposed stock transfer to occur." (PX 0174). Therefore, this Court finds that the settlement with the DOJ and the Consent Decree entered by the District Court of Arizona do not negate a finding that Defendant had the requisite intent for actual fraudulent transfer.

### e. Conclusion

After considering the statutory badges of fraud and the other circumstantial evidence presented by both sides in this case, the Court determines that AMC entered into the challenged transaction with full knowledge that ASARCO's creditors would be hindered or delayed as result. Therefore, the Court finds that AMC had actual intent to hinder or delay ASARCO's creditors and is liable for actual fraudulent transfer under 6 Del. C. § 1304(a)(1).

### III. AIDING & ABETTING ASARCO'S DIRECTORS' BREACH OF FIDUCIARY DUTY

■ ASARCO alleges that AMC aided and abetted ASARCO's directors' breach of fiduciary duty to ASARCO and ASARCO's creditors in connection with the sale of the SPCC shares. (Compl. at ¶¶ 109–11).[133] To prevail on a claim for aiding and abetting a breach of fiduciary duty, ASARCO must prove: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) knowing participation in that breach by the non-fiduciary. *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1039 (Del.Ch.2006) (recognizing existence

---

132. "Should the transfer of ASARCO/SPHC's ownership in SPCC stock be subsequently unwound, invalidated, or nullified pursuant to a judgment issued by a court of competent jurisdiction, (I) this Consent Decree shall become null and void in its entirety . . . ." (PX 0214). The fact that AMC/Grupo closed the transaction with full knowledge that a lawsuit could be brought to set it aside is further evidence of Defendant's intent to hinder, delay, or defraud ASARCO's creditors.

133. In its order on AMC's Motion to Dismiss, this Court determined that New Jersey law applies to the breach of fiduciary duty claims. *ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49, 69 (S.D.Tex.2007). The parties subsequently stipulated that New Jersey law applied to these claims. (Jt. Pretrial Order Agreed Proposition of Law No. 5). The Court also found that where the fiduciary duty law is undeveloped in New Jersey, courts in New Jersey often find Delaware law to be instructive. *ASARCO LLC*, 382 B.R. at 70. The Court also determined that New Jersey would recognize a cause of action against a corporation for aiding and abetting its insolvent subsidiary's directors' breach of fiduciary duty. *Id.* at 72 (citing *VFB v. Campbell Soup Co.*, 482 F.3d 624, 634 (3d Cir.2007)).

of claims against parent for aiding and abetting breaches of fiduciary duty committed by subsidiary's directors); *State of New Jersey v. Qwest Commc'ns Int'l, Inc.,* 387 N.J.Super. 469, 904 A.2d 775, 782 (2006) (stating that a claim for aiding and abetting liability is found in cases where one party "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself").

## A. Existence Of A Fiduciary Duty

■■■■■ As a general rule, a director owes a fiduciary duty only to its corporation and its shareholders (not its creditors). *See VFB v. Campbell Soup Co.,* 482 F.3d 624, 635 (3d Cir.2007) (applying New Jersey law); *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171, 1174 (Del.1988). When a corporation is a wholly owned subsidiary, the directors' duties to the corporation benefit the parent as the sole shareholder. *Id.* New Jersey and Delaware have both adopted an "insolvency exception" to this general rule.[134] If the wholly owned subsidiary is

insolvent, the director's fiduciary duties to the corporation run to the benefit of the creditors. *Prod. Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 790–91, 863 A.2d at 791. ("The fact of insolvency places the creditors in the shoes normally occupied by the shareholders—that of residual risk-bearers."). The directors' focus is no longer solely on its shareholders' interests, but also on the creditors' interests.[135] *Id.; VFB,* 482 F.3d at 635–36.

Like the case at hand, the directors in *VFB* sat on the boards of both the parent corporation and the wholly owned subsidiary. *VFB,* 482 F.3d at 635. The plaintiffs in that case brought a claim against the parent for aiding and abetting the directors' breach of fiduciary duty. *Id.* at 634–36. The court noted that normally when a director serves on the board of two transacting companies, this will trigger heightened scrutiny. *Id.* at 635. However, when the two companies are a parent and its solvent, wholly owned subsidiary, there is only one interest to be protected—that of the sole shareholder, the parent—

---

**134.** *See Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 173 (3d Cir.2002) ("Once a corporation becomes insolvent ... the directors assume a fiduciary or 'quasi-trust' duty to the corporation's creditors."); *In re Scott Acquisition Corp.,* 344 B.R. 283, 289 (Bankr.D.Del.2006) (stating that the subsidiary's creditors and the subsidiary itself are owed a fiduciary duty upon insolvency); *AYR Composition, Inc. v. Rosenberg,* 261 N.J.Super. 495, 619 A.2d 592, 597 (1993) ("As the sole directors ... defendants not only owed a fiduciary duty to [the corporation] while it remained in existence, but also they owed a quasi-trust duty to the plaintiff, as [the corporation's] creditor when [the corporation] became insolvent."); *Prod. Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 790–91 (Del.Ch.2004) ("When a firm has reached the point of insolvency ... the firm's directors are said to owe fiduciary duties to the company's creditors.").

**135.** There appears to be some difference of opinion regarding whether, in the case of insolvency, directors still owe any fiduciary duties to the shareholders, or rather, if the creditors essentially take the place of the shareholders as residual beneficiaries. Some courts seem to take a "community of interests" approach, while others recognize that the creditors and shareholders switch places. *See Laura Lin, Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors,* 46 VAND. L.REV. 1485, 1489–91 (1993). This distinction is not significant to the instant case, especially in light of the fact that in VFB, the court determined that if a corporation is insolvent the directors owe duties to both the creditors and the shareholders, yet the court recognized that a claim against the parent (shareholder) for aiding and abetting the subsidiary's directors' breach of fiduciary duty would have been viable if the subsidiary were insolvent. 482 F.3d at 635–36.

and thus, no need for heightened scrutiny. *Id.* When the subsidiary corporation becomes insolvent, however, its directors then have a duty to the creditors of that corporation. *Id.* at 635–36.

Therefore, ASARCO's directors owed a fiduciary duty to ASARCO's creditors, if, and only if, ASARCO was insolvent at the time of the alleged breach, i.e., at the time of the SPCC stock transfer. The parties agree that the test for insolvency in this context is the same as that under the Bankruptcy Code and UFTA's fraudulent transfer provisions. ASARCO must prove: (1) it was engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; (2) it intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due; or (3) it was insolvent at the time or became insolvent as a result of the transfer or obligation. 6 Del. C. §§ 1304(a)(2), 1305(a); N.J. Stat § 25:2–25, 2–23(b).

### 1. *Unreasonably Small Assets*

The first way ASARCO may prove its "insolvency" is by showing that it "was engaged or was about to engage in a business or a transaction for which the remaining assets of [ASARCO] were unreasonably small in relation to the business or transaction." 6 Del. C. § 1304(a)(2)(a); N.J. Stat. § 25:2–25.

Again, the Court is in a situation in which neither the statute nor New Jersey or Delaware case law sheds light on what constitutes "unreasonably small assets." The Court must predict what the high court in New Jersey would do by looking at the UFTA and case law interpreting it in other states and at case law interpreting the parallel provision in the Bankruptcy Code.[136]

■■■ "Unreasonably small assets" denotes a financial condition short of equitable insolvency. *MFS/Sun Life Trust— High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 944 (S.D.N.Y. 1995) (interpreting fraudulent transfer provisions of Delaware, New York, and Minnesota) (quoting *Moody v. Security Pacific Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir.1992)).[137] The term refers to the inability to generate sufficient profits to sustain operations. *Peltz v. Hatten*, 279 B.R. 710, 744 (D.Del.2002) (interpreting this term's meaning in Bankruptcy Code). "The test is aimed at transferees that leave the transferor technically solvent but doomed to fail." *MFS/Sun Life*, 910 F.Supp. at 944 (citing *Moody*, 971 F.2d at 1070 & 1070 n. 22).

■■■ To determine whether a corporation has unreasonably small assets, the Court should compare ASARCO's projected cash flow (also known as its "working capital" or "operating funds") with ASARCO's capital needs through a reasonable time after the challenged transfer. *In re*

---

**136.** The parallel provision in the Bankruptcy Code states that after proving the transfer was for less than REV, one way a plaintiff may prevail on its constructive fraudulent transfer claim is by showing that the debtor "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital." 11 U.S.C. § 548(a)(1)(B)(ii)(II).

**137.** In *Moody*, the Third Circuit analyzed what "unreasonably small assets" meant under the Uniform Fraudulent Conveyance Act, a precursor to the UFTA. Many courts have since adopted the analysis in *Moody* when interpreting the analogous provisions in the UFTA and the Bankruptcy Code.

*Iridium Operating LLC,* 373 B.R. 283, 345 (Bankr.S.D.N.Y.2007) (discussing the meaning of unreasonably small capital under Bankruptcy Code). In making this comparison, courts weigh the raw financial data against both the nature of the enterprise and the extent of the enterprise's need for capital during the period in question. *Id.* (quoting *Barrett v. Cont'l Ill. Nat'l Bank & Trust Co.,* 882 F.2d 1, 4 (1st Cir.1989)).

 The test for unreasonably small assets is "reasonable foreseeability." *Peltz,* 279 B.R. at 744 (quoting *Moody,* 971 F.2d at 1073). This determination requires an objective assessment of the company's financial projections—the critical question being whether those projections were reasonable. *Id.* (citing *Moody,* 971 F.2d at 1073). The Court must consider the reasonableness of the company's projections with respect to whether they were prudent at the time made, not in hindsight. *MFS/Sun Life,* 910 F.Supp. at 944. The Court should only consider those cash inflows that were reasonable for ASARCO to have expected to receive, whether from new equity, cash from operations, or available credit. *See In re Iridium,* 373 B.R. at 343 (citing *Moody,* 971 F.2d at 1072 n. 24, 1073). The Court should test these projections against ASARCO's historical data. *Moody,* 971 F.2d at 1073. Another factor the Court may consider is the length of time ASARCO survived after the challenged transfer and whether the deterioration of the enterprise was affected by unforeseeable intervening events. *In re Joy Recovery Tech. Corp.,* 286 B.R. 54, 76 (Bankr.N.D.Ill.2002) (discussing "unreasonably small assets" under Illinois's version of UFTA); *In re Dakota Drilling, Inc.,* 135 B.R. 878, 887 (Bankr.D.N.D.1991) (finding that Plaintiff did not meet burden because intervening factors such as de-

pression of oil drilling industry could have led to company's bankruptcy).

The Court finds that ASARCO had unreasonably small assets and on the day of the transfer was unable to generate sufficient cash flow to sustain operations after selling the SPCC shares. ASARCO's auditors issued reports for years ending 2001, 2002, 2003, and 2004 stating that there was "substantial doubt about [ASARCO's] ability to continue as a going concern." (PX 1070; PX 0306; PX 1148). A letter from Houlihan dated May 21, 2002, states that in addition to the market value of the SPCC stock, $641 million at the time, ASARCO would need an additional $193 million. (PX 0082). According to Houlihan's preliminary analysis, in addition to AMC's assumption of the Revolver, ASARCO would need between $346 million to $508 million to continue as a going concern after the transfer. (PX 0084). Houlihan also did a preliminary cash flow analysis demonstrating the effect of selling the SPCC stock. It showed that the transaction would be cash flow positive in the first year, but thereafter ASARCO would have been better off keeping the stock. (PX 0687; PX 0079). Craig Hansen, an attorney with Squire Sanders during the relevant time, testified that there was a significant concern that ASARCO was in danger of running out of cash. (Hansen Depo. 39:16–25). Daniel Tellechea wrote a letter to German Larrea in October 2002 stating that there was a projected cash-flow deficit of $11.24 million for the year and that the deficit would be $31.24 million if ASARCO paid Standard Bank and Societe Generale the $20 million it owed them. (PX 0130). An email from Richard Havel, a partner with Sidley Austin, indicated in October of 2002 that ASARCO would have a negative cash flow of $22 million for 2002 and a projected negative cash flow of $175 million for 2003, which included the payment of $100 mil-

lion for the Yankee Bonds. (PX 0129). EYCF advised ASARCO in February 2003 that if it paid the Yankee Bonds, it would be difficult to obtain a debt facility sufficient to satisfy ASARCO's projected cash deficits and that ASARCO would face a liquidity deficit and might not be able to continue its operations. (PX 0212). Despite ASARCO's poor financial health, the transfer of the SPCC stock was structured in a manner that left ASARCO without any additional cash to resume normal operations or pay debts that were past due. (Tellechea Depo. (2008)430:19–431:14; 96:19–25). All of the cash received was earmarked to pay the Chase Revolver or the Yankee Bonds. (PX 0270). In fact, ASARCO used an additional $50 million of its own cash to retire these bonds. (PX 0270).[138]

AMC points out that ASARCO survived twenty-eight months after the transfer, and contends that this weighs against finding that ASARCO possessed unreasonably small assets. In support of this contention, AMC directs the Court to *Fidelity Bond and Mortgage Co. v. Brand*, 371 B.R. 708 (E.D.Pa.2007) and *In re Joy Recovery Tech. Corp.*, 286 B.R. 54 (Bankr. N.D.Ill.2002). AMC points to *Joy Recovery* for the proposition that "courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction. . . ." 286 B.R. at 76. The cases cited by the *Joy Recovery* court in support of this proposition, however, all involved companies that were paying their creditors during the period between the challenged transfer and filing bankruptcy. *Id.* (citing cases). ASARCO, in contrast, was cannibalizing itself and was, at best, limping along during the interim period and not

paying many of its creditors. (*See, e.g.,* Fitzgerald, June 3, 2008, 106:15–18).

In *Brand*, the district court reviewed a bankruptcy court's finding that the plaintiff did not satisfy the unreasonably small assets test. *See* 371 B.R. *passim.* That court discussed in detail the reasonableness of the projections made by the parties to the challenged merger and found that the positive projections were reasonable at the time they were made. *Id.* at 722–28. The court also mentioned, as another factor in the analysis, that the struggling company did not file bankruptcy for 14 months, it made its interest payments that came due in the interim, and had a positive monthly cash flow. *Id.* at 728. The district court ultimately upheld the bankruptcy court's determination that the plaintiff did not carry its burden. *Brand* is distinguishable from the case at hand for a number of reasons. First, the projections made prior to the transfer of the SPCC transfer predicted negative cash flows, not positive ones. Also, prior to the transaction, ASARCO was not generally paying its debts as they became due nor was it experiencing a positive monthly cash flow on a regular basis. The Court recognizes that ASARCO survived twice as long as the bankrupt company in *Brand*, which is a factor that indicates ASARCO did not have unreasonably small assets; however, that is only one factor to consider.

▪ The Court concludes that the length of time a corporation survives after the challenged transfer is an important factor, but is nevertheless merely one factor to consider in the unreasonably small assets analysis. The fact that ASARCO did not file bankruptcy until over two years after the transfer is not dispositive. In this case, ASARCO was not regularly

---

**138.** As for its cash position, ASARCO sold its best asset, a controlling stake in a Peruvian copper company, and was left with at least

$53 million less in cash than before the transaction.

paying its creditors, not only before the transfer, but also between the time of the transfer and filing for bankruptcy two years later. Additionally, ASARCO survived for over two years primarily because it took drastic measures to do so, such as high-grading mines, monetizing insurance policies, and stopping some operations altogether. Therefore, ASARCO's ability to avoid a total collapse for over two years after the transfer does not persuade this Court that ASARCO's cash flow was sufficient to meet its capital needs. In 2003, ASARCO might accurately have been described as insolvent and "doomed to failure."

Based on the evidence presented at trial and discussed above, the Court finds that ASARCO met its burden of proving that it was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction. ASARCO's reasonable projected cash flows made by competent experts prior to the transaction indicated that there were insufficient operating funds to meet its capital needs, and time proved them to be correct. Therefore, ASARCO has proven it was "insolvent" at the time of the transaction and that ASARCO's directors owed a duty to ASARCO's creditors.[139]

### 2. Unable To Pay Debts

The second test for insolvency is met if ASARCO proves that it "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as

they became due." 6 Del. C. § 1304(a)(2)(b); N.J. Stat. § 25:2–25(b)(2).[140] Unlike the "unreasonably small assets" standard, this test has an objective and subjective prong, and the test is satisfied if either prong is met.

#### a. Subjective Prong

The subjective prong is met if it can be shown that "the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured." *In re WRT Energy Corp.*, 282 B.R. 343, 415 (Bankr. W.D.La.2001) (discussing analogous provision in Bankruptcy Code). Intent may be inferred from the facts and circumstances surrounding the transaction. *Id.* However, ASARCO must show more than simply a chronological relationship. *See In re Suburban Motor Freight, Inc.*, 124 B.R. 984, 994 (Bankr.S.D.Ohio 1990). There must be evidence sufficient for the Court to conclude that the debtor's transfer was contemporaneous with "an intent or belief that [its] subsequent creditors would be injured, i.e., that the debtor would be unable to pay such debts as they matured." *Id.*

The Court finds that Plaintiff proved the subjective prong of the "inability to pay debts" test. In March 2002, Jim O'Neil, then ASARCO's Vice President of Finance testified that ASARCO had $138 million in past-due debts at the end of 2001 and that ASARCO was not able to pay those debts. (O'Neil Depo. (2002), 57:9–57:22). At this time, ASARCO was in arrears to most of

---

139. Plaintiff must only meet one test to establish it was "insolvent" and that ASARCO's directors owed a fiduciary duty to ASARCO's creditors. Nevertheless, the Court will briefly consider the other tests for insolvency as well.

140. Once again, the highest courts in New Jersey and Delaware have not spoken to this,

but the Court may seek guidance from cases discussing similar provisions in the Bankruptcy Code or other states' versions of the UFTA. There is relatively little case law on this section; therefore, the cases cited in this section come from courts across the country.

its vendors and was generally not paying its debts as they became due. (O'Neil Depo. (2002), 70:25–71:9). In October of 2002, Tellechea informed German Larrea of over $60 million in past-due debts. (PX 0130). Craig Hansen, a lawyer with Squire Sanders, mentioned in a November 2002 email to Armando Ortega and others that "ASARCO is undeniably not paying its debts as they become due." (PX 0153). Grant Lyon of EYCF agreed that ASARCO was not able to pay debts as they came due. (Lyon Depo., 213:24–214:14). Genaro Guerrero, treasurer of ASARCO, testified that perhaps thousands of vendors, service providers, and other creditors were having trouble getting paid in early 2003. (Guerrero Depo., 84:24–85:4). ASARCO's past due and liquidated asbestos obligations exceeded $13.7 million in early March 2003, and ASARCO was in arrears with its own defense lawyers for over $3 million. (PX 0967; PX 0242).

The strongest evidence of ASARCO's belief that it was unable to pay its debts is that there were extensive "hold lists" during the relevant time. Genaro Larrea wrote a letter to German Larrea in late February 2003 asking for a cash infusion and stating, "as you know, we have checks stopped for almost $30M US, in addition to the fact that we do not have credit with practically any of our providers." On March 7, 2003, there were over 900 "held checks," totaling over $23 million. (PX 2106; PX 2039). Most of this amount had been held over thirty days. (PX 2106).

The Court is aware that the subjective prong emphasizes "subsequent creditors" and their future claims. The proof in this case is so convincing on the aspect of ASARCO's inability to pay debts as they came due at the time of the closing and on the fact that it left the closing with less cash than it had before the transaction that it would be impossible not to conclude that future creditors and obligations would not be paid. Further, there were numerous predictions of major cash shortages, most of which turned out to be all too accurate. This evidence may be circumstantial, but it is overwhelming and it was verified by what actually happened at ASARCO. This evidence proves that ASARCO not only had a subjective belief but in fact knew that past, current, and subsequent creditors would not be paid as their claims matured. For this reason, the Court finds that ASARCO has proven that it was "insolvent" under this test.

### b. Objective Prong

 The objective prong measures whether ASARCO, as a going concern, would reasonably have been able to pay its debts after making the challenged transfer. *In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 593 (Bankr.N.D.Cal. 1994) (discussing the meaning of the term in California's adoption of the UFTA). "Reasonableness" is often measured through contemporaneous cash flow projections and other forward-looking sources. *Id.* The Court finds, from an objective standpoint, ASARCO was unable to pay debts as they came due prior to and immediately following the transfer.

ASARCO was having cash flow problems in 2001 that continued into 2002 and 2003. (Guerrero Depo. 31:17–32:16). During this time, ASARCO was having trouble paying its vendors and service providers on a timely basis, many of whom threatened to stop supplying needed parts for mining equipment. (Guerrero Depo. 32:13–20; PX 0027; PX 0607; PX 0608; PX 0048; PX 0620). Beginning with ASARCO's 2001 financial statement, ASARCO's auditors stated that there was "substantial doubt about [ASARCO's] ability to continue as a going concern." (PX 0066; PX 1070; PX 0306; PX 1148). By Febru-

ary 2002, unpaid creditors began increasing the pressure on ASARCO. (PX 0056). The revolving credit agreement matured on January 31, 2003, and the Yankee Bonds came due February 3, 2003. (Jt. Pretrial Order Admissions Nos. 49, 52). ASARCO was unable to pay either of these maturities. (PX 0232, PX 0233; PX 0235). In February 2003, Genaro Larrea acknowledged that ASARCO had been operating with negative working capital since July 2001. (PX 0241). From 2001 until the day of the transfer, ASARCO was not able to make any payments to AMC on the intercompany loan of $41.75 million provided by the Larrea family through AMC, and default interest began accruing in June 2002 as a result. (PX 2045). There are numerous creditors in the current bankruptcy proceeding who filed proof of claims based on nonpayment of debts incurred prior to March 31, 2003. (*See, e.g.,* PX 1374, 1397, 1377, 1378, 1375, 1386, 1392, 1388, 1389).

Cash-flow projections and other forward-looking sources prior to the transaction warned that ASARCO would continue to be financially unstable and unable to generate sufficient cash to pay its debts even after the transaction. In May 2002, Houlihan advised that ASARCO would need $346 million to $508 million to continue as a going concern after the transfer. (PX 0084). Houlihan also did a preliminary cash flow analysis, which showed that the transaction would be cash-flow positive in the first year, but thereafter ASARCO would have been better off keeping the stock. (PX 0687, PX 0079). In October 2002, EYCF projected a negative cash balance of $158 million in December 2003 if ASARCO transferred the SPCC stock and paid the Yankee Bonds at par. (PX 0142).

Although in determining whether ASARCO reasonably believed that it would be able to pay its debts as they came due after the transfer the Court should consider only the information available at the time of the transaction, the Court believes it is relevant that the contemporaneous projections are supported by the events that actually occurred after the transaction. EYCF's cash-flow projection proved to be very close to the mark, as ASARCO had negative cash flow of $151.1 million in 2003. (PX 1217). In the months following the transaction, ASARCO was under "severe financial pressures." (PX 0293). It had "limited cash flow and numerous creditors demanding payment." (PX 0293). On July 1, 2003, Assistant Treasurer Rob Kastelic stated that there were minimal funds for operations and described ASARCO's financial condition as a "crisis situation." (PX 1055). In this same month, Tellechea asked German Larrea for at least $10 million to clear land at the Ray mine, and he advised that failure to do this would affect cash flows for the rest of the year and 2004. (PX 0295). At this time, ASARCO was still not able to pay its debts as they came due. (O'Neil Depo. (2008) 285:4–7).[141]

Considering the fact that ASARCO had been unable to pay its debts in a timely manner for well over a year prior to the transfer and taking into account the contemporaneous projections that predicted negative cash flows after the transfer, the Court finds that ASARCO, as a going concern, would not reasonably have been able to pay its debts after closing the SPCC transaction.

### 3. Balance–Sheet Insolvency

#### a. Presumption Of Balance–Sheet Insolvency

Under the balance sheet test, a debtor is insolvent if "the sum of

---

**141.** The Court also finds it interesting that ASARCO reported losses of over $100 million from 2003–2005, despite the price of copper doubling during this period.

[its] debts is greater than all of [its] assets, at a fair valuation." N.J. Stat. § 25:2–23(b); 6 Del. C. § 1302(a). According to New Jersey and Delaware's version of the UFTA, a debtor is presumed to be balance-sheet insolvent if it "is generally not paying debts as they become due...." N.J. Stat. § 25:2–23(b); 6 Del. C. § 1302(b). In order to determine whether a debtor is generally not paying debts as they become due (and therefore presumed to be insolvent under the balance-sheet test), courts consider a variety of factors. The most commonly used factors are: (1) the number of debts; (2) the amount of delinquency; (3) the materiality of non-payment; and (4) the nature of the debtor's conduct of its financial affairs. *See, e.g., In re Reed,* 11 B.R. 755, 759–60 (Bankr.S.D.W.Va.1981).[142]

In the present case, the evidence supports a finding that ASARCO was generally not paying its debts as they became due. First, in March 2003, there were numerous debts that were unpaid. The "hold list" enumerated over 900 held checks at that time. (PX 2039). In addition, contemporaneous emails and memos indicate that numerous creditors, including vendors and service providers, were not being paid. (*See, e.g.,* PX 0048, PX 2039, PX 0212; PX 0288; PX 0291). German Larrea suggested that there might even be thousands of creditors, vendors, and service providers who were having trouble getting paid. (German Larrea Depo. 84:24–85:4).

Second, ASARCO was delinquent in paying millions of dollars worth of obligations. At the time of the transfer, ASARCO had over $20 million in held checks. (PX 2039). ASARCO's past-due asbestos obligations exceeded $13.7 million, and it owed over $3 million to its asbestos counsel. (PX 0967; PX 0242). Prior to the transaction, payments on the $450 million Chase Revolver and the Yankee Bonds, amounting to $100 million at par, were also delinquent. (Jt. Pretrial Order Admission of Fact # 52; O'Neil Depo. 184:4–22).

 The third factor, the materiality of non-payment, considers the duration of the nonpayment and whether there is a reasonable basis for nonpayment. *In re Reed,* 11 B.R. 755, 760 (Bankr.S.D.W.Va. 1981). In March 2003, there were $23 million worth of held checks—18% of this amount was held at least 90 days, and 48% had been held for 30 to 90 days. (PX 2106; PX 2039). Defendant did not present the Court with a legitimate reason for this nonpayment, aside from lack of ability to pay. This also points toward a finding that ASARCO was generally not paying its debts as they came due.

The final factor looks at all the preceding considerations in light of the debtor's overall handling of his financial affairs. *In re Reed,* 11 B.R. at 760. The Court should analyze whether ASARCO conducted its financial affairs in a manner inconsistent with one operating in good faith and in the

---

**142.** There is a dearth of case law on what it means to be "generally not paying debts as they become due," especially from New Jersey and Delaware. There is case law in other jurisdictions, however, that discusses this phrase in an analogous provision of the Bankruptcy Code— § 303(h). The relevant part of this section states, "[o]therwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if ... the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h), (h)(1). The language regarding generally not paying debts is substantially the same. In fact, the comments to the UFTA on this provision reference the case law that has developed regarding § 303(h). UFTA § 2 Cmt. Therefore, the Court finds it appropriate to consider the same factors as other courts use under § 303(h) of the Bankruptcy Code.

regular course of business. *Id.* In January 2003, ASARCO needed to pay $12 million to restore vendor relations for basic materials for operations. (PX 0206). For example, ASARCO was shutting down operations because it could not afford, and did not have sufficient trade credit, to fuel its trucks. (PX 0206). The inability to make fuel payments forced the layoff of over 250 mine maintenance and operations employees at the Ray mine. (PX 0206). Many other vendors and service providers similarly stopped extending credit and providing services to ASARCO for nonpayment. (*See, e.g.,* PX 0027; PX 0607; PX 0608; PX 0056; German Larrea Depo. 84:24–85:4). ASARCO's inability to pay its vendors and service providers is not consistent with a company operating in the regular course of business.

In addition to the circumstantial evidence to this effect, there were also contemporaneous documents and testimony at trial expressly stating that ASARCO was not generally paying its debts. In 2002, O'Neil unequivocally testified that ASARCO was not paying its debts as they came due. (O'Neil Depo. (2002) 70:25–71:9). Tellechea testified that as of March 2002, ASARCO was probably in arrears to most of its vendors and was not paying its debts as they came due. (Tellechea Depo. (2008) 140:19–141:4, 198:20–199:1). In November 2002, Squire Sanders wrote in an email to Armando Ortega that "ASARCO is undeniably not paying its debts as they become due." (PX 0153).

Considering the evidence as a whole, the Court finds that at the time of the transaction, ASARCO was generally not paying its debts as they became due. Therefore, pursuant to the statute, the Court presumes that ASARCO was balance-sheet

insolvent, i.e., that ASARCO's liabilities exceeded its assets.

### b. Rebutting Presumption Of Balance Sheet Insolvency

AMC may rebut the presumption that it is balance sheet insolvent by "proving that the nonexistence of insolvency ... is more probable than its existence." UFTA § 2, cmt 2. In other words, AMC must convince the Court that it is more likely than not that ASARCO was solvent under the balance-sheet test, i.e., that its assets exceeded its liabilities.

▮▮▮▮ Many courts refer to this as the balance-sheet test, but quickly recognize that a fair valuation cannot be ascertained by looking solely at the balance sheets. *See In re Lamar Haddox Contractor,* 40 F.3d 118, 121 (5th Cir.1994). In the context of a going concern, fair value is determined by "the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." *In re Roblin Indus., Inc.,* 78 F.3d 30, 35 (2d Cir.1996). Fair value is the value that can be made promptly effective by the owner to pay debts, and, therefore, asset valuation should be reduced by the value of assets not readily susceptible to liquidation. *In re Trans World Airlines, Inc.,* 134 F.3d 188, 194–95 (3rd Cir. 1998).[143]

According to ASARCO's balance sheet on March 31, 2003, ASARCO's assets were $947.5 million and is liabilities were $932.8 million. (PX 1217). This means that according to the balance sheet, ASARCO's assets exceeded its liabilities by $14.7 million. (PX 1217). The total liabilities, however, did not include any adjustment relat-

**143.** Although the Court should consider market value as opposed to book value, in some circumstances, the book value may be compe-

tent evidence from which inferences of insolvency can be drawn. *In re Roblin Indus., Inc.,* 78 F.3d at 36.

ed to the asbestos contingent liabilities, which were predicted to be at least $860 million. (PX 1217; PX 0283). Additionally, as noted above, the balance sheet is not the actual test; rather it is whether the assets exceeded liabilities at a *fair valuation.*

Navigant, ASARCO's expert, performed a fair valuation analysis, making certain adjustments to the March 31, 2003 balance sheet to reflect ASARCO's position pre-transfer. It adjusted ASARCO's assets by $30.7 million to total $978.2 million and determined the fair value of the adjusted liabilities totaled $1,269 billion. (PX 1217). According to Navigant's analysis, ASARCO's equity was negative $291.1 million. Thus, its liabilities exceeded its assets.

AMC did not present any of its own evidence concerning whether ASARCO's liabilities exceeded its assets at fair valuation. Instead, AMC relies on testimony solicited from Mr. Tucker at trial, where AMC asked Mr. Tucker to assume the contingent liabilities were valued at only $250 million. Given this assumption regarding contingent claims, Mr. Tucker testified that ASARCO's assets would exceed its liabilities by $11 million.[144] (Tucker, May 15, 2008, 210:6–24). This is an extremely low estimate of ASARCO's contingent liabilities. According to a KPMG report dated May 9, 2003, the asbestos-related claims were predicted to be $860 million, at a minimum. (PX 0283).

The Court finds that AMC has not shown that it was more likely than not that ASARCO's assets exceeded its liabilities. Therefore, AMC failed to rebut the presumption of insolvency, and the Court finds that ASARCO was insolvent under the balance-sheet test.

### 4. Conclusion

After analyzing each of the three tests for insolvency, the Court finds that ASARCO proved, by a preponderance of the evidence, that it was insolvent under each of the tests.[145] For this reason, the Court finds that ASARCO was "insolvent" at the time of the transaction, i.e., the time of the alleged breach.[146] Therefore, ASARCO's directors owed a fiduciary duty to ASARCO and ASARCO's creditors.

### B. ASARCO's Directors' Breach of Fiduciary Duty

#### 1. Business Judgment Rule vs. Entire Fairness

Before determining whether ASARCO's directors breached the fiduciary duty they owed ASARCO's creditors, the Court must determine the standard under which it should evaluate the alleged breach. AMC argues that the directors have the protection of the business judgment rule, whereas ASARCO contends that Defendant must show the entire fairness of the transaction.

---

144. In its proposed Findings of Fact and Conclusions of Law, AMC states, "[t]he only evidence in the record on this point is Navigant's conclusion that ASARCO's assets did indeed exceed its liabilities...." AMC's Proposed Findings of Fact and Conclusions of Law ¶ 118.

145. The Court recognizes that ASARCO only needed to meet one test to establish that it was insolvent at the time of the transfer.

146. Delaware courts have found that directors owe a fiduciary duty to creditors

where the corporation is operating in the "zone of insolvency." *See, e.g., Geyer v. Ingersoll Pubs. Co.,* 621 A.2d 784, 791 (Del.Ch. 1992); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.,* Civ. A. No. 12150, 1991 WL 277613, at *34 (Del.Ch. Dec. 30, 1991). The Court finds that ASARCO was certainly within the "zone of insolvency" for the reasons articulated in the Court's discussion of each of the tests for "insolvency" under the UFTA.

The business judgment rule protects a board of directors from being questioned or second-guessed on conduct of corporate affairs. *In re PSE & G S'holder Litig.,* 173 N.J. 258, 801 A.2d 295, 306 (2002). The business judgment rule is a rebuttable presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984); *In re PSE & G,* 801 A.2d at 306. The business judgment rule is comprised of four elements: (1) a business decision; (2) disinterestedness and independence; (3) due care; and (4) good faith. *Roselink Investors, L.L.C. v. Shenkman,* 386 F.Supp.2d 209, 217–21 (S.D.N.Y.2004) (applying Delaware law). The presumption of the business judgment rule can be rebutted by demonstrating that one of these elements is not present. *Id.; In re PSE & G,* 801 A.2d at 306. If a party successfully rebuts the presumption, the burden of proof shifts to the defendant to show the entire fairness of the transaction. *In re PSE & G,* 801 A.2d at 306–07; *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1280 (Del.1989).

ASARCO contends that ASARCO's board was not disinterested. A director is interested if he either: (1) stands on both sides of the transaction; or (2) expects to derive a personal financial benefit from the transaction. *Roselink Investors,* 386 F.Supp.2d at 217 (citing *Aronson,* 473 A.2d at 812). The evidence clearly establishes that ASARCO's directors were "interested" and not "independent." Six of the nine ASARCO directors who approved the transaction also served on AMC's and Grupo's boards of directors. (PX 0507; PX 1369; PX 0930).[147] These gentlemen signed the unanimous consents for both ASARCO and AMC to approve the transaction. (PX 1369; PX 0930).[148] The remaining directors of ASARCO were also closely affiliated with AMC/Grupo. Armando Ortega was Grupo's General Counsel and served as Secretary of Grupo's Finance Committee. (PX 0507; PX 0231). Alberto de la Parra was outside counsel to Grupo and currently serves as Grupo's General Counsel. (Genaro Larrea Depo. 55:4–14; De la Parra Depo. 5:18–21). Manuel Calderon, a mining engineer, was employed by Grupo at the time of the transfer. (Genaro Larrea Depo. 53:23–54:4). The Court concludes that each of these directors stood on both sides of the SPCC transfer; therefore, Defendant has the burden of establishing the entire fairness of the transaction.[149] *See Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del.1983).

147. These directors were German Larrea, Genaro Larrea, Daniel Tellechea, Oscar Gonzalez Rocha, Xavier Garcia de Quevedo, and Alfredo Casar. (PX 0507).

148. All of the directors of SPHC also served on the boards of AMC and/or Grupo or were otherwise closely affiliated with the Grupo conglomerate. The directors at the time of the transfer were: German Larrea, Genaro Larrea, Daniel Tellechea, Oscar Gonzalez Rocha, Xavier Garcia de Quevedo Topete, Alfredo Casar Perez, Alberto de la Parra Zavalia. (PX 0277).

149. As a general rule, directors of a wholly owned subsidiary owe a fiduciary duty only to the parent corporation, as the sole shareholder. Thus, there is typically no divided loyalty even when a director sits on the boards of both the parent and wholly owned subsidiary. When a corporation is insolvent, however, the director owes a fiduciary duty to the corporation's creditors. The Third Circuit has held that when a subsidiary represents some minority interest in addition to the parent (such as that of creditors), the directors have a duty of loyalty to the' creditors as against the parent. *VFB v. Campbell Soup Co.,* 482 F.3d 624, 635–36 (3d Cir.2007) (applying New Jersey law).

The Southern District of New York, applying Delaware law, found that where the di-

 The burden of proof on the issue of fairness can shift back to Plaintiff if a committee of independent directors has approved the challenged transfer. *Emerald Partners v. Berlin,* 726 A.2d 1215, 1222–23 (Del.1999). To obtain the benefit of this burden shifting, "the committee must function in a manner which indicates that the controlling shareholder did not dictate the terms of the transaction and that the committee exercised real bargaining power 'at an arm's length.'" *Kahn v. Tremont Corp.,* 694 A.2d 422, 429 (Del. 1997) (internal citations omitted).

The SPCC transaction was not approved by a committee of independent directors. In October 2002, a Restructuring Committee was established, comprised of Genaro Larrea, Jock Patton, and Al Frei. (PX 0795). Jock Patton and Al Frei were not affiliated with AMC/Grupo or any other entity in the Grupo conglomerate. (*See* PX 0507). The Restructuring Committee was ostensibly vested with the full authority of the board to make decisions related to the recapitalization of ASARCO, including decisions pertaining to creditors. (PX 0795). German Larrea, however, believed the Committee was to serve a purely advisory function and was without authority to make decisions. (German Larrea Depo. 344:7–19). The independent directors were not given any opportunity to negotiate the terms of the transaction because the terms were already in the process of being established before the Restructuring Committee was formed and were finalized by negotiations between AMC/Grupo/AS-ARCO's inside directors and the government. (Frei, May 13, 2008, 50:1–6). Also, as discussed above, the independent directors were not given access to Houlihan's cash flow analysis showing that AS-ARCO would be better off keeping the stock in the long run, nor were they told of Houlihan's inability to issue a solvency opinion. (PX 0082; PX 0084; PX 0089; PX 0687; Patton, May 12, 2008 at 16:15–19:15, 93:13–96:24, 96:24–99:11; Lyon Depo. At 153:3–158:1). The independent directors were also deprived of PWC's valuation and the January 2003 SPCC financial model. (Patton May 12, 2008, 84:7–21; 105:25–106:16; DX 0386). The independent directors complained at least twice about the lack of information that they were receiving. (PX 0245; PX 0257). These facts demonstrate that the Committee did not exercise any real bargaining power and did not "function in a manner which indicates that the controlling shareholder did not dictate the terms of the transaction."

 Furthermore, on March 26, 2003, the only two independent directors, Patton and Frei, resigned from the board and withdrew their approval of the transaction. (PX 0257). The resignation letter expressly stated "if ASARCO proceeds with the transactions contemplated ... it must do so on the clear understanding that it lacks our approval." (PX 0257). At the time the transaction closed on March 31, 2003,

---

rectors of a wholly owned subsidiary stand on both sides of a transaction by virtue of the fact that they also serve on the parent's board, this does not automatically rebut the business judgment rule presumption. *Roselink Investors LLC v. Shenkman,* 386 F.Supp.2d 209, 218 (S.D.N.Y.2004). That court reasoned that this was insufficient to rebut the presumption because the directors of the insolvent subsidiary still owed a fiduciary duty to the parent. *Id.* The Court disagrees with this rationale as it ignores the fact that the directors of an insolvent wholly owned subsidiary have divided loyalties (between the parent, their corporation (the subsidiary), and the subsidiary's creditors), and "[w]hen faced with such divided loyalties, directors have the burden of establishing the entire fairness of the transaction to survive careful scrutiny by the courts." *Mills Acquisition Co. v. Macmillan,* 559 A.2d 1261, 1280 (Del.1989).

key players, including Daniel Tellechea and German Larrea, were aware that the independent directors had resigned and withdrawn their approval. (Genaro Larrea Depo. 146:16–147:10; Tellechea Depo. (2008) 288:9–289:3). Nevertheless, the transaction closed as planned without the approval of any independent directors. Since a committee of independent directors did not approve the challenged transfer, the burden does not shift back to Plaintiff, and AMC maintains the burden of proving the entire fairness of the transaction.[150]

### 2. AMC Failed To Prove The Entire Fairness Of The Transaction

■■■■■■ Since the business judgment rule does not apply, AMC must prove the entire fairness of the transaction. There are two aspects of the entire fairness inquiry: fair dealing and fair price. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del.1983). "Fair dealing" focuses on the actual conduct of the corporate fiduciaries in effecting the transaction. *Id.* *Mills Acquisition Co. v. Macmillan*, 559 A.2d 1261, 1280 (Del.1989). This includes how the transaction was initiated, structured and negotiated and the timing of the transaction. "Fair price" relates to the economic and financial considerations of the transaction. *Id.* Courts have held that this element requires proof that "the price offered was the highest value reasonably available under all the circumstances."

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del.1993); *id.* The test for fairness is not bifurcated, i.e., AMC must prove both fair dealing and fair price. *Weinberger*, 457 A.2d at 711.

### a. Fair Dealing

### i. Initiation Of Transaction

■■■■ The transaction was initiated by the purchaser of the stock, AMC/Grupo, and the inside directors of ASARCO. If it was not aware prior to the LBO, Grupo realized soon after the acquisition of ASARCO that the SPCC stock was ASARCO's crown jewel. Grupo bought ASARCO and blindly, and with the exception of the SPCC stock, it acquired a company with "low productivity, very high operating costs, high real liabilities, and extremely high contingent liabilities." (PX 0023). By November 2001, Grupo had created AMC and was working on transferring the SPCC stock to AMC "at all costs and by any means."

Those who were concerned with ASARCO's creditors' interests did not initiate the transaction. To the contrary, ASARCO's independent directors and senior management wanted to file for Chapter 11 relief before transferring the stock, rather than sell it to AMC outside of bankruptcy. The independent directors recommended Chapter 11 so that ASARCO's affairs could be reorganized in an orderly and supervised manner. (PX 0245). Genaro

---

**150.** AMC contends that the burden of proof cannot shift to a non-fiduciary defendant in the context of an aiding and abetting claim. The typical situation in which this issue is raised is where directors are actually defendants in the suit and the burden shifts to the defendant directors to prove the transaction they engaged in was entirely fair. In the case at hand, there are no directors named in the lawsuit. Thus, it is not defendant directors who would have the burden of proof, but instead the burden is placed on the non-fidu-

ciary defendant accused of aiding and abetting the directors' alleged breach. The Court finds this to be a distinction without a difference and is not persuaded that AMC should not have to prove entire fairness simply because it is the alleged aider and abettor as opposed to the principal wrongdoer. Nevertheless, even if the burden of proof remained with Plaintiffs to overcome the business judgment rule and never shifted, the evidence presented at trial satisfies this burden.

Larrea, CEO of ASARCO, wrote a letter to German Larrea agreeing that a transfer of the stock was necessary, but suggesting three alternatives to the structure of the transaction—that ASARCO: (1) not pay the Yankee Bonds at par, (2) enter into a keep well agreement with AMC, or (3) file Chapter 11 and sell the stock within that process. (PX 0241). German Larrea rejected all three suggestions. (Genaro Depo. 276:25–280:22). Squire Sanders also believed that ASARCO should have filed for bankruptcy before transferring the stock. (PX 0113).

This transfer, and the terms of the transaction, originated with, and were dictated by, AMC/Grupo and the inside directors of ASARCO. It was AMC/Grupo and ASARCO's inside directors who initiated the transaction. This factor weighs against a finding of fair dealing.

### ii. Structure

The structure of the SPCC transaction demonstrates that AMC and the inside directors did not engage in fair dealing with respect to ASARCO's creditors. AMC/Grupo and the inside directors structured the financial aspects of the transaction to benefit AMC/Grupo, leaving ASARCO with no ability to pay its numerous other overdue obligations.[151]

The $450 million in cash went to pay off the Revolver, which had to be paid to complete the transfer. (PX 0270). Grupo had also guaranteed the Revolver, and AMC had actually purchased a participation in the Revolver and, therefore, received $50 million of this amount back. Another element of consideration was forgiveness of an intercompany debt in the amount of $41.75 million. (PX 0279, DX

0145). This benefitted AMC because it received a dollar-for-dollar credit on this unsecured loan and did not give up its right to accrued interest. (PX 0279; PX 0042). Therefore, out of that $491.75 million, Grupo /AMC/the Larrea family received $91.75 million. The $100 million DOJ Trust Note was necessary to appease the DOJ so that it would agree to lift the injunction on the transfer. (PX 0106, PX 0214). The $123 million AMC Note was the only consideration that benefitted only ASARCO. Nevertheless, AMC paid a $12 million advance on this note and then required ASARCO to use this advance to pay costs of the transaction, interest, and the Yankee Bonds. (PX 0270).

AMC/Grupo also required that ASARCO pay the $100 million Yankee Bonds at par plus interest. $50 million in cash consideration was earmarked for this purpose. As part of this transaction, however, ASARCO had to monetize insurance policies and use cash it had available to pay the additional $50 million. (PX 0270). As a result, ASARCO was actually left with less cash available to pay its creditors than it had before the transfer. The Court finds that the structure of the transaction indicates that AMC did not engage in fair dealing with ASARCO or its other creditors.

### iii. Terms Not Negotiated

AMC and the inside directors did not negotiate the terms of the transaction with anyone representing ASARCO's creditors' interests. The only independent directors on ASARCO's board, Al Frei and Jock Patton, were not involved in negotiating the terms of the transfer, since, as Mr. Frei testified, most of the terms were es-

---

**151.** In its discussion on the circumstantial evidence going to AMC's actual intent to hinder or delay ASARCO's creditors, the Court analyzes each element of the transaction, noting that every element in someway benefitted AMC/Grupo. The Court, therefore, will only briefly discuss the structure of the transaction in this section to avoid needless redundancy.

tablished before they joined the board. (Frei, May 13, 2008, 50:1–6).

AMC contends that the transaction was procedurally fair because the "[t]ransaction was effectuated after extensive public negotiations between the parties and the government, analysis by independent third party advisors, and approved by a federal district court in Arizona. . . ." AMC's Proposed Conclusion of Law at ¶ 212. The evidence reflects that the $100 million DOJ Trust Note was negotiated by the DOJ. (PX 759). There is also some evidence that the DOJ suggested the final price for the stock, $765 million. (DX 306).

Although there is some evidence of negotiations with the DOJ regarding other aspects of the transaction, the parties to the negotiations were not considering the interests of ASARCO's other unsecured creditors. The Court noted, above, that the Consent Decree merely represented a settlement between the parties involved in that case. The Court previously stated that the DOJ sought to enjoin the transfer for its own client's purposes, and it did not purport to represent, or even consider, the interests of ASARCO's numerous other creditors. In fact, the Consent Decree itself contemplated a potential unwinding of the SPCC transaction. (PX 0214).

Although some of the key parts of the transaction were negotiated with the DOJ, such as the price of the transaction, paying the Revolver, and establishing the DOJ Trust Note, the Court finds that these negotiations sought merely to appease the DOJ, and were not focused on protecting the rights of ASARCO's other creditors. Therefore, even though some of the terms were negotiated with one creditor, this does not indicate that the transaction was

fair to ASARCO's other unsecured creditors.

### iv. Timing Of The Transaction

AMC/Grupo and the inside directors forced the closing of the SPCC transaction at a time when ASARCO's financial condition and the terms that AMC imposed rendered the transaction harmful to ASARCO and its creditors. The Court finds, as discussed in detail above, that ASARCO was insolvent and suffering from a severe liquidity crisis at the time of the transfer.

Despite ASARCO's cash-flow crisis and inability to pay numerous debts as they came due, the transaction was structured such that ASARCO was forced to use $50 million received in the transfer and $50 million from its own resources to pay the unsecured Yankee Bonds at par.[152] AMC/Grupo forced ASARCO to use the first payment on the note to pay interest on the Yankee Bonds and costs associated with closing the transaction. (PX 0257). The independent directors ultimately resigned, withdrew their consent to the transaction, and specifically noted their disagreement with paying the bonds at par. (PX 0257). EYCF also disagreed with paying the Yankee Bonds at this time. (Lyon Depo. 265:6–14). Genaro Larrea also expressed concern to German Larrea about paying the Yankee Bonds at a time when a $30 million cash shortage was affecting ASARCO's operations. (PX 0241). Then, after the transaction was completed, and after being warned by Sidley Austin to prepare for a lawsuit, the inside directors resigned.

The Court finds that AMC/Grupo and the inside directors' insistence on going forward with the transaction as structured at a time when ASARCO had serious li-

---

**152.** The Court previously discussed the Yankee Bond payment, and the questionable ra-

tionale behind paying these bonds.

quidity problems evidences a lack of fair dealing.

### v. Disapproval Of Independent Directors

The only two independent directors and their financial consulting firm, EYCF, both resigned prior to the transaction closing. The independent directors, Al Frei and Jock Patton, resigned March 26, 2003. (PX 0255). Their resignation letter cites a lack of information and payment of the Yankee Bonds as the primary reasons for their resignation. (PX 0255). The independent directors explicitly stated that if ASARCO proceeded with the transaction as contemplated it would do so without the approval of the independent directors. (PX 0255; McAllister Depo. 369:24–370:4).

Michael Fitzgerald of Sidley Austin testified that he has attended hundreds of closings, but this was the only one where the only independent directors had disapproved the transaction and resigned and the only independent financial advisor had refused to issue a bring down opinion and quit. (Fitzgerald, June 3, 2008, 83:22–84:9). Fitzgerald also testified that Sidley Austin never advised that proceeding with the transaction would not constitute a breach of duty; rather, Sidley Austin merely told the parties that the board of inside directors had the authority, under the law, to approve the transfer. (Fitzgerald, June 3, 2008, 90:25–91:3, 105:24–106:3). Squire Sanders actually warned ASARCO's remaining directors that without the independent directors, the entire fairness standard would apply, and if ASARCO was required to pay the Yankee Bonds to facilitate AMC's financing (which the Court has found), the directors would likely be found in breach of their fiduciary duty.

The Court finds that AMC/Grupo and the inside directors' decision to proceed with the transaction despite the independent directors withdrawing their approval and resigning demonstrates that the inside directors and AMC/Grupo did not deal fairly with ASARCO's creditors. This is further supported by the fact that Squire Sanders warned ASARCO's board that there was no legitimate business reason for paying the Yankee Bonds and that proceeding with the transaction without the independent directors would leave the directors vulnerable to a claim for breach of fiduciary duty. The Court also notes that the other law firm involved, Sidley Austin, did not advise the inside directors or AMC/Grupo that the transaction would not constitute a breach of duty.

### vi. Conclusion

The Court finds that the transaction was initiated by AMC/Grupo and the inside directors once it was realized that the SPCC stock, which was ASARCO's crown jewel, might be lost to creditors. The structure of the transaction was such that it did not consider the interest of most of ASARCO's creditors, to whom ASARCO's directors owed a duty. The key terms of the transaction were negotiated with the DOJ; however, the negotiations were not conducted with consideration of ASARCO's other unsecured creditors, and most of the terms were not negotiated with ASARCO in any type of arm's-length setting, since the main terms of the transaction were established before the independent directors joined the board. This transaction, which left ASARCO with less cash in hand than it had before the transfer, went forward at a time when ASARCO desperately needed cash and could not pay its creditors in a timely manner. Lastly, the transaction closed despite the disapproval and resignation of the only independent directors on ASARCO's board. For these reasons, the Court finds that AMC failed to meet its burden of showing that the directors dealt fairly with ASARCO's

creditors. Further, even if the burden of proof remained with Plaintiffs as maintained by AMC, Plaintiffs successfully proved that ASARCO's directors did not deal fairly with ASARCO or its creditors and, therefore, breached their fiduciary duty.

### b. Fair Price[153]

■ The second element of the entire fairness standard that AMC would have to prove to prevail is that the transaction was for a fair price. "Fair price" relates to the economic and financial considerations of the transaction. *Mills Acquisition Co. v. Macmillan,* 559 A.2d 1261, 1280 (Del. 1989). AMC must demonstrate that "the price offered was the highest value reasonably available under all the circumstances." *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993); *id.*

■ AMC/Grupo/ASARCO did not seek any third-party offers for the SPCC stock. Squire Sanders advised ASARCO to solicit bids for the stock, but AMC/Grupo refused to expose the stock to the market. (Hansen Depo. 30:12–31:10). In fact, in fall of 2002, Armando Ortega asked Squire Sanders for advice on how to deter potential bidders. (PX 0122). German Larrea testified that AMC/Grupo was not interested in selling SPHC to a third party. (German Larrea Depo. 124:7–20). Grupo issued a press release in October 2002 confirming that it did not intend to sell the SPCC stock to any third party.

(PX 0133).[154] Due to AMC/Grupo/ASARCO's refusal to place the SPCC stock on the market, it is impossible to know what the stock would have brought in a fair bidding process. For this reason, AMC has not met its burden of proving that the price offered was the highest price reasonably available under the circumstances.

In additional support of this finding, the Court notes that it determined that the fair market value of the SPCC stock, i.e., the price a willing buyer would pay a willing seller, was between $811.4 million and $853 million at the time of the transfer. The Court found that the consideration ASARCO received (valued at $727.79 million) was reasonably equivalent to the stock's fair market value, even though the consideration was less than the fair market value. The inquiry here, however, is whether the directors received the highest price reasonably available under the circumstances. The disparity between the fair market value and the value of the consideration received in price is further evidence that the transaction was not for a fair price.

### c. Conclusion

AMC has the burden to prove both fair dealing and fair price. The Court finds that AMC failed to prove either prong of the entire fairness inquiry. For this reason, the Court finds that the directors who approved the transaction breached their fiduciary duties to ASARCO's creditors.[155]

---

**153.** As the Court finds that the directors did not deal fairly with ASARCO's creditors, AMC has already failed to meet its burden of proving the entire fairness of the transaction. Nevertheless, the Court will briefly discuss whether the transfer was for a fair price.

**154.** Grupo's press release is also interesting for the manner in which it ignores all corporate formalities and suggests who will be making all decisions concerning the SPCC stock. "Grupo Mexico ... said on Friday

that while *it* might shifts *its* majority stake in Southern Peru Copper Corp (SPCC) between two of *its* units, *it* was not planning to sell the Peruvian based mining firm." (emphasis added). (PX 0133).

**155.** The Court additionally finds that even if the burden of proof remained with Plaintiffs to prove the breach of duty by overcoming the business judgment rule, they successfully met this burden.

## C. AMC Knowingly Participated In ASARCO's Directors Breach Of Fiduciary Duty

■ To prevail on its aiding and abetting breach of fiduciary duty claim, ASARCO must next prove that AMC knew that ASARCO's directors' conduct constituted a breach of duty and AMC gave substantial assistance or encouragement to ASARCO's directors so to conduct themselves. *Judson v. Peoples Bank & Trust Co.*, 25 N.J. 17, 134 A.2d 761, 767 (1957); *New Jersey v. Qwest Commc'ns Int'l, Inc.*, 387 N.J.Super. 469, 904 A.2d 775, 782 (2006).

AMC knew that ASARCO's directors' conduct constituted a breach of fiduciary duty. As discussed in detail above, there was significant overlap between the board members at AMC and ASARCO. (PX 1369. PX 0507). ASARCO's board members who were not also on AMC's board were otherwise affiliated with AMC and/or the Grupo conglomerate.[156] (PX 1369; PX 0507; PX 0231). Further, German Larrea and Daniel Tellechea both knew all the facts communicated to Genaro Larrea. Squire Sanders wrote a memo in February 2003 to the Restructuring Committee (which included Genaro Larrea), copying Tellechea and Armando Ortega, which stated that ASARCO was in the zone of insolvency, if not actually insolvent, and, therefore, the directors owe a fiduciary duty to ASARCO's creditors. (PX 0213). Squire Sanders wrote another memo to the same parties, which advised that even

if the transaction were subject to the business judgment rule instead of the entire fairness standard, "[i]t is extremely difficult for ASARCO to articulate a supportable business justification, consistent with its duties to maximize' recovery to all of ASARCO's creditors, for paying the Yankee Bonds." (PX 0220). The memo further advised that if the Yankee Bonds were paid, the transaction would be subject to legitimate attacks for breach of fiduciary duty. (PX 0220). On February 9, 2003, in a memo sent to Genaro Larrea, Daniel Tellechea, Doug McAllister, Armando Ortega, and Tom Salerno, Squire Sanders advised that paying the Yankee Bonds without filling the "hole" would expose the directors to liability for breach of fiduciary duties. (PX 0226). Based on the repeated warnings of Squire Sanders, the Court finds that AMC knew that ASARCO's directors' owed a fiduciary duty to ASARCO's creditors and that the directors' conduct constituted a breach of that duty.

AMC gave substantial assistance or encouragement to ASARCO's directors' breach. As discussed above in the Court's analysis of whether ASARCO's directors' conduct constituted fair dealing, AMC was intricately involved in every aspect of the transaction. It was AMC/Grupo that established the terms of the transaction and orchestrated the transfer of the stock from ASARCO/SPHC to AMC. It also dictated how the funds would be spent. It rejected all alternatives and insisted the transaction

---

**156.** Most of ASARCO's directors who approved the transaction also served on AMC's and Grupo's board of directors: German Larrea (AMC's CEO, on Grupo's board), Genaro Larrea (on Grupo's board), Daniel Tellechea (AMC's Executive Vice President and CFO, on Grupo's board), Oscar Gonzalez Rocha (on Grupo's board), Xavier Garcia de Quevedo (AMC's Vice President and Chief Operating Officer, on Grupo's board), and Alfredo Casar Perez (on Grupo's board). (PX 0507; PX 1369; PX 0930). The remaining directors of

ASARCO were also closely affiliated with AMC/Grupo. Armando Ortega was Grupo's General Counsel and served as Secretary of Grupo's Finance Committee and was assistant secretary of AMC. (PX 0507; PX 0231). Alberto de la Parra was outside counsel to Grupo and currently serves as Grupo's General Counsel. (Genaro Larrea Depo. 55:4–14; De la Parra Dep. 5:18–21). Manuel Calderon, a mining engineer, was employed by Grupo at the time of the transfer. (Genaro Larrea Depo. 53:23–54:4).

move forward with nothing to "fill the hole." The Court finds that the evidence clearly establishes AMC's substantial assistance in structuring and closing the transaction that constituted the directors' breach. Therefore, the Court finds that AMC knowingly participated in ASARCO's directors' breach of fiduciary duty.

## D. Harm

 ASARCO's creditors were harmed by AMC aiding and abetting ASARCO's directors' breach of fiduciary duty. The payment of the Yankee bonds at par plus interest in effect deprived ASARCO of $100 million.[157] With this money, ASARCO could have paid its vendors and service providers to continue operations and generate more income to satisfy other creditors, or if forced into bankruptcy, this amount would have been available to ASARCO's creditors as part of its bankruptcy estate. Additionally, the decision to forgive a $41.75 million intercompany loan rather than demand that AMC actually pay ASARCO this money in cash deprived ASARCO of much-needed cash to continue its operations and pay its other overdue obligations.

ASARCO's creditors were also harmed by ASARCO's directors' failure to obtain, or attempt to obtain, the highest price for the SPCC stock reasonably available under the circumstances. The fair market value of the shares was between $811.4 to $853 million. In May 2002, Houlihan stated that ASARCO would need $814–$958 million from the transfer to stay viable long term. (PX 0082; PX 0084). In fact,

Houlihan stated that in order to render the requested opinions, the transfer would need to include $193 million in additional equity, bringing the total value of the transaction to $834 million. (PX 0082). Had ASARCO's directors obtained the full value of the stock, this would have put the company in the range Houlihan believed necessary for ASARCO to continue. Failure to obtain a fair price for the stock harmed ASARCO's creditors to whom ASARCO was delinquent in payments, many of whom still have unpaid claims against ASARCO.

## E. Conclusion

The Court finds that ASARCO prevails on its aiding and abetting breach of fiduciary duty claim. The Court finds that at the time of the SPCC transaction, ASARCO was "insolvent" under each of the three tests articulated in New Jersey's and Delaware's versions of the UFTA. For this reason, ASARCO's directors owed a fiduciary duty to ASARCO's creditors. The Court also finds that ASARCO's directors breached their fiduciary duties by entering into the SPCC transaction, which was structured so as to leave a cash-starved ASARCO with less cash than it had prior to the transfer. Lastly, the Court finds that AMC knew that the directors' conduct constituted a breach and provided substantial assistance and encouragement to ASARCO's directors to perform the breach. As a result, ASARCO's creditors suffered harm because the corporation was deprived of cash needed to continue operations and pay its creditors. Therefore, the

---

**157.** If it had bought the Yankee Bonds on the market, ASARCO would have paid $50 million to $70 million for the bonds, based on the rate at which they were being traded. Thus, by paying the full $100 million, ASARCO was deprived of $30 million to $50 million. Had ASARCO not paid any money towards the Yankee Bonds, it would have the $100 million

in cash. The Court realizes that ASARCO would also still have the $100 million debt. Nevertheless, the directors could have then acted in a manner in which it treated all creditors fairly and did not delay or hinder the creditors' ability to receive overdue payments.

Court finds that ASARCO has met its burden of proving its cause of action against AMC for aiding and abetting ASARCO's directors' breach of fiduciary duty.

## IV. AMC'S BREACH OF FIDUCIARY DUTY

ASARCO also alleges AMC owed a fiduciary duty to ASARCO and ASARCO's creditors and that AMC breached this duty. In its order denying Defendant's Motion to Dismiss, the Court determined that New Jersey would likely recognize that a parent owes a fiduciary duty to its wholly owned subsidiary and the subsidiary's creditors if the subsidiary is insolvent. The Court denied AMC's Motion to Dismiss this claim in part because of the standard by which a court must review a motion to dismiss and also because the Court felt it would be more appropriate to decide this issue on a full record. Pursuant to AMC's request, the Court has reconsidered this holding.

 As a general rule, a parent does not owe a fiduciary duty to its wholly owned subsidiary. *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 191 (Del.Ch.2006). Another general rule is that directors owe fiduciary duties only to the corporation and shareholders, not creditors. *Francis v. United Jersey Bank*, 87 N.J. 15, 432 A.2d 814, 824 (1981). When a subsidiary is wholly owned there is only one shareholder, the parent; therefore the subsidiary's directors owe their fiduciary duties to the parent. *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635 (3d Cir.2007); *Trenwick*, 906 A.2d at 200 ("to the extent [subsidiary] was a wholly owned solvent subsidiary of [parent] the fiduciary duties owned by [subsidiary] ran to [parent]."); *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del.1988); *Bresnick v. Frank-*

*lin Capital Corp.*, 10 N.J.Super. 234, 77 A.2d 53, 56 (1951).

 There is at least one exception to the general rule that a parent does not owe fiduciary duties to its subsidiary, and that is where the subsidiary is not wholly owned. There is a clearly established exception that states that a dominant shareholder (parent) owes fiduciary duties to the minority shareholders. *See, e.g., Trenwick*, 906 A.2d at 192 n. 66; *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del.1989). Part of the rationale for this exception is that when minority shareholders are involved, the subsidiary does not exist solely for the parent's benefit. Recognition of a fiduciary duty in the dominant shareholder is designed to protect the entire community. The fiduciary duty of a dominant shareholder is designed for the protection of the entire community. *Pepper v. Litton*, 308 U.S. 295, 307, 60 S.Ct. 238, 84 L.Ed. 281 (1939). This exception also prevents the "corporate machinery" from being "manipulated so as to injure minority shareholders...." *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769, 775 (Del.Ch.1967).

As discussed previously, there is also an exception to the general rule that a director owes fiduciary duties only to the corporation and its shareholders. If the directors' corporation becomes insolvent, the directors owe a fiduciary duty to the creditors of the insolvent corporation. *See VFB LLC*, 482 F.3d at 635–36; *In re Scott Acquisition Corp.*, 344 B.R. 283, 288 (Bankr.D.Del.2006); *In re High Strength Steel, Inc.*, 269 B.R. 560, 569 (Bankr.D.Del. 2001); *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 787 (Del.Ch.1992) ("When the insolvency exception does arise, it creates fiduciary duties for directors for the benefit of creditors."). The reason for this change is that "when the corporation becomes insolvent the creditors' investment

is at risk...." *VFB*, 482 F.3d at 635; *see also In re Scott Acquisition Corp.*, 344 B.R. at 287–88 (noting that directors of an insolvent subsidiary cannot, with impunity, permit the subsidiary to be plundered for the benefit of the parent). "An insolvent corporation is civilly dead in the sense that its property may be administered in equity as a trust fund for the benefit of creditors." *Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808, 813 (Del.1944). For this reason, when a corporation becomes insolvent, the acts performed thereafter will be decided by different principles than if the corporation were solvent. *Id.*

 ASARCO asks the Court to recognize that a parent corporation owes a fiduciary duty to its wholly owned subsidiary and the subsidiary's creditors if the subsidiary is insolvent. This exception is essentially a hybrid of the two principles discussed above: (1) a parent owes a fiduciary duty to minority shareholders of its subsidiary; and (2) directors owe fiduciary duties to the corporation's creditors if the corporation is insolvent. Recall that the rationale for a parent owing a fiduciary duty to minority shareholders is that the corporation does not exist solely for the parent's benefit when minority shareholders are involved. Similarly, directors owe fiduciary duties to creditors of the corporation when it is insolvent because when a corporation is insolvent the creditors' risks are at stake.[158] Thus, the creditors of an insolvent corporation are similar to minority shareholders, since they both represent a minority interest in the company. Therefore, ASARCO argues, the parent company has a fiduciary duty toward the minority interests of its insolvent subsidiary—the creditors. For the following reasons, the Court has reconsidered its prior decision acknowledging this duty and determines that the high court in New Jersey would not recognize the proposed exception.

First, the Court notes that in order to recognize the urged exception, the Court would have to find that a new duty is *created* by the subsidiary's insolvency. Directors always owe fiduciary duties to the corporation. When the corporation is solvent, the beneficiaries of the duty are the shareholders of the corporation; however, if the corporation becomes insolvent, the creditors become beneficiaries of these same duties. In other words, insolvency does not create a new duty, it merely changes the beneficiaries of that duty to include creditors. In contrast, a parent corporation does not a owe a fiduciary duty to its wholly owned subsidiary (if it did, it would essentially owe a fiduciary duty to itself). To recognize the existence of such a duty to the subsidiary and its creditors only if the subsidiary is insolvent would mean that insolvency would *create* a duty where one did not previously exist, instead of merely adding beneficiaries to a pre-existing duty. The Court finds this to be a significant distinction.

Also, this exception is not necessary. One explanation for the insolvency exception in the director-shareholder relationship is that a cause of action based on a director's fiduciary obligation may be necessary to protect creditors' rights when fraudulent transfer or voidable preference laws are inapplicable. Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Director's Duty to Creditors*, 46 VAND. L.REV. 1485, 1516–17 (1993). As discussed *supra*, the applicable law recognizes a claim against a parent corporation for aiding and abetting a sub-

---

158. The District Court of Delaware has noted that "the fact of insolvency places the creditors in the shoes normally occupied by the shareholders—that of residual risk-bearers." *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 547–48 (D.Del.2005).

sidiary's directors' breach of fiduciary duty. The aiding and abetting claim can serve this gap-filling purpose; thus, there is no need to impose a duty directly on the parent corporation.

Lastly, the Court notes that under New Jersey and Delaware law, the aiding and abetting claim ASARCO brought requires knowing participation by a *non*-fiduciary. Thus, by finding a parent corporation can be liable for aiding and abetting its subsidiary's directors' breach of fiduciary duty, courts, including this one, have implicitly acknowledged that the parent corporation has no fiduciary obligation to its insolvent wholly owned subsidiary or its subsidiary's creditors. *See VFB*, 482 F.3d at 634.

For the foregoing reasons, the Court now finds, after consideration with a full record, that even where a wholly owned subsidiary is insolvent, the parent corporation does not owe a fiduciary duty to that subsidiary or its creditors. Therefore, AMC did not owe a fiduciary duty to AS-ARCO or ASARCO's creditors, and AS-ARCO's claim against AMC for breach of fiduciary duty fails.

## V. AIDING & ABETTING GRUPO'S BREACH OF FIDUCIARY DUTY

ASARCO also alleges that Grupo owed and breached its fiduciary duty to ASAR-CO and ASARCO's creditors and that AMC aided and abetted this breach. The first inquiry in the analysis of a cause of action for aiding and abetting a breach of fiduciary duty is whether the principal owed a fiduciary duty to the complainant. For the same reasons that the Court found AMC owed no duty to its insolvent, wholly owned subsidiary, ASARCO, or ASARCO's creditors, the Court also finds that Grupo had no fiduciary obligation to ASARCO or ASARCO's creditors. Therefore, ASAR-CO cannot prevail on this cause of action.

## VI. CONSPIRACY

ASARCO brings two conspiracy claims. First, Plaintiff alleges that Grupo conspired with its wholly owned subsidiary, AMC, to fraudulently transfer the SPCC stock, breach fiduciary duties owed to AS-ARCO and its creditors, and commit other wrongful acts. (Compl. ¶ 97). Second, ASARCO contends that AMC conspired with one or more of ASARCO's directors, including German Larrea, Genaro Larrea, Xavier Garcia, Oscar Gonzalez, and Alfredo Cesar to fraudulently transfer the stock. *Id.* In ruling on AMC's Motion to Dismiss, the Court determined (and the parties have not disputed) that Arizona law applies to these conspiracy claims.

Under Arizona law, "[f]or a civil conspiracy to occur two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395*, 201 Ariz. 474, 38 P.3d 12, 36 (2002) (quoting *Baker v. Stewart Title & Trust of Phoenix*, 197 Ariz. 535, 5 P.3d 249, 256 (2000)) (citing RESTATEMENT (SECOND) OF TORTS § 876). Thus, to establish liability on the basis of conspiracy, a plaintiff must prove by clear and convincing evidence that: (1) the defendant and at least one other person; (2) agreed to accomplish an unlawful purpose or a lawful purpose by unlawful means; (3) accomplished the underlying tort; and (4) caused damages. *Dawson v. Withycombe*, 216 Ariz. 84, 163 P.3d 1034, 1053 (2007).

### A. Two Or More Persons

The most complicated issue in this cause of action is whether a parent corporation and its wholly owned subsidiary (or a parent and the directors of its wholly owned subsidiary who also sit on the parent's board) can constitute "two or more persons" as is required for a conspiracy claim.

There is a dearth of case law on this point in Arizona; thus, in deciding this issue in its Order on Defendant's Motion to Dismiss, the Court was forced to look at the law across the country to determine whether the prevailing view would recognize these cause of actions. The Court concluded that under certain circumstances, a parent company can conspire with its wholly owned subsidiary, and a parent company can conspire with the directors of its subsidiary even when the directors sit on the boards of both companies. In its Order denying Defendant's Motion to Dismiss, the Court determined that ASARCO pled sufficient facts to survive a motion to dismiss its conspiracy claim; the Court now must determine the circumstances under which Arizona would recognize such a claim.

Most jurisdictions agree that courts should look at the relationship of the parties on a case-by-case basis. *See SEECO, Inc. v. Hales,* 341 Ark. 673, 22 S.W.3d 157 (2000); *Academy Plaza L.L.C.1 v. Bryant Asset Management,* No. 2774, 2006 Phila. Ct. Com. Pl. LEXIS 238, 2006 WL 1652687 (Pa. C.P. June 9, 2006); *Shared Commc'ns Servs. of 1800–80 JFK Blvd. Inc. v. Bell Atlantic Props., Inc.,* 692 A.2d 570, 574 (Pa.Super.Ct.1997). Many courts have held that such a claim can only exist where the parent steps outside its role as 100% owner of the subsidiary, or where the directors step out of their corporate role and act pursuant to personal motives. *See, e.g., Findell v. Koos,* No. CV010510859S, 2002 WL 532409 (Conn.Super.Ct.2002) (recognizing the personal stake exception to the intracorporate conspiracy doctrine); *Akande v. Transamerica Airlines, Inc.,* No. Civ.A. 1039–N, 2006 WL 587846, at *6 (Del.Ch. Feb. 28, 2006) (stating that the intracorporate conspiracy doctrine does not apply "when the officer or agent of the corporation steps out of his corporate role and acts pursuant to personal motives");

*Richard Bertram, Inc. v. Sterling Bank & Trust,* 820 So.2d 963, 966 (Fla. 4th DCA 2002) (acknowledging an exception where the agent has a personal stake separate from principal's interest).

At least one court has required a plaintiff to allege bad faith on the part of the parent. In *Allied Capital Corp. v. GC–Sun Holdings, L.P.,* the plaintiffs alleged that the parent "concocted, in bad faith, a scheme whereby one of its controlled, first-tier subsidiaries was rendered unable to pay its debts because Glencoe, the first-tier subsidiary, and a second-tier subsidiary permitted Glencoe's newly formed affiliate to obtain an equity interest in a third-tier subsidiary for an unfair value." 910 A.2d 1020, 1025 (Del.Ch.2006). The court stated that under Delaware law, to state a claim for conspiracy between a corporation and its wholly owned subsidiary, a plaintiff must plead facts that "suggest that the parent acted with scienter, in the sense that it knowingly assisted the affiliate in committing a wrongful act against another." *Id.* at 1026.

Other courts have held that a conspiracy may exist between a parent and its subsidiary unless the subsidiary acts as an instrumentality or alter ego of the parent company. *TRC Self Storage Dev., LLC v. Pub. Storage Inc.,* Civil Action No. 07–cv–0351–WDM–MEH, 2007 WL 2936322, at *2–3, 2007 U.S. Dist LEXIS 77544, at *7–8 (D.Colo. October 9, 2007); *Shared Commc'ns Servs.,* 692 A.2d at 571. Along these same lines, at least one court has stated that if two corporations are sufficiently separate to contract with each other, than they are separate enough to engage in a civil conspiracy. *Id.*

The Court finds that the most well-reasoned approach is the one that recognizes a cause of action for conspiracy between a parent and subsidiary

only when the parent acts outside its role as 100% owner of the subsidiary. Similarly, the Court finds that a corporation can conspire with the directors of its subsidiary only when those directors are acting outside of their capacity as the subsidiary's directors.

## B. Conspiracy Between AMC And Grupo

ASARCO claims that AMC conspired with Grupo to accomplish the fraudulent transfer. To prevail on this conspiracy claim, ASARCO must first prove that AMC and Grupo were separate "persons" for purposes of the conspiracy claim. To do so, ASARCO must show, by clear and convincing evidence, that Grupo acted outside its role as 100% owner of AMC. *See Akande v. Transamerica Airlines, Inc.*, No. Civ.A. 1039–N, 2006 WL 587846, at *7 (Del.Ch. Feb. 28, 2006).

ASARCO suggests it has met this burden by showing that (1) Grupo took steps to avoid becoming liable on the $450 million Revolver and that extinguishing the Revolver benefitted Grupo; (2) Grupo structured the transaction in a manner that allowed the Larrea family, its controlling shareholder, to receive a dollar-for-dollar credit on a $41.75 million loan; (3) Grupo Mexico benefitted from the SPCC transaction in the sense that its investment was protected. (*See* ASARCO's Proposed Findings of Fact and Conclusions of Law at ¶ 214). Assuming, *arguendo*, that each of these facts is true, the Court does not find that these actions demonstrate that Grupo stepped outside its role as sole owner of AMC, much less do these facts prove this point by clear and convincing evidence. Therefore, ASARCO has failed to meet its burden of proof on the first element of its claim that AMC conspired with Grupo. Having failed to satisfy this element, ASARCO's claim based on a conspiracy between AMC and Grupo fails.

## C. Conspiracy Between AMC And AS-ARCO's Directors

### 1. Two Or More Persons

In order to prove that AMC and ASARCO's directors were two or more persons, ASARCO must show that these directors, who were also AMC's directors, acted in their capacity as directors for ASARCO while conspiring with AMC. *See, e.g., Findell v. Koos*, No. CV010510859S, 2002 WL 532409, at *2 (Conn.Super.Ct.2002); *Akande v. Transamerica Airlines, Inc.*, No. Civ.A. 1039–N, 2006 WL 587846, at *7 (Del.Ch. Feb. 28, 2006); *Richard Bertram, Inc. v. Sterling Bank & Trust*, 820 So.2d 963, 966 (Fla. Dist.Ct.App.2002). Many of ASARCO's directors were also directors of AMC, and all of the directors who approved the transaction were in some way affiliated with AMC and/or Grupo. (PX 0507). Relying on the general rule that a corporation cannot conspire with its directors, officers, and agents, AMC contends that it could not have engaged in the alleged conspiracy with ASARCO's directors because those individuals were also officers, directors, and agents of AMC. The generally recognized exception to this rule states that a conspiracy can form between a corporation and its directors if the directors step outside their corporate role and act in their own personal interest. The Court finds similarly that when a director of a parent corporation acts in his capacity as a corporate director of the subsidiary, he has stepped outside his role as director of the parent corporation and can be found to have conspired with the parent against the subsidiary. This is especially true where the subsidiary's directors have fiduciary obligations to minority shareholders or the subsidiary's creditors and not solely to the parent corporation.

In the present case, ASARCO's directors owed fiduciary duties to ASARCO and its sole shareholder, AMC; however once ASARCO became insolvent (or was in the "zone of insolvency") these directors also owed duties to ASARCO's creditors and could no longer look out solely for AMC's best interest. At least at the point of insolvency, if not before, when these gentlemen were in their role as ASARCO's directors, they were wearing a different hat than when they were acting in their capacity as AMC's directors, officers, or agents.[159] For this reason, the Court finds that once ASARCO was insolvent and ASARCO's directors owed a fiduciary duty to ASARCO's creditors, and not just its sole shareholder, at the point those directors breached that duty, AMC and ASARCO's directors were sufficiently independent that they could form a conspiracy, irrespective of the fact that all of ASARCO's directors were affiliated with AMC/Grupo.

2. *Agreed To Accomplish An Unlawful Purpose Or A Lawful Purpose By Unlawful Means*[160]

 ASARCO must next prove that AMC and ASARCO's directors, acting in their role as directors for ASARCO, agreed to accomplish the underlying torts on which the Plaintiffs' conspiracy claims are based. The conspiratorial agreement need not be express and may be implied by the tortious conduct itself. *Dawson v. Withycombe*, 216 Ariz. 84, 163 P.3d 1034, 1053 (2007) (citing RESTATEMENT (SECOND) OF TORTS § 876 cmt. a (1979)). "A conspiracy may be established by circumstantial evidence through the nature of the acts, the relationship of the parties, the interests of the conspirators, or other circumstances." *Id.* Nevertheless, there is a significant difference between an *agreement* to participate in a tort (civil conspiracy) and proving knowing action that substantially aids another to commit a tort (aiding and abetting). *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12, 36 (2002).

 The most persuasive evidence of an agreement between AMC and ASARCO's directors to undertake the challenged transaction, and thereby commit the fraudulent transfer, is the fact that the

---

**159.** As discussed previously, a director's fiduciary duty normally runs to the corporation and its shareholders, which in the case of a wholly owned subsidiary is the parent. If ASARCO was not insolvent, this would mean that ASARCO's directors had a duty to act in the best interest of their corporation, ASARCO, and *its* sole shareholder, AMC. It would be difficult to make a legitimate argument that ASARCO's directors conspired with AMC to effectuate a fraudulent transfer when those directors, even when acting in their capacity as ASARCO's directors, had a duty to act for the benefit of AMC. (It would be impossible to prove conspiracy to breach fiduciary duties since the only duty owed by directors of a solvent wholly owned subsidiary are those owed to the parent as sole shareholder). If ASARCO was not insolvent at the relevant time, its directors' loyalty would not be split. It is (at least in part) because ASARCO's directors had fiduciary duties to persons other than its sole shareholder AMC that makes the directors sufficiently distinct from AMC so that they may be found to have conspired with AMC. The Court finds that ASARCO was insolvent at the relevant time; therefore, ASARCO's directors' loyalty should have been to ASARCO's creditors. Therefore, ASARCO's directors and AMC are separate enough to form a conspiracy.

**160.** Recall that to prevail on its conspiracy claim, ASARCO must prove, by clear and convincing evidence, that (1) the defendant and at least one other person; (2) agreed to accomplish an unlawful purpose or a lawful purpose by unlawful means; (3) accomplished the underlying tort; and (4) caused damages. *Dawson v. Withycombe*, 216 Ariz. 84, 163 P.3d 1034, 1053 (2007).

directors uniformly ignored the advice of those concerned about ASARCO and AS-ARCO's creditors. Each member of AS-ARCO's board who approved the SPCC transaction was affiliated with AMC and/or Grupo. (PX 0507). The only members of the board who were independent of AMC/Grupo were Jock Patton and Al Frei. According to a unanimous consent signed by ASARCO's board of directors, the independent directors, along with Genaro Larrea, would form a Restructuring Committee and would have full authority to make decisions for ASARCO. (PX 0795). The evidence shows, however, that ASARCO's directors were guided more by the desires of AMC than by the recommendations of the independent directors, who were concerned about the interests of ASARCO and ASARCO's creditors. For example, the inside directors proceeded with closing the transaction despite the fact that the independent directors objected to the transaction as structured, withdrew their approval, and resigned from the board in protest of the transaction. (PX 0255; PX 0965). Also, as discussed previously, AMC/Grupo and some of AS-ARCO's other directors kept Patton and Frei uninformed, and in some instances, provided questionable or inaccurate information to the independent directors.

Furthermore, ASARCO's directors, who should have been making decisions that were in the best interest of ASARCO and ASARCO's creditors, ignored the advice of ASARCO's outside accounting advisor, EYCF, and instead, acted solely according to AMC/Grupo's desires. EYCF also resigned days before the transaction closed. (PX 0264). Prior to its resignation, EYCF refused to issue a bring down opinion (Lyon Depo. 444:5–446:1). EYCF expressly stated that it was concerned about the impact of paying the Yankee Bonds on ASARCO's ability to continue in the ordinary course of business and meet its other obligations. (PX 0264). They also ignored the advice and warnings they were being given by Squire Sanders that they were going to be in breach of their fiduciary responsibility and subject to a claim of fraudulent transfer. Despite this impartial advice against closing the transfer structured the way it was, ASARCO's directors, acting at the behest of AMC/Grupo, unanimously approved the transaction. (PX 0965). This further demonstrates that ASARCO's directors had an agreement with AMC to close the transaction as structured.

Based on the evidence presented at trial, the Court finds that AMC had an agreement with ASARCO's directors to abandon their duties to ASARCO and ASARCO's creditors and instead act to structure and accomplish the SPCC transfer, knowing that the transaction as contemplated would constitute a transfer in fraud of ASARCO's creditors.

### 3. Accomplished The Underlying Tort

The SPCC transaction went forward as agreed to by AMC and ASARCO's directors, and as objected to by the independent directors and others who were acting in ASARCO's best interest. (PX 1369). The Court previously determined that AMC had the actual intent to hinder and delay ASARCO's creditors by entering the challenged transaction. As stated above, the Court also finds that AMC and ASARCO's directors reached an agreement to accomplish this transaction with calloused indifference to the interests of ASARCO's creditors. Therefore, ASAR-CO has met its burden of proof on this element of the conspiracy claim.

### 4. Harm

The Court finds that Plaintiffs' damages are directly traceable to the con-

spiracy. ASARCO's unsecured creditors were hindered and delayed as a result of the SPCC transaction. In fact, many creditors still have unpaid claims from dealing with ASARCO. (*See, e.g.,* PX 1372, PX 1374, PX 1375, PX 1376, PX 1377, PX 1378, PX 1380, PX 1381). AMC could not have accomplished this fraudulent transfer without the agreement of ASARCO's directors. Thus, the damages suffered by ASARCO's creditors are a proximate result of this conspiracy between AMC and ASARCO's directors.

## VII. PUNITIVE DAMAGES

▉▉▉▉▉▉ Punitive damages are available only if there is an underlying cause of action pled and proved by a plaintiff that will permit recovery of punitive damages against the defendant. While the Bankruptcy Code does not provide for punitive damages, such relief may be available by application of state law. *In re Amberjack Interests, Inc.,* 326 B.R. 379, 391 (Bankr. S.D.Tex.2005); *cf. In re Maxted,* 107 B.R. 289, 290 (Bankr.D.Mont.1988); *In re Fill,* 82 B.R. 200, 227–28 (Bankr.S.D.N.Y.1987) (not available under New York fraudulent transfer based claim). Plaintiffs do not seek punitive damages under the Bankruptcy Code, but rather on their state-law claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty.[161] The Court determined in its Order denying AMC's Motion to Dismiss that

New Jersey law governs the claim for punitive damages because that is the law applicable to the underlying cause of action on which the claim for punitive damages is based. *ASARCO LLC v. Americas Mining Corp.,* 382 B.R. 49, 83 (S.D.Tex.2007). The Court also found that punitive damages are available for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty.[162]

The requirements for the recovery of punitive damages have been codified in New Jersey:

> Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

N.J. Stat. Ann. § 2A:15–5.12(a). The case law in New Jersey reiterates that punitive damages are appropriate where "the wrongdoer's conduct is especially egregious," not merely negligent. *Jaclyn, Inc. v. Edison Bros. Stores, Inc.,* 170 N.J.Super. 334, 406 A.2d 474, 492 (1986); *Albright v. Burns,* 206 N.J.Super. 625, 503 A.2d 386, 391 (1986).[163]

---

**161.** As the Court did not find that AMC or Grupo owed fiduciary duties to ASARCO or its creditors, Plaintiffs' punitive damages claim is based solely on AMC's aiding and abetting ASARCO's directors' breach of fiduciary duty.

**162.** The Court notes that other jurisdictions also recognize a claim for punitive damages for breach of fiduciary duty. *Standard Chlorine of Del., Inc. v. Sinibaldi,* 821 F.Supp. 232, 253 (D.Del.1992) (finding that punitive damages may be awarded for a willful breach of

fiduciary duty); *Rhue v. Dawson,* 173 Ariz. 220, 841 P.2d 215, 227 (1992) ("Under Arizona law, punitive damages are properly awarded for breach of fiduciary duty....").

**163.** The standard for punitive damages is analogous in other jurisdictions. *Jerman v. O'Leary,* 145 Ariz. 397, 701 P.2d 1205, 1210 (1985) ("In Arizona, punitive damages are based on gross, wanton, malicious and oppressive conduct or on conduct which shows spite, ill will or reckless indifference to the interest of others."); *Jardel Co., Inc. v.*

The Court, after reviewing all evidence of record, finds that AMC's conduct was not "actuated by actual malice or accompanied by a wanton and willful disregard" of ASARCO or ASARCO's creditors. The Court recognizes that, at first blush, this conclusion may seem inconsistent with the Court's finding that AMC acted with actual intent to hinder or delay ASARCO's creditors. In determining whether AMC had the actual intent to hinder, delay, or defraud ASARCO's creditors when it engaged in the SPCC transaction, the Court examined various pieces of direct and circumstantial evidence to conclude that AMC knew that some of ASARCO's creditors would be hindered and delayed as a result of the transaction but closed the transaction anyway. Based in part on this determination, the Court concluded that AMC had the actual intent to hinder or delay some of ASARCO's creditors. Despite the fact that AMC acted with calloused indifference to the rights of ASARCO's creditors, the Court does not find that the transaction was actuated by actual malice, and although AMC's disregard of the creditors' interests was arguably willful, it was not wanton. There is no evidence, for example, that AMC/Grupo engaged in the transaction for the main purpose of hindering, delaying, or defrauding creditors. Nor is there evidence that AMC/Grupo targeted any specific creditor(s) that it wanted to hinder, delay, or defraud. AMC acquired the SPCC stock with knowledge that ASARCO's creditors would be hindered or delayed as a result of the way in which the transaction was structured, but its decision to close the transaction in spite of this can best be characterized as apathy or indifference, not malice or wantonness. The Court finds that ASARCO failed to prove, by clear and convincing evidence, that AMC engaged in the type of egregious conduct that would warrant punitive damages.

## VI. AFFIRMATIVE DEFENSES

In AMC's Answer to the Second Amended Complaint, it asserts 30 affirmative defenses to ASARCO's allegations. The Court will address each defense individually.

### A. First Defense—Failure To State A Claim

AMC's first defense is that the Second Amended Complaint fails to state a claim against AMC for which relief can be granted. The Court finds that AMC prevails on this defense only on ASARCO's claim that AMC owed and breached fiduciary duties to ASARCO and ASARCO's creditors and the claim that AMC aided and abetted Grupo's breach of fiduciary duty. These causes of action are discussed above in greater detail. AMC does not prevail on this defense regarding any other cause of action pled by ASARCO.

### B. Second Defense—Consent Decree Was A Judgment Among the Parties

AMC's Second Affirmative Defense is that the claims asserted in the Second Amended Complaint are barred by the Consent Decree entered in the DOJ lawsuit. AMC contends that the Consent Decree has the effect of a judgment among

Hughes, 523 A.2d 518, 529 (Del.Supr.1987) (noting that under Delaware law, punitive damages are appropriate only where the defendant's conduct is outrageous due to an evil motive or "reckless indifference to the rights of others") (citing the RESTATEMENT (SECOND) OF TORTS § 908 comment b (1979)); Westing-

house Elec. Supply Co. v. Pyramid Champlain Co., 193 A.D.2d 928, 932, 597 N.Y.S.2d 811 (N.Y.App.Div.1993) (indicating that, under New York law, punitive damages are available if the defendant acted in a "wanton, willful or malicious manner").

the parties, including ASARCO and SPHC.

The Court finds that the Consent Decree does not have the effect of a judgment among the parties and does not validate the SPCC transfer. The Consent Decree was a settlement between ASARCO/SPHC and the DOJ and did not purport to adjudicate the rights of anyone not a party to the settlement agreement. (PX 0214). In fact, the Consent Decree itself contemplated that the transaction could be attacked and perhaps unwound by third parties. (PX 0214). That court denied other creditors' motion to intervene in the suit, noting that even though the DOJ was not interested in protecting the intervenors' rights, the intervenors were not left without a remedy. (PX 0174). In fact, in its memorandum in opposition to the motion to intervene, ASARCO suggested that denying the motion to intervene would not impair or impede these creditors' interests because "they are free to assert in their own action against ASARCO any claims they might have with respect to the proposed transfer of the SPCC stock." (PX 0866).

Recall that for purposes of the fraudulent-transfer claims, ASARCO, as debtor in possession, stands in the shoes of its unsecured creditors. For this reason, only defenses that would prevail against these creditors would bar Plaintiff's fraudulent-transfer claim. Therefore, even if the Consent Decree has the effect of a judgment against ASARCO, it would not prevent ASARCO's unsecured creditors from prevailing on a fraudulent-transfer claim. The Consent Decree, therefore, certainly does not bar Plaintiff's fraudulent-transfer claims.

Also, the Consent Decree certainly did not adjudicate Plaintiffs' claims against AMC for aiding and abetting ASARCO's directors' breach of fiduciary duty, nor did it resolve Plaintiffs' conspiracy allegations. For this reason, even if the Consent Decree had the effect of a judgment among the parties, these claims survive as they were not addressed in the decree, and this defense fails.

## C. Third Defense—Barred By Representations In Stock Purchase Agreement

AMC's third defense is that Plaintiffs' claims are barred by Plaintiffs' representations and warranties contained in the Stock Purchase Agreement governing the SPCC transaction. The Stock Purchase Agreement represented that "[t]he sale and transfer of the Shares contemplated by this Agreement provides reasonably equivalent value for the Shares." (PX 0279) Reasonably equivalent value is an element of the constructive fraudulent transfer claim and a factor to consider in the actual fraudulent transfer claim. The Court need not decide the viability of this defense since the Court finds that ASARCO received reasonably equivalent value for the SPCC shares.[164]

## D. Fourth Defense—ASARCO Lacks Standing

As discussed in detail above, Plaintiff ASARCO has standing to bring its fraudulent-transfer claims against AMC because there are actual, unsecured creditors that would have standing to avoid the challenged transfer, and the debtor, ASARCO,

---

**164.** Even if the Court had found that ASARCO did not receive reasonably equivalent value in the SPCC stock transfer, this defense would still fail. For purposes of the fraudulent transfer claims, ASARCO stands in the shoes of its unsecured creditors and is subject only to defenses that would prevail against an unsecured creditor. This is not such a defense, as it was the pre-petition debtor, not ASARCO's unsecured creditors, who made the representation in the Stock Purchase Agreement.

transferred property in which it had an interest. ASARCO proved it had an interest in the SPCC stock by prevailing on a reverse-veil-piercing allegation and convincing this Court to disregard the separateness of ASARCO and SPHC so as to expand ASARCO's estate to include the SPCC stock that formerly belonged to SPHC. The Court found that SPHC lacked standing to bring the fraudulent-transfer claims because it could not point to any actual, unsecured creditors that would have standing to avoid the challenged transfer.

 Plaintiffs also have standing to assert that AMC aided and abetted ASARCO's directors' breach of fiduciary duty. Section 323(b) of the Bankruptcy Code gives trustees the right to prosecute any action belonging to the bankruptcy estate. The estate consists of all legal and equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C. § 541(a)(1). Causes of action that, according to applicable state law, were available to the debtor at the time that the bankruptcy case commenced become property of the estate pursuant to § 541. *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 245 (5th Cir.1988). Thus, a claim for aiding and abetting breach of fiduciary duty is a claim belonging to the estate. *See id.* Other courts have expressly held that trustees have standing to pursue breach of fiduciary claims and aiding and abetting breach of fiduciary duty causes of action. *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1004 (9th Cir. 2005); *In re OODC, LLC*, 321 B.R. 128, 143 (Bankr.D.Del.2005). Debtors in possession have the same rights to sue and be sued as a trustee does. *See* 11 U.S.C. § 1107(a). Therefore, Plaintiffs, ASARCO and SPHC, as debtors in possession, have standing to pursue a claim against AMC for aiding and abetting ASARCO's directors' breach of fiduciary duty.

## E. Fifth Defense—Failure To Join Indispensable Parties

AMC next claims that Plaintiffs have failed to join indispensable parties. According to Federal Rule of Civil Procedure 19(a) "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." AMC has failed to identify such a person.

AMC has not identified any person who must be joined in this lawsuit in order to "accord complete relief among existing parties." AMC currently has control over the SPCC stock. (*See* Doc. No. 372). The dividends on the stock have been paid to shareholders of record. (Jt. Pretrial Order Admission of Fact No. 60). The Court finds that complete relief may be obtained from Defendant AMC. Additionally, AMC has not identified any person who is situated such that disposing of the action in the person's absence may "impair or impede the person's ability to protect the interest" or leave an existing party subject to a substantial risk of inconsistent obligations because of the interest. Therefore, AMC has not proven that Plaintiffs have failed to join an indispensably party.

### F. Sixth Defense—Good Faith

AMC's sixth affirmative defense is that AMC acted in good faith. It is unclear to which claim this defense is addressed, thus the Court will briefly discuss its applicability to each cause of action.

Good faith is an affirmative defense to a constructive fraudulent transfer claim according to Delaware's version of the UFTA. 6 Del. C. § 1308(a). As the Court finds ASARCO failed to meet its burden of proving the constructive fraudulent transfer claim, AMC need not prove its good faith to escape liability on this allegation.

To the extent that good faith is a defense to ASARCO's other causes of action, the Court finds that AMC did not enter into the challenged transaction in good faith. AMC entered into the transaction knowing that it would hinder or delay some of ASARCO's creditors. This intent to hinder or delay ASARCO's creditors seems to preclude a finding that AMC acted in good faith. *See Interpool Ltd. v. Patterson*, 890 F.Supp. 259, 267 (S.D.N.Y. 1995) (stating a transfer is not made in good faith when, *inter alia*, the defendant has intent to, or knowledge of the fact that, the transaction in question will hinder, delay, or defraud others). Therefore, to the extent applicable, AMC's good faith defense fails to shield it from liability on any cause of action.

### G. Seventh Defense—Malice Or Wantonness

AMC's seventh affirmative defense is that it did not act with malice or wantonness. This is a defense to ASARCO's claim for punitive damages. The Court finds that AMC did not engage in the challenged transfer with actual malice or in wanton and willful disregard of ASARCO or its creditors. Therefore, AMC prevails on this defense.

### H. Eighth & Ninth Defenses—ASARCO And SPHC Are Solvent

AMC next argues that Plaintiffs lack standing because they are currently solvent. The parties agreed and represented to the Court that the Bankruptcy Court should determine the question of whether ASARCO and/or SPHC are currently solvent. (*See* January 28, 2008 Hearing Transcript at 16–17, 37–38). The Court honored the agreement of the parties. Little evidence, if any, was presented at trial going to the issue of ASARCO and/or SPHC's current financial condition. The Court defers to the Bankruptcy Court, in which the remainder of this bankruptcy action is pending, to resolve this issue. As such, it is not a defense to the current claims.

### I. Tenth & Eleventh Defenses—ASARCO/SPHC's Solvency At Time Of And After Transaction

AMC's tenth affirmative defense is that neither ASARCO nor SPHC was insolvent at the time of the transfer. Its eleventh defense is that the transaction did not cause either plaintiff to become insolvent. As discussed in detail above, the Court found that ASARCO was insolvent at the time of the transaction. Furthermore, the Court finds that ASARCO's insolvency continued after the SPCC transfer. Therefore, AMC does not prevail on these affirmative defenses.

### J. Twelfth Defense—Reasonably Equivalent Value

AMC contends that ASARCO and SPHC received reasonably equivalent value and fair consideration for the SPCC shares. This would serve as a complete defense to the constructive fraudulent transfer claim. The Court finds that ASARCO received reasonably equivalent value, and as discussed above, Plaintiff did

not prevail on its constructive fraudulent transfer claim.

### K. Thirteenth Defense—Intent To Hinder, Delay, Defraud

AMC's next defense is that the transfer was not made with actual intent to hinder, delay, or defraud creditors. The Court, as discussed *supra*, finds that AMC did have the intent to hinder or delay ASARCO's creditors. For this reason, this defense must fail.

### L. Fourteenth Defense—Transfer Subject To Public And Notorious Litigation

AMC's fourteenth defense is that the transfer of the SPCC stock to AMC was subject to public and notorious litigation. AMC offered no support, and the Court did not find any, for the proposition that it is an affirmative defense to any cause of action brought in this case if the challenged transfer was subject to public and notorious litigation.

Even if this is a viable defense under the law, the facts demonstrate that the DOJ lawsuit (to which AMC presumably alludes) was not quite as public and notorious as AMC represents. The evidence demonstrated that AMC/Grupo kept information from the DOJ during the course of negotiations in connection with this lawsuit. Furthermore, there were events that occurred after the DOJ lawsuit settled that might have changed the course of negotiations, such as the inaccurate press release, EYCF's refusal to issue a bring down opinion, and the resignation of the independent directors and their objection to paying the Yankee Bonds. The litigation affected numerous other creditors, who were not parties to the litigation, not allowed to be parties, and whose interests were not represented. The Court finds that to the extent that it is a defense to

any cause of action alleged, the Court finds that AMC failed to prove that the transfer was subject to public and notorious litigation such that it would constitute a defense.

### M. Fifteenth Defense—Proximate Cause

AMC next contends that any injury sustained by Plaintiffs was not directly or proximately caused by the alleged breach of fiduciary duty. The Court, however, finds that ASARCO's creditors were harmed by AMC aiding and abetting ASARCO's directors' breach of fiduciary duty. The payment of the Yankee Bonds at par plus interest deprived ASARCO and its other creditors of the benefits of that money. Also, forgiving the $41.75 million intercompany loan rather than paying ASARCO this amount in cash deprived ASARCO of much-needed cash to continue its operations and pay its other overdue obligations. ASARCO's creditors were likely harmed by ASARCO's directors' failure to try to obtain the highest price for the SPCC stock reasonably available under the circumstances. Therefore, the Court finds that Plaintiffs' damages were proximately caused by AMC aiding and abetting ASARCO's directors' breach of fiduciary duty.

### N. Sixteenth Defense—Did Not Breach Or Aid And Abet Breach

AMC argues that it did not breach or aid or abet a breach of any duty of care, to the extent that one exists. The Court finds that neither AMC nor Grupo owed a duty to ASARCO or its creditors; thus, AMC did not breach a fiduciary duty, nor did it aid and abet Grupo in breaching a fiduciary duty. As discussed in detail above, the Court finds that ASARCO's directors owed a duty to ASARCO and its creditors and AMC aided and abetted

those directors' breach of their fiduciary duty. Therefore, AMC prevails on this defense to the extent that it goes to AS-ARCO's direct breach of fiduciary duty claim and claim against AMC for aiding and abetting Grupo's breach. This defense fails, however, against ASARCO's claim that AMC aided and abetted ASAR-CO's directors' breach of fiduciary duty.

### O. Seventeenth Defense—No Unlawful Acts

AMC's seventeenth affirmative defense is that it engaged in no unlawful acts. To the extent that AMC asserts this defense to the fraudulent-transfer claims or the breach of fiduciary duty causes of action, the Court finds this defense inapplicable as no unlawful act is necessary to prevail on these causes of action.

In order to prevail on its conspiracy claim, ASARCO had to prove that AMC and ASARCO's directors and/or AMC and Grupo agreed to commit an unlawful objective or a lawful objection by unlawful means. In its discussion, above, regarding the conspiracy claims, the Court found that this element was met. Therefore, AMC's defense that it committed no unlawful acts fails.

### P. Eighteenth Defense—Waiver, Ratification, Estoppel And Laches

AMC next contends that ASARCO's claims are barred by the doctrines of waiver, ratification, estoppel, and/or laches.

#### 1. Waiver

▮▮▮▮▮ In Delaware, waiver is more than mere inaction. The defense of waiver requires an intentional relinquishment of a right, and the facts relied upon to establish

waiver must be "unequivocal in character." *Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co., Inc.,* No. 00C-07–161–JRJ, 2003 WL 22048238, at *10 (Del.Super.Ct.2003). In New Jersey, "[w]aiver involves the intentional relinquishment of a known right and must be evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based." *Scibek v. Longette,* 339 N.J.Super. 72, 770 A.2d 1242, 1249 (2001). It is "an election by the party to dispense with something of value or to forego some advantage which that party might have demanded and insisted upon." *Id.* A party must know of his legal rights and deliberately intend to relinquish them, and while the intent need not be expressly stated, it should be obvious from the facts that the party had knowledge of the right and a continuing indifference to the exercise of that right.

AMC has presented no evidence, and made no arguments, that Plaintiffs (or any of the creditors in whose shoes ASARCO stands for purposes of the fraudulent transfer claims) knowingly and deliberately intended to waive their right to pursue the claims alleged.[165] Therefore, the Court finds that AMC's defense of waiver fails.

#### 2. Ratification

▮▮▮ The defense of ratification requires a showing that the plaintiff: (i) intended to ratify a wrongful act; and (ii) had full knowledge of all material facts. *Intelnet Int'l Corp v. ITT Corp.,* Case No. 2006 WL 2192030, at *14 (N.J.Super.Ct.App.Div. Aug. 4, 2006); *see also Washington Nat. Trust Co. v. W.M. Dary Co.,* 116 Ariz. 171, 568 P.2d 1069, 1072–73

---

**165.** AMC did not even mention this defense in either of its motions for summary judgment (Doc. Nos. 251, 252, 253, 254), throughout trial, or in its proposed findings of facts and conclusions of law.

(1977); *Papaioanu v. Comm'rs of Rehoboth,* 186 A.2d 745, 750 (Del.Ch.1962).

To the extent that AMC asserts this defense against ASARCO's fraudulent transfer allegation, it must fail. For purposes of the fraudulent-transfer claims, ASARCO stands in the shoes of its unsecured creditors. There is no evidence, nor argument, that ASARCO's creditors ratified the challenged transaction.

With respect to the other causes of action, AMC failed to meet its burden of proving that ASARCO intended to ratify the wrongful act with full knowledge of all material facts. This defense was not even mentioned at trial nor did AMC raise it in its proposed findings of facts and conclusions of law. Since AMC has the burden of proving this affirmative defense and failed to do so, the Court finds that ASARCO and ASARCO's creditors did not ratify the transaction.

### 3. Judicial Estoppel

AMC has argued that ASARCO is estopped from bringing the alter-ego claim because of Plaintiff's pre-petition position before the Arizona District Court in the DOJ case. In that case, ASARCO/SPHC denied being alter egos of one another. The Court discussed in detail above why ASARCO/SPHC is not judicially estopped from now raising an alter-ego claim.

### 4. Issue Preclusion

■ Issue preclusion is appropriate only if: (1) the issue under consideration is identical to an issue in a prior action; (2) the issue was actually litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) no special circumstances would render preclusion inappropriate or unfair. *United States v. Shanbaum,* 10 F.3d 305, 311 (5th Cir.1994) (citing *Parklane Hosiery Co. v.*

*Shore,* 439 U.S. 322, 326–32, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)).

■ The Court finds that the issues in the present case were not "actually litigated" in a prior action. The DOJ lawsuit was settled under the terms of the Consent Decree. The Fifth Circuit has noted that when an issue is agreed to, it is not actually litigated. *Shanbaum,* 10 F.3d at 311 n. 3. Consent judgments can be given preclusive effect, but only if the parties manifest such an intention. *Hughes v. Santa Fe Int'l Corp.,* 847 F.2d 239, 241 (5th Cir.1988). The Consent Decree in this case does not contain language expressing such an intent. In fact, the Consent Decree, and subsequent orders from that court, contemplate that non-parties may challenge the SPCC transaction that was agreed upon by the parties to the DOJ lawsuit. Thus, AMC has failed to prove the "actually litigated" element of the issue preclusion defense.

The Court also notes that preclusion in this circumstance would be unfair to ASARCO and ASARCO's creditors. AMC/Grupo dominated and controlled ASARCO at the time the representations were made. It would be unfair for AMC/Grupo to control the settlement with the DOJ, and now allow AMC to avoid liability based on statements it caused ASARCO/SPHC to make.

For the foregoing reasons, the Court finds that issue preclusion does not bar any of ASARCO's claims.

### 5. Judicial Admission

■ A "judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them ... A statement made by counsel during the course of trial may be considered a judicial admission if it was made intentionally as a waiver, releasing the opponent from proof of fact." *Martinez*

*v. Bally's La., Inc.,* 244 F.3d 474, 476 (5th Cir.2001). It by itself is not a defense, although one can make a judicial admission that would support an affirmative defense.

▮ AMC's Motion for Summary Judgment and Proposed Findings of Facts and Conclusions of Law refer to previous statements made by ASARCO/SPHC in court documents stating that ASARCO and SPHC were not alter egos. This defense fails because ASARCO, as debtor in possession, stands in the shoes of ASARCO's unsecured creditors for the alter ego claim (as it is a threshold issue for the fraudulent transfer cause of actions). The alter ego claim is only vulnerable to defenses that would prevail against an unsecured creditor. It was pre-petition ASARCO, not its creditors, that denied that ASARCO and SPHC were alter egos. Furthermore, even if ASARCO does not stand in its unsecured creditors' shoes for purposes of this claim, the Court finds that any alleged judicial admission was made under the domination and control of AMC/Grupo and equity will not permit the statement to be used by AMC to bar Plaintiff's recovery.

To the extent that AMC's defense relies on the statement in the Consent Decree that the transfer was for reasonably equivalent value, the defense is unnecessary as the Court finds ASARCO received reasonably equivalent value.[166]

### 6. Laches

▮ Under New Jersey law, laches does not apply unless the statute of limitations has run on a breach of fiduciary duty claim. *Dynasty Bldg. Corp. v. Ackerman,* 376 N.J.Super. 280, 870 A.2d 629, 634 (2005). The statute of limitations on aiding and abetting a breach of fiduciary duty claim in New Jersey is six years. *In re MacGregor Sporting Goods, Inc.,* 199 B.R. 502, 512 (Bankr.D.N.J.1995); *see State v. Loughrey,* 149 N.J.Super. 264, 373 A.2d 703, 705 (1977); *see also In re The Brown Schools,* 368 B.R. 394, 402 (Bankr.D.Del. 2007) (noting that a breach of fiduciary duty claim and a claim for aiding and abetting a breach of fiduciary duty carry the same statute of limitations under Delaware law). The transaction closed on March 31, 2003 and this lawsuit was filed February 2, 2007; therefore the statute of limitations has not run on ASARCO's aiding and abetting breach of fiduciary duty claim. Thus, AMC's defense of laches fails with respect to Plaintiffs' New Jersey claims.

▮ Under Delaware law, the defense of laches requires proof of: (1) knowledge by the claimant, (2) unreasonable delay in bringing the claim, and (3) prejudice to the defendant. *Homestore, Inc. v. Tafeen,* 888 A.2d 204, 210 (Del. 2005). Similarly, under Arizona law, the defense of laches consists of unreasonable delay and disadvantage or prejudice to the party asserting the defense. *Mayer Unified Sch. Dist. v. Winkleman,* No. 2 CA–CV 2007–0126, 2008 WL 2128064, at *18 (Ariz.Ct.App. May 19, 2008). AMC did not present any evidence or make any argument toward this defense. As a result, AMC failed to meet its burden of proving this affirmative defense.

### Q. Nineteenth Defense—In Pari Delicto

▮ Under the doctrine of *in pari delicto,* actions brought on illegal or cor-

---

**166.** If the Court had not found ASARCO received REV, this defense would still not bar Plaintiff's recovery, however, because ASARCO stands in the shoes of its unsecured creditors for purposes of the fraudulent-transfer claims and this defense would not be good against those creditors.

rupt bargains cannot prevail if the plaintiff was a significant participant in the wrongdoing, bearing at least equal fault. *See Pinter v. Dahl,* 486 U.S. 622, 632, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Because AMC/Grupo dominated and controlled ASARCO during the relevant time and dictated the terms of the SPCC transaction, the Court finds that ASARCO (and its creditors) were not at equal fault. Thus, AMC's *in pari delicto* defense fails.

### R. Twentieth Defense—Ripeness

▪▪▪▪▪ AMC's twentieth affirmative defense is that Plaintiffs' claims for damages are not ripe. All jurisdictions whose laws apply to this case recognize the doctrine of ripeness. In determining whether a case or controversy is ripe for review, courts balance: "(1) the fitness of issues for judicial review and (2) the hardship to the parties if judicial review is withheld at this time." *K. Hovnanian Cos. of N. Cent. Jersey, Inc. v. N.J. Dep't of Env. Protection,* 379 N.J.Super. 1, 876 A.2d 847, 853 (2005). In determining whether an issue is fit for judicial review, courts often consider whether review would require additional factual development. *Id.*

In the present case, no additional factual development is necessary to determine any of the claims based on a transaction that took place over five years ago, and there is no contingency that precludes entry of a judgment.[167] Further, some of the unpaid creditors are owed sums certain and have been since well before the transaction that is the basis of this lawsuit. The Court, therefore, finds that all of the issues raised in ASARCO's Second Amended Complaint are ripe for review.

### S. Twenty–First Defense: Lack Of Cognizable Injury Caused By AMC

AMC's next defense is that ASARCO failed to establish that it suffered a cogni-

zable injury as a result of AMC's conduct. As discussed above, ASARCO and its creditors suffered harm that was caused by AMC's actual intent to hinder or delay ASARCO's creditors, aiding and abetting ASARCO's directors' breach of fiduciary duties, and conspiring with ASARCO's directors to close the fraudulent transfer. Thus, this defense fails.

### T. Twenty–Second Defense—Failure To Plead Fraud With Particularity

AMC's twenty-second defense states that Plaintiffs' claims are barred because they did not plead fraud with particularity. Federal Rule of Civil Procedure 9(b) states that in alleging fraud, "a party must state with particularity the circumstances constituting fraud ...." This rule is designed to give effect to a number of public policies. *Temple v. Haft,* 73 F.R.D. 49, 51 (D.Del. 1976). One purpose is to prevent injury to the reputation of potential defendants from irresponsible or improvident fraud allegations. *Id.* Another rationale behind the rule is that a defendant needs a substantial amount of information about a fraud claim to properly prepare a response. *Id.* Also, this rule helps ensure that a fraud complaint is not used as a mere pretext for discovery of unknown wrongs. *Id.*

In its Order denying AMC's Motion to Dismiss, this Court found that ASARCO failed to plead fraud with particularity because it failed to specify the applicable state law on which their fraudulent-transfer claims were based. *ASARCO LLC v. Americas Mining Corp.,* 382 B.R. 49, 84 (S.D.Tex.2007). The Court granted leave for ASARCO to amend its complaint to specify the state law under which it intended to pursue its fraud claims. Plaintiffs complied with this order, stating that their

---

**167.** AMC offered no support for this affirmative defense.

fraudulent transfer claims were brought under Delaware law. (Doc. No. 169). The allegations in the Second Amended Complaint provide sufficient information on which AMC could prepare an answer, and it is clear that the allegations of fraud were not made improvidently or for the sole purpose of discovering unknown wrongs. Further, AMC put up a spirited defense to the fraudulent-transfer claims and quite obviously knew all about them. The Court finds that Plaintiffs complied with Federal Rule 9(b); therefore, AMC does not prevail on this defense.

### U. Twenty–Third Defense—Limitations

AMC next contends that Plaintiffs' claims are barred by the applicable statute of limitations or repose. The SPCC transaction, which underlies all of Plaintiffs' claims, closed on March 31, 2003. This lawsuit was filed February 2, 2007.

 The statute of limitations for fraudulent transfers under Delaware law is four years. 6 Del. C. § 1309(1)-(2). In New Jersey, the statute of limitations for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty is six years. *In re MacGregor Sporting Goods, Inc.*, 199 B.R. 502, 512 (Bankr.D.N.J.1995); *see State v. Loughrey,* 149 N.J.Super. 264, 373 A.2d 703, 705 (1977); *see also In re The Brown Schools,* 368 B.R. 394, 402 (Bankr.D.Del.2007). This lawsuit was filed within the statute of limitations for each of these claims. Therefore, ASARCO's claims are not time barred.

### V. Twenty–Fourth & Twenty Fifth Defenses—Damages

AMC's twenty-fourth defense is that it is entitled to a lien or a right to retain an interest in the SPCC shares to the extent of the consideration paid in the transfer for any increase in the value of the shares as a result of the AMC ownership thereof. Its twenty-fifth defense is that avoidance of the SPCC transfer is not necessary to satisfy any creditor's claim against the bankruptcy estates of ASARCO or SPHC and will not benefit either debtor's estate. These defenses will be addressed as necessary in this Court's subsequent opinion on damages.

### W. Twenty–Sixth Affirmative Defense—Recoupment

AMC's twenty-sixth affirmative defense, and its sole remaining counterclaim, is that it is entitled to recoupment to the extent that Plaintiffs are granted the relief they seek.[168] Specifically, AMC alleges that if ASARCO proves it received less than reasonably equivalent value for the stock, the fraudulent transfer claims are subject to recoupment because of ASARCO's and SPHC's representation in the Stock Purchase Agreement that "[t]he sale and transfer of the [SPCC] Shares contemplated by this Agreement provides reasonably equivalent value for the Shares." (PX 0279). AMC argues that if the transaction was for less than REV in spite of this statement, it has a claim in recoupment based on breach of material representation, breach of material warranty, and breach of the implied duty of good faith and fair dealing.

The Court need not reach AMC's claim in recoupment because the Court finds that ASARCO received reasonably equivalent value for the stock, and therefore did

---

**168.** In its live answer, Americas Mining Corporation's Answer to Second Amended Complaint, AMC dropped all of its counterclaims so arguably it has no counterclaim to argue. However, the parties refer to this "counter- claim" in the Joint Pretrial Order. Thus, the Court finds that this counterclaim/affirmative defense has not been waived, has consistently been pursued and, if nothing else, has been tried by consent.

not violate its representation to this effect. Although not necessary for the disposition of this case, the Court will briefly discuss whether AMC would succeed on its recoupment claim if the Court had found that ASARCO received less than reasonably equivalent value.

■■■■■■ "Recoupment is a common-law, equitable doctrine that permits a defendant to assert a defensive claim aimed at reducing the amount of damages recoverable by a plaintiff." *TIFD III–X LLC v. Fruehauf Prod. Co., L.L.C.*, 883 A.2d 854, 859 (Del.Ch.2004) (quoting 80 C.J.S. *Set-off and Counterclaim* § 2 (2000)); *see 182 Franklin St. Holding Corp. v. Franklin Pierrepont Assocs. et al.*, 217 A.D.2d 508, 509, 630 N.Y.S.2d 64 (N.Y.App.Div.1995).[169] Unlike a claim for set-off, which is unrelated to a plaintiff's claim, a claim for recoupment requires a defendant to prove that the recoupment claim arises out of the same transaction or occurrence as the plaintiff's suit. *182 Franklin St. Holding Corp.* at 509, 630 N.Y.S.2d 64; *TIFD III–X LLC*, 883 A.2d at 859. Additionally, the underlying damage claim and the claim in recoupment must involve the same litigants. *Id.*

■■■■■■ For purposes of the fraudulent transfer claims, ASARCO stands in the shoes of its unsecured creditors. These claims, therefore, are only subject to defenses that would prevail against the unsecured creditors, and not those that would bar only the pre-petition debtor. The claim in recoupment is based on a statement made by pre-petition ASARCO in the Stock Purchase Agreement in which AS-ARCO represented that the transfer was for reasonably equivalent value. (PX 0279). Setting aside any equitable considerations, if the Court had found that AS-ARCO received less than reasonably equivalent value, pre-petition ASARCO would have arguably breached this representation. However, ASARCO, as debtor in possession, stands in the shoes of its creditors for the fraudulent-transfer claim. The claim in recoupment would not be available against ASARCO's creditors. Thus, AMC's recoupment claim would fail on this ground.

■■■■ AMC's recoupment claim also fails because the equities weigh against a finding in favor of AMC on this claim. AMC/Grupo controlled most aspects of the SPCC transaction, including the statements made in the Stock Purchase Agreement. According to Fitzgerald's testimony, Sidley Austin's advice regarding the transaction was intended only for ASARCO's parent, AMC, but with regard to documenting the transaction, the firm represented AMC as well as ASARCO and SPHC. (Fitzgerald, June 3, 2008, 57:15–25). Doug McAllister, who signed the Stock Purchase Agreement on ASARCO's behalf, testified that ASARCO was controlled by and was not dealing at arm's length with Grupo. (McAllister Depo. 46:19–47:23; 91:9–91:20). McAllister further testified that German Larrea exercised "pervasive control" of ASARCO. (McAllister Depo. 375:1–4). Numerous emails and memos confirm that AMC President German Larrea controlled the transaction. (*See, e.g.*, PX 0612).

---

**169.** The Stock Purchase Agreement has a choice-of-law provision stating, "[t]his Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than the State of New York." The Court, therefore finds New York to be the applicable law for this claim in recoupment based on representations made in the Stock Purchase agreement.

This is not a situation in which the transferee was unaware of some aspect of the transaction because it relied on a misrepresentation by the transferor. To the contrary, here, AMC not only was aware of all of the pertinent facts and circumstances surrounding the transfer, but it actually controlled the transfer. It was AMC's counsel who drafted the Stock Purchase Agreement containing this representation. AMC/Grupo knew of all the expert analyses conducted in connection with the transaction and in fact commissioned most of the REV and insolvency analyses. The Court does not find that AMC relied upon the REV representation made in the Agreement, since it was AMC/Grupo who controlled the terms of the transaction and caused the statement to be included. It did so with full knowledge of the facts. It would be inequitable for the Court to allow AMC to prevail on a claim in recoupment based on a statement in a Stock Purchase Agreement, the terms of which AMC/Grupo dictated. AMC's claim for recoupment would fail for these reasons.

## X. Twenty–Seventh Through Thirtieth Defenses—Punitive Damages

AMC's next four defenses go to ASARCO's claim for punitive damages. The defenses are: (1) AMC is not liable for any conduct for which punitive damages could or should be awarded; (2) Any award of punitive damages would violate the laws of the United States; (3) Any award of punitive damages must not violate the excessive fines provision of the Eighth Amendment as it is incorporated by the Fourteenth Amendment; and (4) Subjecting AMC to an award in this case would amount to and constitute a denial of property without due process.

The Court determined that ASARCO is not entitled to punitive-damages because it failed to prove by clear and convincing evidence that the transaction was actuated with actual malice or accompanied by a wanton and willful disregard of ASARCO and its creditors. Therefore, the Court need not reach these affirmative defenses to the punitive damages claim.

## Y. CONCLUSION

The Court, having presided over this adversary proceeding for well over a year and having heard four weeks of trial testimony, has found that the plaintiffs have prevailed on several of their causes of action. Previously, the Court denied AMC's Motion to Dismiss, Motion for Summary Judgment, and Motion for Directed Verdict. In these rulings, the Court considered AMC's arguments raised in these motions and with the benefit of a full record, ruled in favor of AMC on some of its arguments. Specifically, the Court was persuaded that neither AMC nor Grupo owed fiduciary duties to ASARCO or its creditors, and the Court found that ASARCO received reasonably equivalent value, precluding a finding of constructive fraudulent transfer. With respect to damages, it has deferred its ruling in favor of allowing the parties to directly address these issues in subsequent briefing. The exception to this deferral is the issue of punitive damages, which the Court has addressed herein.

Nevertheless, the Court finds a need to go further and discuss certain rulings it did not make. The Court takes this somewhat unusual tack of making contingent findings because some of these findings may be useful to appellate court in ultimately resolving this matter on appeal without the need for a remand. The parties have literally spent millions of dollars in the preparation and presentation of this matter for trial. They have deposed countless witnesses, reviewed millions of documents, and briefed and argued count-

less motions, and as noted just above, still have more to address. At any one point in trial, there were not less than 20–30 lawyers in attendance either representing these three parties, the intervenors, or other entities with an interest in the outcome of this case.

Almost none of the key legal issues were governed by states whose courts have issued a clear statement of law. The Court was called upon to use (and the parties to brief and argue) Texas choice-of-law rules to enforce at any one time the laws of New Jersey, Delaware, Arizona, and New York. The law in these states regarding the pertinent issues was rarely clear-cut and, on many points, non-existent. In one instance, this Court even sought help from the Supreme Court of Arizona via a certified question, but the request was rejected.

For all the above reasons, and to hopefully aid the Fifth Circuit in any future review, the Court feels compelled to discuss briefly what the Court described above as "the rulings it did not make," but might also be described with some accuracy as "contingent findings," which would only come into play should the Fifth Circuit be convinced that this Court strayed from the "not so beaten path" in its analysis. Some of the "findings" involve questions of law that are more appropriately within the bailiwick of the Circuit Court to rule on as it may, but others are either factually based or mixed questions of law and fact. In either instance, the Court hopes the Circuit finds the following contingent findings to be helpful.

1. If on appeal the Fifth Circuit finds that the State of Delaware would not allow Plaintiffs to utilize the concept of reverse-veil piercing, then the defendant AMC would prevail as a matter of law on both Actual Fraudulent Transfer and Constructive Fraudulent Transfer.

2. If the Fifth Circuit finds that Delaware law allows reverse-veil piercing, but finds that the burden of proof in Delaware to pierce the corporate veil is a clear and convincing evidence standard as opposed to a preponderance of the evidence standard, then this Court finds Defendant prevails on both the causes of action of Actual Fraudulent Transfer and Constructive Fraudulent Transaction. The Court finds that the plaintiff proved the single business entity concept by clear and convincing evidence, but finds that plaintiffs did not prove the second element of the alter ego claim, use of the corporate form to effect fraud, injustice, or unfairness, by clear and convincing evidence.

3. If the Fifth Circuit finds that ASARCO received less than reasonably equivalent value for the SPCC stock, ASARCO prevails on the issue of constructive fraudulent transfer because ASARCO proved the other element of this cause of action, "insolvency," by a preponderance of the evidence.

4. If the Fifth Circuit finds, contrary to the view expressed in this opinion, that paying outstanding debts, regardless of the structure and effects on other creditors, is a legitimate business purpose and that it is a complete bar to a claim of Actual Fraudulent Transfer, then the defendant prevails on this cause of action.

5. If the Fifth Circuit finds the standard of proof in Delaware for the cause of action of Actual Fraudulent Transfer is clear and convincing evidence, the Court finds that

ASARCO has satisfied that burden and still prevails.

6. If the Fifth Circuit finds that the director of an insolvent company does not owe a fiduciary duty to the company's creditors, then the defendant prevails on the claim of Aiding and Abetting a Breach of Fiduciary Duty.

7. If the Fifth Circuit finds that the ASARCO directors, given the facts in this case and contrary to this Court's ruling, could rely on the business judgment defense, the plaintiffs still prevail on the cause of action for Breach of Fiduciary Duty as this Court finds that the plaintiffs have successfully rebutted the business judgment presumption and have otherwise proven all the elements of this cause of action.

8. If the Fifth Circuit finds that AMC did not have the burden of proving entire fairness to escape liability on Plaintiffs' cause of action of aiding and abetting ASARCO's directors' breach of fiduciary duty, the Court, nevertheless, finds that the plaintiffs met their burden of proving ASARCO's directors breached their fiduciary duty to ASARCO and its creditors.

9. If the Fifth Circuit finds that the concept of "fair price" and "reasonably equivalent value" are one and the same and a party can satisfy the former by proving the latter, then the defendant has proven the "fair price" aspect of the "Entire Fairness" inquiry, but still loses on the cause of action of aiding and abetting ASARCO's directors' breach of fiduciary duty because it did not prove "fair dealing."

10. If the Fifth Circuit finds that AMC owed a fiduciary duty to ASARCO and ASARCO's creditors, then the Court finds that AMC has breached this duty. Throughout this opinion, the Court has detailed how AMC and its principals and parent company structured this transaction to the detriment of ASARCO's many unsecured creditors. The Court finds no need to repeat all of the facts, but suffice it to say that the evidence would greatly exceed the applicable burden of proof.

11. If the Fifth Circuit finds that Grupo owes a fiduciary duty to ASARCO and ASARCO's creditors, then Grupo breached this duty and AMC is liable for aiding and abetting the breach of this fiduciary duty for the many reasons detailed in the opinion.

12. If the Fifth Circuit finds that under all circumstances a corporation cannot conspire with the directors of its wholly owned subsidiary, which is contrary to the exceptions recognized by this Court herein, then the defendant prevails on this conspiracy claim and is not liable under the conspiracy cause of action discussed above.

These findings are not meant to invade the province of the appellate court. As stated above, the Court makes them contingently in the interest of efficiency and judicial economy.

Lastly, the Court in the Order issued simultaneously with this opinion, solicited each party to file any additional briefing that it feels is appropriate on the issue of damages, the propriety and the amount of recoverable attorneys' fees and/or costs. The Court will move in an expeditious fashion to resolve these issues and then enter a final judgment.